**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**EDWARD G. MCDONOUGH,**

                                        **Plaintiff,**

        **vs.**                                        **1:15-cv-01505**
                                                       **(MAD/DJS)**

**YOUEL C. SMITH, III, individually and as Special District**
**Attorney for the County of Rensselaer, New York a/k/a TREY**
**SMITH; RICHARD J. MCNALLY, JR., individually and as**
**District Attorney for the County of Rensselaer, New York;**
**KEVIN B. MCGRATH; JOHN F. BROWN; WILLIAM A.**
**MCINERNEY; JOHN J. OGDEN; KEVIN F. O'MALLEY;**
**DANIEL B. BROWN; ANTHONY J. RENNA; ALAN T.**
**ROBILLARD; THE COUNTY OF RENSSELAER, NEW YORK,**

                                        **Defendants.**
_____

**APPEARANCES:**                              **OF COUNSEL:**

**PREMO LAW FIRM**                            **BRIAN D. PREMO, ESQ.**
20 Corporate Woods Boulevard
Albany, New York 12211
Attorneys for Plaintiff

**NAPIERSKI, VANDENBURGH LAW FIRM**           **THOMAS J. O'CONNOR, ESQ.**
296 Washington Avenue Extension              **DIANE LUFKIN SCHILLING, ESQ.**
Albany, New York 12203
Attorneys for Defendant Smith

**OFFICE OF ROBERT A. BECHER**               **ROBERT A. BECHER, ESQ.**
5 Wilson Street
Albany, New York 12207
Attorneys for Defendant McNally

**ANDERSON, MOSCHETTI LAW FIRM**             **PETER J. MOSCHETTI, JR., ESQ.**
26 Century Hill Drive
Suite 206
Latham, New York 12110
Attorneys for Defendant McGrath

**COOPER, ERVING LAW FIRM**                  **PHILLIP G. STECK, ESQ.**
Albany Office
39 North Pearl Street - 4th Floor

Albany, New York 12207
Attorneys for Defendants John F. Brown
and Daniel B. Brown

**OFFICE OF JAMES E. LONG**   **JAMES E. LONG, ESQ.**
668 Central Avenue
Albany, New York 12206
Attorneys for Defendant McInerney

**ATTORNEY GENERAL OFFICE - ALBANY**  **WILLIAM A. SCOTT, AAG.**
The Capitol
Albany, New York 12224
Attorneys for Defendant Ogden

**CARTER, CONBOY LAW FIRM**   **JAMES A. RESILA, ESQ.**
20 Corporate Woods Boulevard
Albany, New York 12211
Attorneys for Defendant O'Malley

**ANTHONY J. RENNA**
102 Sherman Avenue
Troy, New York 12180
Defendant, *pro se*

**REHFUSS, LIGUORI LAW FIRM**   **STEPHEN J. REHFUSS, ESQ.**
40 British American Boulevard     **ABIGAIL W. REHFUSS, ESQ.**
Latham, New York 12110
Attorneys for Defendant Robillard

**BAILEY, KELLEHER LAW FIRM**   **JOHN W. BAILEY, ESQ.**
Pine West Plaza 5
Suite 507
Washington Avenue Extension
Albany, New York 12205
Attorneys for Defendant County of Rensselaer

**RENSSELAER COUNTY ATTORNEY**   **STEPHEN A. PECHENIK, ESQ.**
1600 Seventh Avenue
Troy, New York 12180
Attorneys for Defendant County of Rensselaer

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

# I. INTRODUCTION

Plaintiff Edward G. McDonough ("Plaintiff") commenced the instant action by filing a 174 page, 1220 paragraph complaint on December 18, 2015, asserting three causes of action pursuant to 42 U.S.C. § 1983 against eleven named defendants. *See* Dkt. No. 1. Currently before the Court are five motions to dismiss, filed separately by Defendants McInerney, O'Malley, Robillard, McNally, and jointly by John and Daniel Brown. *See* Dkt. Nos. 12, 40, 50, 56, 64. The Court will address Defendants Smith, Ogden, and the County's motions to dismiss in a subsequent order. *See* Dkt. Nos. 73, 95, 96, 97.

# II. BACKGROUND[1]

Defendant Youel C. Smith III, also known as Trey Smith ("Defendant Smith"), was appointed special district attorney of Rensselaer County to prosecute alleged absentee ballot forgeries in the 2009 Troy city elections. Dkt. No. 1 at ¶¶ 24-25. Defendant Richard J. McNally, Jr. ("Defendant McNally"), at the relevant times of this action, was employed as the district attorney of Rensselaer County. *Id.* at ¶ 27. Defendant William A. McInerney was serving as Troy City Clerk and was active in the recruitment of voters for the Democratic Party in Rensselaer County. Dkt. No. 12-2 at 2. Defendant John Brown is a Democratic city councilman in Troy, New York, and his brother, Daniel, served as his campaign manager during the relevant portions of this action. *See* Dkt. No. 40-3 at 3. Defendant Kevin McGrath is the brother of a State Supreme Court Justice and is active in the Rensselaer County Democratic party. Dkt. No. 1 at ¶ 3. Defendant Kevin O'Malley is an employee at the Rensselaer County Board of Elections.

---

[1] The following factual background is taken from Plaintiff's verified complaint. Any statements contained herein are treated merely as allegations and not as statements of fact.

*Id.* at ¶ 10.  Defendant John J. Ogden is an investigator for the Rensselaer County District Attorney's office.  *Id.*

At all relevant times of this action, Plaintiff was employed by Rensselaer County as a full-time Democratic Commissioner of the Rensselaer County Board of Elections (the "Board of Elections").  Dkt. No. 1 at ¶ 23.  The general allegations in this case surround an alleged scheme to forge and submit false applications for absentee ballots ("AAB") and then file the subsequently forged absentee ballots ("AB").

An AAB is a simple, single page document that must be signed and completed by the voter or his agent before it can be filed with the Board of Elections.  *Id.* at ¶ 101.  Once an AAB is completed, signed and filed, an AB and an AB envelope is mailed to the voter or to the voter's AB agent, if one is designated.  *Id.* at ¶ 102.  The AABs require the voter to list a reason for why he or she is eligible to vote absentee ("excuses").  *Id.* at ¶ 2.

In the summer of 2009, Defendant McGrath announced that he was running to take Democratic control of the Working Family Party ("WFP") line for the City of Troy elections.  *Id.* at ¶ 51.  To obtain this end, Defendant McGrath approached several people that were enrolled in the WFP, including Marc Welch and Jennifer Taylor.  *Id.* at ¶ 52.  Defendant McGrath allegedly had those WFP members sign an AAB without completing the remainder of the form.  *Id.* at ¶ 53.  Thereafter, he completed these AABs with false AB names and excuses, filed them, and obtained the AB for those voters.  *Id.* at ¶ 54.  After receiving the ABs, Defendant McGrath and/or others falsely voted with those ABs in forged AB envelopes.  *Id.* at ¶ 56.  On August 24, 2009, Defendant McGrath brought the AAB signed for by Jennifer Taylor to Plaintiff at the Board of Elections offices.  *Id.* at ¶ 57.  Defendant McGrath told Plaintiff the excuse to list on Ms. Taylor's AAB, and Plaintiff thereafter wrote down that excuse and filed the AAB.  *Id.* at ¶ 58.

On one or more occasions prior to September 10, 2009, Defendant McInerney and Anthony DeFiglio sought to have public housing WFP residents sign AABs without completing the application, discussing their eligibility to vote by AB, or naming an AB agent. *Id.* at ¶¶ 67-68. Defendant McInerney, Mr. DeFiglio, and Gary Galuski told some voters that signing an AAB "was a new way to vote" and that an AB would be returned to them. *Id.* at ¶ 70. Defendant McInerney, John Brown, and Dan Brown then completed these AABs with false names and excuses and filed them with the Board of Elections. *Id.* at ¶ 72. Again on September 12, 2009, Defendant McInerney, John Brown, Dan Brown, and several others had multiple WFP members in public housing sign incomplete AAB forms. *Id.* at ¶¶ 81-90.

On September 10, 2009, Defendants John or Dan Brown filed approximately thirteen false or forged AABs with the Board of Elections. *Id.* at ¶¶ 74-76. On September 14, 2009, John Brown brought approximately 35 AABs to Plaintiff at the Board of Elections for filing. *Id.* at ¶¶ 115-16. Plaintiff reviewed these AABs and discovered that thirteen of them were not completed and signed. *Id.* at ¶ 122. Plaintiff set aside five AABs that did not name an AB agent and told John Brown that the AB would be mailed directly to those voters. *Id.* at ¶ 123. John Brown then made a phone call and reported to Plaintiff that he had received the names that the voters gave as AB agents. *Id.* at ¶¶ 124-131. After this phone call, Plaintiff wrote those names on the AABs and also filled in missing excuses where John Brown told him to. *Id.* at ¶¶ 132-137. At John Brown's direction, Plaintiff delivered these ABs to Defendant McInerney. *Id.* at ¶¶ 143-145. Defendant McInerney thereafter forged each of the ABs that were delivered to him. *Id.* at ¶ 151. These ABs were delivered by Michael LoPorto to Sarah Couch, who filed them with the Board of Elections on September 15, 2009. *Id.* at ¶¶ 156-160.

On or after September 15, 2009, Robert Mirch, who was running as a Republican for the Rensselaer County Legislature in the 2009 election, obtained the absentee voter master list summary from the Board of Elections and identified the individuals named in AABs and their agents. *Id.* at ¶ 161. A private investigator thereafter obtained affidavits from approximately 35 voters who stated that their AABs were falsely completed or forged and that their ABs were forged. *Id.* at ¶¶ 162-63. Some of these voters identified or described Defendants McGrath, McInerney, John Brown, Dan Brown, and DeFiglio as the individual who had them sign their AABs. *Id.* at ¶¶ 164-65.

On September 23, 2009, Christian Lambertsen commenced an action to invalidate the ABs filed by democratic operatives in the WFP (the "*Lambertsen* action"). *Id.* at ¶ 180. Soon thereafter, John Brown asked several individuals in the WFP, including Plaintiff, to meet him the following day to discuss the *Lambertsen* action. *Id.* at ¶¶ 184-187. The purpose of this meeting was to ask the WFP to issue a press release stating that any accusations of voter fraud were without merit. *Id.* at ¶¶ 188-90. Although Plaintiff attended this meeting, he did not know who forged the ABs. *Id.* at ¶ 192.

Shortly after the AB forgery was discovered, Defendant McInerney drove to Defendant McNally's home to ask what attorney he should hire, deliberately avoiding talking on the telephone for fear of being overheard. *Id.* at ¶ 213. Defendant McInerney retained the attorney recommended by McNally. *Id.* at ¶ 215. Defendant McInerney allegedly threw his cell phone in the river at his attorney's advice in order to destroy evidence and evade subpoena. *Id.* at ¶ 216.

On September 28, 2009, Mirch held a press conference to ask for a federal investigation into the AB forgery. *Id.* at ¶ 222. On that same day, Defendant McNally disqualified his office from investigating or prosecuting any case related to the AB forgery. *Id.* at ¶ 229. In an off-the-

record conference with County Court Judge Robert Jacon and the attorney from the *Lambertsen* action, Defendant Smith was appointed as special prosecutor for any further criminal action related to the 2009 AB forgery. *Id.* at ¶ 229. The County Court issued an order of disqualification "based on the speculation of politics and the appearance of impropriety." *Id.* at ¶ 232. Defendant McNally failed to make a formal motion for disqualification of himself or his office. *Id.* at ¶ 230. However, Plaintiff has produced a letter dated September 18, 2009, which was purportedly sent by Defendant McNally as a request for the appointment of a special prosecutor. *Id.* at ¶ 231. At the time of Defendant McNally's disqualification, only Defendant McGrath and DeFiglio were publicly named as being involved in the AB forgery. *Id.* at ¶ 236. In an affidavit dated July 7, 2011, Defendant McNally stated the following reasons for his disqualification:

"(a) McInerney had worked on his 2007 campaign; (c) [sic] *DeFiglio* had done campaign work with McInerney in the past; (d) he had contact with *James Welch* during his 2007 campaign; and, (b) [sic] he believed that [Brandt] Caird worked on his 2007 campaign but did not know whether [Tom] Aldrich did." *Id.* at ¶ 238.

Prior to October 1, 2009, Defendant Smith allegedly told Defendants McInerney and John Brown that they would not be prosecuted for the AB forgery. *Id.* at ¶ 266. Thereafter, in late October or early November of 2009, Defendant Smith "leaked to the press" that Plaintiff was the primary target for the AB fraud prosecution. *Id.* at ¶ 267.

At an October 1, 2009 hearing for the *Lambertsen* action, testimonial and documentary evidence implicated Defendant McGrath and DeFiglio by name in the AB forgery. *Id.* at ¶ 271. After the hearing, Defendant Smith "took possession of all the falsified/forged AB documents produced or introduced into evidence." *Id.* at ¶ 270.

Defendants Smith and McNally talked about the AB forgery case after Defendant McNally disqualified himself from the matter. *Id.* at ¶ 300. Specifically, on or about "January 11, 2010, May 19, 2010 and November 2, 2010, the [New York State Police] laboratory sent McNally its DNA reports regarding AB documents at the request of [Defendant] Smith." *Id.* at ¶ 302.

Starting upon his appointment on September 28, 2009, Defendant Smith was actively engaged in the investigation for the alleged AB forgery case, including the interrogation and questioning of witnesses. *Id.* at ¶¶ 322-34. Defendant Smith requested that the New York State Police use their "new" DNA extraction methods to retrieve samples off of the forged AB envelopes. *Id.* at ¶ 328. These reports indicated that Plaintiff's DNA was found on three of the AB envelopes. *Id.* at ¶ 329.

Plaintiff alleges that, through this investigation, Defendant Smith had sufficient evidence to prosecute Defendants McGrath, McInerney, and DeFiglio for the AB forgery. *Id.* at ¶ 335. Specifically, Defendant Smith obtained numerous forged AB documents and the testimony of more than 50 witnesses, many of whom implicated Defendant McInerney in the forgery scheme. *Id.* at ¶ 336. Rather than follow this evidence, Defendant Smith targeted Plaintiff for prosecution in the forgery case. Herein lies the alleged basis for the instant action; that the Defendants, working in concert, actively conspired to initiate a scapegoat prosecution against Plaintiff in order to shift the negative attention and criminal charges away from the other Defendants, who were all democratic party operatives. *Id.* at ¶¶ 343-45. Plaintiff contends that Defendant Smith

> pretentiously adopted and pursued a preposterous prosecution
> theory he knew was wrong; buried crucial testimony of DeFiglio
> and other witnesses; did not seek readily available evidence or the
> truthful cooperation of any perpetrator; accepted the self-serving
> incredible false assertions of many suspects implicated in the
> crimes; immunized or gave extraordinary favorable cooperation

> agreements to many suspects implicated in the crimes; purposely
> ignored material evidence; and fabricated false evidence against
> McDonough.

*Id.* at ¶ 345.  Defendant Smith allegedly engaged in these actions in furtherance of the conspiracy

to avoid convicting Defendants McGrath, John Brown, and McInerney, when there was otherwise

sufficient evidence to convict.  *Id.* at ¶¶ 347-51.

**B.      Lack of Prosecution Against Defendants**

The alleged inadequacies of Defendant Smith's investigation into the other Defendants for

the AB forgery include the following; (1) the photograph shown to voters to identify Defendant

McInerney was a 20 year old photo, which did not accurately reflect his current appearance; (2)

photographs of Defendants John Brown, Dan Brown, and other democratic operatives were not

shown to voters; (3) several key democratic party operatives, including Defendant Renna and

Robert Martiniano, were not interviewed for the investigation; (4) certain witnesses were not

specifically asked questions about Defendant McInerney's involvement in the AB forgery; (5) the

forged AB documents purportedly signed by Defendant McInerney were not examined by a

handwriting expert; (6) when presented with significant evidence that Defendant McInerney had

participated in AB fraud in the 2007 and 2008 elections, Defendant Smith stated that he did not

have authority to prosecute those actions.  *Id.* at ¶¶ 364-380, 400, 487, 492-500.

James Welch, Brandt Caird, and Sarah Couch, individuals who were involved in the AB

forgery, retained attorneys and refused to speak with Defendant Smith absent an immunity

agreement.  *Id.* at ¶¶ 409-10.  In October or November of 2009, Couch and Caird were given

promises of non-prosecution in return for their truthful testimony.  *Id.* at ¶ 411.  In their

depositions, Couch and Caird admitted that they allowed John Brown to falsely write their names

as AB agents on several AABs.  *Id.* at ¶ 422.  Further, Couch stated that she was asked to file the ABs, but did not know that they were forged.  *Id.* at ¶¶ 423-25.

On or prior to November 13, 2009, Defendant Smith gave a promise of non-prosecution to Aldritch, an individual who allegedly assisted Defendants McInerney and Dan Brown in getting voters to sign AABs, and who was named as AB agent on 19 of the falsified AABs.  *Id.* at ¶¶ 432-33.  In a sworn statement, Aldritch denied committing any wrongdoing in connection with the AB forgeries.  *Id.* at ¶ 434-35.  Several others who were allegedly involved in the forgery professed their innocence, and Defendant Smith took these individuals' statements as true and did not conduct any further investigations into their actions.  Defendant O'Malley, who was present in Plaintiff's office when the fraudulent AB envelopes were delivered to Plaintiff, was not asked to give a sworn statement about this account or provide a detailed statement after his general denial of the events.  *Id.* at ¶¶ 463-70.

In contrast to the non-confrontational approach of questioning the above-mentioned witnesses, Defendant Smith had Defendant Ogden interview Plaintiff twice on November 19, and December 7, 2009, gave him *Miranda* warnings, and took a sworn, written deposition on both occasions.  *Id.* at ¶ 472.

In August of 2010, Defendant Renna allegedly called DeFiglio and "told him that McInerney wanted him to know that if he did not talk to the [police] again it would all be over soon and 'they' would get him an attorney and '*it would all go away*.'"  *Id.* at ¶ 503.  DeFiglio reported this call to the police, but Defendant Smith did not question Defendant Renna about this apparent witness tampering.  *Id.* at ¶¶ 505-06.  On November 6, 2009, DeFiglio completed a written sworn statement, which, in essence, contains the following information:

> (a) the AB forgery was committed by the [democratic party
> operatives] as part of a scheme to falsely vote AB of public housing

voters; (b) [John] Brown and McInerney were the primary culprits; (c) [DeFiglio] had assisted McInerney on a few occasions in September 2009; (d) McInerney had possession of all the signed but incomplete AAB that were obtained; and (e) the same scheme of falsely voting AB was perpetrated by DeFiglio, McInerney, Renna and other [democratic party operatives] for more than 25 years.

*Id.* at ¶ 534; *see also* Dkt. No. 1-1 at 10-12. In this written statement, DeFiglio states that "there is no possible way that the Democratic Commissioner of the [Board of Elections], Ed McDonough, could not have known what was happening." Dkt. No. 1-1 at 12.

From 2009 through 2011, Defendant Smith told officials in the New York State Police that Defendants McInerney and John Brown could not be prosecuted because the evidence against them "was not legally sufficient to corroborate the testimony of DeFiglio or any accomplice or co-conspirator . . . ." *Id.* at ¶ 573.

In an interview on January 27, 2010, Defendant Smith met with Plaintiff to discuss the AB forgery case. The interview started off with Defendant Smith professing animosity toward Plaintiff's father, the Democratic Party Chair, who had allegedly "turned his back" on Defendant Smith's ambitions to run for County District Attorney. *Id.* at ¶¶ 581-83. When Plaintiff attempted to tell Defendant Smith his recollection of what happened during the AB forgery, Defendant Smith responded that "he was going to 'fuck' [Plaintiff] like his father did him in the past and 'if you don't tell me anything more, the next time we speak will be at a Grand Jury.'" *Id.* at ¶ 585. Plaintiff did not have an attorney present at this meeting. *Id.* at ¶ 586.

After this meeting, Defendant Smith telephoned Defendant McGrath's attorney and offered his client immunity for "anything of value." *Id.* at ¶ 609. Defendant Smith contacted Defendant McGrath's attorney approximately four times between that meeting and March 2, 2010. *Id.* at ¶ 611. On March 12, 2010, Defendant McGrath executed a written cooperation agreement. *Id.* at ¶ 616. In a written deposition on March 22, 2010, Defendant McGrath implicated Plaintiff

in the AB forgery scheme. *Id.* at ¶¶ 617-22. Plaintiff contends that this statement was patently false and contradicted by substantial evidence in the record. *Id.* at ¶ 623.

## C. Grand Jury Proceeding

In September of 2010, Defendant Smith commenced a grand jury proceeding against Plaintiff and LoPorto. *Id.* at ¶ 708. Despite Defendant Smith stating in his application for DNA testing of the AB envelopes that "the AB forgery was committed in conspiracy by McGrath, [John] Brown, McInerney and other, including [Plaintiff]," no conspiracy charges were brought before the grand jury. *Id.* at ¶¶ 710-11. The evidence presented against Plaintiff at the grand jury proceedings consisted of several witness' testimony and the discovery of Plaintiff's DNA on three AB envelopes. *Id.* at ¶ 714. The press was informed that Plaintiff was the lead subject in the grand jury proceeding and his indictment was imminent. *Id.* at ¶ 709. Plaintiff refused to enter a guilty plea despite several requests from Defendant Smith to do so. *Id.* at ¶ 716. Plaintiff also expressed his intent to testify on his own behalf at the grand jury proceeding. *Id.* at ¶ 724. After this, Defendant McNally contacted Plaintiff and attempted to get him to change his attorney. *Id.* at ¶¶ 726-33. Plaintiff ultimately did not testify at the grand jury. *Id.* at ¶ 739.

On or about December 8, 2010, Defendant McGrath testified before the grand jury. *Id.* at ¶ 748. Essentially, he stated "that he witnessed McDonough write false Excuses on the Dickenson and/or Taylor AAB and on another date overheard McDonough talking with [John] Brown about names he intended to write as AB Agents on about thirty-five (35) AAB . . . ." *Id.* at ¶ 749. Defendant McGrath did not mention that Defendant O'Malley was in the room with him at Plaintiff's office. *Id.* at ¶ 751. Plaintiff contends that this allegedly "false testimony set the foundation for the false testimony of Ogden, [John] Brown and O'Malley." *Id.* at ¶ 757.

Defendant Ogden testified before the grand jury that he reviewed the handwriting on the forged AABs and concluded that they were all falsified by the same person. *Id.* at ¶ 758. Defendant Ogden "later admitted at trial that his purported law enforcement expert testimony before the Grand Jury was not correct and a mistake." *Id.* at ¶ 768.

Defendant O'Malley initially testified before the grand jury that he wrote excuses on several of the AABs. *Id.* at ¶¶ 769-70. He stated that the person who gave him those excuses was "'probably the candidate' who got that information from 'probably a [democratic committee] operative.'" *Id.* at ¶ 772. In emails between Defendant Smith and Defendant Ogden's and O'Malley's attorney, Defendant Smith expressed his concern that Defendant O'Malley had committed perjury in his testimony. *Id.* at ¶¶ 774-77; *see also* Dkt. No. 1-1 at 23-24. After this, on December 15, 2010, Defendant Smith "sent O'Malley's attorney an e-mail threatening to prosecute him for AB for AB forgery and warning that it made no sense for him to protect his boss." Dkt. No. 1 at ¶ 781. That same day, Defendant O'Malley returned to the grand jury and testified that "on September 14, 2009, his boss McDonough called him into his office and told him to make-up Excuses and write them on those eight (8) AAB, so he did." *Id.* at ¶ 783. At trial, O'Malley admitted that Defendant Smith called him at his home the night before this change in his testimony. *Id.* at ¶ 784.

**D.      The Indictment and Trials**

On January 28, 2011, Plaintiff was charged by indictment with 38 counts of felony forgery in the second degree and 36 counts of felony criminal possession of a forged instrument in the second degree. *Id.* at ¶ 809. In the grand jury proceeding, Defendant Smith presented either testimony or an affidavit from each voter listed on the falsified ABs. *Id.* at ¶ 813. Defendant Smith prepared and notarized the affidavits of those individuals who did not testify. *Id.* at ¶ 815.

At trial, two of those voters testified that the signature on their purported affidavit was not genuine. *Id.* at ¶ 816; *see also* Dkt. No. 1-1 at 26-30.

On February 24, 2011, Plaintiff unsuccessfully moved to disqualify Defendant Smith as special prosecutor. Dkt. No. 1 at ¶¶ 859-62. On June 13, 2011, Plaintiff filed an unsuccessful motion to dismiss the criminal charges on the basis that Defendant Smith's appointment was unlawful. *Id.* at ¶¶ 869-71. This motion laid out Plaintiff's entire argument that the Defendants had engaged in a scapegoat prosecution against him. *Id.* at ¶ 904. After this motion became public news, "Martiniano came forward and disclosed in a sworn statement to a private investigator that the [police] never interviewed him, [John] Brown and McInerney told him they were going to use the AAB gathered on September 14, 2009 to forge signatures onto AB envelopes and McNally told him that he should not contact the [police] or [Defendant] Smith and disclose the facts he know about the matter because 'it will all be over soon.'" *Id.* at ¶ 908. Defendant Smith took no action against Defendants McInerney or John Brown as a result of this statement. *Id.* at ¶ 913.

On June 10, 2011, Defendant Smith moved to compel the handwriting samples from Plaintiff and LoPorto. *Id.* at ¶ 880. Defendant Robillard was the forensic document examiner hired to perform this comparison. *Id.* at ¶ 884. In his request for a handwriting comparison, Defendant Smith detailed the testimony against Plaintiff in a letter to Defendant Robillard. *See* Dkt. No. 1-1 at 35-37. Also, Defendant Ogden testified that he "talked to Robillard about the theory of prosecution and evidence" before he issued his report. Dkt. No. 1 at ¶ 1137. Defendant Robillard gave his expert testimony that it was Plaintiff's handwriting on nearly all of the falsified AABs. *Id.* at ¶ 897. He made this initial findings without comparing the handwriting of John Brown, Dan Brown, Defendant McGrath, or other suspects. *Id.* at ¶ 1145. Defendant Robillard

was paid approximately $100,000 and was instructed by Defendant Smith to not conduct an ink analysis on several of the falsified AABs. *Id.* at ¶¶ 898, 902, 1152.

In April of 2011, Plaintiff contacted the U.S. attorney's office and requested an FBI investigation into his allegedly unlawful prosecution. *Id.* at ¶ 929. Thereafter, in May of 2011, special agent McDonald was assigned to conduct an investigation into this matter. *Id.* at ¶¶ 930-31. Between May 25 and August 4, 2011, the New York State Police conducted an independent investigation into this matter. *Id.* at ¶ 944. That investigation gathered sufficient evidence against Defendant McInerney for the forgery of approximately 50 of the AABs that appeared to be forged in his handwriting. *Id.* at ¶ 947. Through this investigation, the FBI confirmed that Defendant Smith's "statement to the [police] that McInerney and [John] Brown could not be prosecuted was not true because . . . the voter testimony and forged AB documents were sufficient to corroborate the testimony of any accomplice . . . ." *Id.* at ¶ 942.

On August 8, 2011, Defendant McInerney was arrested on several felony complaints for AB forgeries in 2007 and 2008 elections. *Id.* at ¶ 993. In July of 2011, Defendant Smith had Defendant McNally disqualify himself from prosecuting the actions surrounding the 2007 and 2008 elections. *Id.* at ¶ 1001. Prior to Defendant McInerney entering into a cooperation agreement, he met several times with Defendant Smith outside of the presence of the New York police or the FBI. *Id.* at ¶¶ 1003-04. Defendant McInerney pled guilty to one felony count and was sentenced to a 90 day work order. *Id.* at ¶ 971; Dkt. No. 12-2 at 3.

In two written deposition dated October 20 and November 9, 2011, Defendant Renna made statements confessing his involvement in the forgery scheme and implicating Plaintiff. Dkt. No. 1 at ¶¶ 1022-30. On December 5, 2011, Defendant Renna executed a cooperation agreement, pursuant to which he was required to plead guilty to one felony and sentenced to 200 hours of

community service. *Id.* at ¶ 1033. Defendant Renna thereafter testified in a grand jury proceeding against several others involved in the forgery, again implicating Plaintiff. *Id.* at ¶¶ 1034-35.

On December 6, 2011, Defendant John Brown entered into a cooperation agreement, pursuant to which he was required to provide complete and truthful cooperation in return for a guilty plea to one felony count with up to six months incarceration and five years probation. *Id.* at ¶ 1056. Thereafter he gave a written sworn statement and testified before the grand jury as follows:

> (a) he saw McGrath g[i]ve [Plaintiff] an AAB and what seemed to be a false Excuse for an older voter and [Plaintiff] the wrote information on that AAB; (b) he was in [Plaintiff's] office for about forty (40) minutes during which he saw the AAB he brought to the [board of elections] sitting on [Plaintiff's] desk; (c) he saw [Plaintiff] writing on documents but could not say for sure that they were those AAB; and, (d) he saw O'Malley come in and out of the office but did not recall him sitting at a desk or writing on any AAB.

*Id.* at ¶ 1059. Plaintiff alleges that Defendant Smith met with John Brown before he issued this statement to ensure that it was consistent with the other Defendants' sworn testimony. *Id.* at ¶ 1061.

Plaintiff contends that Defendants McGrath, John Brown, O'Malley, McInerney, Renna, Robillard, Ogden, and Dan Brown each gave false testimony at trial that was consistent with their previous false grand jury testimony and written statements. *Id.* at ¶ 1094. In regards to Defendant Renna's testimony, at the second trial against Plaintiff, the court ordered that his testimony be stricken in its entirety due to its apparent falsity and he was directed to leave the courthouse immediately. *Id.* at ¶ 1125. Despite this, Defendant Smith asked Renna to be sentenced to a work order in accordance with his cooperating agreement. *Id.* at ¶ 1162.

Plaintiff alleges that the County and Defendant McNally's failure to take action to disqualify Defendant Smith from the prosecution contributed to his injuries in this action. *Id.* at ¶ 1181. Plaintiff was indicted on January 28, 2011 and endured two trials before he was acquitted on December 21, 2012. Dkt. No. 1 at ¶¶ 1199-1200. Plaintiff also suffered emotional and reputational injuries and amassed significant attorneys fees for his criminal defense. *Id.* at ¶¶ 1204-08.

### III. DISCUSSION

**A.  Standard of Review**

*1. Rule 12(b)(6)*

A motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the party's claim for relief. *See Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007). In considering the legal sufficiency, a court must accept as true all well-pleaded facts in the pleading and draw all reasonable inferences in the pleader's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted). This presumption of truth, however, does not extend to legal conclusions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Although a court's review of a motion to dismiss is generally limited to the facts presented in the pleading, the court may consider documents that are "integral" to that pleading, even if they are neither physically attached to, nor incorporated by reference into, the pleading. *See Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002)); *see also Sutton ex rel. Rose v. Wachovia Secs., LLC*, 208 Fed. Appx. 27, 29-30 (2d Cir. 2006) (noting that, on a motion to dismiss, a court may take judicial notice of documents filed in another court).

To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," *see* Fed. R. Civ. P. 8(a)(2), with sufficient factual "heft to 'sho[w] that the pleader is entitled to relief[,]'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (quotation omitted). Under this standard, the pleading's "[f]actual allegations must be enough to raise a right of relief above the speculative level," *id.* at 555 (citation omitted), and present claims that are "plausible on [their] face," *id.* at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" *Id.* (quoting *Twombly*, 550 U.S. at 557, 127 S. Ct. 1955). Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," *Twombly*, 550 U.S. at 558, or where a plaintiff has "not nudged [its] claims across the line from conceivable to plausible, the[] complaint must be dismissed[,]" *Id.* at 570.

## B.    General Arguments

While the Defendants are each separately represented and most have moved independently to dismiss Plaintiff's complaint on numerous grounds, several of the arguments are not specific to any individual Defendant and, thus, will be considered before addressing any of the Defendant-specific arguments.

### 1. Local Rule 7.1

Northern District of New York Local Rule 7.1(a)(1) states that "[n]o party shall file or serve a memorandum of law that exceeds twenty-five (25) pages in length, unless that party obtains leave of the judge hearing the motion prior to filing." Further, Rule 7.1(b)(3) states that

"[t]he Court shall not consider any papers required under this Rule that are not timely filed or are otherwise not in compliance with the Rule unless good cause is shown."

In opposition to two of the pending motions, Plaintiff filed memorandum that vastly exceed the 25 page limit. In response to Defendant McInerney's motion, Plaintiff's opposition is 70 pages long, and in response to the Brown Defendants' motion, it is 66 pages with an attached "supplement addendum" that contains an additional 41 pages of factual allegations. *See* Dkt. Nos. 36, 60, 60-2. While these responses grossly exceed the local rule page limit, upon closer examination, the Court need not strike the entire opposition. In the 70 page opposition to Defendant McInerney's motion, the first 39 pages of Plaintiff's memorandum contains a general restatement of the factual allegations contained in his complaint. *See* Dkt. No. 36. In the 66 page opposition to the Brown Defendants' motion, the first 16 pages generally restates the factual allegations in the complaint, and the following eight pages discuss the facts as alleged in the Brown Defendants motion, pointing to allegations in the complaint to refute those facts. *See* Dkt. No. 60. Moreover, the "supplement addendum" to Plaintiff's opposition consists entirely of additional factual allegations. *See* Dkt. No. 60-2.

The Court does not condone Plaintiff's disregard for the Local Rules page limits for motion practice, especially in light of his failure to seek an exception to the rule. To the extent that they provide additional information not contained in the complaint, the above-mentioned factual sections of Plaintiff's excessive responses to Defendants' motions will be stricken from being considered in ruling on the respective motions. Significantly, Plaintiff has not moved to amend his complaint to allege any additional facts, and opposition memorandum of law are not the proper place to include such facts. When the excessive factual sections are stricken from Plaintiff's oppositions, his memorandum come much closer to the page limits set by the Local

Rules.  The Court orders that Plaintiff is to strictly abide by the Local Rules' page limits in any

further submissions on dispositive motions.

### 2. Rule 8

With respect to the pleading requirements under Rule 8 of the Federal Rules of Civil

Procedure, the Second Circuit has stated as follows:

> Rule 8 provides that a complaint "shall contain . . . a short and plain
> statement of the claim showing that the pleader is entitled to relief."
> Fed. R. Civ. P. 8(a)(2).  The statement should be plain because the
> principal function of pleadings under the Federal Rules is to give
> the adverse party fair notice of the claim asserted so as to enable
> him to answer and prepare for trial.  *See, e.g.*, *Geisler v. Petrocelli*,
> 616 F.2d 636, 640 (2d Cir. 1980); 2A Moore's Federal Practice ¶
> 8.13, at 8-61 (2d ed. 1987).  The statement should be short because
> "[u]nnecessary prolixity in a pleading places an unjustified burden
> on the court and the party who must respond to it because they are
> forced to select the relevant material from a mass of verbiage."  5 C.
> Wright & A. Miller, Federal Practice and Procedure § 1281, at 365
> (1969).
>
> When a complaint does not comply with the requirement that it be
> short and plain, the court has the power, on its own initiative or in
> response to a motion by the defendant, to strike any portions that
> are redundant or immaterial, *see* Fed. R. Civ. P. 12(f), or to dismiss
> the complaint.  Dismissal, however, is usually reserved for those
> cases in which the complaint is so confused, ambiguous, vague, or
> otherwise unintelligible that its true substance, if any, is well
> disguised.  *See Gillibeau v. City of Richmond*, 417 F.2d 426, 431
> (9th Cir. 1969).  When the court chooses to dismiss, it normally
> grants leave to file an amended pleading that conforms to the
> requirements of Rule 8.  *See generally* 5 C. Wright & A. Miller,
> Federal Practice and Procedure § 1281, at 366-67; 2A Moore's
> Federal Practice ¶ 8.13, at 8-81 to 8-82 n.38.

*Salahuddin v. Cuomo*, 861 F.2d 40, 41-42 (2d Cir. 1998).

Plaintiff's complaint is a 1220 paragraph, 174 page document with 50 additional pages of

attached exhibits.  *See* Dkt. No. 1.  While this is undoubtedly a voluminous pleading, Plaintiff's

allegations span an approximately four year period and implicate ten separate defendants and

countless other individuals who played a role in the underlying events giving rise to this action. While there are several repetitious arguments throughout the complaint, it is essentially written in concise separate paragraphs that each provide additional relevant information. Moreover, with a few exceptions, the complaint largely avoids the oftentimes-fatal pitfall of pleading baseless legal conclusions and unsupported hypotheticals. Significantly, Plaintiff's three causes of action are well pled and succinctly stated in the final four pages of his complaint. *See* Dkt. No. 1 at ¶¶ 1209-1220. Further, each Defendant that has responded to the complaint has been able understand the allegations stated therein enough to present colorable arguments and defenses in opposition. Thus, it cannot be said that Defendants are so utterly confused or overwhelmed by Plaintiff's complaint that they are unable to form a reasonable response to it. If Plaintiff had opted to state a less-detailed version of the alleged events giving rise to his claims, Defendants would undoubtedly argue that Plaintiff had failed to present enough factual support to sustain his action under Rule 12(b)(6). The existence of a conspiracy, especially a conspiracy spanning numerous years and encompassing a multitude of actors, necessarily requires significant factual allegations to provide the requisite background to support any related claims. Accordingly, the Court finds that Plaintiff's complaint, although voluminous, complies with the requirements of Rule 8 and Defendants McInerney, McNally, Ogden, and Rensselaer County's motions to dismiss are denied on this ground.

### 3. Statute of Limitations

The statute of limitations applicable to Section 1983 claims is the "statute of limitations applicable to personal injuries occurring in the state in which the appropriate federal court sits." *Dory v. Ryan*, 999 F.2d 679, 681 (2d Cir. 1993) (citations omitted). In New York State, the statute of limitations for personal injury claims is three years. N.Y. Civ. Prac. L. § 214(5); *see*

*also Pearl v. City of Long Beach*, 296 F.3d 76, 79 (2d Cir. 2002) (holding that Section 1983 claims arising in New York are subject to a three-year statute of limitations).  Further, accrual begins when the plaintiff "knows or has reason to know of the injury that is the basis for his action."  *Pauk v. Bd. of Trustees of City Univ. Of N.Y.,* 654 F.2d 856, 859 (2d Cir. 1981) (citation omitted).  Significant in this case is the different accrual points for both malicious prosecution and fabrication of evidence claims: "a cause of action for malicious prosecution does not accrue until the criminal proceedings have terminated in the plaintiff's favor[,]" *Heck v. Humphrey*, 512 U.S. 477, 489 (1994); whereas "a fair trial claim premised on fabrication of evidence accrues when the plaintiff learns or should have learned that the evidence was fabricated and such conduct causes the claimant some injury[,]" *Mitchell v. Home*, 377 F. Supp. 2d 361, 373 (S.D.N.Y. 2005) (citing *Veal v. Geraci*, 23 F.3d 722,724-25 (2d Cir. 1994)).

Plaintiff asserts a malicious prosecution and a fabrication of evidence claim against each of the Defendants.  *See* Dkt. No. 1 at ¶¶ 1209-1220.  Plaintiff was acquitted of all charges brought against him on December 21, 2012.  *See id.* at ¶ 1200.  Plaintiff's malicious prosecution claim accrued upon this favorable disposition of his criminal case.  *See Heck*, 512 U.S. at 489.  Accordingly, Plaintiff had three years from this point, until December 21, 2015, to assert a malicious prosecution claim.  Thus, this cause of action was timely commenced on December 18, 2015, and, to the extent that any of the Defendants' motions argue otherwise, they are denied on this ground.

Plaintiff's opposition appears to argue that, since the alleged malicious prosecution was based upon the use of fabricated evidence, then both of the claims accrued upon Plaintiff's acquittal from the criminal charges.  *See* Dkt. No. 60 at 42-59.  However, none of the cases cited in Plaintiff's opposition, nor any precedent discovered by the Court, contradicts the clearly

established principle that fabrication of evidence claims accrue when the plaintiff learns, or should have learned, that the evidence was fabricated. *See, e.g.*, *Keller v. Sobolewski*, No. 10-CV-5198, 2012 WL 4863228, *4 (E.D.N.Y. Oct. 12, 2012) (quoting *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 127 (2d Cir. 1997)) ("A § 1983 claim for deprivation of the right to a fair trial arises '[w]hen a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors'"); *Bailey v. City of New York*, 79 F. Supp. 3d 424, 444 (E.D.N.Y. 2015) (quotation omitted) ("A claim premised on fabrication of evidence 'accrues when the plaintiff learns or should have learned that the evidence was fabricated and such conduct causes the claimant some injury"). Moreover, the "reference to 'knowledge of the injury' does not suggest that the statute [of limitations] does not begin to run until the claimant has received judicial verification that the defendants' acts were wrongful." *Mitchell*, 377 F. Supp. 2d at 373 (quoting *Veal*, 23 F.3d at 724). Thus, even when a plaintiff's malicious prosecution claims are premised upon a finding that evidence was fabricated, these are two distinct claims that each accrue separately. *Cf.*, *Morse v. Spitzer*, No. 07-CV-4793, 2012 WL 3202963, *6 (E.D.N.Y. 2012) (emphasis added) ("In such cases, the question of whether the defendant fabricated evidence becomes synonymous with the question of whether genuine probable cause existed, and accordingly a plaintiff's malicious prosecution and fair trial claims would rise or fall together. Even in such cases, however, *these remain distinct constitutional claims*").

Plaintiff also argues that his fabrication of evidence claims are premised upon his Sixth Amendment right to a fair trial, and not solely under the due processes clauses of the Fifth and Fourteenth Amendments. Plaintiff contends that, while the due process claim for fabrication of evidence may accrue when that evidence is first produced, the Sixth Amendment claim accrues upon the termination of his criminal proceeding. *See* Dkt. No. 60 at 48-51 (citing *Bailey v. City of*

*New York*, 79 F. Supp. 3d 424, 455 (E.D.N.Y. 2015); *Covington v. City of New York*, 171 F.3d 117, 124 (2d Cir. 1999)). Plaintiff bases this argument on the Supreme Court's holding in *Heck*, which delayed the accrual of a prison inmate's § 1983 claim until after his outstanding conviction was overturned, because his § 1983 claim would have otherwise established the invalidity of his conviction. 512 U.S. at 484. In *Covington*, the Second Circuit extended the holding in *Heck* to "claims that, if successful, would necessarily imply the invalidity of a potential conviction on a pending criminal proceeding." *Covington*, 171 F.3d at 124. The Second Circuit adopted the position that "there is no difference between a conviction which is *outstanding* at the time the civil rights action is instituted and a *potential* conviction on a pending charge that may be entered at some point thereafter." *Id.* (quoting *Smith v. Holtz*, 87 F.3d 108, 113 (3d Cir. 1996)). Thereafter, the Supreme Court admonished the expansion of the *Heck* accrual rule to cases such as this in which a final conviction had not been obtained, holding that such expansion was not warranted:

> What petitioner seeks, in other words, is the adoption of a principle that goes well beyond *Heck*: that an action which would impugn an anticipated future conviction cannot be brought until that conviction occurs and is set aside. The impracticality of such a rule should be obvious. In an action for false arrest it would require the plaintiff (and if he brings suit promptly, the court) to speculate about whether a prosecution will be brought, whether it will result in conviction, and whether the pending civil action will impugn that verdict, *see Heck*, 512 U.S., at 487, n.7, 114 S. Ct. 2364—all this at a time when it can hardly be known what evidence the prosecution has in its possession. And what if the plaintiff (or the court) guesses wrong, and the anticipated future conviction never occurs, because of acquittal or dismissal? Does that event (instead of the *Heck*-required setting aside of the extant conviction) trigger accrual of the cause of action? Or what if prosecution never occurs—what will the trigger be then?
>
> We are not disposed to embrace this bizarre extension of *Heck*. If a plaintiff files a false-arrest claim before he has been convicted (or files any other claim related to rulings that will likely be made in a

24

> pending or anticipated criminal trial), it is within the power of the
> district court, and in accord with common practice, to stay the civil
> action until the criminal case or the likelihood of a criminal case is
> ended. *See id.*, at 487–488, n.8, 114 S. Ct. 2364 (noting that
> "abstention may be an appropriate response to the parallel
> state-court proceedings"); *Quackenbush v. Allstate Ins. Co.*, 517
> U.S. 706, 730, 116 S. Ct. 1712, 135 L. Ed. 2d 1 (1996).  If the
> plaintiff is ultimately convicted, and if the stayed civil suit would
> impugn that conviction, *Heck* will require dismissal; otherwise, the
> civil action will proceed, absent some other bar to suit.  *Edwards v.
> Balisok*, 520 U.S. 641, 649, 117 S. Ct. 1584, 137 L. Ed. 2d 906
> (1997); *Heck*, 512 U.S. at 487, 114 S. Ct. 2364.

*Wallace v. Kato*, 549 U.S. 384, 393-94 (2007).  Moreover, alleging a conspiracy to submit fabricated evidence, rather than asserting the claims against the individual defendants, does not change the accrual date of such claims because with "claims alleging civil conspiracies, including conspiracies to violate an individual's civil rights, 'the cause of action accrues and the statute of limitations begins to run from the time of commission of the overt act alleged to have caused damages.'" *Harrison v. New York*, 95 F. Supp. 3d 293, 327 (E.D.N.Y. 2015) (citations omitted). Accordingly, Plaintiff's fair trial claim based upon the fabrication of evidence accrued when he knew or should have known that such evidence was being used against him and not upon his acquittal in his criminal case.

The Court notes that, while only the Brown Defendants, Defendant McNally, and the County raise the defense of statute of limitations in their respective motions to dismiss, the Court will consider the timeliness of the claims brought against the remaining Defendants as well.  *See Clement v. United Homes, LLC*, 914 F. Supp. 2d 362, 375 (E.D.N.Y. 2012) (citing *Leonhard v. United States*, 633 F.2d 599, 609 n.11 (2d Cir. 1980)) (quotation omitted) ("Where one defendant has successfully raised a statute of limitations defense with respect to a particular claim, a court may also dismiss the claim *sua sponte* as to similarly situated defendants").  Significantly, Plaintiff does not contend that any of the Defendants fabricated evidence within the three-year

statute of limitations, rather he relies solely on the argument that this claim did not accrue until his acquittal. As Plaintiff commenced the instant action on December 18, 2015, a fabrication of evidence claim is timely if Plaintiff knew or should have known that the evidence was fabricated on or after December 18, 2012. Plaintiff's complaint clearly alleges that all of the fabricated evidence was either presented at grand jury proceedings or during his two trials, all of which occurred prior to December 18, 2012. Accordingly, Count I of Plaintiff's complaint alleging the fabrication of evidence is barred by the statute of limitations and, thus, is dismissed as against all Defendants. The Court will not address the merits of the individual Defendants' arguments that Plaintiff failed to state a claim for his fabrication of evidence cause of action.

### 4. Legal Standard

#### 1. Malicious Prosecution

"The Fourth Amendment right implicated in a malicious prosecution action is the right to be free of unreasonable seizure of the person – i.e., the right to be free of unreasonable or unwanted restraints on personal liberty." *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 116 (2d Cir. 1995). To assert a Fourth Amendment claim for malicious prosecution under Section 1983, a plaintiff must show a deprivation of his or her liberty consistent with the concept of "seizure," so as to ensure that the harm suffered is of "constitutional proportions." *Id.* The elements of malicious prosecution under Section 1983 effectively mirror the elements of the same claim under New York law. *See Hygh v. Jacobs*, 961 F.2d 359, 366 (2d Cir. 1992) (citations omitted). Accordingly, to state a cause of action for malicious prosecution in New York, the plaintiff must prove "'(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions.'" *Jocks v. Tavernier*, 316 F.3d 128,

136 (2d Cir. 2003) (quotation omitted).  To sustain the malicious prosecution claim under Section 1983, "the state law elements must be met, and there must also be a showing of a 'sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights.'" *Rutigliano v. City of New York*, 326 Fed. Appx. 5, 8-9 (2d. Cir. 2009) (quotation omitted).

Plaintiff's complaint clearly pleads the first two elements of a malicious prosecution claim because he was indicted and charged with 74 felony counts, arrested on January 28, 2011, and acquitted of all charges on December 21, 2012. *See* Dkt. No. 1 at ¶¶ 1199-1200; *see also Phillips v. DeAngelis*, 571 F. Supp. 2d 347, 353 (N.D.N.Y. 2008) (citing *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997)) ("The requirement that a plaintiff show an initiation or continuation of a criminal proceeding by the defendant may be satisfied by a showing that the defendants filed formal charges and caused the plaintiff to be arraigned").

"'[T]he existence of probable cause is a complete defense to a claim of malicious prosecution in New York.'" *Manganiello v. City of New York*, 612 F.3d 149, 161-62 (2d Cir. 2010) (quoting *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003)).  "Probable cause may . . . exist where the officer has relied on mistaken information, so long as it was reasonable for him to rely on it.  However, 'the failure to make a further inquiry when a reasonable person would have done so may be evidence of lack of probable cause.'" *Id.* at 161 (quoting *Colon v. City of New York*, 60 N.Y.2d 78, 82 (1983)) (internal citation omitted).  Moreover, "indictment by a grand jury creates a presumption of probable cause that may *only* be rebutted by evidence that the indictment was procured by 'fraud, perjury, the suppression of evidence or other [official] conduct undertaken in bad faith.'" *Savino*, 331 F.3d at 72 (quoting *Colon*, 60 N.Y.2d at 83).  Lastly, the lack of probable cause alone "generally raises an inference of malice." *Ricciuti*, 124 F.3d at 131.

Here, Plaintiff was indicted by a grand jury on January 28, 2011. Dkt. No. 1 at ¶ 809. Plaintiff's indictment was based, in part, upon affidavits from voters who claimed that their ABs had been falsified, which were prepared and notarized by Defendant Smith. *Id.* at ¶¶ 813, 815. At trial, two of the voters whose affidavits were presented at the grand jury proceeding testified that the signature on their purported affidavits were not genuine. *Id.* at ¶ 816; *see also* Dkt. No. 1-1 at 26-30. Plaintiff's indictment was also partially based upon the testimony of Defendant Ogden, who told the grand jury that he reviewed the handwriting on the forged AABs and concluded that they were all falsified by the same person. Dkt. No. 1 at ¶ 758. Thereafter, Defendant Ogden "admitted at trial that his purported law enforcement expert testimony before the Grand Jury was not correct and a mistake." *Id.* at ¶ 768. Defendant O'Malley likewise testified before the grand jury, initially stating that he wrote excuses on several of the AABs, which he testified probably came from the AB candidate who got the information from a democratic committee operative. *Id.* at ¶ 772. Thereafter, Defendant O'Malley returned to the grand jury to testify that "on September 14, 2009, [Plaintiff] called him into his office and told him to make-up Excuses and write them on those eight (8) AAB, so he did." *Id.* at ¶ 783. Plaintiff contends Defendant Smith called Defendant O'Malley at his house and encouraged him to change his testimony in this manner. *Id.* at ¶ 784. Based upon these allegations of forgery, untruthful testimony, and suppression of evidence, Plaintiff has sufficiently rebutted the presumption that a grand jury indictment creates probable cause for his indictment. *See Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003) (quoting *Colon*, 60 N.Y.2d at 82-83) ("The presumption is rebuttable, and may be overcome by evidence establishing that the police witnesses 'have not made a complete and full statement of facts . . . that they have misrepresented or falsified evidence . . . or otherwise acted in bad faith.'").

On the element requiring the prosecution to be motivated by actual malice, the alleged lack of probable cause supporting the grand jury decision, coupled with the alleged purpose of Plaintiff's indictment to be a "scapegoat prosecution" to shield other political candidates from public and legal scrutiny, sufficiently pleads that the prosecution was undertaken with actual malice. *See Ricciuti*, 124 F.3d at 131 (citation omitted) ("[L]ack of probable cause generally raises an inference of malice . . . .").

To state a § 1983 malicious prosecution claim, a plaintiff must also allege "a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000) (citation omitted).

> The Fourth Amendment right implicated in a malicious prosecution action is the right to be free of unreasonable seizure of the person–i.e., the right to be free of unreasonable or unwarranted restrains on personal liberty. A plaintiff asserting a Fourth Amendment malicious prosecution claim under § 1983 must therefore show some deprivation of liberty consistent with the concept of 'seizure.'

*Id.* (quoting *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 116 (2d Cir. 1995)). Thus, a plaintiff pursuing a malicious prosecution claim "under § 1983 must show that the seizure resulted from the initiation or pendency of judicial proceedings." *Id.*

Here, Plaintiff was required to endure two separate trials and was not acquitted of the charges against him until nearly two years until after he was indicted. *See* Dkt. No. 1 at ¶¶ 1199-1200. These allegations clearly state that Plaintiff suffered a restraint on his liberty that extended beyond the arraignment itself. *See Rohman*, 215 F.3d at 216 (holding that a plaintiff who was required "to return to court on at least five occasions before the charges against him were ultimately dropped[,]" coupled with the fact that a New York criminal defendant released on his own recognizance "must 'render himself at all times amenable to the orders and processes of the

court,'" was sufficient to allege post-arraignment liberty restraint).  Accordingly, the Court finds that Plaintiff's complaint has sufficiently alleged facts to support a § 1983 malicious prosecution claim.  However, the Court will discuss below whether each Defendant is individually liable for this malicious prosecution and whether any of the defendants have a valid defense to the claim.

### 2. § 1983 Conspiracy

A plaintiff may maintain a Section 1983 action against a private party defendant who is engaged in a conspiracy with one or more state actors.  *See Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 324 (2d Cir. 2002).  To survive a motion to dismiss, the complaint must allege "(1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Id.* at 324-25 (citing *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999)).  Thus, a plaintiff must first allege sufficient facts to support an underlying constitutional violation in order to state a valid § 1983 conspiracy claim.  *See Curley v. Vill. of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001).  Moreover, "[w]hile 'conclusory allegations' of a § 1983 conspiracy are insufficient, we have recognized that such 'conspiracies are by their very nature secretive operations,' and may have to be proven by circumstantial, rather than direct, evidence." *Pangburn*, 200 F.3d at 72 (quoting *Dwares v. City of New York*, 985 F.2d 94, 99-100 (2d Cir. 1993); *Rounseville v. Zahl*, 13 F.3d 625, 632 (2d Cir. 1994)).  In the instant case, the alleged unconstitutional injury implicated by the conspiracy is based on a claim of malicious prosecution.  As discussed above, Plaintiff has adequately pled facts to support a malicious prosecution claim.  In the following sections, the Court will discuss whether Plaintiff's complaint sufficiently alleges actions taken by each of the Defendants to support a conspiracy claim.

### 5. Absolute Immunity

Trial or grand jury witness testimony, even if perjured, cannot serve as the basis for a §

1983 claim. *See Coggins v. Cnty. of Nassau*, 988 F. Supp. 2d 231, 244 (E.D.N.Y. 2013) (citing

*Briscoe v. LaHue*, 460 U.S. 325, 335-36 (1983)); *see also Rehberg v. Paulk*, 132 S. Ct. 1497,

1506-07 (2012) (holding that asserting a § 1983 claim as a conspiracy, rather than as an

individual action, does not remove the absolute immunity protection). Moreover, preparatory

communications between a witness and a prosecutor regarding the contents of any future

testimony is entitled to absolute immunity. *See Rehberg*, 132 S. Ct. at 1506-07 ("In the vast

majority of cases involving a claim against a grand jury witness, the witness and the prosecutor

conducting the investigation engage in preparatory activity, such as a preliminary discussion in

which the witness relates the substance of his intended testimony").

### a. Coggins Exception

Simply because a defendant is a witness in a grand jury or trial proceeding, however, does

not grant that individual absolute immunity for all actions arising out of the substance testified

about. *See Coggins v. Buonora*, 776 F.3d 108, 112-13 (2d Cir. 2015). Rather, the absolute

immunity extends only to that information that was the substance of the witness' testimony. In

*Coggins*, the Second Circuit held that a plaintiff may state a valid malicious prosecution claim

against a grand jury witness, even with absolute immunity for the testimony given in such

proceeding, if the plaintiff alleges actions taken in excess of that witness' testimony that would

amount to an independent § 1983 claim. *Id.* at 113.

> When a police officer claims absolute immunity for his grand jury
> testimony under *Rehberg*, the court should determine whether the
> plaintiff can make out the elements of his § 1983 claim without
> resorting to the grand jury testimony. If the claim exists
> independently of the grand jury testimony, it is not "based on" that

> testimony, as that term is used in *Rehberg*. *Id.* at 1506.
> Conversely, if the claim requires the grand jury testimony, the
> defendant enjoys absolute immunity under *Rehberg*.

*Id.* A defendant likewise does not receive absolute immunity for information related to their testimony that he or she discloses through another source. *Id.* ("The fact that [a witness'] grand jury testimony paralleled information he gave in other contexts does not mean that [the plaintiff's] malicious prosecution claim was 'based on' [the witness'] grand jury testimony. Rather it was based on [the witness'] conduct that laid the groundwork for [the plaintiff's] indictment").

The Second Circuit's holding in *Coggins* requires a court to determine whether a statement or action made in addition to a witness' testimony is preparatory activity in anticipation for that testimony, which would receive absolute immunity. *See Coggins*, 776 F.3d at 113 n.7. In the post-*Coggins* line of cases in this circuit, there are three emerging factors that are relevant to whether a given activity is considered preparatory. First is the timing of the action as compared to the plaintiff's indictment and the defendant's testimony, *see O'Neal v. City of New York*, 14-CV-7649, 2016 WL 4035522, *6 (S.D.N.Y. July 22, 2016), second is the form of the action, whether it is a written documentation or an oral statement to the prosecutor or investigator, *see id.* at *7, and the third is whether the defendant's statement was an isolated remark that is "merely prefatory to a defendant['s] . . . own testimony" as compared to one designed to elicit additional false testimony from other witnesses, *see Fappiano v. City of New York*, No. 01 Civ. 2476, 2015 WL 94190, *20 (E.D.N.Y. Jan. 7 2015).

Fabricated documentary evidence, such as a police report or investigative affidavit, given to a district attorney that lays the groundwork for a plaintiff's indictment is clearly not preparatory activity and does not receive absolute immunity. *See Rucks v. City of New York*, 96 F. Supp. 3d 138, 150 (S.D.N.Y.) (holding that an investigating officer's actions of making false statements to

each other, in written police reports, and to the ADA were not entitled to absolute immunity). In *Coggins*, the Second Circuit concluded that an officer who falsified official documents related to the plaintiff's arrest, failed to complete an incident report, and conspired to create "an altered version of what transpired . . . and made a conscious decision to omit certain information and include false information in the Police Report and accompanying arrest paperwork" was not entitled to absolute immunity. 776 F.3d at 110-11. The officer's actions and falsified reports were the main basis for the plaintiff's grand jury indictment. *Id.* By contrast, in *O'Neal*, the defendant witness made oral false statements to a prosecutor two weeks before he testified at trial, and nearly ten months after the plaintiff was indicted. 2016 WL 4035522, at *5. The Southern District concluded that these statements were merely preparatory activity since they did not play an active role in the plaintiff's indictment, they consisted solely of oral statements to the prosecutor and did not include any fabricated documentary evidence, and the statement to the prosecutor simply mirrored the defendant's testimony at trial. *Id.* at *7-8.

In *Fappiano v. City of New York*, the Eastern District drew the distinction between an officer merely presenting false testimony at trial, and an officer actively engaging in pre-trial acts to solicit false testimony from other witnesses in order to "fill the gaps" in his story to aid in the plaintiff's conviction. 2015 WL 94190, at *20 (citing *Mitchell v. City of Boston*, 130 F. Supp. 2d 201, 212 (D. Mass. 2001)). In *Mitchell*, "the court found that the officer whose total involvement was allegedly testifying falsely was immune under *Briscoe*, while the other officer, who was 'the mastermind of the plot to fabricate evidence,' was not immune because he did more than falsely testify—he fabricated a case against the defendant-turned-plaintiff by taking 'it upon himself to fill the gaps in his story by soliciting false testimony from [his partner].'" *Fappiano*, 2015 WL 94190, at *20 (quoting *Mitchell*, 130 F. Supp. 2d at 213). The *Coggins* decision requires the

district court to determine whether a plaintiff's complaint contains sufficient allegations against the witness-defendants, separate from his trial or grand jury testimony, that amount to an independent § 1983 claim. 776 F.3d at 113.

### b. Complaining Witness

An individual who plays a role in initiating a criminal defendant's prosecution is known as a complaining witness. *See White v. Frank*, 855 F.2d 956, 959 (2d Cir. 1988); *see also Rehberg v. Paulk*, 132 S. Ct. 1497, 1507 (2012) (noting that a complaining witness need not testify before a grand jury or in trial). Such a complaining witness, even if he or she later testifies, does not receive absolute immunity for the actions taken to initiate the prosecution. *White*, 855 F.2d at 959 (citing *Malley v. Briggs*, 475 U.S. 335, 340 (1986)). However, merely presenting key testimony at a grand jury proceeding that leads to an indictment does not transform that witness into a complaining witness. *See Rehberg*, 132 S. Ct. at 1507-08. Rather, a complaining witness must take such control over the initiation of the prosecution as to effectively overtake the decision of whether to press charges away from the prosecutor. *Id.*

## C. Defendant McInerney[2]

### 1. Malicious Prosecution

#### a. Individual Liability

Initially, Plaintiff has failed to allege that Defendant McInerney was directly responsible for his malicious prosecution. Plaintiff's opposition argues that Defendant McInerney was a complaining witness and, as such, is subject to an individual malicious prosecution claim.

---

[2] The Court will not consider the self-serving affidavits that Defendant McInerney or Plaintiff submitted with this motion. *See Friedl v. City of New York*, 210 F.3d 79, 83-84 (2d Cir. 2000).

However, Plaintiff has not alleged that Defendant McInerney became involved in the investigation or gave any statements about the circumstances underlying his prosecution until after Plaintiff had already been indicted. The only pre-indictment actions done by Defendant McInerney was his grand jury testimony. As such, to the extent that Plaintiff's complaint contains a direct cause of action for malicious prosecution against Defendant McInerney, any such claim is dismissed.

### b. Conspiracy

Defendant McInerney argues that his motion to dismiss should be granted for the following three reasons: (1) that he enjoys absolute immunity for his trial and grand jury testimony, (2) that the routine communications between himself and the prosecutor, Defendant Smith, cannot serve as the basis for a § 1983 conspiracy claim, and (3) Defendant McInerney's cooperation in investigations and during plea negotiations cannot amount to a malicious prosecution conspiracy. *See* Dkt. No. 12-2 at 7-12.

Plaintiff alleges that Defendant McInerney conspired with Defendant Smith to produce false testimony at trial and before the grand jury. The acts alleged in furtherance of this conspiracy are that (1) Defendant McInerney testified falsely at the direction of Defendant Smith and withheld pertinent information from his testimony that would have exonerated Plaintiff, (2) Defendant McInerney prepared a sworn, written statement on September 16, 2011 that falsely incriminated Plaintiff, (3) Defendant McInerney engaged in several discussions with Defendant McNally and Defendant Smith outside of police presence, and (4) Defendant Smith offered Defendant McInerney immunity for his testimony and, after his indictment was imminent, offered a generous plea deal that avoided significant incarceration.

Defendant McInerney's grand jury and trial testimony receive absolute immunity and cannot serve as the basis for a § 1983 claim, even if that testimony was fabricated or perjurious. *See generally Rehberg v. Paulk*, 132 S. Ct. 1497 (2012). Further, allegations of a witness' communication with the prosecutor to prepare for such testimony are likewise insufficient to state a conspiracy claim. *See Scotto v. Almenas*, 143 F.3d 105, 115 (2d Cir. 1998) (quoting *San Filippo v. U.S. Trust Co.*, 737 F.2d 246, 256 (2d Cir. 1984)) ("[T]here [is] 'nothing suspicious or improper in such meetings [between a witness and a prosecutor], which are routine and necessary in the preparation of evidence,' and that the 'mere allegation of their occurrence is [not] sufficient to create a material issue of fact as to whether something improper took place during them. . . ."); *see also Rehberg*, 132 S. Ct. at 1506-07.

Defendant McInerney's act of issuing a written statement, however, does not automatically receive absolute immunity. *See Coggins*, 776 F.3d at 113. His written statement says, in part, that "on September 15, 2009 LoPorto called several times and asked if the AB 'were done yet' and after he forged them he gave them to LoPorto at City Hall in a manila envelope." Dkt. No. 1 at ¶ 156. Further, Defendant McInerney state that he was "certain that those AB never left the [Board of Elections], and that they were forged by [Plaintiff] while in his office." *Id.* at ¶ 1018. This written statement was prepared at Defendant Smith's direction and falsely incriminated Plaintiff. *Id.* at ¶¶ 1008-13. The Court concludes that, based upon the allegations in Plaintiff's complaint, Defendant McInerney's written statement was not merely preparatory activity for his trial testimony and, thus, is not entitled to absolute immunity.

In *Coggins* and *Rucks*, as opposed to here, the allegedly false written statement was issued prior to the plaintiff's indictment by the grand jury. *See Coggins*, 776 F.3d at 114; *Rucks*, 96 F. Supp. 3d at 148. By contrast, Defendant McInerney did not issue his written statement until after

36

Plaintiff was indicted by the grand jury on January 28, 2011. *See* Dkt. No. 1 at ¶ 809. The Court

finds that the holding in *Coggins* is not limited to written statements made prior to a plaintiff's

indictment, as a defendant may be liable for a malicious prosecution claim for the continuation of

a proceeding after it is clear that no probable cause exists and not just for the initiation of such

action in the absence of probable cause. *See, e.g.*, *Weiner v. McKeefery*, 90 F. Supp. 3d 17, 35

(E.D.N.Y. 2015) (quotation omitted) ("[C]ontinued prosecution after facts sufficient to exonerate

the accused have been provided may give rise to an action for malicious prosecution under New

York law"). Here, Defendant McInerney issued his written statement prior to Plaintiff's first trial

in February of 2012 and well before Plaintiff's second trial. Moreover, Plaintiff clearly alleged

that Defendant McInerney's written statement served as a basis upon which the other witnesses

fabricated their testimony to ensure that it was consistent with the prosecution's otherwise

unsupported theory against Plaintiff. Dkt. No. 1 at ¶ 1009. Accordingly, the fact that Defendant

McInerney's written statement was made after Plaintiff had already been indicted does not

preclude the finding that the written statement nonetheless contributed to Plaintiff's continued

malicious prosecution. Further, that Defendant McInerney issued his statement as a sworn,

written document, rather than simply through oral communications with Defendant Smith,

warrants a finding that this statement was more than merely a preparatory action for his testimony

and instead was created to influence the testimony of the other witnesses. *See Mitchell*, 130 F.

Supp. 2d at 212 (holding that a written statement that forms the basis for future false testimony is

not protected by absolute immunity). Plaintiff has clearly alleged that this written statement was

made in connection with and at the direction of Defendant Smith, thereby alleging an agreement

between Defendant McInerney, a private actor, and Defendant Smith, a state actor. Dkt. No. 1 at

¶ 1008. The Court finds that, based upon Plaintiff's allegations, Defendant McInerney's written

statement was not created solely for the preparation of his trial testimony. Thus, the written statement, which is not protected by absolute immunity, could have been a foundation upon which other witnesses may have shaped their allegedly false testimony that was presented at trial, thereby alleging an independent ground apart from Defendant McInerney's trial testimony upon which to base the malicious prosecution claim.

Plaintiff's additional allegations, although circumstantial, support his claim that Defendants Smith, who is a state actor, and McInerney were acting in concert. *See In re Dana Corp.*, 574 F.3d 129, 153 (2d Cir. 2009) (quotation omitted) ("[I]t is well established that '[b]oth the existence of a conspiracy and a given defendant's participation in it with the requisite knowledge and . . . intent may be established through circumstantial evidence'"). Defendant Smith's initial promise of non-prosecution, coupled with the allegedly lenient treatment of Defendant McInerney in affording him a favorable plea deal for the same conduct that Plaintiff was accused of, supports Plaintiff's contention that the Defendants were attempting to focus the prosecution on him so that the other Defendants involved would not be convicted of the forgeries in which they were directly implicated. Defendant Smith offered Defendant McInerney a plea deal for one felony charge and a 90 day work order in satisfaction of all charges that could have been brought against him for the three years of easily provable forgeries involved in the 2007, 2008, and 2009 elections, each charge of which would have carried consecutive sentences of two to seven years. Dkt. No. 1 at ¶ 971; Dkt. No. 12-2 at 3. During the initial investigation into Plaintiff, Defendant Smith repeatedly declared that he did not have enough evidence to indict McInerney for the forgery scheme, *see* Dkt. No. 1 at ¶ 573, despite ultimately changing his position and indicting Defendant McInerney only after independent New York State Police and FBI investigations intervened, *id.* at ¶¶ 929, 930-31, 942. Further, as soon as it became clear that

Defendant McInerney was going to face charges for forgeries in the 2007 and 2008 elections, Defendant Smith immediately moved to expand his jurisdiction to prosecute those cases, *id.* at ¶¶ 993, 1001, despite previous repeated assertions that he did not have the authority to prosecute the earlier elections' forgeries when evidence clearly implicated Defendant McInerney, *see id.* at ¶¶ 364-380, 400, 487, 492-500. Moreover, Plaintiff's allegations of several off-the-record meetings between Defendant Smith and McInerney hint at the possibility of the two acting in concert.[3] *See id.* at ¶¶ 1003-04. Accordingly, Plaintiff has stated a valid claim that Defendant McInerney conspired to maliciously prosecute Plaintiff in violation of § 1983. Defendant McInerney's motion is denied on this ground.

### 3. Municipal Liability

Defendant McInerney argues that Plaintiff has failed to allege any facts sufficient to hold him personally liable for the allegations contained in Count III. *See* Dkt. No. 12-2 at 19. As Count III is directed solely at the County of Rensselaer and does not implicate any individual Defendant, Defendant McInerney's motion on this ground is denied as moot. To the extent that any of the other individual Defendants raise an argument to dismiss Count III, those arguments are likewise denied as moot since Count III does not allege any action against the individual Defendants.

## C. John and Daniel Brown[4]

---

[3] The Court notes that, if discovery were to establish that these meetings constituted "preparatory activity" for Defendant McInerney's trial testimony, then Defendant McInerney would be entitled to absolute immunity for that conduct. *See Coggins*, 776 F.3d at 113 & n.7 (citing *Rehberg*, 132 S. Ct. at 1506-07).

[4] The Court will not consider the self-serving affidavits or additional evidence submitted with the Brown Defendants' motion to dismiss. *See Friedl v. City of New York*, 210 F.3d 79, 83-

Plaintiff's opposition to the Brown Defendants' motion states that "the allegations of conspiracy [in the complaint] are supported by numerous particularized facts which, taken as true, 'suggest than an agreement was made' whether tacit or expressed . . . ." Dkt. No. 60 at 60-61. However, Plaintiff does not describe what particular assertions he is referring to. A liberal reading of Plaintiff's complaint finds the following specific accusations against the Brown Defendants. Prior to October 1, 2009, Defendant Smith allegedly told and John Brown that he would not be prosecuted for the AB forgery. *Id.* at ¶ 266. On December 6, 2011, Defendant John Brown entered into a cooperation agreement, pursuant to which he was required to provide complete and truthful cooperation in return for a guilty plea to one felony count with up to six months incarceration and five years probation. *Id.* at ¶ 1056. Thereafter on December 6, 2011 he gave a sworn, written deposition wherein he fabricated incidents that occurred in Plaintiff's office and implicated Plaintiff in the forgery scheme. *Id.* at ¶ 1057-58. Specifically, John Brown stated that

> (a) he saw McGrath g[i]ve [Plaintiff] an AAB and what seemed to be a false Excuse for an older voter and [Plaintiff] then wrote information on that AAB; (b) he was in [Plaintiff's] office for about forty (40) minutes during which he saw the AAB he brought to the [Board of Elections] sitting on [Plaintiff's] desk; (c) he saw [Plaintiff] writing on documents but could not say for sure that they were those AAB; and, (d) he saw O'Malley come in and out of the office but did not recall him sitting at a desk or writing on any AAB.

*Id.* at ¶ 1059. Plaintiff alleges that Defendant Smith met with John Brown before he issued this statement to ensure that it was consistent with the other Defendants' sworn testimony. *Id.* at ¶ 1061. Further, Plaintiff contends that John Brown tampered with another witness, DeFiglio, by

84 (2d Cir. 2000).

offering him a job in Vermont in an attempt to get DeFiglio not to talk with the police. *See id.* at ¶¶ 504, 509.

This written statement is similar to Defendant McInerney's, in that it was issued after Plaintiff was indicted, but before any testimony at either of his trial. Plaintiff contends that this written statement served the basis for other Defendants' allegedly false testimony in an attempt to continue the malicious prosecution of Plaintiff. *Id.* at ¶ 1061. While this written statement does not receive absolute immunity and is arguably an overt act that contributed to Plaintiff's malicious prosecution, Plaintiff has failed to state sufficient allegations that John Brown and Defendant Smith had an agreement to engage in such unconstitutional actions. Plaintiff's complaint consists of mainly conclusory allegations that John Brown conspired with Defendant Smith to scapegoate prosecute Plaintiff for the AB forgeries. In contrast to the allegations against Defendant McInerney that state specific interactions and communications between Defendant Smith and Defendant McInerney to state a valid conspiracy claim, Plaintiff's allegations against John Brown are mere conclusory statements and any circumstantial evidence linking John Brown to Defendant Smith is fall more tenuous than that against Defendant McInerney. *See Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir. 1993), *overruled on other grounds by Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163 (1993) ("[A plaintiff] should make an effort to provide some 'details of time and place of the alleged effect of the conspiracy'").

The extent of Plaintiff's non-conclusory allegations against John Brown are that, prior to 2011, Defendant Smith told officials from the New York State Police that John Brown could not be prosecuted because the evidence against him was not legally sufficient to corroborate the testimony of DeFiglio. *Id.* at ¶ 573. On December 6, 2011, after his indictment was imminent, John Brown entered into a cooperation agreement and pled guilty to one felony count and was

sentenced to six months incarceration and five years probation.  *Id.* at ¶ 1056.  This sentence was the most that any of the co-conspirators in the forgery scheme received, far less favorable that the 90 day work order given to Defendant McInerney or the 200 hours of community service given to Defendant Renna.  *See* Dkt. No. 1 at ¶¶ 971, 1033; Dkt. No. 40-3 at 16; *see also Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 324 (2d Cir. 2002) (holding that the adversarial position of alleged co-conspirators belies bald conclusory allegations of conspiracy).  Plaintiff's response to the Brown Defendants' motion argues that "numerous detailed facts and circumstances" contained in the complaint indicate John Brown's alleged agreement to conspire with Defendant Smith, yet he does not specifically cite to any of these so-called "detailed facts."  *See* Dkt. No. 60 at 60. Accordingly, the Court finds that Plaintiff's complaint fails to sufficiently allege, beyond mere conclusory allegations, that John Brown actively or implicitly agreed to conspire with Defendant Smith in an effort to continue the malicious prosecution against Plaintiff.  As such, Plaintiff's malicious prosecution conspiracy claims against John Brown are dismissed.

The only allegations implicating Daniel Brown is that he falsely testified before the grand jury.  *Id.* at ¶ 1133.  In their motion to dismiss, the Brown Defendants argue that Daniel Brown did not testify before the grand jury, and only testified in Plaintiff's first criminal trial.  *See* Dkt. No. 40-3 at 9.  Irrespective of when Daniel Brown testified, his testimony from either the grand jury or at trial are equally entitled to absolute immunity and cannot serve as the basis for a § 1983 conspiracy claim.  *See Rehberg*, 132 S. Ct. at 1506-07.  Plaintiff argues that the Brown Defendants do not receive absolute immunity for their testimony because they are "complaining witnesses."  *See* Dkt. No. 60 at 63-64.  This argument is unavailing given that neither of the Brown Defendants were involved in the investigation until after Plaintiff had been indicted.  As such, their actions could not have directed Defendant Smith to start the prosecution against

Plaintiff and, also, could not have formed the basis of Plaintiff's indictment. Accordingly, all malicious prosecution and conspiracy claims against Daniel Brown are dismissed given his absolute immunity for trial and grand jury testimony. The Brown Defendants' motion to dismiss is granted in its entirety and both John and Daniel Brown are terminated from this action.

## D.     Defendant O'Malley

Plaintiff's complaint repeatedly states, in conclusory fashion, that Defendant O'Malley actively conspired with Defendant Smith and the other Defendants to scapegoat prosecute Plaintiff for the AB forgeries. Fatal to Plaintiff's claims, however, is the absence of any allegation of an overt act taken by Defendant O'Malley, apart from trial and grand jury testimony, that was in furtherance of any such alleged conspiracy. In fact, Plaintiff specifically alleges that "O'Malley's role . . . was to not talk prior to Grand Jury, but give fabricated false testimony as needed at Grand Jury and trial to initiate and continue the scapegoat prosecution." Dkt. No. 1 at ¶ 452. As discussed above, Defendant O'Malley's testimony, even if fabricated or perjurious, receives absolute immunity and cannot serve as the basis for a § 1983 claim. *See Rehberg*, 132 S. Ct. at 1506-07.

Plaintiff's opposition argues that Defendant O'Malley took actions in concert with Defendant Smith, at some unmentioned time and unknown location, to work together to fabricate O'Malley's grand jury testimony to be consistent with the other Defendants'. *See* Dkt. No. 69. Even if Plaintiff alleged in a less conclusory and more detailed fashion the manner in which Defendants Smith and O'Malley worked together to plan his grand jury testimony, such preparatory activity is entitled to absolute immunity. *See Coggins v. Buonora*, 776 F.3d 108, 113 n.7 (2d Cir. 2015). Plaintiff does not allege that Defendant O'Malley took some other action outside of his testimony, such as contributing to a false police report, issuing a false written

statement, or actively participating in the investigation, that acted to further the alleged conspiracy. Accordingly, Plaintiff has not stated any allegations separate and distinct from Defendant O'Malley's trial or grand jury testimony that would independently support a § 1983 claim. *See id.* at 113.

Plaintiff also argues that "[n]o decision has extended absolute immunity to prosecutors, police officers or private citizens for the act of manufacturing false evidence outside the judicial process to later present before a grand jury or trial." Dkt. No. 69 at 13. While Plaintiff's opposition does not separate whether he is discussing his fabrication of evidence claims or his malicious prosecution claims, it appears that the majority of his discussion involves the fabrication of evidence claim. As noted above, all such claims are dismissed on statute of limitations grounds. Thus, Defendant O'Malley's motion to dismiss is granted in its entirety and he is terminated from this action.

## E.       Defendant Robillard

Defendant Robillard argues that the only allegations against him in the complaint are either conclusory statements that he engaged in the conspiracy or concern activities that are protected by absolute immunity. *See* Dkt. No. 56-1. Plaintiff's memorandum in opposition, which is in large part identical to his opposition to Defendant O'Malley's motion, again focuses mainly on his fabrication of evidence claims. *See* Dkt. No. 71.

Plaintiff's complaint patently fails to allege that Defendant Robillard engaged in any actions in furtherance of the alleged conspiracy that are not covered by absolute immunity. Defendant Smith hired Defendant Robillard as the forensic document examiner to perform a comparison of handwriting samples from Plaintiff and LoPorto. Dkt. No. 1 at ¶¶ 880, 884. In his request for a handwriting comparison, Defendant Smith detailed the testimony against Plaintiff in

a letter to Defendant Robillard. *See* Dkt. No. 1-1 at 35-37. Also, Defendant Ogden testified that

he "talked to Robillard about the theory of prosecution and evidence" before he issued his report.

Dkt. No. 1 at ¶ 1137. Defendant Robillard gave his expert testimony that it was Plaintiff's

handwriting on nearly all of the falsified AABs. *Id.* at ¶ 897. He made these initial findings

without comparing the handwriting of John Brown, Dan Brown, Defendant McGrath, or other

suspects. *Id.* at ¶ 1145. Defendant Robillard was paid approximately $100,000 and was

instructed by Defendant Smith to not conduct an ink analysis on several of the falsified AABs.

*Id.* at ¶¶ 898, 902, 1152. Accordingly, the only alleged act undertaken by Defendant Robillard in

this case was testifying in his expert opinion that it was Plaintiff's handwriting on the falsified

AABs. Such testimony is clearly covered by absolute immunity and cannot form the basis for a §

1983 claim. *See, e.g.*, *Elmasri v. England*, 222 F. Supp. 2d 212, 222 (E.D.N.Y. 2000) (citing

*Briscoe v. LaHue*, 460 U.S. 325, 335 (1983)) ("This [absolute witness] immunity extends to all

persons, whether governmental, expert, or lay witnesses, integral to the trial process").

       To the extent that Plaintiff contends that any meetings between Defendant Smith or Ogden

and Defendant Robillard are overt acts in furtherance of the conspiracy, these arguments are

likewise unavailing. The alleged discussions and meetings between these Defendants were

clearly in preparation for Defendant Robillard's testimony. Plaintiff alleges that Defendants

Smith and Ogden informed Defendant Robillard of their theory of the case and instructed him to

shape his testimony to meet this theory. *See* Dkt. No. 1 at ¶¶ 362, 890-95, 903. Such preparatory

activity, even if preparing to present false testimony, is entitled to absolute immunity. *See*

*Rehberg*, 132 S. Ct. at 1506-07; *Coggins*, 776 F.3d at 112. Further, to the extent that Plaintiff

alleges that Defendant Robillard failed to conduct a sufficient examination of the handwriting, all

of the allegations state that Defendant Smith instructed Defendant Robillard to not compare

additional handwriting samples and to not conduct an ink analysis. *See* Dkt. No. 1 at ¶¶ 898, 902, 1145, 1152; *see also Shmueli v. City of New York*, 424 F.3d 231, 237 (2d Cir. 2005) (citing *Imbler v. Pachtman*, 424 U.S. 409, 431 n.34 (1976)) (noting that absolute immunity attaches to a prosecutor's decision to withhold exculpatory information). Accordingly, the Court finds that all of Defendant Robillard's alleged acts in furtherance of Plaintiff's malicious prosecution are protected by absolute immunity. Thus, Defendant Robillard's motion is granted, he is terminated from this action, and Plaintiff's claims against Defendant Robillard are dismissed.

## F.  **Defendant McNally**

### *1. Official Capacity*

The Eleventh Amendment provides a state with sovereign immunity from suit. *See Va. Office for Prot. & Advocacy v. Stewart*, 131 S. Ct. 1632, 1638 (2011) (citation omitted). "To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state." *Ying Jing Gan v. City of New York*, 996 F.2d 522, 529 (2d Cir. 1993) (citations omitted). Here, Plaintiff concedes that Defendant McNally is entitled to Eleventh Amendment immunity for the suit against him in his official capacity. *See* Dkt. No. 82 at 10. Accordingly, Plaintiff's claims against Defendant McNally in his official capacity are dismissed.

### *2. Individual Capacity*

Defendant McNally argues that his decision to recuse himself as district attorney is entitled to absolute prosecutorial immunity and, even if no such immunity applies, Plaintiff has failed to sufficiently allege that Defendant McNally engaged in the conspiracy with Defendant Smith to continue the malicious prosecution against Plaintiff. *See* Dkt. No. 64-4.

The Second Circuit has not clearly established whether a district attorney's decision to recuse himself is entitled to absolute immunity. Plaintiff argues that the recusal decision is a purely administrative decision, which is not entitled to prosecutorial immunity. *See* Dkt. No. 82 at 11; *see also Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993) ("A prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity"). Defendant McNally, on the other hand, argues that his decision to recuse himself is akin to the decision of whether or not to initiate a prosecution, which is afforded absolute immunity. *See* Dkt. No. 84 at 8; *see also Schloss v. Bouse*, 876 F.2d 287, 290 (2d Cir. 1989) (holding that absolute prosecutorial immunity extends to the decision to prosecute as well as the decision not to prosecute). The Court finds that a district attorney is entitled to absolute immunity for the act of recusing himself from a prosecution because such act is intimately tied to his functions as an advocate for the people. If a prosecutor could be personally liable for his decision to recuse himself from a case, it would open the possibility of having to decide between refusing to recuse, which could potentially taint the outcome of a case if a perceived conflict is present, and recusing one's self and potentially being subject to personal liability for this action. It would be contrary to the goals of the inherent advocacy in our judicial system to allow such decisions to be influenced by concerns of personal liability. The Second Circuit has extended absolute immunity to other, similar actions because of the same concern that potential personal liability should not influence important prosecutorial decisions. If a prosecutor is entitled to absolute immunity for choosing to prosecute an action, then it is logically extended that they should be entitled to absolute immunity for deciding to forego prosecution, as it would be improper for a prosecutor's decision on whether or not to prosecute to be based upon concerns of potential personal liability. *Schloss*, 876 F.2d at

290. In a similar vein, a judge's decision to recuse himself is described as a judicial, rather than administrative, act that is entitled to absolute judicial immunity. *See Bobrowsky v. Yonkers Courthouse*, 777 F. Supp. 2d 692, 714 (S.D.N.Y. 2011). Moreover, at least one other circuit has held that a district attorney's decision to recuse himself is entitled to absolute prosecutorial immunity. *See Delta Fuel Co., Inc. v. Maxwell*, 485 Fed. Appx. 685, 686 (5th Cir. 2012) (per curium) (citing *Imbler v. Pachtman*, 424 U.S. 409, 428 (1976)) ("[B]ecause the recusal was done in [the defendant's] role as district attorney, [the defendant] was entitled to absolute prosecutorial immunity"). To the extent that Plaintiff argues that Defendant McNally's recusal was illegal or improper, Justice Pulver of Rensselaer County Supreme Court so ordered Defendant McNally's recusal and appointed Defendant Smith to be acting special district attorney for the case, thereby affirming Defendant McNally's position that his recusal and Defendant Smith's appointment were legal actions sanctioned by the state supreme court. *See* Dkt. No. 99-55. Accordingly, Defendant McNally's decision to recuse himself from prosecuting the AB forgery case is entitled to absolute immunity and cannot serve as the basis for a § 1983 claim.

The actions that Defendant McNally took after he recused himself, however, are not entitled to absolute immunity. *See Kulwicki v. Dawson*, 969 F.2d 1454, 1467 (3d Cir. 1992) (holding that actions taken by a prosecutor after he had recused himself from the case were not entitled to absolute prosecutorial immunity). Plaintiff alleges that "McNally also violated the rules of ethics and N.Y.S. Judiciary Law § 493 by giving legal advice to McInerney, McDonough and Martiniano, taking physical custody of AB documents and DNA reports related to the case and discussing the matter with Trey Smith subsequent to his unlawful self-disqualification." Dkt. No. 1 at ¶ 257. Plaintiff alleges that Defendant McNally's cell-phone records "will show he communicated with McInerney, Trey Smith and Chair Wade before and/or during the scapegoat

48

prosecution." *Id.* at ¶ 220. Further, Defendant Smith admitted "that he and McNally talked about the AB forgery after McNally disqualified himself from the matter." *Id.* at ¶ 300. Defendant McNally allegedly advised Robert Martiniano to not inform the police or Defendant Smith that he had relevant knowledge about the AB forgery. *Id.* at ¶¶ 651-58.

The Court finds that Defendant McNally's act of dissuading Robert Martiniano from providing police with relevant testimony that would have allegedly exonerated Plaintiff was an overt act that allowed the continued malicious prosecution of Plaintiff. However, Plaintiff has not sufficiently alleged that Defendant McNally engaged in this act in furtherance of an agreement with Defendant Smith to scapegoat prosecute Plaintiff. While Plaintiff alleges that Defendant McNally knew that Martiniano had "personal knowledge of facts relevant to the AB forgery," *id.* at ¶ 651, Plaintiff does not contend that Defendant McNally knew that the information would have been exculpatory for Plaintiff. In fact, Plaintiff specifically states that Defendant McNally "gave that advice without having any discussion with Martiniano about the facts of which he had knowledge." *Id.* at 656. Plaintiff contends that Defendants McInerney and John Brown admitted to Martiniano that they were forging ABs, however Plaintiff fails to allege that Defendant Smith or McNally knew the substance Martiniano's knowledge of the AB forgeries at the time Defendant McNally advised him not to talk to police. Thus, the overt act of discouraging Martiniano from talking with the police could not have been done for the purpose of furthering Plaintiff's malicious prosecution because Defendant McNally had no reason to know what Martiniano's cooperation with police might have uncovered.

The remaining allegations against Defendant McNally are likewise insufficient to support the assertion that he acted in agreement with Defendant Smith to further Plaintiff's malicious prosecution. While Defendants Smith and McNally undoubtedly talked about the AB forgery

case and Defendant McNally had access to relevant evidence in the case, Plaintiff has only stated conclusory allegations that the meetings or conversations between the two were for the purpose of maliciously prosecuting Plaintiff. Mere communications between an individual and a prosecutor, without more concrete allegations of wrongdoing, are insufficient to state a malicious prosecution conspiracy claim. Defendant McNally's continued contact with Defendant Smith after recusing himself from the prosecution, while not advised given the potential appearance of impropriety, does not necessarily indicate a conspiratorial agreement. Plaintiff's repeated conclusory allegations that these meetings were for the purpose of continuing the prosecution against Plaintiff do not give legitimacy to otherwise insufficient allegations. *See Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 325 (2d Cir. 2002) (quotation omitted) ("[C]omplaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct"). Accordingly, the Court finds that Plaintiff has failed to sufficiently allege that Defendant McNally agreed with Defendant Smith, either implicitly or explicitly, to maliciously prosecute Plaintiff. Defendant McNally's motion is granted in its entirety and he is terminated from this action.

# IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions, and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendant McInerney's motion to dismiss (Dkt. No. 12) is **GRANTED** in part and **DENIED** in part as stated herein;[5] and the Court further

**ORDERS** that Defendants John and Daniel Brown's motion to dismiss (Dkt. No. 40) is **GRANTED** in its entirety; and the Court further

**ORDERS** that Defendant O'Malley's motion to dismiss (Dkt. No. 50) is **GRANTED** in its entirety; and the Court further

**ORDERS** that Defendant Robillard's motion to dismiss (Dkt. No. 56) is **GRANTED** in its entirety; and the Court further

**ORDERS** that Defendant McNally's motion to dismiss (Dkt. No. 64) is **GRANTED** in its entirety; and the Court further

**ORDERS** that Plaintiff's fabrication of evidence claims are **DISMISSED** as against all Defendants on statute of limitations grounds; and the Court further

**ORDERS** that Defendants John and Daniel Brown, O'Malley, Robillard, and McNally are terminated from this action; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: September 30, 2016
      Albany, New York

_Mae A. D'Agostino_
Mae A. D'Agostino
U.S. District Judge

---

[5] Plaintiff's § 1983 conspiracy to commit malicious prosecution claim against Defendant McInerney survives the instant motion. Plaintiff's fabrication of evidence and *Monell* liability claims against Defendant McInerney are dismissed.

51