UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

───────────────────────────────

EDWARD G. McDONOUGH,

                              Plaintiff,

    -against-

YOUEL C. SMITH III, individually and as Special District
Attorney for The County of Rensselaer, New York, *aka*
TREY SMITH; KEVIN B. McGRATH;
WILLIAM A. McINERNEY; JOHN J. OGDEN; and
ANTHONY J. RENNA;

                            Defendants.

VERIFIED
AMENDED COMPLAINT
For Damages from
Violation of Rights
Under Color of Law
(Civil Rights Action)

Civil Action Number:
1:15-CV-1505 (MAD/DJS)

JURY DEMANDED

───────────────────────────────

## NATURE OF ACTION

Plaintiff Edward G. McDonough seeks to recover compensatory and punitive damages, reasonable attorney fees, and costs against the defendants for their actions to deprive him of his constitutional rights to due process, a fair trial, and freedom from unreasonable searches and seizures, all through the conspiratorial fabrication and use of false testimony to prosecute him for alleged acts he did not commit, apparently to protect political candidates and operatives for the voter fraud and absentee ballot document falsification and forgery they committed to win a minor party primary election and/or other arbitrary and capricious reasons. The action is predicated on Title 42, U.S. C. §§1983 and 1988, and the secured to him by the Fourth, Fifth, Sixth, and/or Fourteenth Amendments of the Constitution of the United States and the laws of the United States.

Plaintiff seeks to recover damages for the personal injuries, substantial attorney fees, and costs he suffered as a direct consequence of the violation of his rights. He also seeks punitive damages for defendants intentional, malicious, and unconscionable actions in fabricating false testimony to deprive him of his right to be free from unreasonable seizure, liberty interests, and right to a fair trial; as well as payment of reasonable attorney fees incurred in pursuing this action.

1

## PRELIMINARY STATEMENT

### Trey Smith Fabricated Statements in an Investigative Role that He Later Used in Grand Jury and Trial to Initiate and Continue a Wrongful Prosecution

1.      This action arises from a criminal prosecutor's investigative fabrication of false testimonial evidence to frame and scapegoat prosecute an election official for allegedly writing false voter information on applications for absentee ballots ("AAB"), which he did not do, in lieu of prosecuting identified Democrat candidates and operatives ("Dem C/O") who fraudulently obtained and completed, or simply forged, and then filed, AAB to obtain, forge, and file absentee ballots ("AB") in forged envelopes ("AB Env") to win said election ("AB forgery").

2.      Specifically, Special District Attorney Youel C. Smith ("Trey Smith") acted in conspiracy and complicity with candidate Kevin B. McGrath, operative William A. McInerney, operative Anthony J. Renna, state police investigator John J. Ogden, and others to wrongfully prosecute Rensselaer County Board of Elections ("BOE") Commissioner Edward G. McDonough on 74 felony charges for allegedly writing false reasons for absentee ballot voting ("Excuses") and names of agents to whom absentee ballots were to be released ("AB Agent") on AAB that known Dem C/O fraudulently falsified or totally forged and filed with the BOE in order to obtain and falsely vote AB to win the 2009 Troy City Council Working Families Party ("WFP") primary.

3.      The guilt of about seven (7) known Dem C/O, including McGrath, Brown, McInerney, Renna, and Anthony DeFiglio was provable from the substantial documentary and testimonial evidence obtained by a private investigator, Republican Board of Elections Commission, Trey Smith, and New York State Police ("NYSP"), and/or McDonough before Trey Smith took action to fabricate evidence and initiate the wrongful prosecution.

4.      Still, Trey Smith fabricated the false statements of Dem C/O who committed the AB forgery to frame McDonough, including the following chief culprits:

(a)       Kevin McGrath, brother of a New York State Supreme Court Justice, convicted drug felon, and candidate who initiated the AB forgery and whose conviction was a *fait accompli* but was given immunity by Trey Smith to provide a basis for McDonough's scapegoat prosecution by denying his own guilt, not incriminating the other Dem C/O who committed the AB forgery, and falsely alleging he saw McDonough write false Excuses on 2 of many AAB he had voters sign before he and/or others falsely completed and filed them to obtain, forge, and file their AB and, on another occasion, heard McDonough talk with candidate John Brown about names he assumed McDonough was going to write as false AB Agents on AAB, all of which was contrary to the irrefutable sworn statements, AAB, AB, and AB Env of voters which proved his guilt and the falsity of his patently incredible "cooperation."

(b)       John Brown, an ambitious, politically connected candidate who pushed McInerney into assisting him commit the AB forgery and whose conviction for those crimes and perjury was a *fait accompli* but was told by Trey Smith in 2009, 2010, and 2011 that he would not be prosecuted and never was meaningfully prosecuted or required to provide truthful cooperation that would have exonerated McDonough even after he was prosecuted in 2011 only because of McDonough's actions in defending his innocence which exposed the scapegoat prosecution and caused NYSP Senior Investigator Christopher O'Brien (Ret.) to conduct an investigation of the AB forgery without Trey Smith's knowledge ("NYSP independent investigation").

(c)       William McInerney, a prolific AB forgery operative, friend of sitting District Attorney Richard McNally ("DA" or "McNally"), and supporter of Brown who committed AB forgery in support of the DA's 2007 election won by AB, threatened to take everyone down if prosecuted, obtained the DA's legal advice, retained the attorney who represented the DA in his 2007 election, destroyed his cell phone on his attorney's advice, and whose conviction for

3

hundreds of AB forgery crimes committed in 2009, 2008, and 2007 was a *fait accompli* but was told by Trey Smith in 2009, 2010, and 2011, that he would not be prosecuted despite substantial known and readily obtainable evidence sufficient to convict him, and never was meaningfully prosecuted or required to provide truthful cooperation that would have exonerated McDonough even after he was prosecuted in 2011 only because of the NYSP independent investigation.

5.      If successful, the wrongful prosecution would have also covered-up a decades-long scheme of Dem C/O to defraud and forge the AB votes of public housing residents.

6.      The record facts related to Trey Smith's investigation and prosecution establish that he purposely fabricated testimonial evidence in an investigatory capacity to wrongfully frame and scapegoat prosecute McDonough for alleged criminal acts he did not do instead of prosecuting known Dem C/O which common sense and substantial evidence proved were guilty of the crimes.

7.      Trey Smith's misconduct was so egregious and inexplicable that it belies any claim of reasonableness, ignorance, or incompetence.

8.      Prior to election day, the AB forgery was discovered by a Republican operative who hired a private investigator to talk to WFP voters whose AB were filed by Dem C/O.

9.      The private investigator gathered numerous affidavits from WFP voters that directly implicated McGrath, Brown, and other Dem C/O in the AB forgery.

10.     The Republican operative publicly called for a federal investigation of the matter.

11.     McInerney then drove to the DA's home and, upon his advice, hired the attorney who represented him in his 2007 election won by AB, many of which McInerney forged.

12.     Days later, the DA had Trey Smith appointed special prosecutor to investigate the AB forgery because McGrath, Brown, and other Dem C/O were identified/described and directly implicated in the crimes by the voters through solicitation of their signatures on incomplete AAB.

4

13.     The voters' affidavits and forged AB documents were sufficient evidence to lead to the convictions of McGrath, Brown, McInerney, and all the other guilty Dem C/O.

14.     Trey Smith nonetheless directly targeted McDonough for wrongful prosecution even though he was not implicated in any criminal conduct by any voter, suspect, or document.

15.     Thereafter, Trey Smith ignored all evidence which proved the guilt of known Dem C/O, especially McGrath, McInerney, DeFiglio, and Brown, and adopted the preposterous theory that the Dem C/O who were all familiar with the AB process, defrauded voters and falsified (or simply forged) their AAB in order to obtain and forge their AB - but purposely did not enter false Excuses or AB Agent names on those AAB which they knew had to be fully completed to be filed so they could obtain and forge their AB - so McDonough could do so.

16.     Trey Smith then fabricated false statements against McDonough through investigative activities, tasks, and strategies, including interrogation, threats of prosecution, grants of immunity, and promises of non-prosecution in return for his incrimination and the non-disclosure of facts that would have exonerated him and incriminated the guilty Dem C/O.

17.     Soon after the AB forgery was discovered, DeFiglio came forward as a cooperating witness and gave detailed facts that directly incriminated McInerney and Brown in the AB forgery.

18.     Trey Smith interviewed DeFiglio several times and knew the evidence he gave was sufficient for the prosecution of McInerney and all the other guilty Dem C/O. However, Trey Smith recorded that information in personal notes instead of a witness deposition and ignored them.

19.     On the other hand, Trey Smith sought DeFiglio's incrimination of McDonough and ignored DeFiglio when he told him that his prosecution theory was wrong and nonsense.

20.     Trey Smith then simply misled supervisory NYSP with the blatant lie that McInerney and Brown could not be prosecuted because there was no evidence to corroborate

DeFiglio's accomplice testimony when, in fact, the known and readily available voter testimony and documents was more than legally sufficient corroboration for conviction under state law.

21.     At that time, Trey Smith told McInerney and Brown they would not be prosecuted.

22.     During his investigation, Trey Smith also gave agreements and promises of non-prosecution to Dem C/O and others without any legitimate law enforcement reason or benefit.

23.     On or about November 2009, Trey Smith played a "bad cop" role and threatened to "fuck" McDonough unless he told everything about his BOE "forgery factory," purportedly to scare him into incriminating McInerney.

24.     Then, Trey Smith fabricated the false statement of McGrath to provide a basis for McDonough's prosecution by giving him immunity for a patently false denial of guilt in direct contradiction of the irrefutable sworn statements and forged AB documents of numerous voters, blanket denial of knowledge about the AB forgery, and false incrimination of McDonough.

25.     Later, in the fall of 2010, McNally advised Dem C/O Robert Martiniano that he should not come forward to disclose his knowledge about the AB forgery to Trey Smith or the NYSP *because it will all be over soon.*" Of course, McInerney and Brown knew that they admitted to Martiniano while asking voters to sign incomplete AAB that they were going to use them to "trace forge" voter signatures on AB.

26.     Soon thereafter, Trey Smith publicly leaked that McDonough was the primary target of his investigation and began presenting a case against him before a Grand Jury.

27.     At that time, however, McDonough had not been implicated in AB forgery by any document, voter, or suspect; DeFiglio had told Trey Smith that McInerney, Brown, and operatives committed the AB forgery and that his purported theory against McDonough was nonsense; and the only purported evidence that Trey Smith could present against him was: (i) the alleged presence

of McDonough's DNA on 3 AB documents filed at the BOE where he assisted in the filing of AB documents; (ii) the patently false testimony of McGrath; which would not have been sufficient for indictment once McDonough testified about what occurred in his office on September 14, 2009, in contradiction to the patent perjury of McGrath and Brown.

28.     After it was publicly reported that McDonough's attorney gave Trey Smith notice of his intent to testify before the Grand Jury, Rensselaer County Democratic Chair Thomas Wade told McDonough that he should not do so while McNally and McInerney gave him the names of an another attorney to hire. Trey Smith then threatened to prosecute BOE Commissioner Lawrence Bugbee, openly treated with hostility BOE employees he knew had close relationships with McDonough and identified McDonough as the target of his investigation.

29.     In the process of purportedly gathering evidence, Trey Smith fabricated the false oral statements of Ogden and BOE employee Kevin O'Malley as needed to initiate the prosecution.

30.     Specifically, after McDonough gave notice of intent to testify before the Grand Jury, Trey Smith and Ogden devised and agreed that Ogden would give the patently false and improper purported opinion testimony that all the entries on all the questioned AAB appeared to be written by the same person when it was clear from those documents that not so - to provide a basis for indictment of McDonough with respect to all falsified or forged AAB in question when considered together with McGrath's false testimony consistent with his prior false statement.

31.     Trey Smith then fabricated BOE employee Kevin O'Malley's false testimony that McDonough "made him" write false AB Agent names on a number of the AAB that Brown filed on September 14, 2009, by threats of prosecution as a "kingpin", promise of non-prosecution, and a telephone conversation after O'Malley initially vaguely but truthfully testified before the Grand

Jury that he obtained the information from a candidate who got it from an operative (i.e. Brown and McInerney and/or WFP operative James Walsh).

32.     Trey Smith also notarized alleged forged signatures of 2 voters on their forgery affidavits he prepared for presentation before a Grand Jury.

33.     After indictment, Trey Smith fabricated the false statements of a private Forensic Document Examiner, McInerney, Brown, and Renna while acting in an investigatory to later use at trial to continue the wrongful prosecution.

34.     Then, acting in an investigative role, Trey Smith gave Alan T. Robillard, a private Forensic Document Examiner (labeled on the website of a Certified Handwriting Examiner as an "unethical professional liar for hire") all pertinent information about the indictment and a fee of about $100,000.00 for his clearly false report and opinion that all the false AB Agents and Excuses on questioned AAB were more likely than not written by McDonough.

35.     Trey Smith also directed Robillard to not do a simple ink analysis on about 13 AAB filed on September 10, 2009, and September 14, 2009, on which all entries appear to have been written in the same ink because such a finding would have exonerated McDonough and debunked the prosecution theory, i.e. it would have established that those AAB were falsely completed or forged by in the same ink by McInerney, Brown, and/or other Dem C/O before being filed and that the testimony of McGrath, Brown, Ogden, O'Malley, and McInerney to the contrary was false.

36.     Trey Smith fabricated the false statements of McGrath, Ogden, and O'Malley to obtain indictment and the false statements of Robillard, McInerney, Brown, Renna, and DeFiglio to continue the prosecution through false incrimination or failure to tell the truth that would have exonerated McDonough, incriminated the guilty Dem C/O and exposed the wrongful prosecution.

37.     Trey Smith fabricated the false testimonial evidence through the investigative tasks (i.e. actions related to information gathering processes) and investigative thinking (i.e. actions related to process of analyzing information and theorizing to develop investigative plans) of interviews, threats of prosecution, and agreements or promises of immunity or non-prosecution.

38.     Trey Smith prosecuted McDonough for allegedly merely writing false Excuses and AB Agent names on authenticated or ostensibly authenticated AAB which Dem C/O fraudulently had voters sign or totally forged without his knowledge.

39.     On the other hand, Trey Smith did not prosecute or ever seek to prosecute any Dem C/O for the forgery of AB votes he claimed at a press conference was a massive denial of the voters' most fundamental right - despite overwhelming evidence of their guilt.

40.     Even after the NYSP independent investigation caused him to prosecute McInerney, Brown, and Renna, Trey Smith took action to continue McDonough's wrongful prosecution by ensuring they did not disclose the truth that would have exonerated him and protecting them from any meaningful federal or state prosecution.

41.     Thereafter, Trey Smith interviewed and assisted McInerney, John Brown, and/or Renna in preparing statements without the knowledge or participation of police.

42.     Trey Smith also gave McInerney, John Brown, and Renna extraordinarily favorable plea bargains to falsely incriminate or not exonerate McDonough

43.     Trey Smith also engaged in the extraordinary judicial function of aiding Brown in misleading the appellate court with blatant material misrepresentations of fact and law in a frivolous appeal to reduce his agreed upon sentence after waiver of the right to appeal.

44.     Trey Smith quashed a federal investigation into the scapegoat prosecution and AB forgery that was being conducted without his prior knowledge based on McDonough's complaint of public corruption and falsely accused the investigating FBI agent of official misconduct.

45.     Trey Smith and Ogden caused a false complaint of misconduct to be made against Sr. Inv. O'Brien to impugn his credibility and keep him from testifying at the criminal trials about the scapegoat prosecution and nefarious conduct of Trey Smith, Ogden, and others.

46.     At all relevant times, Trey Smith acted in conspiracy or complicity with the co-defendants and others to fabricate evidence for use in the malicious prosecution of McDonough.

47.     At all times relevant, Trey Smith fabricated testimonial evidence in an investigative capacity that he later used it in the judicial criminal processes to initiate and continue the scapegoat prosecution of McDonough without probable cause based solely on fabricated evidence, with malice and intent to deprive him of his constitutional rights to freedom from unreasonable seizure, due process liberty interests, and a fair trial.

48.     At all times relevant, Trey Smith, the co-defendants, and others acted in conspiracy and/or complicity to frame and wrongfully prosecute McDonough without probable cause.

49.     Defendants' acts were also a criminal violation of McDonough's civil rights.

50.     The insidious wrongful prosecution ended on December 21, 2012, in the acquittal and dismissal of all 74 felony charges against McDonough following two protracted trials.

51.     Nonetheless, there is little doubt McDonough would have been wrongfully convicted but for his actions in defending his innocence that, among other things, caused: (a) the FBI's investigation into the prosecution without Trey Smith's prior knowledge until he stopped it; (b) the NYSP independent investigation into the AB forgery with resulted in the arrest of McInerney and imminent arrest of Brown and Renna without Trey Smith's prior knowledge, which

forced his feeble prosecution of them, his investigatory fabrication of their false written statements to continue the prosecution, and the discovery of evidence favorable to McDonough that otherwise would not have been disclosed because they would have invoked their Fifth Amendment rights.

## PROCEDURAL REQUIREMENTS

52.     Plaintiff is not required to exhaust any administrative procedures prior to suit under the United States Constitution and the Civil Rights Act of 1871.

## JURISDICTION AND VENUE

53.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§1331 and 1343 and Rules 18 and 20 of the Federal Rules of Civil Procedure to protect and remedy deprivation of rights secured by: (a)  The Fourth Amendment right to freedom from unreasonable searches and seizures; (b) The Fifth Amendment right not to be deprived of liberty or property interest without due process of law; (c) The Sixth Amendment right to a fair trial; (d) the Fourth Amendment Right to due process of law, both procedural and substantive, and (e) The Civil Rights Act of 1871, 42 U.S.C. §1983 and §1988 providing for the protection of all persons in their civil rights as well as compensatory damages, punitive damages, and other relief to redress the deprivation of protected federal constitutional and statutory rights under color of state law.

54.     The unlawful violations of plaintiff's federal constitutional and statutory civil rights complained of herein were committed within the Northern District and State of New York.

55.     Venue is proper in this District under 28 U.S.C. §1391(b)(2).

56.     Venue is appropriate in this district because the alleged violations occurred therein.

**Plaintiff**

57.     Plaintiff, Edward G. McDonough ("McDonough") is a citizen of the United States of America and a resident of the Town of Schaghticoke, County of Rensselaer, State of New York.

11

58.     At all times relevant, plaintiff McDonough was and is employed as the Democratic Commissioner of The Rensselaer County Board of Elections.

**Defendants**

59.     Defendant Youel C. Smith III, *aka* Trey Smith, is a citizen of the United States and a resident of the Town of North Greenbush, County of Rensselaer, State of New York.

60.     At all times relevant, defendant Smith was acting in his capacity as a Special District Attorney and acted as an agent, employee, and/or officer for the County of Rensselaer, New York. Plaintiff claims against him in his individual and official capacities.

61.     At all times relevant, defendant Trey Smith held himself out to be, and was, acting within the scope of his employment, office, or agency with Rensselaer County, New York.

62.     At all times relevant, defendant Trey Smith acted under color of state law, to wit: under the color and pretense of the statutes, ordinances, regulations, policies, customs, practice and/or usages of the State of New York and/or County of Rensselaer.

63.     Defendant Kevin B McGrath is a citizen of the United States and a resident of the City of Troy, County of Rensselaer, State of New York.

64.     At all times relevant, defendant McGrath was a private citizen acting in concert, complicity, and agreement with Trey Smith in his official capacity. Plaintiff claims against him in his individual and representative capacities.

65.     Defendant William A. McInerney is a citizen of the United States and at relevant times was a resident of the City of Troy, County of Rensselaer, State of New York.

66.     At all times relevant, defendant McInerney was a private citizen acting in concert, complicity, and agreement with Trey Smith in his official capacity. Plaintiff claims against him in his individual and representative capacities.

67.     Defendant John J. Ogden is a citizen of the United States and a resident of the County of Rensselaer, State of New York.

68.     At all times relevant, defendant Ogden was a private citizen acting in concert, complicity, and agreement with Trey Smith in his official capacity. Plaintiff claims against him in his individual and representative capacities.

69.     Defendant Anthony J. Renna is a citizen of the United States and a resident of this district, residing in the County of Rensselaer, State of New York.

70.     At all times relevant, defendant Renna was a private citizen acting in concert, complicity, and agreement with Trey Smith in his official capacity. Plaintiff claims against him in his individual and representative capacities.

**FACTS RELATED TO CONSPIRATORIAL
FABRICATION OF EVIDENCE AND MALICIOUS PROSECUTION CLAIMS**

71.     The following facts were or should have been known to Trey Smith before or during his investigation and prosecution of McDonough.

**I.          McGrath Initiated AB Forgery Before September 2009**

72.     In the summer of 2009, McGrath publicly bragged he about taking the WFP line for Democrats in City of Troy elections away from Republican operative Robert Mirch.

73.     In August 2009, McGrath and/or his assistants engaged in AB forgery with respect to several people Mirch enrolled in the WFP, including Marc Welch ("MWelch") and Jennifer Taylor (i.e. he/they had the voters sign incomplete AAB so he/they could complete them with false Excuses and AB Agents, file them, and obtain and falsely vote their AB).

Taylor AAB: McGrath Gave McDonough a False Excuse to Write on AAB

74.     However, on August 24, 2009, when McGrath brought the Taylor AAB to the BOE McDonough told him it could not be filed because it did not have an Excuse on it.

75.     In response, McGrath told McDonough the Excuse he said Taylor gave him and McDonough wrote it on the AAB pursuant to lawful BOE practice.

76.     McDonough did not know that the Excuse was inaccurate or false.

**II.          Brown, McInerney, DeFiglio, and Others Joined in AB Forgery**

77.     In late August or early September 2009, Brown enlisted McInerney to help him commit AB forgery to win the WFP primary.

78. In turn, McInerney got DeFiglio and Renna to assist in the AB forgery.

A.     Solicitation of Signed AAB Before September 10, 2009: McInerney and DeFiglio

79.     On one or more occasions before September 10, 2009, McInerney and DeFiglio engaged in the AB forgery of public housing resident WFP members.

80.     McInerney, Brown, and/or another Dem C/O falsely completed or totally forged and filed all those AAB that they had voters sign, including about 13 AAB for voters filed at the BOE by Brown or Dan Brown on September 10, 2009.

81.     McInerney, Brown, Dan Brown, and/or another Dem C/O obtained, forged, and/or filed the AB released on those AAB, including the 13 filed on September 12, 2009 that were released on the AAB filed on September 10, 2009.

82.     McGrath, Brown, Dan Brown, McInerney, DeFiglio, Renna, and/or another Dem C/O committed the AB forgery in conspiracy.

B.     Solicitation of Signed AAB by Dem C/O: September 12, 2009

83.     On September 12, 2009, McInerney, McGrath, Brown, Dan Brown, LoPorto, Martiniano, Galuski, Clement Campana, DeFiglio, and Thomas Aldrich solicited public housing resident WFP members to sign without completing an AAB or discussing an Excuse or AB Agent

84.     Brown or another Dem C/O took custody of all AAB (about 35) signed that day.

85.     Thereafter, McInerney, Brown, and/or another Dem C/O falsely completed or totally forged, and filed those AAB, and obtained the AB released on them.

86.     McInerney, Brown, and/or another Dem C/O then forged and filed those AB.

C.      Brown and McInerney Admitted the AB Forgery to Martiniano

87.     On September 12, 2009, while soliciting signatures on AAB, Brown admitted to Martiniano that he was going to use the signed AAB to forge signatures on AB Env. After voting the AB and McInerney told him not to worry about it because all the AAB were going to him.

D.      Dem C/O Were Aware of AB Process and Lawful BOE Practice

88.     McGrath, Brown, McInerney, Renna, DeFiglio, and O'Malley knew about the AB process and BOE practices.

89.     In particular, they all knew that: (i) an AB could not be obtained by a voter or his/her agent unless an AAB was filed, (ii) an AAB could not be filed unless the voter or his/her agent signed and completed all required information, including an Excuse, (iii) an AB could not be released to a anyone but a voter, AB Agent named on his/her AAB or person designated by either one, (iv) a voter or his/her agent could complete an AAB, (v) once a signed and completed AAB is filed, an AB and AB Env is mailed to the voter unless released to an AB Agent named on the AAB or someone designated by the voter or that named AB Agent.

90.     Thus, the Dem C/O engaged in AB forgery knew they could not get AB to falsely vote unless they totally forged or falsely completed a signed AAB with an Excuse and AB Agent.

91.     Also, it was and is lawful BOE practice to assist voters and their agents, including political operatives, to properly complete and file AAB, and to release AB to any person designated by the voter on an AAB as his/her AB Agent or any person designated by either one of them.

92.     As discussed below, DeFiglio admitted to Trey Smith and Ogden in October or November 2009 that the 2009 AB forgery was committed principally by McInerney and Brown and that Dem C/O had engaged in the same AB forgery scheme to defraud public housing voters for at least the prior 25 years, decades before McDonough was a BOE Commissioner. For example, when DeFiglio was assisting McInerney, if a voter had moved or did not answer the door, McInerney said "*that one's ours*", and forged AB documents for that voter.

E.     McGrath and McInerney Told McDonough They Were Soliciting WFP AB Votes

93.     On or about early September 2009, McInerney mentioned to McDonough that Dem C/O were going to solicit AB votes for the WFP primary.

94.     However, McGrath, McInerney, Brown, and all the other Dem C/O involved in the subject AAB solicitation and/or AB forgery knew that McDonough was not told about or involved in their activities or AB forgery and should not have been targeted for prosecution by Trey Smith.

95.     Also, immediately after his appointment, Trey Smith knew that McDonough was not involved with any of the Dem C/O in the solicitation of AAB.

96.     Later, during the wrongful prosecution, Trey Smith and Ogden admitted that they had no reason to suspect McDonough was involved in the AB forgery until March 2010 when McGrath, for immunity, accused him of writing false Excuses on 2 of the many AAB he filed in the WFP, Democrat, and Independent Party primaries.

**III.     Events of September 14, 2009 in BOE and McDonough's Office:**
**Brown Filed About 30 Falsified / Forged AAB**
**Brown Gave McDonough / O'Malley False AB Agents / Excuses (13 AAB)**
**McGrath Witnessed Brown Give O'Malley False Excuses**

97.     On September 14, 2009, Brown took about 35 AAB that the Dem C/O had voters sign on or before September 12, 2009, to McInerney to be photocopied and used to forge AB Env.

98. Later that day, Brown retrieved the obtained those AAB from McInerney and brought them to the BOE for filing.

99. Upon information and belief, McInerney, Brown, and/or Dan Brown purposely did not falsely complete 13 of those AAB in effort to have a BOE employee assisting in the filing unwittingly writing false Excuses and AB Agents names they gave them onto those AAB.

100. At trial, Brown vaguely admitted that he noticed "some" of those AAB were complete before he brought them to the BOE.

101. At trial, Brown admitted that he did not ask to speak with McDonough about those AAB and had no specific intent to do so when he went to the BOE to file them.

102. At trial, Brown admitted that he intended to take the AB released on those AAB to McInerney so he could forge them.

103. In accordance with BOE practice, McDonough reviewed the AAB to ensure that they could be filed and found that all but 13 were completed and signed.

104. McDonough set aside 5 AAB that did not name an AB Agent and told Brown that the AB for them would be mailed to those voters and could not be released to him.

105. In response, Brown asked McDonough to write his name as AB Agent on them so the AB could be released to him, but McDonough refused and reiterated that only an AB Agent name provided by the voters could be entered on any AAB.

106. Brown then used his cell phone and told McDonough that he obtained the AB Agent names that the voters gave to others for those AAB.

107. However, Brown did not obtain that information from the voters.

108. At trial, Brown admitted he called McInerney, and then, WFP Chair James Welch ("JWelch") and WFP Co-Chair Brandt Caird and got their permission to name them as AB Agent.

109.    However, at trial, Brown did not admit that he gave those Excuses or AB Names to McDonough and O'Malley or the truth that would have proved the perjury of McGrath and O'Malley, proved the conspiratorial scapegoat prosecution and exonerated McDonough.  Instead, he committed more perjury to continue the scapegoat prosecution as discussed below.

110.    Regardless, McDonough did not know that those voters never gave anyone an Excuse or AB Agent name or that Brown did not obtain them from the voters or their agents.

111.    Brown then gave McDonough the names he said the voters gave as AB Agents.

112.    In accord with lawful practice, McDonough wrote those names onto those AAB.

113.    McDonough also told Brown that 8 AAB did not state an Excuse and they could not be filed unless Excuses the voters gave were obtained and entered on them.

114.    McGrath then came into the room and asked McDonough for assistance.

115.    So, McDonough called O'Malley into the office and asked him to help Brown by writing the Excuse any voter gave onto their respective AAB if he obtained it.

116.    Brown made telephone calls and told O'Malley the Excuses he said voters gave.

117.    In accord with lawful practice, O'Malley then wrote those Excuses onto those eight (8) AAB while sitting across the desk from Brown.

118.    McDonough, McGrath, Brown, and O'Malley were in the small office at that time.

119.    Upon information and belief, O'Malley did not know that those voters never gave anyone an Excuse or that Brown did not obtain them from the voters or their agent.

120.    Upon information and belief, Brown, McInerney, and/or other Dem C/O forged or falsely completed all the other AAB Brown brought to the BOE that day.

121.    While at the BOE that day, Brown also separately filed an AAB for David Daniels in the WFP primary as well as AABs for Kathleen DeFabio, James Petit and Charles Tangredi in the Independent and Democratic Party primaries.

122.    As discussed below, Brown totally forged those 4 AAB and AB released on them.

A.    Brown Asked McDonough to Take AB Released on AAB to McInerney and McInerney and/or Others Forged Them and AB Env

123.    While filing the AAB that day, Brown told McDonough that McInerney was returning all the AB released on them to the voters and asked if he would give them to McInerney in his office at Troy City Hall a few blocks away when released because he had to leave.

124.    Because McInerney told him about the Dem C/O effort to obtain AB votes and Brown was acting as AB agent, McDonough agreed and did so during his routine lunch break walk. O'Malley went with him and witnessed McDonough leave the AB with McInerney.

125.    All those AB were later forged by McInerney and filed at the BOE by WFP operative Sara Couch at the request of Dem C/O Michael LoPorto.

B.    McInerney Staged Return of AB, Renna Aided Brown in AB Forgery, and LoPorto Asked Couch to Take the Forged AB to the BOE

126.    On September 14, 2009, McInerney met Campana, LoPorto, Brown, and Renna gathered to purportedly return AB to the voters who signed AAB on September 12, 2009.

127.    At the time, Renna gave Brown a few AB and stopped him from voting them while standing on the street.

128.    A short time later McInerney announced that they were "done."

129.    At trial, McInerney admitted that he forged all those AB documents.

130.    At trial, McInerney said he refused to file those forged AB and demanded one of the candidates do it because he did not want to do the WFP AB forgery and did not trust the WFP.

131.   In his written deposition dated September 16, 2011, McInerney stated that on September 15, 2009 LoPorto called several times and asked if the AB *"were done yet"* and after he forged them he gave them to LoPorto at City Hall in a manila envelope.

132.   On September 15, 2009, LoPorto then gave those forged AB to Couch inside a folded newspaper and asked her to file them with the BOE.

133.   On September 15, 2009, Couch filed those forged AB at the BOE.

134.   At trial, McInerney admitted that McDonough was not involved in the solicitation of AAB or AB forgery or aware of his criminal activities.

IV.   **Private Investigation Obtained Evidence Sufficient to Convict McGrath and DeFiglio and Lead to Evidence Sufficient to Convict Other Dem C/O**

A.   <u>Mirch Discovered McGrath's AB Forgery and Requested Federal Investigation</u>

135.   On or about September 14, 2009, BOE Commissioner Bugbee told Mirch that AAB and AB were filed for some voters he had enrolled in the WFP and/or McGrath told Mirch that he got a number of AB votes from WFP members he had enrolled in the party.

136.   On or about September 15, 2009, Mirch talked to a few WFP members he had enrolled, including Taylor and Dickenson, and discovered they had signed AAB for McGrath which were falsely completed and that their AB were also forged.

137.   On or after September 15, 2009, Mirch obtained the BOE Absentee Voter Master List Summary which identified the AB Agents on the WFP filed AAB.

138.   Trey Smith later obtained that public record. It is incorporated herein by reference.

139.   Mirch then hired private investigators to obtain statements from those WFP voters.

140.   Investigators obtained affidavits from about 35 WFP voters who stated that their AAB were falsely completed or totally forged and their AB were forged. The same are incorporated herein by reference.

B.      Voters Named McGrath and DeFiglio, and Described Brown, McInerney, Others

141.    Those voters named McGrath and/or DeFiglio and/or described McInerney, Brown,

Dan Brown, and//or other Dem C/O as having them sign AAB on September 12, 2009.

142.    Therefore, the voters' AB documents and testimony was irrefutable direct and/or

circumstantial evidence of the guilt of McGrath and DeFiglio as well as other identifiable Dem

C/o, including McInerney and Brown in the AB forgery.

143.    It is likely that some voters would have been able to identify McInerney, Brown,

Dan Brown, and/or others if shown photographs that accurately depicted them.

C.      Dem C/O and WFP Operatives Named as AB Agents on Falsified/Forged AAB

144.    Furthermore, the relevant BOE records showed that the following Dem C/O and

WFP operatives were named AB Agents on the stated number of falsified/forged AAB:

| | | |
|---|---|---|
| McInerney:  1 (Suozzo) | DeFiglio: 6 | Brown: 1 (Daniels) |
| JWelch: 7 | Caird: 8 | Aldrich: 19 |
| McGrath: 2 (Taylor and Dickenson) | Rick Mason (McGrath friend and helper): 2 | |
| M. Leonard (McGrath relative): 2 | | |

D.      Evidence Sufficient to Convict McGrath, DeFiglio, and Other Dem C/O

145.    Therefore, the testimonial and documentary evidence a private investigator

obtained by September 2009 was sufficient to prove that: (a) The named and identifiable Dem C/O

who had voters sign an AAB, but not complete it were directly or circumstantially incriminated in

the crimes; (b) voters were not asked if they had a valid reason to vote by AB or wanted an AB

Agent to obtain and deliver their AB; (c) False Excuses and/or AB Agent names were later written

on the AAB; (d) The AAB were filed at the BOE by known Dem C/O; (e) Some AAB were totally

forged; (f) The AB released on the falsified/forged AAB were obtained and later filed by known

Dem C/O; (g) All those AB were forged; (h) The object crime was the false voting of AB; (i) The

defrauding of voters, falsification and forgery of AAB, forgery of AB Env and filing of false

documents were crimes ancillary to the false voting of AB; (j) The forged AB documents were direct and likely forensic evidence; and, (j) The Dem C/O who had voters sign AAB and/or were named as AB Agent on falsified/forged AAB were implicated in the crimes or material witnesses.

146.    In short, that evidence was sufficient to prove that the AB forgery was committed by known and/or identifiable Dem C/O involved in voter fraud and AAB falsification/forgery.

147.    That evidence proved and common sense dictated the AB forgery was committed by those who directly benefited from it, i.e. known and identifiable Dem C/O.

148.    That evidence proved and common sense dictated that the AB forgery was committed by those known and identifiable Dem C/O acting in conspiracy.

149.    That evidence proved and common sense dictated that anyone who had voters sign AAB, who was named as AB Agent on AAB, and/ or who filed AB document(s) committed the AB forgery or were material witnesses, i.e. the Dem C/O and WFP operatives.

150.    In particular, the affidavits of MWelch and Taylor established that McGrath knew on September 15, 2009 that Mirch brought them to the polls after he had them sign AAB before it was falsely completed, and their AB was obtained by him or Mason and forged.

151.    Also, numerous voters identified DeFiglio by name as having had them sign AAB before it was falsely completed, and their AB forged.

152.    Therefore, the record facts establish that the direct evidence known by September 2009 was sufficient to convict McGrath and DeFiglio of committing the AB forgery with others.

153.    As discussed, the record facts also establish that if that evidence was followed by rudimentary investigation it would have led to discovery of more evidence sufficient to convict all the other Dem C/O who committed the AB forgery, including Brown, McInerney, and Renna.

154.    Also, the falsification or total forgery of AAB was essential to the AB forgery.

**V.**        ***Lambertsen* Action Commenced to Invalidate Forged AB, and
Brown Prepared Press Release for WFP to Accuse Mirch of Lying**

155.    On September 23, 2009, Christian Lambertsen commenced action to invalidate AB
filed by Dem C/O in the WFP based on the affidavits of 16 voters and Mirch as well as the BOE
Absentee Voter Master List Summary.

156.    Those papers showed only that: 44 AB were released to McGrath, Brown, Mason,
Aldrich, DeFiglio, JWelch, Caird and McInerney; at least 35 AB were falsely voted; and, at least
35 AAB were falsely completed after being signed by the voter.

157.    Welch, Caird, and Couch agreed to meet Brown at LoPorto's business the next day.

158.    McDonough agreed to meet Brown at LoPorto's that day because he was a party in
the *Lambertsen* action and upset about the AB forgery.

159.    At the meeting, Brown asked the WFP members to issue a Press Release that he
and his brother prepared to publicly accuse Mirch of making false allegations of voter fraud.

160.    Couch refused Brown's request and questioned him about the AB forgery.

161.    At that time, Brown told Couch that no crimes were committed, "*they were there*"
and "*it isn't as bad as it looks*" but he appeared to the others to be acting nervous and "guilty."

162.    At that time, Brown did not accuse McDonough of writing false data on any AAB.

163.    McDonough did not know why Brown asked to meet with him, did not know
anyone else would be present, did not know who forged the AB documents, but was upset about
the filing of false AB so he asked if anyone was recording the discussion, expressed anger at Brown
and WFP about the false use of their names as AB Agents, and asked what they were going to do
when confronted with prosecution and perhaps jail.

164.    At trial, Brown admitted those facts and that he asked McDonough to be there only
to explain the AB process, if needed.

165.    At trial, Brown admitted that he never talked to McDonough about the AB forgery he and other Dem C/O committed any time before, during, or after the meeting.

**VI.        McDonough Not Implicated in the AB Forgery**

166.    McDonough was not involved in the AB forgery or implicated in it by any voter, suspect, or AB document at any time in 2009.

**VII.       McInerney Got Patronage Job After Forging AB Documents for Democrats Including McNally in 2007 Election Won by AB, Threatened to Take Everyone Down if Prosecuted, Got Advice from McNally, Retained McNally's Attorney and Destroyed His Cell Phone**

167.    In 2007, McInerney started working for Democrat campaigns in Rensselaer County after being fired from employment with the state legislature for telling a female co-worker she was promoted because she gave their male boss oral sex and a gay male co-worker witness that he was upset because he was not given the same opportunity.

168.    That same year, McInerney forged hundreds of AB documents to help Democrats win election, including McNally, Brown, and other candidates for Troy City Council.

169.    McInerney and McNally became friends through the 2007 election process.

170.    McInerney, Renna, and DeFiglio were close associates in political operations.

171.    In January 2008, McInerney was appointed Troy City Clerk by Chair Wade in reward for his instrumental role he played in getting them and McNally elected in 2007.

172.    Thereafter, McInerney committed AB forgery for Democrat candidates in 2008 elections and the subject 2009 WFP primary, with the help of DeFiglio and Renna.

173.    Upon information and belief, McInerney told candidates that he committed AB forgery for them for self-interested reasons.

174.    On or about September 2009, McInerney warned Dem C/O that he would "*take everyone down*" with him if prosecuted for the AB forgery.

175.    At trial McInerney testified that soon after the AB forgery was discovered he drove about 20 miles to McNally's home only to ask what attorney he should hire because he did not want to talk on the telephone and that they did not talk about anything else.

176.    At trial, McInerney admitted that upon McNally's advice he retained the attorney who represented him in his 2007 election won by AB, many of which McInerney forged.

177.    McInerney admitted that he also threw his cell phone away based on legal advice. McInerney's relevant trial testimony is incorporated herein by reference.

**VIII.        Mirch Calls for Federal Investigation and Takes Evidence to U.S. Attorney**

178.    On September 28, 2009, Mirch held a press conference, called for a federal investigation of the AB forgery, and announced he was taking evidence to the U.S. Attorney.

**IX.          McDonough Picked to Take Political Fall for AB Forgery**

179.    Upon information and belief, on or before September 28, 2009, some Dem C/O picked McDonough to "take the fall" and be scapegoat prosecuted for the AB forgery.

**X.           McNally Disqualified His Office and Had Trey Smith Appointed**

180.    On September 28, 2009, McNally disqualified his office and had Trey Smith appointed to investigate and prosecute the AB forgery.

181.    On September 28, 2009, the County Court executed an order stating that *McNally* "*disqualified himself and his staff*" from the matter "*based on the speculation of politics and the appearance of impropriety ...*" That Order is incorporated herein by reference.

182.    McNally asserted in a July 7, 2011 affidavit that he was disqualified because: McInerney had worked on his 2007 campaign; *DeFiglio* had done campaign work with McInerney in the past; he had contact with *James Welch* during his 2007 campaign; and, he believed that

Caird worked on his 2007 campaign but was not sure. McNally's July 7, 2011 affidavit is incorporated herein by reference.

183.    However, at that time, McNally should not have had any knowledge about the AB forgery and voters named only McGrath and DeFiglio as being involved in the AAB solicitation.

**XI.        Trey Smith Targeted McDonough for Prosecution and
            Word Spread to Dem C/O Not to Talk Because *It Will All Be Over Soon***

184.    Almost immediately after his appointment on September 28, 2009, Trey Smith targeted McDonough for prosecution in lieu of the Dem C/O who committed the AB forgery.

185.    On or about September 28 - October 14, 2009, Trey Smith contacted the U.S. Attorney's Office and determined there would be no federal investigation or prosecution of the AB forgery.  See, copy of letters Trey Smith sent to the U.S. Attorney and FBI on April 27, 2011 and April 28, 2011, after he learned about the FBI investigation, attached as Exhibit A.

186.    Then, from on or about October 1, 2009, until July 2011, Chair Wade, McNally, Brown, McInerney, Renna, and others told the Dem C/O implicated in the AB forgery that they should not talk to the authorities or worry about the matter because "*it will all be over soon.*"

187.    At trial, McInerney and Brown admitted that Trey Smith told them in 2009, 2010, and 2011 that they would not be prosecuted for the AB forgery.

188.    On or about late October - early November 2009, Trey Smith leaked to the press and others that McDonough was a primary target and his prosecution imminent even though there was no factual basis to suspect he was involved in the AB forgery.

**XII.       Hearing Evidence was Sufficient to Lead to Conviction of Brown, McInerney
            and All Other Guilty Dem C/O**

189.    On October 1, 2009, the state court held a hearing in the *Lambertsen* case.

190.    Trey Smith attended the hearing and took possession of all the falsified/forged AB documents produced or introduced into evidence.

191.    Once again, the testimonial and documentary evidence implicated McGrath and DeFiglio by name and identifiable Dem C/O by description in the AB forgery.

192.    The only reasonable view of the evidence was that the AB forgery was committed by the Dem C/O who solicited AAB, i.e. they needed to have voters sign AAB so they could falsify them and obtain their AB to vote regardless of whether they were eligible to vote by AB and use their signatures to "trace" forge them on AB Env.

A.    Brown Committed Perjury re Daniels AB Documents That He Forged

193.    No Democrat candidate except Brown testified at the hearing.

194.    In part, Brown testified that WFP member "David Daniels" was a friend who completed or gave him permission to complete his AB documents.

195.    However, they were not friends and Brown forged all of Daniels' AB documents.

196.    Brown also forged all the AB documents he filed for DeFabio, Petit and Tangredi in the Independence Party and Democratic Party 2009 primaries at the same time on September 14, 2009 that he filed the forged Daniels AAB. Those AAB are incorporated by reference.

197.    Trey Smith took possession of the forged Daniels AB documents and knew Brown was a suspect and/or material witness.

198.    It was a matter of public record that Brown was also involved in those Democratic and Independence Party primaries.

199.    The testimony and forged AB documents of Daniels, DeFabio, Petit, and Tangredi alone would have been sufficient to convict Brown of the AB forgery and similar crimes if the evidence were followed by rudimentary investigation.

B.    Suozzo Testified About His AB Documents That McInerney Forged

200.    Brian Suozzo testified at the hearing that all his AB documents were forged.

201.    Suozzo lived a few houses away from McInerney and knew him personally.

202.    McInerney enrolled Suozzo in the WFP in 2007.

203.    McInerney was named as the AB Agent on Suozzo's forged AAB.

204.    Suozzo had no contact with any other Dem C/O about AB voting.

205.    McInerney had also forged AAB and AB for Suozzo and many other voters in 2007, 2008, and 2009 elections in his distinctly unique and recognizable handwriting.

206.    Trey Smith took possession of the Suozzo forged AB documents.

207.    Trey Smith knew that Suozzo was a material witness.

208.    Trey Smith then or soon thereafter knew that McInerney was closely associated with Brown, DeFiglio, Renna and other candidates for whom he was active in obtaining AB votes in the subject WFP primary and prior elections, including McNally and Brown.

209.    Trey Smith knew that McInerney's physical appearance matched the description some voters gave of one of the people who had them execute AAB.

210.    Trey Smith had access to all the AB documents filed in all the 2009, 2008, and 2007 primary and general elections in Troy and Rensselaer County.

211.    Suozzo's testimony and forged 2008 and 2007 AB documents alone would have been sufficient to convict McInerney of the AB forgery and similar crimes.

C.    Mason Testified re AAB that McGrath had Dickenson and Taylor Sign

212.    Mason testified that he saw voters Dickenson and Taylor sign AAB for McGrath.

213.    Those voters swore that their AAB were falsely completed and AB forged.

D.    Trey Smith Gave McNally Custody of the AB Documents, Talked to McNally About AB Forgery, and Had NYSP DNA Reports Sent to McNally

214.    Trey Smith talked with McNally about the AB forgery during his investigation.

215.    At or about the time of the *Lambertsen* hearing, Trey Smith took possession of the AB documents and put them into the custody of McNally's office.

216.    On or about January 11, 2010, May 19, 2010, and November 2, 2010, the NYSP laboratory sent McNally its DNA reports regarding AB documents at the request of Trey Smith.

217.    Upon information and belief, Trey Smith did those things for McNally to review and discuss that evidence with him and/or McInerney to further the scapegoat prosecution.

**XIII.        McGrath Publicly Asserts Innocence in Contradiction of Voters**

218.    On October 2, 2009, McGrath publicly declared he was innocent of the AB forgery.

*219.*    Specifically, the Times Union reported that: *"[McGrath] disputed the accounts of Taylor and Dickenson that they never filled out [their AB]. He ... retrieved the [AB] ... returnable to Mason ... but ... said there was nothing improper. 'I took those [AAB] to the [BOE], and I did receive the [AB], and with certainty I brought them back to those two individuals and they did absolutely sign those. I am a good guy. I did nothing wrong here ... '."*

220.    However, irrefutable sworn statements and AB documents of numerous voters directly incriminated McGrath in the AB forgery - contrary to his public proclamations.

221.    Notably, McGrath did not then allege that any of the many AAB he filed was falsely completed at the BOE, that he saw McDonough write false Excuses on the Taylor and Dickenson AAB, or that he heard McDonough and Brown talk about names to use as AB Agents on AAB.

222.    Instead, like McInerney, Brown, Dan Brown, and others involved in the crimes, he got an attorney and refused to talk to the NYSP without immunity, which he soon received.

**XIV.        Trey Smith Told McInerney and Brown They Would Not Be Prosecuted, and They Were Not Concerned about Being Prosecuted until McInerney Arrested at Direction of Sr. Inv. O'Brien in 2011 without Trey Smith's Prior Knowledge**

223.    At trial, McInerney admitted that he forged hundreds of AB documents in 2007, 2008, and 2009 in his normal handwriting which is distinct and identifiable.

224.    At all relevant times, McInerney also knew: (a) Trey Smith was investigating the matter with NYSP assistance; (b) he forged hundreds of AB in 2007, 2008, and 2009, in his normal handwriting that was distinct and identifiable; (c) Suozzo and many other witnesses and forged documents could be obtained through rudimentary investigation to convict him; (d) the testimony and forged AB documents of Suozzo alone would convict him; (e) DeFiglio committed AB forgery in conspiracy with him, agreed to cooperate in October 2009, and disclosed detailed facts to Trey Smith that could convict him; (f) McGrath was given immunity to cooperate, had knowledge of facts that could convict him, and allegedly disclosed information to Trey Smith in March 2010; (g) McDonough, O'Malley, and Brown knew that on September 14, 2009 he was given numerous AB for voters that he forged; (h) DeFiglio, Brown, McGrath, Dan Brown, LoPorto, Campana, Galuski, Renna, and others had knowledge of facts that could convict him; (i) Martiniano had knowledge of facts and admissions that could convict him; (j) Martiniano came forward in February 2011 and could testify about his and Brown's admissions; (k) he and Brown had Renna tamper with DeFiglio to keep him from cooperating further with Trey Smith; and, (l) the matter was widely-reported and witnesses might come forward.

225.    Still, McInerney returned to his usual activities without concern of being prosecuted for that hundreds of AB forgery crimes he committed in 2007, 2008 and 2009.

226.    Again, at trial, McInerney admitted Trey Smith told him in 2009, 2010, and 2011, that he would not be prosecuted.

227.    At trial, McInerney admitted that he had no concern about being prosecuted for any AB forgery until unexpectedly arrested in July 2011 by NYSP without Trey Smith's knowledge. McInerney's relevant testimony is incorporated herein by reference.

228.    Nonetheless, McInerney asked McDonough several times in 2009 not to tell the authorities that he gave him the AB released on the AAB that Brown filed on September 12, 2009.

229.    Upon information and belief, McInerney did so to set-up McDonough for scapegoat prosecution in furtherance of the alleged conspiracy.

230.    At trial, Brown admitted that he committed the AB forgery as well as perjury about it in the court hearing with Trey Smith present.

231.    At all relevant times, Brown also knew: (a) Trey Smith was investigating the matter with NYSP assistance; (b) he forged numerous AB documents in his normal handwriting; (c) the testimony and AB documents of Daniels, DeFabio, Petit, and Tangredi alone would convict him; (d) Daniels and other witnesses and forged documents could easily be obtained through rudimentary investigation to convict him; (e) DeFiglio committed AB forgery with McInerney for him, agreed to cooperate in October 2009, and had knowledge of facts that could convict him; (g) McGrath was given immunity to cooperate, had knowledge of facts that could convict him, and allegedly disclosed information to Trey Smith on or before March 2010; (h) McDonough, O'Malley, and McGrath knew he filed numerous AAB on September 14, 2009 and gave AB Agent names and Excuses to McDonough and O'Malley to write on AAB he filed for release of AB that he asked McDonough to bring to McInerney which were later filed on September 15, 2009 by Couch at the request of LoPorto (all of which of which were falsified or forged); (i) DeFiglio, McGrath, McInerney, O'Malley, LoPorto, Campana, Galuski, Renna, and others had knowledge of facts that could convict him t; (j) Martiniano had knowledge of facts and admissions that could

convict him; (k) Martiniano came forward in February 2011 and could testify about his and McInerney's admissions; (l) his family allegedly set a job up for DeFiglio in Vermont and he and McInerney had Renna tamper with DeFiglio to keep him cooperating with Trey Smith; and, (m) the matter was widely-reported and witnesses might come forward.

232.    Still, Brown returned to his usual activities in 2009 without any concern of being prosecuted for his readily provable crimes.

233.    Again, at trial Brown admitted that Trey Smith told him in 2009, 2010, and 2011 that he would not be prosecuted.

234.    At trial, Brown admitted he had no concern about being prosecuted for any AB forgery or perjury until McInerney was arrested and evidence of his forgery of the Daniels, DeFabio, Petit, and Tangredi AB documents was obtained by the NYSP independent investigation. Brown's relevant testimony is incorporated by reference.

## XV.    Trey Smith Directed and Participated in Investigation and Fabricated Statements and Related Testimony to Wrongfully Prosecute McDonough

235.    As stated, Trey Smith was appointed to investigate and prosecute the AB forgery.

236.    On or about October 14, 2009, the NYSP assigned Ogden and other investigators to assist Trey Smith in his investigation.

237.    Still, Trey Smith directed and participated in the investigative gathering and analysis of evidence all times after his appointment throughout all stages of the prosecution, including the interrogation of suspects, material witnesses, and purportedly cooperating Dem C/O.

238.    In his investigative capacity Trey Smith fabricated the false statements and testimony of purported cooperating Dem C/O and other witness to prosecute McDonough and suppress evidence that would have exculpated him and/or incriminated the Dem C/O.

239.    In his investigative capacity, Trey Smith also directed and advised the NYSP laboratory in its use of a "new" method to extract DNA from sealed AB Env after its attempts to obtain McDonough's DNA from numerous AB documents were unsuccessful.

240.    Trey Smith and/or Ogden attended the NYSP laboratory when his proposed DNA extraction method was used and McDonough's DNA was allegedly found on 3 AB Env, 2 of which he never touched. The relevant emails, letters, reports, and a photograph of Trey Smith wearing anti-contamination garb are incorporated herein by reference.

241.    At trial, Ogden admitted that Trey Smith directed and participated in the investigation throughout the case. His relevant testimony is incorporated herein by reference.

242.    Trey Smith admitted during argument on a motion for handwriting exemplars that NYSP Investigators Ogden and Fancher had been "*working on [the] case with [him] for two years*", "*every step of the way*" and that he considered them "*to basically be one entity working together.*" That portion of the transcript of that application is incorporated herein by reference.

243.    On August 3, 2011, after learning that the FBI and supervisory NYSP were conducting investigations into the scapegoat prosecution and AB forgery without his knowledge, Trey Smith admitted his investigatory role by stating in a memo sent to Ogden and Fancher at 5:06 a.m. that: "*None of this has anything to do with the integrity of our investigation of McDonough.*"

244.    More significantly, upon information and belief, Sr. Inv. O'Brien will testify that Trey Smith, among other things: (a) directed and participated in the investigation, interrogation of purported cooperating Dem C/O and witnesses, and the gathering and analyzing of evidence; (b) told the supervisory NYSP in 2009, 2010, and 2011 the blatant lie that McInerney and Brown could not be prosecuted because the evidence was not sufficient to corroborate accomplice testimony; (c) did not have prior knowledge of the NYSP independent investigation that led to the

discovery of substantial evidence to convict McInerney, Brown and Renna; (d) did not have prior knowledge of the arrest of McInerney or imminent arrest of Brown and Renna; (e) interviewed guilty Dem C/O alone after misleading the NYSP or FBI about the same, including McInerney, Brown, and DeFiglio; (f) aided McInerney in preparing deposition he gave as part of his purported "cooperation" without the presence of the police or FBI, contrary to law enforcement practice and NYSP policy; (g) took action to prevent McInerney, Brown, and others from being prosecuted or meaningfully so; (h) essentially quashed a federal investigation into the AB forgery, prior election crimes, and scapegoat prosecution; (i) compelled him to submit to an interrogation after Ogden indirectly caused false allegations of leaking NYSP evidence to be made against him, but then asked only about the FBI investigation of McDonough's scapegoat prosecution, whether he was a target of the FBI investigation, and whether the FBI had had audio surveillance in his office or telephones; and (j) made false statements to the state court about relevant matters.

245.    The fact Trey Smith acted in an investigative capacity in gathering and analyzing evidence throughout the scapegoat prosecution of McDonough is also proven by certain memoranda, emails, depositions, and other records maintained by the NYSP and/or Trey Smith concerning the matter. Those relevant documents are incorporated herein by reference.

## XVI.    Trey Smith Had Sufficient Evidence to Convict McGrath, DeFiglio and McInerney and All Other Guilty Dem C/O in 2009

246.    Through his investigation Trey Smith gathered sufficient evidence by November 2009 to convict McGrath, DeFiglio, McInerney, and other Dem C/O.

247.    Furthermore, that evidence, if followed by rudimentary investigation, would have led to discovery of other evidence sufficient to convict all the Dem C/O who committed the AB forgery as well as McInerney for many hundreds of AB forgery and felonies he committed in 2007

and 2008, especially if DeFiglio, McGrath, and/or Renna were required to provide complete, truthful information as dictated by their purported "cooperation" agreement.

248.    All the Dem C/O involved in having voters sign AAB in September 2009 knew that McGrath, Brown, and McInerney were the chief culprits in the AB forgery.

249.    All those Dem C/O also knew that Brown was closely associated with McInerney and McInerney was closely associated with DeFiglio and Renna in obtaining AB for candidates.

250.    Nonetheless, instead of following the evidence, Trey Smith immediately targeted McDonough for prosecution without probable cause.

251.    To do so, Trey Smith, among other things: adopted and pursued a preposterous prosecution theory he knew was wrong; ignored crucial testimony of DeFiglio and other witnesses; did not seek available evidence, including the truthful cooperation of any Dem C/O; accepted patently incredible false assertions of Dem C/O and others implicated in the crimes; immunized or gave extraordinarily favorable cooperation agreements to many Dem C/O and others implicated in the crimes; and fabricated false evidence against McDonough.

252.    Trey Smith did so in conspiracy with the co-defendants and others.

253.    Specifically, Trey Smith: fabricated false statements and testimony later used at Grand Jury and/or trial as intended; ignored and/or failed to obtain testimonial and documentary evidence that would have convicted the guilty Dem C/O and/or exonerated McDonough; give Dem C/O and others immunity, promises of non-prosecution, and extraordinarily favorable treatment to not tell the truth that would have led to the conviction of the guilty Dem C/O and exoneration of McDonough; took action to cover-up the nature and extent of the AB forgery; and took action to protect the guilty Dem C/O from any meaningful prosecution throughout.

254.    For example, Trey Smith ignored and/or purposely did not seek the testimony and/or AB documents of DeFiglio, Daniels, DeFabio, Petit, Tangredi, Suozzo, Martiniano, Renna, or a law enforcement FDE that would have led to the successful prosecution of McGrath, Brown, and McInerney and/or the exoneration of McDonough.

## XVII.    Trey Smith Ignored Evidence of Dem C/O Guilt, Targeted McDonough, and Sought His Incrimination without Reasonable Suspicion

255.    A rudimentary proper investigation by Trey Smith would have led to the conviction of all the Dem C/O who committed the AB forgery and exoneration of McDonough.

256.    Therefore, Trey Smith purposely did not obtain evidence and feigned mistake, ignorance, or lack of skill for not doing so.

257.    Trey Smith did not prosecute any Dem C/O until forced by action of McDonough, supervisory NYSP, and FBI to ostensibly prosecute them and then he did not do so meaningfully because their prosecution and truthful acceptance of responsibility and cooperation would have necessarily led to McDonough's exoneration.

258.    For the same reason, Trey Smith never prosecuted any Dem C/O for the perjury they all committed, especially Brown, McGrath, O'Malley, McInerney, and Renna.

259.    Trey Smith never prosecuted any Dem C/O for their conspiracy to commit the AB forgery (as alleged in Ogden's DNA application) and none of them would ever admit that they acted in conspiracy - even after their ostensible prosecutions were forced by McDonough - except Brown who at trial did just as the proceedings ended for the day, but he recanted the next morning.

260.    If Trey Smith pursued conspiracy charges - or any Dem C/O admitted that fact - all the guilty Dem C/O would have been convicted and McDonough exonerated.

261.    If any of the Dem C/O admitted their conspiracy - it would have been an admission of the conspiratorial prosecution for which they would be liable.

262.    Nonetheless, at trial, all the testifying Dem C/O admitted that McDonough did not act in conspiracy with them to commit the AB forgery.

263.    If Trey Smith had properly interviewed Martiniano, O'Malley, Suozzo, DeFiglio, McGrath, McInerney, Brown, McDonough, Daniels, DeFabio, Petit, and/or Tangredi that would have led to the conviction of all the guilty Dem C/O and exoneration of McDonough.

264.    Instead, Trey Smith acted so McGrath, McInerney, Brown, O'Malley, Robillard and others would not tell the truth that would have prevented the framing of McDonough.

A.    McInerney Not Identified: 20-Year-Old Photograph Shown to Voters

265.    Trey Smith had the NYSP show voters a 20-year-old "mugshot" of McInerney that did not even grossly accurately depict his facial or physical appearance in September 2009. That photograph used for identification purposes is incorporated herein by reference.

266.    Therefore, McInerney was never identified by the voters.

B.    Brown, Dan Brown, and Others Not Identified: No Photographs Shown to Voters

267.    Trey Smith never showed any voter a photograph of Brown, Dan Brown or other Dem C/O known to have been involved in the solicitation of AAB.

268.    Therefore, those Dem C/O were never identified by the voters.

C.    Trey Smith Did Not Obtain Testimony and Forged AB Documents of Daniels, DeFabio, Petit, and Tangredi that Would Have Convicted Brown

269.    The NYSP questioned every WFP voter for whom an AB was filed except David Daniels - even though Brown testified (falsely) about his (forged) AB documents in said hearing.

270.    Daniels was the only WFP voter not questioned out of about 50.

271.    Trey Smith never questioned DeFabio, Petit, or Tangredi or obtained their (forged) AB documents - even though Brown filed them when he filed the Daniels (forged) AB documents.

272.    The irrefutable testimony and forged AB documents of Daniels, DeFabio, Petit, and Tangredi was readily available and alone would have been sufficient to convict Brown.

273.    In his press release after McDonough's indictment, Trey Smith professed that he had conducted a lengthy, exhaustive investigation, yet he did not follow the evidence to gather the testimony and AB documents of those voters which would have convicted Brown.

274.    Additionally, if he were prosecuted and required to provide truthful cooperation, Brown would have disclosed other evidence sufficient to convict all the guilty Dem C/O.

275.    Thus, Trey Smith purposely did not obtain that evidence.

276.    The NYSP independent investigation obtained that evidence in 2011 (except the testimony of decedent Daniels) without Trey Smith's knowledge and forced Brown's prosecution.

D.    Trey Smith Did Not Obtain Testimony and Past Forged AB Documents of Suozzo That Would Have Convicted McInerney

277.    As stated, even though Suozzo was questioned during Trey Smith's investigation, he was not asked basic questions that would have elicited testimony that alone would have been sufficient to convict McInerney for forging his AB documents in 2007, 2008 and 2009. Copies of his November 2009 deposition (Trey Smith investigation) and June 2011 depositions (NYSP independent investigation), are attached as Exhibit B and incorporated herein by reference.

278.    Trey Smith did not ask Suozzo about McInerney, whether anyone enrolled him in the WFP, or whether anyone asked him about AB voting (McInerney had) even though he was asked about his registration card and 2009 AAB.

279.    Suozzo was the only WFP voter who was not asked such basic questions.

280.    Notably, Suozzo's 2007, 2008, and 2009 AB documents were forged in the same handwriting, i.e. McInerney's.

281.    Suozzo's testimony and forged AB documents were readily available.

282.    As discussed below, Trey Smith ignored evidence of McInerney's 2008 and 2007 AB forgery when Bugbee provided it to him in 2010, and again, when McDonough did so in 2011.

283.    As discussed below, the testimony and forged AB documents of Suozzo and about 50 other voters sufficient to convict McInerney for hundreds of AB forgeries he committed in 2009, 2008, and 2007 was obtained by the NYSP independent investigation in 2011.

284.    Trey Smith should have obtained and followed Suozzo's testimony and forged AB documents that would have been sufficient to convict McInerney, but he did not.

285.    Trey Smith also should have obtained and followed the testimony and forged AB documents of those many other voters for whom McInerney forged AB documents in 2009, 2008, and 2007 that would have been sufficient to convict McInerney, but he did not.

286.    If Trey Smith prosecuted and required McInerney to provide truthful cooperation, he would have disclosed other evidence sufficient to convict all the guilty Dem C/O.

287.    If Suozzo were properly questioned and his AB documents obtained, Trey Smith would have been required to prosecute McInerney.

288.    Trey Smith purposely did not obtain that evidence because he did not want to convict McInerney or other Dem C/O who committed the AB forgery.

289.    Instead, Suozzo's November 2009 deposition was made scant on facts to support the scapegoat prosecution by the false implication that he had no contact with any Dem C/O and, therefore, his AB documents must have been forged in the BOE.

290.    However, McInerney enrolled Suozzo in the WFP, talked with him about AB voting, and forged his AB documents in 2009, 2008, and 2007.

291.    If Trey Smith had no knowledge about McInerney's past dealings with Suozzo or truly believed McDonough that forged AB documents in the BOE, he would have asked Suozzo and all other witnesses such basic questions, but he did not.

292.    Trey Smith knew Suozzo lived in a private residence near McInerney, Suozzo had no contact with any other Dem C/O who solicited AAB on September 12, 2009, McInerney was AB Agent on Suozzo's forged AAB, and Suozzo's AB was forged.

293.    Also, DeFiglio told Trey Smith in October 2009 that McInerney and Brown committed the AB forgery.

294.    Still, Trey Smith never asked Suozzo any questions about McInerney.

295.    The only reasonable inference is that he knew Suozzo's testimony and AB documents would have resulted in the conviction of McInerney and exoneration of McDonough.

296.    Moreover, McInerney has very distinctive handwriting and his unmasked print was on hundreds of AB documents filed in numerous 2007 and 2008 elections.

297.    Also, Bugbee, DeFiglio, and others told Trey Smith in 2009 and 2010 that it was obvious from the 2009 AB documents and primary role McInerney played in obtaining AB votes in 2007 and 2008, that McInerney committed the AB forgery.

298.    Still, Trey Smith did not inspect or have those AB documents examined by a handwriting expert at any time.

299.    As stated below, when Bugbee (and later McDonough) disclosed some of those AB documents to Trey Smith in 2010 (and 2011) as evidence of McInerney's AB forgery in 2009, he rejected that evidence out of hand.

300.    However, when McDonough provided those same AB documents to supervisory NYSP in 2011 it led to the discovery of overwhelming evidence sufficient to convict McInerney for hundreds of AB document forgeries he committed in 2007, 2008, and 2009.

301.    Trey Smith purposely did not inspected the AB documents, ask Suozzo and other voters if they had contact with anyone about enrolling in the WFP or AB voting, ask DeFiglio and other Dem C/O involved in the solicitation of AAB basic questions about McInerney, had the AB documents of Suozzo and others examined by a FBI or police FDE, or otherwise conducted a proper investigation because it would have led to McInerney's conviction .

302.    If McInerney was meaningfully prosecuted he likely would have fully cooperated against all his cohorts, as warned.

303.    Throughout his investigation and prosecution, Trey Smith consistently ignored or did not obtain relevant evidence from voters, witnesses, and cooperating defendants that would have been sufficient to convict all the guilty Dem C/O.

304.    Throughout his investigation and prosecution, Trey Smith consistently did <u>not</u> ask them basic questions about McInerney, Brown and others that would have led to his exoneration and the conviction of the guilty Dem C/O.

305.    On the other hand, despite having no probable cause to do so, Trey Smith sought to have BOE employees, WFP operatives, and Dem C/O incriminate McDonough from the beginning of his investigation and throughout by asking questions about his conduct.

306.    Trey Smith knew from the relationships between himself, McGrath, Brown, McInerney, McInerney's attorney, McNally, and/or others that if McDonough, Suozzo, DeFiglio, O'Malley, Renna, Martiniano, Daniels, DeFabio, Petit, Tangredi, and/or others were properly

questioned they would have disclosed evidence that would have led to the conviction of the guilty Dem C/O and exoneration of McDonough.

307.    Trey Smith did not require DeFiglio, McGrath, O'Malley, McInerney, Brown or Renna to provide complete truthful information in accordance with their purported Cooperation Agreements for the same reasons.

E.    <u>Couch, Caird and JWelch Got Attorneys and Refused to Talk Without Immunity Trey Smith Gave Couch, Caird and JWelch Immunity and Sought Incrimination of McDonough Although Not Implicated in AB Forgery</u>

308.    JWelch and Caird, who gave Brown permission to falsely name them as AB Agents on AAB, retained attorneys and refused to talk with Trey Smith without immunity.

309.    Couch, who at the request of LoPorto filed AB that McInerney forged, retained an attorney, and refused to talk with Trey Smith without immunity.

310.    On or about October and November 2009, Trey Smith gave Couch and Caird promises of non-prosecution in return for their purported truthful testimony.

311.    Couch and Caird gave the NYSP a sworn written deposition on October 22, 2009, and November 4, 2009, respectively. Their depositions are incorporated herein by reference.

312.    Coach and Caird denied committing the AB forgery or any crimes.

313.    Upon information and belief, Trey Smith on one or more occasions interviewed Couch and Caird and sought to have them incriminate McDonough in the AB forgery.

314.    Their depositions show that Trey Smith sought the incrimination of McDonough but Couch and Caird could not do so truthfully and did not falsely.

315.    Still, the innocuous comments McDonough made at LoPorto's Restaurant were recorded in their depositions for the false implication of incrimination, as stated above.

316.     On or about December 6, 2010, Trey Smith gave JWelch immunity in return for his purported truthful testimony pursuant to an executed cooperation agreement.

317.     JWelch denied committing the AB forgery or any crimes.

318.     Trey Smith did not obtain a sworn written deposition from JWelch.

319.     Upon information and belief, Trey Smith did not obtain a written deposition from JWelch because he could only have incriminated Brown.

320.     Otherwise, the WFP operatives directly incriminated only Brown and LoPorto.

321.     In their depositions, Couch and Caird admitted that on September 14, 2009, Brown asked for permission to falsely write their names as AB Agent on AAB and they agreed.

322.     In her deposition, Couch also admitted that LoPorto handed her a newspaper folded over AB and asked her to file them but forget she got them from him. She stated LoPorto did not tell her that the AB were forged but acted furtively about the matter.

323.     Couch admitted that she delivered AB to the BOE on September 15, 2009 at LoPorto's request, but again claimed that she did not know they were forged.

324.     Couch and Caird also admitted that at LoPorto's Restaurant on or about September 24, 2009, Brown and Dan Brown asked them to issue a Press Release accusing Mirch of making false claims of voter fraud, Brown acted nervous and guilty and Brown said *"they were there,"* *"it was not as bad as it appeared"* when confronted about the AB forgery by Couch and McDonough.

325.     Trey Smith accepted the denials of guilt from the WFP operatives without properly questioning them and obtaining all their truthful knowledge about the AB fraud.

F.     <u>Brown, Dan Brown, McInerney, LoPorto, Campana, Galuski, and Aldrich Got Attorneys and Refused to Talk Without Immunity</u>

326.    McGrath, Brown, Dan Brown, McInerney, LoPorto, Galuski, Campana, and Aldrich who were implicated or material witnesses to the AB forgery, retained attorneys, and refused to talk to Trey Smith or NYSP without immunity.

G.    Trey Smith Did Not Give Brown or McInerney Immunity Because Their Testimony Would Have Convicted Guilty Dem C/O and Exonerated McDonough

327.    Trey Smith could not give Brown or McInerney immunity because they would have had to give substantially truthful testimony that would have convicted the guilty Dem C/O and prevented the scapegoat prosecution of McDonough.

328.    Therefore, Trey Smith: (a) made them targets so they could assert their right to remain silent; (b) told Brown and McInerney that they would not be prosecuted; and (c) told the supervisory NYSP the blatant lie that they could not be prosecuted because there was insufficient evidence to corroborate DeFiglio's accomplice testimony, including that of any voter deemed to be complicit in the crimes as a matter of law, as discussed herein.

329.    Upon information and belief, Trey Smith also told Dan Brown in 2009, 2010, and 2011 that he would not be prosecuted.

H.    Trey Smith Gave Aldrich Promise of No Prosecution and Sought Incrimination of McDonough Although Not Implicated in AB Forgery

330.    Aldrich, a close associate of LoPorto who assisted McInerney and Dan Brown in getting voters to sign AAB on September 12, 2009, and was named the AB Agent on 19 falsified or forged AAB for which AB were forged by McInerney and filed by Couch at LoPorto's request, retained an attorney and refused to talk to Trey Smith without immunity.

331.    On or prior to November 13, 2009, Trey Smith gave Aldrich a promise of non-prosecution in return for his purported truthful testimony.

332.    On November 13, 2009, Aldrich gave the NYSP a sworn written deposition. His deposition is incorporated herein by reference.

333.    Aldrich denied committing the AB forgery or any crimes.

334.    Trey Smith accepted Aldrich's denial of guilt without properly questioning him and obtaining all his truthful knowledge about the AB forgery.

335.    Trey Smith on one or more occasions interviewed Aldrich and sought to have him incriminate McDonough in the AB forgery.

336.    His deposition shows that Trey Smith sought the incrimination of McDonough, but Aldrich could not do so truthfully and did not falsely.

I.    LoPorto, Galuski, and Campana Refused to Falsely Incriminate McDonough

337.    Upon information and belief, on occasions on and/or after October or November 2009, Trey Smith sought to have LoPorto, Galuski, and Campana incriminate McDonough for immunity, but they could not do so truthfully and did not falsely.

J.    Leonard and Mason Refused to Give Written Depositions

338.    Richard Mason, a friend, and campaign helper of McGrath refused to talk to the NYSP about the matter even though he testified at state court hearing.

339.    Michael Leonard, a relative and campaign helper of McGrath, told the NYSP he knew nothing about the AB forgery and refused or was not asked to give a deposition.

340.    Trey Smith accepted Leonard's word without questioning him about the AB documents he filed in 2009 and past years (for the same voters and/or with similar Excuses) and/or taking a written statement from him.

K.    Trey Smith Sought McDonough's Incrimination from Donald Cunningham and Louis Schneider

341.     City Employees Donald Cunningham and Louis Schneider were interviewed by NYSP and gave sworn written depositions on November 24, 2009. Their depositions are incorporated herein by reference.

342.     They were questioned about McDonough to obtain any evidence that might incriminate him, specifically with respect to any dealings with McInerney.

L.     Trey Smith Sought McDonough's Incrimination from BOE Employees

343.     On or about November 10, 2009, Trey Smith interviewed most BOE employees.

344.     All BOE employees were interviewed at the BOE, except McDonough.

345.     Trey Smith did not give *Miranda* warnings to any BOE employee or take the sworn deposition of any BOE employee, except McDonough.

346.     At that time, Trey Smith purposely did not seek to take a deposition from all BOE employees because it would have required O'Malley to either truthfully incriminate Brown and exonerate McDonough or falsely incriminate McDonough at that time.

347.     Upon information and belief, Trey Smith did not want O'Malley's to not talk unless and until he needed to fabricate his false testimony for Grand Jury and/or trial.

348.     At that time, all BOE employees told Trey Smith it was lawful BOE practice to: (a) assist voters and their agents by writing data they gave onto AAB so it could be filed; and (b) release AB to voters, voters' named AB agent, or persons designated by either of them.

M.     O'Malley Did Not Tell the Truth That Would Have Incriminated Brown and McInerney But Did Not Falsely Incriminate McDonough in 2009

349.     O'Malley was also a political operative known to have solicited AB in his town on behalf of Democrats and was appointed to his BOE position by Chair Wade.

350.    McDonough discovered in the defense of the scapegoat prosecution that O'Malley had filed AAB for certain voters from the Town of Hoosick over the years, including an unusually high number who had the same Excuse ("*home recovering from a stroke*") in a 2009 election.

351.    O'Malley was a member of the Town Board when Trey Smith was appointed its attorney through the efforts of a mutual friend and past political associate.

352.    When questioned by Trey Smith and/or Ogden in 2009 or 2010, O'Malley did not disclose facts about what happened on September 14, 2009 that would have incriminated McGrath, Brown, and McInerney in the AB forgery as well as disproved the prosecution theory; i.e. that he sat across a desk from Brown in McDonough's office and wrote Excuses on 8 AAB that Brown said voters gave while McDonough helped McGrath; and, later that day was with McDonough when he delivered to McInerney all the AB released on the AAB Brown had filed earlier (which were forged and filed the next day by Couch for LoPorto).

353.    O'Malley did not then claim (falsely) that he heard McDonough tell McInerney he "*had two HVCC students*" who "*owed him a favor*", as he later did only at trial.

354.    At that time, O'Malley did not falsely report that McDonough called him into his office and made him write false Excuses on AAB when they were alone, as he did only at trial.

355.    When questioned again by Ogden in December 2009, O'Malley did not give a deposition or tell the truth about what happened on September 14, 2009 in McDonough's office or when he walked to McInerney's office with McDonough.

356.    At trial, O'Malley said that he lied to Ogden about what happened when McDonough gave McInerney the AB released on the AAB Brown filed on September 14, 2009.

357.    Even after McDonough told Ogden that O'Malley was with him when he gave McInerney the AB released on the AAB Brown filed on September 4, 2009, O'Malley did not give

a written statement when he falsely told Ogden on that date that he "*did recall walking with McDonough to the City Clerk's office … could not be any more specific … he waited in the lobby and could not remember if McDonough had an envelope with him.*"

358.    Trey Smith never asked O'Malley about what happened in McDonough's office on that date or the actions of Brown or McGrath concerning the filing of AAB.

359.    O'Malley allegedly told Trey Smith and the NYSP several times in 2009 that he did not have any knowledge about the AB forgery.

360.    At trial, Trey Smith asserted that O'Malley declined to give a written statement.

361.    In any event, O'Malley did not at any time tell the truth about what happened on Sept 14, 2009, which would have proven Brown's crimes and perjury, proven McGrath's false accusations and perjury, incriminated McInerney concerning forged AB/AB Env and prevented the scapegoat prosecution - but he later testified falsely to protect McInerney, Brown, and McGrath as well as initiate and continue the scapegoat prosecution of McDonough.

362.    O'Malley lied about everything and falsely accused McDonough so that he did not incriminate Brown, McGrath and McInerney or exonerate McDonough.

363.    Later, O'Malley destroyed AAB and AB filed in 2007 elections after McDonough and Bugbee began to discover and disclose to the FBI and supervisory NYSP ones that McInerney and Renna forged in past elections as evidence of their 2009 crimes. A June 10, 2011 email from Trey Smith to O'Malley's attorney in which he adds: "*of course, this could fall into a known pattern of doing as he is told*", is incorporated herein by reference

N.    McDonough Twice Questioned at NYSP Station After *Miranda* Warnings

364.    In contrast, Trey Smith had Ogden interview McDonough twice at the NYSP station, gave him *Miranda* warnings, and took a sworn written deposition on both occasions, i.e. November 19, 2009 and December 7, 2009.

365.    Ogden directed the interviews and asked about McInerney. He focused on forged AB and McDonough's delivery of AB to McInerney on September 14, 2009 but did not ask about: AAB or the filing of AAB by McGrath, Brown, McInerney, DeFiglio, or Renna or the completion of AAB for McGrath, Brown, or any other voter agent.

366.    McDonough was cooperative and gave two written depositions without counsel.

367.    McDonough disclosed that on September 14, 2009, he took the AB issued on the AAB Brown filed that day to McInerney at Brown's request, and that O'Malley accompanied him.

368.    McInerney had asked McDonough several times in the fall of 2009 not to talk to the NYSP or tell them he got the AB released on the AAB Brown filed on September 14, 2009.

369.    At the same time, Chair Wade told McDonough that he should get an attorney and not talk to the NYSP.

370.    Nonetheless, McDonough remained a cooperative witness, would have testified truthfully if called as a witness, and was not be dissuaded from talking to the NYSP.

O.    <u>Trey Smith Did Not Interview Martiniano or Renna Because Their Testimony Would Have Led to Conviction of McInerney, Brown, and All Guilty Dem C/O</u>

371.    Trey Smith and Ogden knew that Martiniano was involved in the solicitation of voter signatures on AAB and therefore potentially involved or a material witness to the AB forgery.

372.    Trey Smith and Ogden knew that Renna was a longtime operative, close associate of McInerney, and involved in the AB forgery or material witnesses to the crimes.

373.    McInerney and Brown knew that Martiniano and Renna had personal knowledge of facts that could directly incriminate them in the subject crimes and that they would likely be arrested and/or prosecuted if either one talked to the NYSP.

374.    Martiniano and Renna were important witnesses whose truthful testimony, if obtained, would have corroborated the testimonial and documentary evidence and been sufficient to convict Brown and McInerney, including the admissions of guilt Brown and McInerney made to him that would have prevented the scapegoat prosecution.

375.    However, Trey Smith did not interview Martiniano or Renna in 2009 or 2010.

376.    Martiniano and Renna were the only Dem C/O involved in the effort to obtain signed AAB that were not questioned by Trey Smith or the NYSP during his investigation.

P.    <u>Trey Smith Ignored Forged AAB Bugbee Provided that Alone Was Sufficient to Lead to the Conviction of McInerney for AB forgery in 2009, 2008, and 2007</u>

377.    In 2009, Bugbee and BOE employees Mary Sweeney and Bonnie Becker told Trey Smith and/or Ogden that there was no reason to believe McDonough forged any AB document and, in response, he implied that they were acting in complicity with him.

378.    In 2009, Bugbee and other BOE employees told Trey Smith and/or Ogden that it was lawful BOE practice to: (1) assist voters/agents by writing data voters gave onto AAB so it could be filed; and (2) release AB to voters, their AB Agent, or person designated by an AB Agent.

379.    In 2009 and/or 2010, Bugbee told Trey Smith and/or Ogden that it was obvious from the 2009 forged AB documents and voter statements that McGrath, McInerney, and other Dem C/O committed the crimes.

380.    On or about November 15, 2010, in response to a voter's complaint that someone forged his wife's signature at a voting poll in 2009. However, the BOE records showed that the voter's registration card was forged, not her 2007/2008 AAB.

381.    Bugbee then reviewed BOE records and discovered about 20 AAB filed in 2007 and 2008 elections that all appeared to have been forged in the same unique print as that forged voter registration card.

382.    Bugbee provided those BOE records to Trey Smith and the NYSP and told them that he knew the print to be McInerney's handwriting and requested proper criminal action. Those 2007 and 2008 AAB are incorporated herein by reference.

383.    However, Trey Smith told Bugbee that the NYSP were not interested in the matter and that he had no authority to prosecute any past election crimes.

384.    Thus, he avoided obtaining that evidence of McInerney's past AB forgery relevant to the 2009 AB forgery that would have led to McDonough's exoneration.

385.    If followed, that evidence would have led to voter testimony sufficient to convict McInerney for AB forgery he committed in 2007, 2008, and 2009.

386.    Those documents showed that McInerney also filed AAB for the same voters in more than one year (i.e. he had a "stable" of voters for whom he forged AB).

387.    Trey Smith and Ogden ignored that evidence and did not obtain the testimony of any of those voters that would have led to McInerney's conviction.

388.    Later in 2010, McDonough gave Trey Smith those and/or other 2007 and 2008 AAB that appeared to have been partially or entirely written in the handwriting of McInerney or Renna as additional proof of their AB forgery in 2009. Those 2007 and 2008 AAB, which McDonough also later provided to the supervisory NYSP, are incorporated herein by reference.

389.    Trey Smith and Ogden again ignored those past AB documents that would have led to the discovery of evidence sufficient to convict McInerney for AB forgery he committed in 2007,

2008, and 2009 on the basis that he had no authority to pursue those crimes and the NYSP were "not interested" in the evidence.

390. Those documents and the testimony of voters sufficient to prove McInerney's guilt in 2009 and past years could have been easily obtained by rudimentary investigation.

391. Trey Smith also could have had the scope of his authority perfunctorily expanded as he later did to protect McInerney from federal or state prosecution for those crimes when the supervisory NYSP independently acted on that same evidence without Trey Smith's knowledge.

Q. <u>Renna Tampered with DeFiglio for McInerney and Brown with Impunity</u>

392. On or about August 2010, Renna called DeFiglio and told him that McInerney wanted him to know that if he did not talk to the NYSP again it would all be over soon and that "*they*" would get him an attorney and *"it would all go away."*

393. Renna also told DeFiglio that "*they*" wanted him to know that Brown's family had a job lined-up for him in Vermont and he should move there.

394. DeFiglio told Trey Smith about the tampering and the NYSP made arrangement to record a call between the two of them but Renna never again talked to DeFiglio on the telephone.

395. Trey Smith did not arrest, prosecute, or attempt to talk to Renna regarding the witness tampering, the AB forgery, or his participation in gathering AAB or AB.

396. If obtained, Renna's truthful cooperation would have been sufficiently corroborated by the substantial evidence already obtained and alone enough to convict McInerney and, therefore, likely lead to the conviction of all other guilty Dem C/O.

**XIII.     Trey Smith Adopted Purported Nonsensical Prosecution Theory Debunked by Common Sense, Evidence, and DeFiglio in October/November 2009**

397. As stated, almost immediately after his appointment, Trey Smith began to seek any evidence upon which to base a prosecution of McDonough.

398.   Various emails and documents related to Trey Smith's investigation show that throughout the process he meticulously analyzed evidence and facts for that purpose.

399.   Trey Smith also immediately adopted a preposterous theory for McDonough's prosecution that no reasonable prosecutor would have considered in view of the evidence.

400.   Trey Smith then fabricated evidence to prosecute McDonough based on that theory even though it was debunked by DeFiglio, disproved by evidence, and contrary to common sense.

401.   In simple terms, the preposterous theory was that the Dem C/O defrauded voters into signing AAB so they could falsify and file them to obtain, falsely vote, and file their AB in forged AB Env, but purposely did not enter false AB Agents and Excuses on any of those AAB which they knew could not be filed unless completed, so that McDonough could do it in "*the finishing process*" at his BOE "*forgery factory*" under the watchful eyes of opposing political Party employees, even though he was not implicated in the crimes by any evidence.

402.   No Dem C/O ever alleged that they purposely did not complete the AAB they had voters sign to obtain and vote their AB so that McDonough could falsely complete them, even after he forced their prosecutions and Trey Smith gave them immunity or favorable plea and/or cooperation agreements to incriminate him.

403.   At trial, Brown, McInerney and others also admitted that the theory was wrong.

404.   In any case, there never was any evidence, allegation, or reasonable suspicion that McDonough or anyone at the BOE forged any elections documents or operated a "*forgery factory*" for the "*finishing*" of incomplete AAB that Dem C/O had voters sign to forge AB.

405.   Moreover, Trey Smith and Ogden knew that the object crime was the false voting of AB and the falsification or forgery of AAB and AB Env was integral to the crime.

**XIX.**       **Trey Smith Asked DeFiglio About McDonough**
**DeFiglio Admitted AB Forgery and Debunked Prosecution Theory**

**Trey Smith Buried Detailed Facts DeFiglio Disclosed against McInerney**

406.    On or about October 2009, DeFiglio agreed to cooperate with Trey Smith *pro se*.

407.    On or about October and/or November 2009, and/or thereafter, Trey Smith and/or Ogden interviewed DeFiglio.

408.    Trey Smith did not require DeFiglio to enter into a written cooperation agreement.

409.    On or about November 6, 2009, DeFiglio gave a sworn written deposition.

410.    However, only the following general facts and speculation about the AB forgery were recorded in DeFiglio's deposition: (a) the AB forgery was committed by Dem C/O as part of a scheme to falsely vote AB of public housing voters; (b) Brown and McInerney were the primary culprits; (c) he assisted McInerney on a few occasions in September 2009; (d) McInerney possessed all the signed but incomplete AAB obtained; and (e) the same scheme of falsely voting AB was perpetrated by DeFiglio, McInerney, Renna, and other Dem C/O for more than 25 years. A copy of his deposition is attached as Exhibit C and incorporated herein by reference.

411.    DeFiglio's deposition contains no specific evidentiary facts or admissions about the AB forgery he, McInerney, Brown, and the other Dem C/O committed in 2009 or any other year.

412.    However, Trey Smith questioned DeFiglio specifically about McDonough and his prosecution theory even though there was no reason to suspect he was involved in any crime.

413.    It is also clear that Trey Smith sought the incrimination of McDonough because DeFiglio's fallacious speculation that McDonough "*had to know*" about the AB forgery is recorded in his deposition instead of specific evidentiary facts concerning the AB forgery committed by McInerney, Brown and/or any other Dem C/O in conspiracy.

414.   Trey Smith and Ogden did not ask DeFiglio rudimentary questions about McInerney, Brown, other Dem C/O, the AB forgery, or the 25 year scheme, that would have resulted in his disclosure of more evidence against McInerney and other Dem C/O.

415.   Ogden testified at trial that no attempt was made by Trey Smith or the NYSP to obtain any specific evidence from DeFiglio about the 2009 or prior AB forgery or the identity of those Dem C/O who had committed those when he gave his statement or thereafter.

416.   However, only because McDonough went to trial, Trey Smith was required to disclose his own handwritten notes that showed DeFiglio had actually disclosed substantial detailed evidentiary facts about the AB forgery and McInerney on one or more occasions when interviewed by Trey Smith and/or Ogden on or about October and/or November 2009.

417.   Those detailed evidentiary facts directly incriminated McInerney in the forgery of specific AB documents for identified voters on specific dates.

418.   Trey Smith recorded in his notes that on several occasions <u>before September 10, 2009</u>, DeFiglio, Galuski and McInerney sought to have AAB signed by the following voters for whom AAB were falsely completed or forged: (1) Amey; (2) Berrios; (3) Flores; (4) Gonzalez; (5) Ponce; (6) Rouse; (7) A. Santiago; (8) Torres; (9) Vasquez; (10) B. Ward; (11) M. Ward; (12) Washington; and, (13) Welling.

419.   In his notes, Trey Smith also recorded that DeFiglio: (a) identified 5 AAB that were "*totally forged*"; and (b) stated that "*it was unspoken they [the voters] would not get [AB] back.*"

420.   BOE records show that Aldrich was the named AB Agent on all those 13 falsified or forged AAB and that they were filed at the BOE on September 10, 2009.

421.   Still, Trey Smith indicted McDonough related to those 13 AAB that DeFiglio admitted McInerney and/or other Dem C/O conspiratorially falsified or forged to forge AB.

422.    At trial, McInerney admitted that he does not recall which one of the other Dem

C/O he had file those AAB, but the record facts support the inference it was Dan Brown.

423.    Trey Smith recorded in his notes that DeFiglio disclosed that on September 12,

2009, he, Galuski, and McInerney again sought to have AAB signed by 16 specifically named

voters for whom AAB were falsely completed or forged.

424.    Trey Smith also recorded with respect to those 16 AAB that DeFiglio: (a) identified

3 that were "*totally forged*" (because voter moved); and (b) stated he "*did not know but probably*

*heard someone say at meeting a Griswold Heights 'just get them to sign [the AAB]'*" but "*does*

*not recall specific instructions not to fill in the [AB Agent] or [Excuse] fields [on the AAB]."*

425.    Trey Smith also recorded with respect to those AAB that DeFiglio also stated that

"*McInerney would say if it appeared a voter moved … that's ours*", meaning that McInerney or

another Dem C/O would totally forge that voter's AAB and AB.

426.    BOE records identify which Dem C/O was the named AB Agent on each of those

16 falsified and forged AAB and that they were filed at the BOE on September 12, 2009.

427.    Trey Smith also indicted McDonough for the forgery and/or criminal possession of

those 16 AAB which DeFiglio admitted McInerney and/or other Dem C/O falsified or forged.

428.    At trial, DeFiglio testified that he was questioned by Trey Smith and Ogden

together as well as by Trey Smith alone on several occasions.

429.    At trial, DeFiglio testified that he told Trey Smith and Ogden in 2009 and 2010,

among other things, that: (a) he and Galuski helped McInerney fraudulently have public housing

voters sign incomplete AAB before and on September 12, 2009; (b) McInerney or other Dem C/O

then falsely completed those AAB; (c) he identified specific voters for whom McInerney or other

Dem C/O totally forged an AAB; (d) the AAB were falsely completed or forged so AB could be

obtained and falsely voted; (e) the object crime was AB forgery and the "game" was to get voters to only sign AAB so they could be falsely completed and AB obtained and voted "*the right way*" regardless of whether a voter was eligible to vote by AB; (f) public housing voters were targeted for AB forgery because they would be less likely to know, care or complain about it; (g) he identified those voters who signed AAB that were falsely completed and totally forged; (h) the AB fraud was committed by the Dem C/O, primarily McInerney and Brown; but not by anyone in the BOE; (i) the object crime was the false voting of AB; (j) the Dem C/O committed the AB forgery by having voters sign an AAB that they then completed with false Excuses and AB Agents so they could obtain and vote an AB for Democrats; (k) Dem C/O knew the AB process and related BOE practices, especially that AAB had to be completed with an Excuse and AB Agent to be filed before an AB for a voter could be obtained and voted; and (l) Dem C/O had voters sign but not complete an AAB so they could write a false Excuse and AB Agent on them and obtain and falsely vote their AB "*the right way*" without risk that the voters were not eligible to vote by AB or would not vote for Democrats.

430.    DeFiglio also testified that Trey Smith and Ogden asked about their prosecution theory against McDonough when they questioned him on or before November 6, 2009.

431.    More significantly, DeFiglio testified that when Trey Smith and Ogden asked him about their prosecution theory, he told them it was wrong and made no sense.

432.    Even McGrath, McInerney and Brown admitted at trial that the theory was wrong.

433.    Again, Trey Smith knew by November 2009, and common sense dictated, that the false completion or forgery of AAB was integral to their false voting of AB.

434.    It was also common knowledge among the Dem C/O that the AB forgery was committed primarily by McInerney, McGrath, J. Brown, D. Brown, DeFiglio and Renna.

435.   DeFiglio also testified that he would have told Trey Smith and Ogden everything he knew about the AB forgery, but *"they did not ask"* and *"they did not want to know."*

436.   DeFiglio testified that Trey Smith and Ogden ignored what he told them because they *"did not want to hear it"* and *"would not listen."*

437.   DeFiglio's testimony about the AB forgery was corroborated by substantial testimony and forged AB documents and alone sufficient to convict McInerney.

438.   If followed, the evidence DeFiglio gave would have led to the discovery of other evidence sufficient to convict McInerney, Brown, and all the other guilty Dem C/O.

439.   However, Trey Smith and Ogden effectively buried that evidence in his personal notes that were kept in his file and disclosed (but not identified) just before trial, rather than in DeFiglio's deposition or a report made part of the NYSP records, reviewed by supervisory NYSP, and timely disclosed to McDonough in pre-trial discovery - contrary to good law enforcement practice and NYSP policy. A copy of Trey Smith's handwritten notes is attached as Exhibit D and incorporated herein by reference.

440.   In any case, the detailed facts DeFiglio disclosed in 2009 were not used to prosecute McInerney, even after Renna tampered with him for McInerney and Brown in 2010.

## XX.   Trey Smith Misled Supervisory NYSP throughout Investigation with Blatant Falsehood that McInerney and Brown Could Not be Prosecuted

441.   From about November 2009 until 2011, Trey Smith told supervisory NYSP the blatant lie that McInerney and Brown could not be prosecuted because the evidence was not legally sufficient to corroborate the testimony of DeFiglio or any accomplice.

442.   However, the substantial voter statements and forged AB documents was legally sufficient to corroborate the testimony of DeFiglio or any accomplice as a matter of state law.

443.     That voters' testimony and AB documents alone were also sufficient evidence to convict McGrath, Brown, McInerney and other Dem C/O from the inception, even without the testimony of DeFiglio or any accomplice.

444.     In 2011, McDonough exposed the scapegoat prosecution and Trey Smith's blatant falsehood in defense motions and made complaint concerning the criminal violation of his rights.

445.     That action caused the FBI and NYSP to commence investigations which, in turn, forced the prosecutions of McInerney, Brown, and Renna and the disclosure of their testimony that further exposed Trey Smith's nefarious misconduct in the wrongful prosecution.

**XXI.      Trey Smith Played "Bad Cop" and Threatened to "Fuck" McDonough to Set-up Initiation of Scapegoat Prosecution**

446.     In the fall 2009, McInerney asked McDonough several times not to talk to the NYSP or tell them he got the AB for the AAB Brown filed on Sept. 14, 2009.

447.     At the same time, Chair Wade told McDonough that he should get an attorney and not talk to the NYSP.

448.     Still, McDonough remained a cooperative witness and had no concerns about it.

449.     That changed only when Trey Smith denigrated his deceased father and threatened him to prosecute him for the AB forgery.

450.     On January 27, 2010, McDonough was called to the NYSP for further questioning by Trey Smith. The relevant facts of the interview are set forth in McDonough's affidavit dated February 24, 2011, which is incorporated herein by reference.

451.     At that time, Trey Smith began the interview by telling McDonough that his desire to be District Attorney was crushed when his father, the Democratic Party Chair, *"turned his back on me"* and *"wouldn't even talk to me"* about that possibility.

452.    Trey Smith told McDonough that he was not happy about the experience and said, as Ogden walked into the room, "*in finishing what I was talking about, I think you can now see how it is ironic that now we are here, I am Special Prosecutor and I have the ability to make you King for the Day*" and was giving McDonough the opportunity to tell "*everything*", but warned that he was "*a very busy person*" who did not have "*any time to waste.*"

453.    When McDonough began to discuss what he previously told Ogden, Trey Smith interrupted and stated: "*I am a very busy man and I want you to tell me all about what went on with you and your friends in your Forgery Factory.*"

454.    Trey Smith told McDonough he was going to "*fuck*" him like his father did him in the past and "*if you don't tell me anything more, the next time we speak will be at a Grand Jury.*"

455.    Trey Smith had no legitimate reason or purpose for meeting with McDonough, especially without counsel present under the obvious circumstances.

456.    That fact is evident from his failure to give *Miranda* warnings, his demand for a confession without any regard for McDonough's Fifth or Sixth Amendment rights, and his failure to ask McDonough about any allegations, witness statements, documents, or other evidence.

457.    Of course, McDonough then acquired counsel and a deep distrust of Trey Smith.

458.    Trey Smith later claimed under oath that he played a "bad cop" role and threatened McDonough to scare him into giving information against McInerney. Portions of Trey Smith's affirmation dated March 11, 2011 relevant to the matter are incorporated herein by reference.

459.    However, the record facts and common sense belie Trey Smith's claims.

460.    In the first place, Trey Smith already had obtained substantial evidence sufficient to convict McGrath and DeFiglio and, if followed, it would have led to the discovery of other evidence sufficient to convict McInerney, Brown, Dan Brown, Renna and all the Dem C/O.

461.    Also, McDonough was a relatively minor cooperative fact witness. There was no reasonable basis to suspect that he had any substantive knowledge about the AB forgery.

462.    Trey Smith and Ogden did not previously ask McDonough or others basic questions that would have elicited relevant facts about the acts of McInerney, Brown, and others.

463.    Otherwise, as a past prosecutor with more than 25 years' experience in criminal practice, Trey Smith could not have expected McDonough to provide information against McInerney by threatening to prosecute him unless he confessed to crimes he did not commit.

464.    In addition, as discussed, Trey Smith and Ogden had already purposely ignored or failed to obtain testimony, forged AB documents, and other evidence that would have been sufficient to convict the Dem C/O who committed the AB forgery, especially McInerney.

465.    Also, Trey Smith told McInerney and Brown that they would not be prosecuted and the supervisory NYSP that they could not be prosecuted.

466.    Moreover, McGrath's conviction was a *fait accompli* and he could have been offered a plea deal for truthful information against his cohorts Brown, McInerney, and the others.

467.    Still, Trey Smith did not first prosecute McGrath and then offer him a plea deal in return for truthful information against Brown, McInerney, and his other cohorts.

468.    Also, Trey Smith did not return to DeFiglio or any cooperating perpetrator for more information that he was willing to provide against the Dem C/O.

469.    Instead, Trey Smith threatened to "*fuck*" McDonough unless he confessed to the crimes the substantial evidence already obtained proved was committed by McInerney, McGrath, Brown and other Dem C/O in order to scare him into giving information against McInerney, whom he already told he was not going to prosecute, and, did not prosecute.

470.    McDonough was also cooperative and not suspected or implicated in any crimes.

471.    On the other hand, McGrath, Brown, McInerney and O'Malley knew that McDonough would testify truthfully and incriminate them, especially concerning their actions on September 14, 2009, if he was properly questioned or called to testify.

472.    Trey Smith also knew there was no evidence upon which to obtain McDonough's indictment, especially if he testified about what he knew about the events of September 14, 2009.

473.    Therefore, Trey Smith threatened McDonough to keep him from testifying in the Grand Jury which would have incriminated others and likely prevented his own indictment.

474.    Upon information and belief, Trey Smith also did it to set-up his prosecution.

475.    Upon information and belief, McGrath, Brown, O'Malley, and Ogden played interdependent roles in the initiation and continued wrongful prosecution of McDonough.

## XXII.    Trey Smith Gave McGrath Immunity to Deny Guilt, Not Incriminate Other Guilty Dem C/O and Falsely Incriminate McDonough

476.    Immediately after Trey Smith threatened to "fuck" McDonough on January 27, 2010, he telephoned McGrath's attorney and offered his client immunity for "anything of value."

477.    Several months later, McGrath entered a cooperation agreement pursuant to which he was granted immunity in return for complete, truthful information.

478.    In return for immunity, however, McGrath denied any guilt or knowledge about the AB forgery in contradiction of irrefutable voter testimony and AB documents that proved his guilt and made false accusations against McDonough that supported Trey Smith's prosecution theory.

479.    Notably, contemporaneous billing record entries show that Trey Smith spoke briefly with McGrath's attorney by telephone on four occasions from January 27, 2010 to February 5, 2009, and then on March 2, 2010, prepared a cooperation agreement. Trey Smith's pertinent billing record entries are incorporated herein by reference.

480.    Trey Smith's time record entries show that from the date of his appointment on September 28, 2009 until the date he threatened McDonough on January 27, 2010, he spent little or no time investigating any Dem C/O known to be a suspect.

481.    However, upon information and belief, those records show that within an hour of threatening to prosecute McDonough he offered McGrath immunity from prosecution.

482.    Upon information and belief, before January 27, 2010, Trey Smith conspired with McGrath to fabricate his false incrimination of McDonough to provide a basis for his prosecution.

483.    On March 12, 2010, McGrath executed a written cooperation agreement and was questioned by Trey Smith and Ogden about the AB forgery. The Cooperation Agreement is incorporated herein by reference.

484.    On March 22, 2010, McGrath executed a written deposition after reviewing and/or revising it with counsel and/or Trey Smith. His deposition is incorporated herein by reference.

485.    Trey Smith and Ogden permitted McGrath, McInerney and others to review and revise their depositions after meeting with law enforcement contrary to established law enforcement best practices and NYSP policy, rules, or regulations.

486.    Essentially, in his sworn statement, McGrath falsely incriminated McDonough and lied about everything, especially what occurred in McDonough's office on Sept. 14, 2009.

487.    Specifically, McGrath alleged therein that: (a)  He saw McDonough write false Excuses on 2 of the many AAB he filed; and, (b)  On September 14, 2009, he heard McDonough and Brown talk about *"... the need to have names [for an AB Agent] listed on each of the [AAB] ... [he] took [] to mean that the "Released To" names were blank on the [AAB] they were speaking about. ... JWelch come up as a name that could be entered .... [He] remember[ed Brown] ... calling [Jim] from his cell phone ... [but did] not recall [Brown] mentioning the number of [AAB]*

*... [He] knew from the conversation ... there were roughly 35 [AAB] they were talking about. ... [He] knew it would be difficult to track people down with the [AB] .... [He] wasn't sure who had the [AAB] at that point .... [He] told them both to make sure that they didn't mess with the voters from District 1. [He] specifically mentioned JWelch and told them both that his excuse was that he was a diabetic. [He] knew his [AAB] was in the pile because [he] had seen it Saturday when [he] met with Dan Brown and Aldrich at Corliss Park. [He] had also seen [] McDonough fill-in the blank excuses on the [AAB] of Dickinson and Taylor back in August."*

488.    McGrath also alleged that McDonough "kicked" him and Brown out of his office after mentioning AB Agent names, apparently because he did not want them to be involved or witnesses to his false "finishing" of AAB.

489.    McGrath did not mention that O'Malley was also in the room at any time.

490.    The accusations McGrath made against McDonough were directly contradicted and proven false by voter affidavits, AB documents, and trial testimony of Brown and JWelch.

491.    Trey Smith and Ogden also knew that McGrath's denial of guilt was proven false by the voter affidavits and AB documents already obtained, as follows:

(a) <u>Dickinson AB Documents</u>. <u>McGrath</u> claimed: The voter entered Mason as AB Agent, McDonough entered a false Excuse and he signed voter's name with permission. <u>Dickinson</u> stated: He signed a voter registration card (or document) for McGrath; he did not give anyone any information on the AAB; and he did not receive an AB, sign an AB Env or vote.

(b) <u>Taylor AB Documents</u>. <u>McGrath</u> claimed: The voter wrote Mason as AB Agent; he told McDonough the correct voter Excuse; and, he signed her name on AB Env and voted her AB with her permission. <u>Taylor</u> stated: She signed a voter registration card; she never got an AB or gave anyone permission to vote it; and the Excuse on her AAB was incorrect.

(c) <u>John Gilbert AB Documents</u>. <u>McGrath</u> claimed: Gilbert had his wife sign his AAB; he wrote voter's AB Agent on his AAB; he does not recall who wrote the Excuse on his AAB; and, he signed the voter's AB Env and voted his AB with permission. <u>Gilbert</u> stated: He could not read/write too well; he was not registered to vote; he never saw or signed an AAB; McGrath had him sign something; he did not believe it is his signature on AB Env, but was not certain; and, he never saw or voted an AB or just signed an AB Env.

(d) <u>Stephan Carpenter AB Documents</u>. <u>McGrath</u> claimed: he signed and completed the voter's AAB with information from the voter; the voter signed his AB Env and he voted the AB with permission and "licked the envelope and mailed it to the BOE as [he] did with all the ballots"; and, he knew the voter. <u>Carpenter</u> stated: McGrath asked to vote for him and he signed a voter registration form; he signed an AAB, but did not complete it, his name was spelled wrong and his address was wrong on both forms; he did not recall voting an AB or seeing AB Env, but the signature looks like his; he did not recall checking boxes on a paper ballot; and he had no objection if his AB was voted for McGrath because he also knew his brother the State judge.

(e) <u>Marc Welch AB Documents</u>. <u>McGrath</u> claimed: he knew the voter and did not fill-out his AAB but introduced him to Brown and Aldrich and they completed the AAB with him; the voter signed his AB Env and he voted the AB with the voter because the voter had trouble writing; and, he licked the AB Env and sent to BOE for the voter. <u>Welch</u> stated: McGrath and [Mason] had him sign an AAB; he did not sign an AB; and he voted in person instead.

492.    Trey Smith and Ogden knew that the evidence already obtained was sufficient to convict McGrath and proved that his purported cooperation was false in its entirety.

493.     Upon information and belief, McGrath was given immunity solely to protect him from prosecution, keep him from incriminating the other Dem C/O, and provide a basis to initiate the scapegoat prosecution of McDonough because he had no other reason to lie once immunized.

494.     By November 2009, all the guilty Dem C/O had been silenced and prevented from being called as witnesses by being named targets, given no incentive to come forward or tell the truth and told not to be concerned because it would all be over soon.

495.     Nonetheless, substantial irrefutable evidence was sufficient to convict McGrath and, therefore, his prosecution was unavoidable without a scapegoat.

496.     McGrath, Trey Smith, and Ogden knew that the testimony and AB documents of voters, especially Welch and Taylor, would prove his guilt and the falsity of his cooperation.

497.     They also knew, however, that if McGrath told the truth it would have led to the conviction of McInerney and everyone involved in the crimes.

498.     At the same time, he could not truthfully incriminate McDonough for the crimes that he and his cohorts committed.

499.     Thus, the only way Trey Smith could avoid convicting McGrath and other Dem C/O was to give him immunity to falsely accuse McDonough of forging AAB of those voters.

500.     Consequently, McGrath was given immunity with impunity because overwhelming and irrefutable evidence of his guilt, including the inevitable finding of his DNA on AB Env that he forged and licked close, would also prove that he breached his cooperation agreement by not giving complete or truthful information.

501.     Thus, Trey Smith and Ogden accepted McGrath's patently false denial of guilt.

502.     So, McGrath gave a false sworn statement about what happened in McDonough's office on September 14, 2009 to falsely incriminate him for Brown's crimes while at the same time

he failed to mention that O'Malley was present and sitting across the desk from Brown as he wrote Excuses on several AAB that Brown gave him.

503.     Later, Brown and O'Malley gave fabricated testimony consistent with McGrath's false accusation which could not have happened unless they all acted in conspiracy because they all knew that their testimony was fatally contradictory and false.

504.     In addition, McGrath's failure to admit that he, McInerney, Brown or any of the other Dem C/O acted in conspiracy to commit the AB forgery (especially with respect to the AAB of Welch, Taylor and Dickenson that the record facts were completed in the handwriting of Brown or Dan Brown) even after given immunity and Smith's failure to prosecute him even though his purported cooperation and testimony was proven false by the voters and forged AB documents, also evidences the conspiracy to scapegoat prosecute McDonough at its inception.

505.     According to Trey Smith, he blindly offered McGrath immunity for "*anything of interest*" only because by November 2009 his investigation was stalled, "*many questions were unanswered*" and he and Ogden thought McDonough knew more about McInerney.

506.     Trey Smith further claims that on or about January 27, 2010 to March 12, 2010, McGrath unexpectedly dropped a bombshell of incrimination against McDonough.

507.     However, the facts and common sense belie Trey Smith's absurd claims.

508.     No reasonable investigator officer or prosecutor would have given McGrath immunity without first knowing that he was going to give complete, truthful, valuable information, especially because his conviction was a fait accompli.

509.     The case was about "massive" fraudulent AB voting, and the evidence possessed proved that McGrath, McInerney, Brown and others committed those crimes in conspiracy.

510.    Nonetheless, instead of offering McGrath a plea deal only if he provided truthful information against Brown, McInerney, and his other cohorts that was consistent with the evidence or returning to DeFiglio or any other cooperative witnesses for more information, he gave immunity to McGrath allegedly without knowing the nature of the cooperation first and then accepted his patently false denial of guilt or knowledge and "unexpected" incrimination of McDonough to commence prosecution against a elections officer for entering data on AAB.

511.    According to Trey Smith, it just happened that McDonough was the same cooperative witness who, although he was not accused, suspected, or implicated in any crimes, he threatened to "*fuck*" unless he confessed to the AB forgery that McInerney and others committed to get him to incriminate McInerney - even though he already told McInerney he would not be prosecuted - only moments before offered McGrath immunity "for anything of interest."

512.    Furthermore, McGrath's patently false accusations just happened to support Trey Smith's prosecution theory which he later affirmed he adopted only because of McGrath even though he previously asked DeFiglio about it sought McDonough's incrimination from others.

513.    Trey Smith used McGrath's false statement as a basis to prosecute McDonough.

514.    Upon information and belief, Brown, O'Malley, and other Dem C/O conspired and agreed prior to January 27, 2010 to give whatever false testimony was "needed" to corroborate McGrath's false testimony in the initiation and continuation of the prosecution.

515.    Trey Smith failed to rescind McGrath's immunity even though his denial of guilt and failure to provide any information against the guilty Dem C/O was proven to be false by substantial irrefutable evidence and, therefore, a breach of his cooperation agreement.

516.    Trey Smith then prosecuted McDonough for acts he did not commit instead of McInerney, McGrath, and other Dem C/O for the serious crimes evidence proved they did commit.

**XXIII.**    **Other Evidence of Conspiracy to Frame McDonough**

A.    McNally Advised Martiniano to Not Report Facts Because "*It Will Be Over Soon*"

517.    Upon information and belief, on/about September-December 2010, at LoPorto's Restaurant, Martiniano told McNally that he knew Trey Smith and NYSP talked to witnesses but they never contacted him and he had personal knowledge of facts relevant to the AB forgery.

518.    Upon information and belief, at that time, Martiniano specifically asked McNally whether he should contact Trey Smith or the NYSP about the matter.

519.    Trey Smith, Ogden and NYSP knew Martiniano and Renna were implicated in the AB forgery or material witnesses but they were never questioned.

520.    In response, McNally told Martiniano that he should not contact anyone or worry because "*it was all going to go away soon anyway.*"

521.    Martiniano relied upon McNally's advice because he was the county prosecutor.

522.    McNally gave that advice without having any discussion with Martiniano about the facts of which he had knowledge.

523.    As stated, McInerney and Brown admitted to Martiniano on September 12, 2009 that they were going to use AAB they had voters sign to forge AB.

524.    Therefore, the advice McNally gave Martiniano effectively resulted in the further suppression of direct evidence of the guilt of McInerney and Brown as well as the innocence of McDonough that should have been obtained by Trey Smith and Ogden before his indictment.

525.    Obviously, McInerney and Brown knew what they had told Martiniano.

526.    Consequently, the personal relationships among McNally, McInerney, Trey Smith and other Dem C/O who committed the AB forgery is compelling circumstantial evidence of their conspiracy to scapegoat prosecute McDonough as alleged.

B.     McNally Made Extrajudicial Statements Likely to Prejudice McDonough

527.   On September 29, 2011, during a WNYT newscast, McNally said McDonough's defense were "*ridiculous conspiracy theories*" and admitted he talked with him and McInerney about the case for the obvious implication that he was guilty.

528.   Later, on or about October 19, 2011, during a Talk 1300 radio show interview, McNally said "*it would take an eternity*" to understand the logic of McDonough's motion to dismiss the indictment and disqualify *Trey Smith* based on his illegal appointment despite the fact it was based on well-settled law and a few indisputable record facts of which he was aware.

529.   Upon information and belief, there could be no plausible reason for McNally's public comments after disqualification himself other than to further the scapegoat prosecution.

C.     Trey Smith Failed to Obtain McInerney's Cell Records

530.   Trey Smith subpoenaed and reviewed the mobile phone records of McDonough, LoPorto, Brown, Welch and others but claimed that he and the NYSP were unable to obtain those of McInerney despite repeated efforts.

531.   McNally refused a state freedom of information law request to provide the records of his public mobile phone, even redacted to protect law enforcement or personal privacy.

D.     No Law Enforcement Forensic Expert Witness Utilized During Investigation

532.   Despite the fact that Trey Smith was conducting an investigation of AB forgery he did not obtain the services of one of the many qualified law enforcement Forensic Document Examiners ("FDE") or handwriting experts available to analyze the questioned AB documents without cost during his investigation and prior to any Grand Jury presentation.

533.   Upon information and belief, Trey Smith purposely did not request and obtain the services of any such law enforcement FDE or handwriting expert because a proper examination of

the forged and falsified AB documents would have required that handwriting exemplars first be obtained from any suspect and specifically, McGrath, McInerney, Brown, Dan Brown, Renna and other Dem C/O who were suspects, but not McDonough.

534.    Upon information and belief, Trey Smith purposely did not request and obtain the services of any such law enforcement FDE or handwriting expert because he did not want proper and objective handwriting and forensic analysis or findings concerning the AB documents.

535.    Upon information and belief, Trey Smith purposely did not obtain the services of a law enforcement FDE because of he sought to fabricate the false testimony of a private FDE in support of the wrongful prosecution of McDonough.

E.      No Handwriting Exemplars of Dem C/O Obtained During Investigation

536.    Trey Smith did not obtain handwriting exemplars of McGrath, McInerney, Brown, Dan Brown, Renna or any other Dem C/O for the purpose of having a FDE or handwriting analysis during his investigation, and specifically, before he began to present a case to the Grand Jury.

537.    Trey Smith did not obtain handwriting exemplars of McDonough for that purpose during his investigation, and specifically, before he began to present a case to the Grand Jury.

538.    Upon information and belief, Trey Smith purposely did not do so because he sought to wrongfully prosecute McDonough.

F.      Effort Made to Coerce McDonough's Guilty Plea
        McDonough Tells Trey Smith He Will Expose Scapegoat Conspiracy

539.    On or about January 2010, and thereafter, up to and including January 28, 2011, Trey Smith sought to coerce McDonough into pleading guilty to avoid indictment.

540.    The effective suppression of the truthful testimony of O'Malley, Martiniano, McInerney, Renna, Galuski, Campana, and others that would have exculpated McDonough and

the false testimony of McGrath and Brown would never have been undone if McDonough had plead guilty in the face of a grossly over-charged indictment.

541.    Also, Renna would never have come forward, all the Dem C/O would have asserted their 5th Amendment right to remain silent to keep from testifying and Trey Smith would have simply discredited and marginalized Martiniano if he later came forward.

542.    However, because he was innocent, the conspiracy did not end in McDonough's plea because he refused to succumb to coercion even after Trey Smith targeted him for prosecution as the mastermind of the AB forgery and leaked that his indictment was imminent.

543.    Furthermore, even after McGrath in March 2010 made his false accusations against McDonough as stated, there was no reasonable cause to believe McDonough forged any AB or committed any crime concerning AAB.

544.    Also, there could be no credible evidence against McDonough because he committed no crime and was not involved in the AB forgery of the Dem C/O.

545.    On the other hand, by November 2009, there was substantial evidence to prove that all the AB released on AAB the Dem C/O filed on September 12, 2009 and September 14, 2009 were forged by McInerney, McGrath, Brown, Renna, and others in conspiracy.

546.    In fact, Dem C/O, including McGrath, McInerney, Brown, and Renna, falsely voted all the forged AB as well as forged and sealed the AB Env in which they were filed.

547.    Also, Trey Smith took no further substantive action in the investigation of the AB forgery after McGrath falsely incriminated McDonough in March 2010.

548.    At all times on or about July 2010 and thereafter, McDonough informed Trey Smith through counsel that he would provide truthful testimony if called upon to testify but if prosecuted would seek vindication by dismissal or trial verdict.

549.   More specifically, after Trey Smith disclosed copies of all witness statements and related records obtained through the private and criminal investigations, McDonough informed him it was obvious from the evidence that the AB forgery was committed by those Dem C/O he sought not to prosecute; i.e. McGrath, Brown, McInerney, DeFiglio, Renna, and others.

550.   In fact, defense counsel repeatedly told Trey Smith that if McDonough were wrongfully prosecuted, he would take all proper actions to expose the scapegoat conspiracy in defense of any such unlawful and reprehensible action.

G.   Trey Smith Assists in Allegedly Finding McDonough's DNA on 3 AB Forged by McInerney and Renna To Support Prosecution Theory After Lab Fails to Find DNA

551.   Upon information and belief, because of the alleged conspiracy, Trey Smith knew from McInerney, Brown, and/or McGrath, likely indirectly through counsel and/or McNally, that: (a) Renna's DNA likely would be found on several AB Env he forged; (b) McGrath's DNA likely would be found on several AB Env; (c) McInerney's DNA likely would not be found on any AB Env because he used gloves and water to seal them; and Brown's DNA would likely not be found on any AB Env because he did not seal them.

552.   Trey Smith must have known that the DNA of McInerney, Brown, and Dan Brown would not be found on any AB Env because he told them they would not be prosecuted before DNA testing was sought (although McInerney forged all or most of them).

553.   Trey Smith must have known that McGrath's DNA would be found on AB he forged because he gave him immunity with impunity so he would not be prosecuted and, therefore, there was no need to test for his DNA (he breached the cooperation agreement in the making).

554.   Also, Trey Smith never questioned Renna or named him as a suspect, so no AB Env was tested for his DNA at that time.

555.    On or about July 2011, Trey Smith obtained a court order compelling McDonough, LoPorto, McInerney, and/or others to submit to DNA testing.

556.    On various dates thereafter, Trey Smith had numerous AB Env tested for DNA even though the focus of his investigation was never centered on AB forgery.

557.    Upon Trey Smith's direction, the NYSP tested numerous AB Env for DNA.

558.    Thereafter, the NYSP crime lab allegedly found McDonough's DNA on the sealed portion of 3 forged AB Env (voters Testa, Robertson and Suozzo).

559.    Interestingly, McDonough's DNA was allegedly found: (a) only after the NYSP crime lab used extraction methods Trey Smith proposed and monitored following many negative findings using established protocols; and (b) only on 3 AB Env of voters who were not among the public housing residents asked to sign AAB by McGrath, McInerney, DeFiglio, Brown, Dan Brown, LoPorto, Galuski, Aldrich, or any other Dem C/O on or before September 12, 2009, to support Trey Smith's theory that McDonough finished the forgery process at the BOE.

560.    Also, McInerney forged voter Suozzo's AB but he did not mention McInerney in his deposition, and, Renna forged the Testa and Robinson AB but had no contact with them and was never questioned or identified as a suspect by Trey Smith, even after he tampered with DeFiglio for McInerney and Brown in 2010 to keep him quiet.

561.    Therefore, it just so happened that McDonough's DNA was extracted from AB Env of voters that, as long as McInerney and Renna did not testify, would appear had no contact with any Dem C/O for the false implication that they must have been forged by McDonough "behind the counter" at the BOE, which just happened to support Trey Smith's purported theory.

562.    McDonough's DNA was purportedly found using Trey Smith's proposed new technique while in his and Ogden's presence, after none was extracted from many other envelopes.

563.     However, McDonough determined and disclosed to the supervisory NYSP after his indictment that: (a) the AAB for voters Testa and Robertson appeared to be completed entirely in the uniquely identifiable handwriting of Renna (for which he was later prosecuted only because of the action of McDonough and supervisory NYSP), and, (b) the 2008 and 2007 AAB for voter Suozzo appeared completed in the handwriting of McInerney (for which he was later arrested).

564.     McDonough recalled seeing Renna only once in that election period and assisting him in filing 2 AAB for the 2009 WFP primary openly at the BOE counter with employees nearby.

565.     McDonough recalls that in assisting Renna he inserted those AB into envelopes.

566.     However, McDonough had no contact with Suozzo or his AB Env, did not falsely vote any AB or forge any AB Env, and was not indicted for doing so.

567.     Thus, the finding of his DNA on those envelopes is innocuous or questionable.

568.     Ogden collected McDonough's DNA and attended the NYSP crime lab with Trey Smith to use his proposed technique to extract DNA from those AB Env.

569.     At trial, McInerney admitted that Renna was like a father figure and his mentor.

570.     McDonough was not involved in the forgery of any AB Env, did not lick or seal any of those AB Env, and no saliva was present or tested on any AB Env.

571.     Therefore, if McDonough's DNA was truly present on any of those AB Env it is only because of incidental handling, the environment, or contamination.

572.     Regardless, the alleged finding of McDonough's DNA on those AAB is relevant only as it concerns the fabricated trial testimony of McInerney and Renna, as discussed below.

H.     Trey Smith Takes Case to Grand Jury Action with No Credible Evidence

573.     On or about September 2010, Trey Smith commenced a Grand Jury proceeding against McDonough and LoPorto.

75

574.    At the same time, Trey Smith served subpoenas with McDonough as a defendant and leaked to the media that he was the primary target whose indictment was imminent.

575.    In support of a DNA application, Trey Smith submitted the affidavit of Ogden in which he alleged the AB forgery was committed in conspiracy by McGrath, Brown, McInerney and others, including McDonough.

576.    However, Trey Smith did not present a conspiracy charge before the Grand Jury, never charged any Dem C/O of committing the AB in conspiracy, and never intended to indict or prosecute McGrath, Brown, McInerney, and other Dem C/O who committed the AB forgery.

577.    Trey Smith had no handwriting or forensic evidence against any person.

578.    At the time, Trey Smith had no credible evidence to even establish reasonable cause to believe that McDonough committed AB forgery or any crime.

579.    Trey Smith had only the fabricated false accusations of McGrath about 2 AAB and a purported conversation between McDonough and Brown about AB Agent names, as stated, and the essentially evidentiarily meaningless purported finding of McDonough's DNA on 3 AB Env.

580.    Therefore, it would have been plain to any reasonable investigating prosecutor or that there was no reasonable cause to suspect McDonough committed AB forgery or any crime.

581.    Nonetheless, on or about September 2010 to January 2011, Trey Smith sought to coerce McDonough into pleading guilty through routine leaking of information, abuse of process, and other scare tactics while he presented evidence before a Grand Jury.

582.    Again, however, McDonough stood on his innocence and refused to bow.

I.      McDonough's Notice of Intent to Testify and Request for Witness Testimony

583.    In September 2010, McDonough gave Trey Smith notice of his intent to testify in Grand Jury and request that Bugbee, O'Malley and others be called as witnesses on his behalf.

584.    That fact was reported in the local newspapers and, upon information and belief, was known by McInerney, McNally, Chair Wade, and others.

J.    Trey Smith, McNally, McInerney, and Chair Wade Acted in Concert to Keep McDonough and Bugbee from Testifying in Grand Jury

585.    Trey Smith knew that the fabricated false testimony of McGrath was insufficient to obtain such an indictment, especially if challenged.

586.    Trey Smith knew the false testimony of Brown, Ogden, and O'Malley had to be fabricated to be plausibly consistent with McGrath's fabricated false testimony, especially regarding the events of September 14, 2009 in McDonough's office, especially if he testified.

587.    Trey Smith also knew that if he testified McDonough would incriminate McGrath, Brown, and McInerney in AB forgery and perjury.

588.    Trey Smith also intended to obtain a grossly over-charged indictment to coerce a guilty plea or obtain a wrongful conviction at trial.

589.    Therefore, after McDonough gave notice of his intent to testify, McInerney, McNally, Chair Wade and Trey Smith took action to prevent him from testifying.

590.    There can be no other plausible reason for McNally to once again involve himself in the matter from which he was disqualified by giving legal advice to the primary target of a Grand Jury case, especially in view of other pertinent facts.

591.    Initially, Chair Wade told McDonough he should not testify before the Grand Jury.

592.    Soon thereafter, McNally called McDonough, without the knowledge or consent of his attorney, to give him the names of attorneys to retain in substitution of record counsel.

593.    McInerney acted as McNally's messenger in giving those names to McDonough.

594.    On December 6, 2010, McNally left McDonough a voice message to call him.

595.   On December 7, 2010, BOE employee Mary Sweeney told McDonough that McInerney gave her the names of two attorneys McNally said he should contact because they would "*do a good job at a lesser fee*" than his attorney.

596.   On December 8, 2010, McNally answered McDonough's return call and asked if he had "*gotten the message from our friend*", but when asked his advice about testifying before the Grand Jury, said "*I can't answer that question, I got to go*" and ended the conversation.

597.   Shortly after that call, Chair Wade called and told McDonough that one of the two named attorneys owed him a favor and he would make a call for him.

598.   When called, that attorney told McDonough that he likely would not have him testify before the Grand Jury and could probably resolve the case without too much expense.

599.   Then, before the date McDonough would be permitted to testify, O'Malley and other BOE employees told McDonough that Trey Smith had treated them in an aggressive and rude manner ("*almost as if they were criminals*").

600.   Trey Smith's actions were further tactics to scare, intimidate, and prevent McDonough from testifying in conjunction with his prior personal derogatory remarks and threat.

601.   Trey Smith also ensured that Bugbee did not testify before the Grand Jury about AB protocol and procedures or the 2007 and 2008 AAB that he believed were forged by McInerney but ignored by Trey Smith by advising him that if he testified he might incriminate himself and be prosecuted so he would be required to waive immunity and he should retain an attorney.

602.   Trey Smith's actions were purposeful tactics to prevent Bugbee from testifying about facts that would exonerate McDonough and incriminate McInerney in the AB forgery.

603.   All those actions instilled in McDonough more concern and distrust of Trey Smith and caused him to not testify at Grand Jury contrary to the advice of his attorney.

604.   McDonough believed that Trey Smith was intent on fabricating false testimony to wrongfully prosecute him instead of the Dem C/O guilty of the AB forgery and he did not trust him to properly and fairly present the matter before the Grand Jury.

## XXIV.   Conspiratorial Fabrication of False Testimony to Initiate Prosecution

605.   When the orchestrations to coerce McDonough into pleading guilty failed, Trey Smith then had to fabricate the false statements and Grand Jury testimony of Ogden and O'Malley to be as consistent as possible with McGrath's false testimony, especially if he did testify.

606.   If McGrath, Brown, or O'Malley told the truth, especially about what happened in his office on September 14, 2009, he could not have been prosecuted.

607.   Ogden also played a key role in the initiation of the prosecution through patently false and improper purported law enforcement expert opinion testimony.

A.   Trey Smith and Ogden Emails Show Lack of Evidence and Conspiracy in Prelude to Ogden's Fabricated False Grand Jury Testimony to Initiate Prosecution

608.   As said, when Trey Smith began presenting a case before the Grand Jury the purported evidence against McDonough was essentially non-existent, i.e. the uncorroborated, self-serving statement of McGrath for immunity that was patently false in all other respects.

609.   Trey Smith and Ogden essentially admitted that fact in emails related to DNA.

610.   In an email dated September 27, 2010, Trey Smith stated: *"Now I'm thinking maybe I start off with an indictment of both LoPorto and McDonough instead of just LoPorto ... I don't think any statements from McDonough to third parties (NYSP) explicitly incriminate LoPorto and none from LoPorto (to Couch) explicitly incriminate McDonough ...."*

611.   In reply, by email dated September 29, 2010, Ogden stated: *"I agree with indicting both []. At the very least that McDonough is guilty of official misconduct."* A copy of those emails is attached as Exhibit "E" and incorporated herein by reference.

B.   McGrath's Conspiratorially Fabricated False Testimony to Initiate Prosecution

612.   On or about December 8, 2010, McGrath testified at Grand Jury consistent with his prior fabricated false statement.

613.   In substance, McGrath testified that he witnessed McDonough write false Excuses on the Dickenson and/or Taylor AAB and on another date overheard McDonough talking with Brown about names he intended to write as AB Agents on about thirty-five (35) AAB that the Dem C/O had voters sign on and/or before September 12, 2009.

614.   Again, McGrath testified that McDonough "kicked" him and Brown out of his office after mentioning AB Agent names to be entered on AAB apparently because he did not want them to be involved or witnesses to his false "finishing" of AAB.

615.   Again, however, McGrath did not mention that O'Malley was in the room when he and Brown were there.

616.   McGrath also denied having committed the AB forgery or criminal acts in conspiracy with Brown, Dan Brown, McInerney, and/or other Dem C/O.

617.   McGrath intentionally did not testify truthfully about material facts that would have incriminated Brown, McInerney, and others in the AB forgery, incriminated Brown in perjury, exonerated McDonough and exposed the conspiratorial scapegoat prosecution.

618.   Specifically, McGrath did not admit that he committed the AB forgery in conspiracy with Brown, McInerney, Dan Brown, DeFiglio, Renna and others.

619.   McGrath's testimony was false in all material respects and fabricated in conspiracy with Trey Smith and/or others to initiate the scapegoat prosecution of McDonough.

620.   McGrath's fabricated false testimony incriminated McDonough in alleged acts which he did not do, but for which he was indicted as a direct result thereof.

621.   More significantly, McGrath's false testimony set the foundation for the false testimony of Ogden, Brown and O'Malley as discussed below.

C.   Ogden's Conspiratorially Fabricated False Testimony to Initiate Prosecution

622.   On or about January 13, 2011 and January 24, 2011, Ogden testified before the Grand Jury, in substance, that he reviewed the handwriting on the Dickenson and/or Taylor AAB and all the other allegedly falsified or forged AAB filed in the subject WFP (about 40) and in his experience as a NYSP investigator it was his opinion that the AB Agent and Excuses on all those AAB were written in the same handwriting and distinct pattern that showed they were all falsified by the same person.

623.   At trial Ogden testified that he believed McGrath's patently false denial of guilt over the irrefutable sworn statements of the defrauded voters who stated that they did not complete or give him permission to compete their AB documents, including AB vote.

624.   At the same time, Ogden intentionally did not testify about relevant evidence obtained during the investigation that would have exonerated McDonough and proved that the subject AB forgery was committed by known Dem C/O, including McGrath.

625.   Upon information and belief, Ogden's testimony was false in all material respects and fabricated in conspiracy with Trey Smith to initiate the scapegoat prosecution of McDonough and obtain the objectives of their extrajudicial conspiracy.

626.   The Excuses and AB Agents on all those AAB do not appear to the naked eye and lay observer to have been written in the same handwriting and the facts prove they were not.

627.   No reasonable investigator could have offered such patently improper and false testimony or purported expert investigator opinion testimony.

628.    Ogden's fabricated false testimony incriminated McDonough in alleged acts which he did not do but for which he was indicted as a direct result thereof.

629.    More significantly, Ogden's false testimony provided the only purported direct evidence for the indictment of McDonough for all charges in the indictment except those related to the 10 AAB based on the false testimony of McGrath and O'Malley and those related to the 3 AB Env based on the purported DNA evidence, as described.

630.    At trial, Ogden admitted that his purported law enforcement expert testimony before the Grand Jury was not correct and a mistake.

D.    O'Malley's Conspiratorially Fabricated False Testimony to Initiate Prosecution

631.    On or about December 9, 2009, O'Malley appeared before the Grand Jury in response to subpoena openly served upon him at the BOE.

632.    At that time, Trey Smith elicited O'Malley's vague but truthful testimony that he wrote Excuses on several of the AAB in McDonough's office on September 14, 2009.

633.    At that time, Trey Smith did not show O'Malley all eight AAB on which he wrote the Excuses that Brown gave him while in McDonough's office on September 14, 2009.

634.    O'Malley testified that the person who gave him those Excuses was "*probably the candidate*" who got that information from "*probably an operative.*"

635.    Indeed, O'Malley got all those Excuses from Brown (the candidate) after Brown made a telephone call to McInerney (the operative) and told O'Malley that he had the Excuses the voters gave to be entered on the AAB, as stated.

636.    O'Malley's initial testimony was orchestrated by Trey Smith as a ruse to hide from McDonough the fact O'Malley would return to the Grand Jury and falsely accuse him of making him write false Excuses on AAB in his office.

637.    The fabrication of O'Malley's false testimony by Trey Smith is further evidenced by certain relevant memoranda and emails between Trey Smith, Ogden, and O'Malley's attorney. Relevant memoranda/email are attached as Exhibit "F" and incorporated herein by reference.

638.    Those memoranda and emails show that before and/or after O'Malley first testified at Grand Jury, Trey Smith purportedly analyzed the AAB and determined that his handwriting appeared on many AAB and, therefore, he could be prosecuted as a "kingpin" of the AB forgery.

639.    Then, on or about December 13, 2010 at 2:45 a.m., Trey Smith directed Ogden to contact O'Malley and warn him that he should get an attorney because there were perjury problems with his Grand Jury testimony.

640.    Upon information and belief, Ogden did so that same day.

641.    On December 14, 2010, Trey Smith contacted the BOE and informed its employees under subpoena that the Grand Jury scheduled for the next morning was cancelled.

642.    That same day, Trey Smith called McDonough's counsel to specifically confirm that the Grand Jury scheduled for the next morning had been cancelled.

643.    Then, on December 15, 2010 at 4:10 a.m., Trey Smith sent O'Malley's attorney an e-mail threatening to prosecute him for AB forgery and warning that it made no sense for him to protect his boss, who was likely going to be publicly disgraced and imprisoned.

644.    That morning, O'Malley took a personal day off and re-appeared before the Grand Jury without informing anyone in the BOE about it.

645.    O'Malley returned to the Grand Jury and testified, in substance, that on September 14, 2009, his boss McDonough called him into his office and told him to make-up Excuses and write them on those 8 AAB, so he did.

646.   At trial, O'Malley admitted that Trey Smith called him at his home the night before he returned to the Grand Jury, although he had never done so before.

647.   O'Malley testified he could not recall the substance or one word of the discussion.

648.   O'Malley's testimony was false in all material respects and fabricated in conspiracy with Trey Smith and/or others to initiate the scapegoat prosecution of McDonough and obtain the objectives of their extrajudicial conspiracy.

649.   O'Malley's surreptitious return to the Grand Jury was orchestrated by Trey Smith to avoid exposing O'Malley's false testimony and the conspiracy to McDonough.  Several relevant contemporaneous e-mails between Trey Smith and McDonough's defense attorney concerning the matter are incorporated herein by reference.

650.   O'Malley's truthful testimony would have incriminated Brown and McInerney in the AB forgery, incriminated McGrath and Brown in perjury, exonerated McDonough and exposed the conspiratorial scapegoat prosecution.

651.   O'Malley intentionally did not testify truthfully.

652.   Specifically, O'Malley did not admit that Brown told him the Excuses to write on those AAB in McDonough's office in the presence of McGrath and that he did not commit any crime while assisting Brown nor, to his knowledge, did McDonough.

653.   At that time, O'Malley intentionally did not testify truthfully about the delivery of the AB released on the AAB filed on September 14, 2009 to McInerney that also would have incriminated Brown and McInerney in the AB forgery, incriminated Brown and McGrath in perjury, exonerated McDonough, and exposed the conspiratorial scapegoat prosecution.

654.    O'Malley's testimony was false in all material respects and fabricated in conspiracy with Trey Smith and/or others to initiate the scapegoat prosecution of McDonough and obtain the objectives of their extrajudicial conspiracy.

655.    O'Malley's fabricated false testimony incriminated McDonough in alleged acts which he did not do, but for which he was indicted as a direct result thereof.

656.    More significantly, O'Malley's false testimony was given to be consistent with the false testimony of McGrath and Ogden as well as the prosecution theory.

657.    Trey Smith knew O'Malley was in McDonough's office on September 14, 2009 and wrote Excuses on those AAB because McGrath (and/or Brown) told him - even though he purposely did not mention that fact in his statement (of Grand Jury testimony).

658.    O'Malley knew the truth but played along with Trey Smith's charade that he committed perjury in his initial Grand Jury testimony (when he had not) and that he was worried about being indicted as a kingpin in the AB forgeries (when he was not).

659.    O'Malley testified at trial that he was a nervous person afraid of his own shadow, had never committed any crime before, and knew the investigation centered on "his boss."

660.    If O'Malley, McGrath, and Brown were not acting in conspiracy with Trey Smith none of them would have been able to lie consistently about those facts.

661.    Upon information and belief, O'Malley was told by the Dem C/O (got the "word") not to talk and would not be involved in the prosecution unless and until necessary.

662.    Notably, McGrath did not mention O'Malley when he gave his statement in March 2010 or testified in the Grand Jury.

663.    Trey Smith knew that he "needed" O'Malley to give false testimony before the Grand Jury to obtain an indictment only after McDonough gave notice of intent to testify.

664.    Trey Smith gave O'Malley immunity to falsely testify against McDonough with impunity as he did McGrath.

665.    McGrath and Brown knew that O'Malley could not be named as a suspect to enable his to raise his 5th Amendment right and refuse to testify (stay silent) because he did nothing wrong.

666.    Thus, O'Malley would be used only if McDonough did not plead guilty.

667.    More importantly, O'Malley, McGrath and Brown knew that if O'Malley told the truth he would exonerate McDonough and expose all of them to prosecution and civil liability.

668.    Upon information and belief, O'Malley's false testimony was therefore fabricated by Trey Smith and the others to be direct proof of McDonough's guilt because it would be consistent with McGrath's false testimony (i.e. McDonough had him write false Excuses on AAB).

669.    The conspiracy is also shown by the fact McGrath, O'Malley, Brown, McInerney, and others could have told the truth to exonerate McDonough at any time, but they did not.

## XXV.    74 Count Indictment

670.    On January 28, 2011, McDonough was indicted on 74 felony counts (38 Forgery 2nd Degree and 36 Criminal Possession of a Forged Instrument 2nd Degree).

671.    Trey Smith obtained the indictment based on the false testimony of McGrath, O'Malley, and Ogden after having about 14 months to follow, gather and analyze the evidence.

672.    All the charges concern the alleged entry of false data on signed AAB and AB, not the forgery of AB votes and signatures committed by those Dem C/O who were never indicted.

673.    Nonetheless, Trey Smith arranged for McDonough to suffer a pre-arraignment arrest, detainment, handcuffing, and "perp-walk" before the court and media. At arraignment, Trey Smith requested the forfeiture of any passport pending disposition of the case and McDonough's liberty was restricted to travel within the United States.

**XXVI.**      **Trey Smith Notarized Forged Signatures on Grand Jury Voter Affidavits**

674.    To obtain an overcharged indictment, Trey Smith had to present the testimony or CPL 190.40 affidavits ("Forgery Affidavit") of all the voters before the Grand Jury.

675.    Relevant records of his investigation show that Trey Smith had some difficulty in locating and ensuring the appearance of witnesses.

676.    Trey Smith prepared and notarized such affidavits concerning falsification of their AAB for all or most voters in case needed at Grand Jury in lieu of testimony.

677.    At trial, two of those voters testified that the signature on their purported Forgery Affidavit was not genuine.

678.    College student Jermaine Joseph was the first prosecution witness.

679.    On cross examination, Mr. Joseph testified that the signature above the name "Joseph Jermaine" on his purported Forgery Affidavit - which Trey Smith notarized - was not his.

680.    Mr. Joseph testified that he never saw the document before and found it humorous that his name was incorrectly juxtaposed in print several places without correction.

681.    He said he never would sign such a document without correcting such an error.

682.    In chambers, Trey Smith perspired so profusely that sweat literally dripped down his face as he struggled to address the issue with the Court.

683.    Notably, even the trial court stated on the court record: *"... The whole trial - the first witness out of the box says there's a forged instrument that the People presented."* The relevant portion of the court transcript is incorporated herein by reference.

684.    Later, voter Jolene Van Vranken testified similarly.

685.    Mrs. Van Vranken also signed a court exhibit which clearly demonstrated that her signature did not match the one notarized by Trey Smith.

686.    She also confirmed her testimony in affidavits given to a private investigator and N.Y.S. Attorney General investigator. Her Forgery Affidavit, portion of her relevant trial testimony, and trial exhibit are attached as Exhibit "G" and incorporated herein by reference.

687.    Trey Smith did not question those voters about their testimony and opposed a motion for hearing on the issue but later contradicted their un-impeached testimony by affirming that they signed their affidavits in his presence.

688.    The signatures of the forgery affidavits do not appear to match that of the voters.

689.    Later, private and Attorney General Investigators obtained affidavits from voter Van Vranken and her husband which confirmed her trial testimony that the signature Trey Smith notarized was not hers. Those statements and reports are incorporated herein by reference.

## XXVII.    Post-Indictment Acts in Continuation of Scapegoat Prosecution

690.    About a year after his appointment and the expenditure of hundreds of thousands of dollars in fees, costs, and laboratory resources, only McDonough and LoPorto were indicted.

691.    None of the Dem C/O alleged by Trey Smith in his application for DNA samples to have committed the AB forgery in conspiracy were indicted or prosecuted.

692.    To the contrary, Trey Smith: (a) gave immunity, promises of non-prosecution, or very favorable treatment to McGrath, DeFiglio, Couch, Caird, Welch and Aldrich; (b) told Brown, McInerney, and Dan Brown they would not be prosecuted; (c) did not investigate Michael Leonard and Richard Mason; and, (d) failed to contact Renna and Martiniano.

693.    Trey Smith played the role of lead investigator in directing and participating in his investigation throughout all stages, especially the questioning of suspects.

694.    Trey Smith continued to pursue the scapegoat prosecution in that capacity to gather (i.e. fabricate) evidence throughout, including after McDonough's indictment and during trial.

695.    After indictment, Trey Smith publicly stated that he simply "followed the evidence" in his investigation.

696.    However, Trey Smith, acting in concert and conspiracy with the co-defendants and others, intentionally and maliciously acted to deprive McDonough of his liberty without due process of the law by failing to obtain, ignoring, and suppressing evidence sufficient to convict McInerney, Brown, McGrath, and the other guilty Dem C/O, and fabricating and orchestrating the false testimony of McGrath, O'Malley, Ogden, Brown, McInerney, Renna, and Robillard to initiate and continue his wrongful prosecution as a scapegoat for alleged acts he did not commit.

697.    It is alleged the record facts prove Trey Smith, in that capacity, did so to avoid prosecution of the Dem C/O who committed serious election crimes.

698.    Trey Smith abused the criminal process by wrongfully obtaining a baseless and grossly over-charged indictment to coerce McDonough into pleading guilty in order to avoid the exorbitant cost of a protracted trial and likely imprisonment with no prospect of the jury hearing the testimony of those who could exonerate him if they told the truth.

A.      Trey Smith Had No Intention of Prosecuting the Guilty Dem C/O

699.    On the day of arraignment, during an off-record discussion in chambers, Trey Smith told Court that he did not intend to present any other related matters before a Grand Jury.

700.    Trey Smith denied that fact weeks later when McDonough exposed the scapegoat prosecution in a motion to disqualify and dismiss, which caused the supervisory NYSP concern.

701.    However, the supervisory NYSP later disclosed Trey Smith told them in 2009, 2010, and 2011 that McInerney and Brown could not be prosecuted because the evidence was not sufficient to corroborate accomplice (DeFiglio) testimony.

702.   At trial, McInerney and Brown admitted that their ostensible prosecutions were forced in 2011 by the NYSP independent investigation.

B.   Improper Extrajudicial "Press Release" Statements with McDonough's Enlarged "Mug Shots" Conspicuously Displayed

703.   On January 28, 2011, Trey Smith held a post-arraignment press conference during which he essentially announced the end of his investigation. A copy of Trey Smith's "Press Release" is attached as Exhibit "H" and incorporated herein by reference.

704.   Trey Smith had McDonough's arrest photo displayed at the conference.

705.   In his release, Trey Smith publicly said that McDonough committed "*massive fraud perpetrated on the citizens*" of the county that deprived all of them of their most fundamental Constitutional right to vote and that he was guilty of the 74 felonies charged.

706.   Trey Smith stated, among other things, that: (a) his understanding of the case was first limited to the information produced at the *Lambertsen* hearing; (b) although it was clear that the rights of numerous voters were violated, it was not then clear who was responsible so he called on the NYSP to assist his investigation because of the extent of the fraud and need for investigation and possible forensic examination of evidence; (c) "*[t]ogether with the [NYSP], [he] followed this case where the evidence led us. ... and even the evidence of those [elected officials] who have cooperated must be viewed critically in this search for the truth;*" (d) "*While some have admitted very limited responsibility ... not surprisingly no one has come forward to take full responsibility for the massive fraud perpetrated ...*"; (e) ...; (f) Inv. Ogden "*poured over the documentary evidence and discerned patterns in that evidence which led to the indictment unsealed today*"; (g) ... and (h) all citizens were victimized by the misappropriation of the votes of others and that anyone who minimizes the crimes thereby trivializes a principle of equality that our Founding Fathers believed to be a fundamental right of all human beings.

C.      Trey Smith Hired Robillard to Give Opinion that Supported False Testimony and
        To Not Perform Ink Analysis on Dickenson and Thirteen (13) Other Crucial AAB
        for Payment of One Hundred Thousand Dollars

707.    On June 10, 2011, Trey Smith sought McDonough's handwriting exemplar.

708.    Trey Smith did not seek those of McGrath, McInerney, Brown, Dan Brown, or any
other Dem C/O alleged in his DNA application to have committed the AB forgery in conspiracy.

709.    Trey Smith did not obtain the services of a law enforcement FDE.

710.    Instead, Trey Smith retained purported private FDE Robillard to: (i) compare
McDonough's handwriting with the false AB Agent and Excuses on the AAB; and, (ii) conduct
ink and indentation forensic analysis of them.

711.    A routine computer search at the time would have revealed that Robillard was then
identified as "*a paid professional liar for hire*" by one of his peers.

712.    A routine computer search at the time would have revealed that Robillard's
qualification to testify as an expert was the subject of the U.S. Supreme Court case of *Delaware v.
Fensterer*, 474 U.S. 15 (1985) because he gave an opinion in support of a prosecution theory
without being able to recall the scientific method he used to come to that conclusion.

713.    A routine computer search at the time would have also revealed that Robillard was
a supervisor of the FBI crime laboratory DNA Unit before its reorganization following highly-
publicized investigations by the government concerning alleged improper hair and fiber, ballistics,
and other forensic laboratory services during which it was reported he admitted to ordering a
subordinate to destroy the results of proficiency tests that were all substandard.

714.    On September 26, 2011, McDonough gave handwriting exemplars to Robillard.

715.    However, Robillard essentially became part of the prosecution team and acted closely with Trey Smith and Ogden to formulate purported opinion and indentation "evidence" in support of their prosecution theory against McDonough.

716.    Relevant letters and records show Trey Smith essentially told Robillard what findings and opinions were needed to support every count of the indictment, witness testimony, and purported prosecution theory against McDonough. A copy of Trey Smith's self-explanatory letter of July 22, 2011 which shows the same is attached as Exhibit "I" and incorporated herein.

717.    Trey Smith did not request Robillard to perform a handwriting comparison concerning the AAB in accordance with the established standards of forensic practice to ensure a proper, objective handwriting and forensic examination of the AAB.

718.    To the contrary, Trey Smith provided Robillard a copy of the indictment and a summary of what he called the "evidence" against McDonough related to each count thereof.

719.    Trey Smith and Ogden told Robillard the theory of the prosecution and what AB Agent and Excuses were alleged to be false and have been written by McDonough.

720.    Later, after the prosecutions of McInerney, Brown, and Renna were forced by the NYSP independent investigation, Trey Smith gave Robillard charts explaining by indictment count each AAB entry a Dem C/O admitted to making or McDonough allegedly wrote.

721.    Trey Smith essentially gave Robillard the answers to the questions and paid him to give the opinion "needed" to supplant the false Grand Jury testimony of Ogden, and support the theory of prosecution and fabricated false testimony of McGrath, O'Malley, Brown and others.

722.    In his December 1, 2011 handwriting comparison report, Robillard essentially gave the opinion that McDonough wrote all the false AB Agent and Excuses on the questioned AAB.

723.     Robillard was paid approximately one-hundred thousand ($100,000.00) dollars for his handwriting comparison, ink and indentation analysis, report and opinion testimony before another Grand Jury and McDonough trials.

724.     Robillard's report supported the preposterous prosecution theory and Ogden's improper false opinion testimony before the Grand Jury in all material respects.

725.     However, McDonough did not write the AB Agent and Excuses on all these AAB and the handwriting on many of them does not appear to match his examples.

726.     At trial, Robillard testified that Trey Smith asked him to not perform an ink analysis on those 14 AAB that McInerney, DeFiglio, and Galuski obtained before September 10, 2009 and Brown, Dan Brown or another Dem C/O filed on September 10, 2009.

727.     Those AAB appear to the naked eye to have been made entirely in the same ink.

728.     Of course, that fact alone would have exonerated McDonough, disproved the prosecution theory, and proved the falsity of the testimony of Robillard, Ogden, and others.

729.     On or about June or July 2011, Trey Smith fabricated the false forensic opinion report and trial testimony of Robillard by the payment of about $100,00.00 in fees.

## XXVIII.     McDonough Exposed Scapegoat Prosecution in Motion Martiniano Disclosed Further Evidence of Scapegoat Prosecution

730.     On February 24, 2011, McDonough filed a motion to disqualify and dismiss in which he exposed the scapegoat prosecution by stating those facts then known.

731.     McDonough's motion exposing the framing of McDonough was reported in the local news media and Trey Smith's plans began to unravel.

732.     Thereafter, Trey Smith gave patently incredible excuses for his misconduct and attacked all who questioned it.

733.    Thereafter, Trey Smith variously falsely claimed, among other things: (a) Martiniano and Renna were mistakenly not interviewed, not credible, or refused to give statements; (b) admissible evidence was missed by mistake or rejected because it concerned matters beyond his authority; (c) McDonough's attorney was a liar, committed perjury, and controlled an FBI agent; (d) he had "trust issues" with the FBI agent conducting an investigation into McDonough's complaint of scapegoat prosecution who had character flaws and engaged in misconduct to end the prosecution; (e) BOE employees Bugbee and Sweeney were complicit in McDonough's crimes; and, (f) Sr. Inv. O'Brien had engaged in misconduct, been disciplined, and forced to retire.

A.    <u>Martiniano Disclosed Admissions Made by Brown and McInerney and McNally's Advice to Him Not to Come Forward</u>

734.    The next day, on February 25, 2011, Martiniano came forward and disclosed in a sworn statement to a private investigator that the NYSP never interviewed him, Brown and McInerney told him they were going to use the AAB gathered on September 14, 2009 to forge signatures onto AB Env, and McNally told him that he should not contact the NYSP or Trey Smith and disclose the facts he knew about the matter because "*it will all be over soon.*"

735.    Immediately, Trey Smith publicly impugned Martiniano's credibility and integrity in the news reports and court papers.

736.    At the same time, Brown publicly called Martiniano a liar and denied any guilt during a press conference, but Brown's comments were proven to be lies.

737.    Martiniano's statements later proved to be true.

738.    Still, Trey Smith later called Martiniano as a witness at trial only to impeach him.

739.    Trey Smith took no action against McInerney or Brown with that new evidence.

740.    Similarly, when McDonough in an affidavit filed with the court disclosed the facts of September 14, 2009 which incriminated Brown and McInerney, Trey Smith essentially

defended Brown and McInerney in a memo to Ogden dated February 28, 2011, with the following comment: "*I think we have already established that he has a credibility problem; I what find really interesting is how he is now really blowing in not just McInerney, but John Brown as well.*"

741.    Many of the voluminous memorandum, emails, and other records of Trey Smith's investigation evidence the conspiracy and its objectives. The same are incorporated by reference.

B.    McDonough and Newspaper Reporter Discovered Move Evidence of the Guilt of McInerney and Renna That Trey Smith and Ogden Once Again Ignored

742.    After indictment, McDonough reviewed numerous AAB on file at the BOE and found 19 filed in the 2007 general election on which McInerney was the AB Agent, all of which also appeared to have been completed in the same distinct handwriting as the registration card of McInerney and his mother Shirley McInerney.

743.    At that time, McDonough also found 37 AAB filed in the 2008 elections on which McInerney was AB Agent that were completed in his handwriting.

744.    Many of those 2007 and 2008 also had similarly stated vacation Excuses.

745.    As stated, in 2010 Bugbee gave Trey Smith many of those 2007 and 2008 AAB.

746.    Trey Smith told Bugbee that the NYSP was not interested in past AB forgery and he did not have the authority to prosecute those crimes.

747.    Before indictment in 2011, McDonough's counsel provided many of those same AAB to Trey Smith and was given the same response.

748.    At that time, however, a Troy Record newspaper reporter needed only to approach three of those voters to discover from them that their AAB had false information and signatures. That newspaper's related March 7, 2011 article is incorporated by reference.

**XXIX.    NYSP Learned Trey Smith Lied About McInerney and Brown
NYSP and FBI Did Investigations and Interviewed McDonough without Trey
Smith's Knowledge**

**Trey Smith Quashes Federal Investigation**
**Trey Smith Forced to Prosecute McInerney**
**Trey Smith Meets with McInerney and Gives Favorable Agreement**

A.    Supervisory NYSP Questioned Trey Smith's Conduct

749.    Upon information and belief, Sr. Inv. O'Brien questioned Trey Smith's actions in the fall of 2009 when it became apparent McDonough was the focus of his investigation.

750.    As stated, at the time, Trey Smith told the supervisory NYSP that McInerney and Brown could not be prosecuted due to lack of evidence to corroborate accomplice testimony.

751.    Upon information and belief, once McDonough exposed the falsity of that statement and other relevant facts in his post-indictment motion, the supervisory NYSP again had concerns about the investigation, prosecution, and Trey Smith's conduct.

752.    Upon information and belief, the supervisory NYSP then began to take action to conduct a proper investigation and prosecution of the AB forgery.

B.    McDonough Made Complaint about Criminal Violation of Federal Civil Rights
      FBI Assigned to Investigate Scapegoat Prosecution and/or Past AB Forgery

753.    On or about April 2011, McDonough contacted the U.S. Attorney's Office through counsel and requested an FBI investigation into the criminal violation of his civil rights by the unlawful prosecution and the decades of AB forgery DeFiglio disclosed to Trey Smith.

754.    In response, on or about May 2011, the FBI, through an agent in the public corruption unit, began to investigate McDonough's complaint of the violation of his civil rights.

755.    It is known that FBI Special Agent McDonald was assigned to conduct that investigation at the request of the US Attorney's Office.

C.    Trey Smith Acted to Derail FBI Investigation

756.    Upon information and belief, on or about April 26, 2011, Trey Smith learned from a news reporter that the FBI was conducting a federal investigation concerning the matter.

96

757.    Trey Smith immediately sent letters to the U.S. Attorney Office and FBI dated April 27, 2011 and April 28, 2011, respectively.

758.    Those letters show that Trey Smith was concerned about an FBI investigation because it would discredit his work and for other reasons discussed. See, Exhibit A.

759.    Trey Smith publicly stated that he welcomed a federal investigation or take-over of the matter and sought that assistance in the past, but it was declined.

760.    However, Trey Smith then took action to derail it.

761.    Trey Smith leaked to the newspapers variously that there was no federal investigation, the U.S. Attorney confirmed there was no investigation, he was aware of the FBI investigation, and the FBI was assisting the NYSP in his investigation.

762.    Trey Smith falsely told Bugbee that he was working in conjunction with the NYSP, FBI and U.S. Attorney's Office in investigating the AB forgery.

763.    Trey Smith leaked the name of the FBI agent conducting the investigation to impair his ability to get witnesses or suspects to talk to him.

764.    Trey Smith leaked information to the news media that impaired the federal investigation and blamed the FBI Special Agent for doing it, but then admitted he did it.

765.    All times relevant, Trey Smith acted to keep his co-conspirators from cooperating with the FBI and disclosing the scapegoat prosecution.

    D.    <u>Supervisory NYSP Learned Trey Smith's Assertion that McInerney and Brown Could Not Be Prosecuted was False</u>
<u>NYSP Began Independent Investigation to Ensure Their Arrest and Prosecution</u>

766.    On or about May 21, 2009, or soon thereafter, the FBI also confirmed that Trey Smith's statement to the NYSP that McInerney and Brown could not be prosecuted was not true

because the voters' testimony and forged AB documents were sufficient to corroborate the testimony of any accomplice, especially DeFiglio.

767.   On or about May 25, 2011, the supervisory NYSP began to conduct the independent investigation of McInerney without the knowledge of Trey Smith due to their frustration, concern, dissatisfaction, and lack of trust in him.

768.   From on or about May 25, 2011 to August 4, 2011, the NYSP independent investigation gathered overwhelming proof of the guilt of McInerney, Brown, and Renna.

769.   The NYSP obtained that evidence by simple investigation based on the known evidence as stated - without the need for costly DNA or forensic expert services.

770.   That evidence consisted of the same known and easily discoverable testimony and AB documents that Trey Smith ignored or purposely did not obtain throughout.

771.   The NYSP gathered AAB, BOE records and statements from witnesses, including Suozzo, that was sufficient to convict McInerney for the forgery of about 50 AAB that appeared to have been entirely forged in his handwriting. Those AAB, BOE records, and statements are incorporated herein by reference.

E.   Sr. Inv. O'Brien and FBI Interviewed McDonough without Trey Smith's Prior Knowledge on June 1, 2011

772.   At the same time Trey Smith took action to derail the FBI investigation, Sr. Inv. O'Brien sought FBI assistance and federal authorities to take the case over.

773.   Consequently, on May 27, 2011, the FBI requested McDonough to meet with the FBI and Sr. Inv. O'Brien at the FBI building for an interview.

774.   On June 1, 2011, McDonough was interviewed by FBI and NYSP about the unlawful prosecution and his knowledge of the activities of the Dem C/O related to the AB forgery.

775.    Sr. Inv. O'Brien expressly conditioned the meeting upon McDonough's agreement not to disclose it to Trey Smith or any person until the NYSP task was completed.

776.    Trey Smith had no knowledge about that meeting until Ogden informed him of it on or about August 2, 2011.

777.    McDonough was informed at that time that the supervisory NYSP were aware that Trey Smith did not properly investigate or prosecute the matter.

778.    Obviously, the meeting would never have taken place if the NYSP supervisory personnel had confidence and trust in Trey Smith's investigation and related conduct.

779.    Its occurrence alone is beyond extraordinary and speaks volumes.

780.    The NYSP later again showed its lack of confidence and trust in Trey Smith's investigation and conduct by arresting McInerney without his prior knowledge.

F.    <u>Trey Smith Meets with U.S. Attorney Office and FBI, Declared Had Trust Issues with FBI Agent and Quashed Independent FBI Investigation on June 2, 2011</u>

781.    On June 2, 2011, Trey Smith met with the FBI, U.S. Attorney's Office and NYSP.

782.    Trey Smith demanded that meeting purportedly for the primary reason of discussing a coordination of federal and state investigations into the AB forgery and, especially, the prospect of offering McInerney a cooperation agreement.

783.    However, Trey Smith then sought to quash the federal investigation and did so.

784.    At that meeting, Trey Smith stated he had "trust issues" with the assigned FBI Agent because he commenced an investigation, interviewed McDonough's attorney, and interviewed DeFiglio and other witnesses without his knowledge.

785.    At that meeting, Ogden also expressed concern that if the FBI interviewed witnesses or subjects and gave cooperation agreements it might impair Trey Smith's investigation.

786.    At that meeting, the FBI told Trey Smith that the attorneys for several suspects said their clients did not trust him.

787.    In fact, Sr. Inv. O'Brien did not trust Trey Smith and at the time the supervisory NYSP were dissatisfied with his investigation and prosecution of the matter.

788.    At that meeting, Trey Smith was required to admit that there was more than enough corroboration to prosecute and convict McInerney, Brown, and others.

789.    At that meeting, Trey Smith indicated that his investigation would be done soon.

790.    However, at that time, Trey Smith also quashed the independent FBI investigation into McDonough's complaint of public corruption by requesting that it no longer actively investigate the matter independently but merely coordinate and assist the NYSP. A copy of unclassified but redacted FBI reports dated June 3, 2011 (3 p.), June 9, 2011 (2 p.), June 13, 2011 (1 p.), July 20, 2011 (1 p.) and August 5, 2011 (1 p.) that confirm the above facts are attached as Exhibit "J" and incorporated herein by reference.

791.    Thereafter, Trey Smith continued to tell the supervisory NYSP that the arrest and prosecution of McInerney, Brown, and others was imminent.

792.    However, once Trey Smith realized that Sr. Inv. O'Brien was aware he had lied about not being able to prosecute McInerney and Brown and that it was inevitable they were going to be arrested, he made arrangements for McInerney to plead guilty on or about July 15, 2011, to an SCI charging a felony (or misdemeanor) in satisfaction of all charges that could be filed before any cooperation was provided.

793.    Thus, Trey Smith attempted to feign incompetence or poor judgment by giving McInerney the same immunity with impunity that he gave McGrath.

794.    However, Sr. Inv. O'Brien prevented that disposition.

100

G.     McInerney Entered Cooperation Agreement on July 22, 2011

795.   Thereafter, on July 22, 2011, Trey Smith gave McInerney a cooperation agreement pursuant to which he was required to provide complete truthful cooperation in return for a plea of guilty to 1 felony and 90 day work order in satisfaction of all charges related to the 2009 AB forgery, without the waiver of the right to appeal.

796.   However, McInerney would not agree to provide the required cooperation unless the NYSP and FBI agreed not to pursue his arrest or prosecution for any of the AB forgery he committed in past years, especially 2007.

797.   The supervisory NYSP and FBI would not agree to abide by the terms of McInerney's cooperation agreement unless he was fully debriefed by them and they determined that his information was complete, truthful, and accurate.

798.   Trey Smith and McInerney postponed a debriefing because they knew McInerney could not tell the truth without disclosing the conspiracy to scapegoat prosecute McDonough and incriminate all those involved in the AB forgery, conspiracy, and its cover-up.

H.     Trey Smith Told That FBI Interviewed McDonough without His Knowledge
       Trey Smith Sent Email to Ogden Attacking FBI Agent, Defense Attorney, and
       Implying that McNally May Have Committed AB Forgery with McInerney

799.   On August 2, 2011, FBI Agent McDonald told Trey Smith, with agreement of Sr. Inv O'Brien, that the proposed plea bargain was not satisfactory, proper criminal justice procedure required McInerney to provide complete, truthful information about any crimes he may have committed before he received any consideration regarding his arrest, prosecution or sentencing, including any AB forgery he committed in 2007 or 2008.

800.    The supervisory NYSP and FBI knew that they already had obtained and could gather more evidence to convict McInerney of many AB forgery and other serious elections crimes he committed in 2007 and 2008.

801.    Trey Smith also staged a confrontation with the FBI agent at a scheduled initial debriefing of McInerney on or about August 2, 2011, to abruptly end it and give him time to derail the investigations, protect McInerney from prosecution for elections crimes committed in 2007 and 2008, and continue the wrongful prosecution of McDonough.

802.    On August 2, 2011, Ogden told Trey Smith that the FBI had already interviewed McDonough without his knowledge.

803.    As a result, on August 3, 2011, at 5:06 a.m., Trey Smith sent an email to Ogden in which he postulated a conspiracy theory that ironically applies to the scapegoat prosecution and transposed allegations of criminal and/or unethical conduct upon the FBI agent, McDonough, and his attorney. A copy of Trey Smith's email is attached as <u>Exhibit "K"</u> and incorporated herein.

804.    Upon information and belief, Trey Smith succumbed to the pressure of continuing the scapegoat prosecution, its cover-up, and efforts to protect McInerney and others.

805.    Trey Smith may have provided the actual reason for the scapegoat prosecution and its cover-up by stating: "*I would assume that McDonough ... implicated McNally in a conspiracy with McInerney to win the DA's race in 2007. All McDonough would have to do is say that he overheard [them] discussing [it], and that would be sufficient for the Feds to bring conspiracy allegations against McNally. I also assume that presently McDonald [sic] has nothing to corroborate McDonough's allegations.*"

806.    In his memo, Trey Smith essentially told Ogden and Fancher they had to decide where they stood concerning their investigation and impugned the integrity of the FBI agent who

sought to obtain McInerney's complete truthful information before being immunized by stating that he was a "*willing instrument*" of defense counsel and "*very strange individual*" who "*suffered from a number of defects, notably judgment and ambition.*"

807.    Trey Smith attempted to prevent McInerney from telling the truth by giving him the same deal he gave McGrath; i.e. immunity with impunity before he gave any false information in breach of the cooperation agreement which he later did, as stated below.

808.    Later, to continue the wrongful prosecution, Trey Smith falsely told the trial court that he had prior knowledge of the NYSP and FBI interview of McDonough and had directed Sr. Inv. O'Brien to ask specific questions but he purposely did not when, in truth, Trey Smith had no prior knowledge of the meeting which was conditioned upon its non-disclosure to him.

809.    During the trial, Trey Smith accused Sr. Inv. O'Brien of misconduct related to another NYSP investigation and falsely alleged that he was forced to retire.

810.    In any event, McInerney had not provided any cooperation by August 5, 2011.

811.    Therefore, on or about August 5, 2011, a NYSP Captain told the FBI that the NYSP would no longer wait for Trey Smith to make decisions concerning the prosecution of McInerney and others before it took its own action. See, FBI Reports, Exhibit J, above.

I.      McDonough Gave NYSP AAB that Proved Renna Forged AAB for Testa

812.    In that regard, after McDonough was wrongfully indicted for the forged Testa AAB, he discovered that the distinctive handwriting on that AAB also appeared to be on other AAB and party enrollment cards for 2007 and 2008 that were released to, or filed by, Renna.

813.    McDonough provided copies of about 5 of those AAB to the FBI and NYSP when they met in July 2011.

814.     Later in 2011, McDonough's counsel gave the supervisory NYSP copies of 15 other AAB filed in 2007 that also appeared to be fully or partially completed in the same handwriting that appeared to be on the Testa AAB.

815.     The NYSP then easily obtained evidence sufficient to convict Renna for the forgery of those documents, including the Testa AAB, without the need for forensic or DNA evidence.

816.     Regarding McInerney, as stated, the NYSP independent investigation obtained the depositions and forged AB documents of more than 50 witnesses for whom he had sign registration cards and/or AAB which he then used to forge their AB documents, including Suozzo. Those witness statements and forged AB documents are incorporated herein by reference.

817.     The NYSP also obtained the depositions and forged AAB of voters DeFabio, Tangredi and Petit that alone was sufficient evidence to convict Brown.

**XXX.     Supervisory NYSP Independent Investigation Led to Arrest of McInerney and Imminent Arrest of Brown and Renna without Trey Smith's Knowledge**

818.     Consequently, on August 8, 2011, the supervisory NYSP arrested McInerney on several felony complaints for AB forgeries he committed in 2008 and/or 2007.  The related accusatory instruments are incorporated herein by reference.

819.     At that time, the supervisory NYSP also told Trey Smith that the arrest of Brown and Renna was imminent.

820.     Trey Smith did not hold a press conference to publicly disgrace or announce the conviction of the most prolific AB forger in county history.

821.     Trey Smith did not indict McInerney on even only dozens of the easily provable hundreds of AB forgery crimes he committed or seek his imprisonment.

822.     Instead, Trey Smith quietly arranged his guilty plea to one felony which he initially publicly denied was a jurisdictionally defective conviction and proffered a fallacious argument in

court papers for its validity, but then admitted the defect in communications with the NYSP. Those papers related to that matter are incorporated herein by reference.

## XXXI.        Trey Smith's Actions to Continue and Cover-up Wrongful Prosecution

823.    As a result of the FBI and supervisory NYSP actions, Trey Smith was no longer able to keep his promise not to prosecute McInerney and Brown.

824.     All times while the NYSP and FBI conducted their own investigations, Trey Smith took action to continue the scapegoat prosecution, cover-up the conspiracy and protect McInerney, Brown, and Renna from meaningfully prosecution and, especially, keep them from telling the truth that would have exonerated McDonough and exposed their conspiracy.

825.    There is no other plausible explanation for the otherwise inexplicable conduct of Trey Smith, McInerney, Brown, and Renna.

A.    McNally Disqualify Himself and Trey Smith Obtained an Order Extending His Authority to Protect McInerney from Prosecution for 2007 and 2008 Crimes

826.    In reaction to the NYSP arrest of McInerney, in July 2011, more than a year after telling Bugbee and McDonough's attorney that he could not do so, Trey Smith perfunctorily had McNally disqualify himself and obtained an Order extending his authority to prosecute McInerney for his 2007 and 2008 AB forgery. The relevant letters of Trey Smith and McNally to the court dated July 18, 2011, and July 19, 2011, respectively, are incorporated herein by reference.

B.    Trey Smith Interviewed McInerney without the NYSP or FBI Present

827.    For a period thereafter, Trey Smith and McInerney's attorney told the supervisory NYSP that McInerney would schedule a meeting to provide complete truthful information to the NYSP and FBI prior to his guilty plea.

828.    However, Trey Smith misled the supervisory NYSP for a period so that he could meet with McInerney and fabricate his false statement.

829.   On several occasions, Trey Smith met with McInerney for hours without the knowledge of the supervisory NYSP or FBI and "went over" his purported cooperation.

## XXXII.   Fabricated False Statements of McInerney, Brown and Renna

A.   Trey Smith Fabricated McInerney's False Statement to Continue Prosecution

830.   Thereafter, when the NYSP and FBI finally met with McInerney to obtain his cooperation, Trey Smith announced that he had already done so.

831.   Sr. Inv. O'Brien and the FBI present had reasonable cause to believe that McInerney's purported cooperation was not complete or truthful.

832.   Sr. Inv. Ogden had reasonable cause to believe that the information McInerney gave was materially false and previously fabricated with Trey Smith.

833.   Trey Smith allowed McInerney to prepare his sworn written statement over a period with the assistance of his attorney and/or Trey Smith. The statements that were drafted and/or signed by McInerney and any related correspondence is incorporated herein by reference.

834.   Trey Smith fabricated the false statement of McInerney to ensure that he would not tell the truth or provide complete information about all the relevant facts but, instead to be as consistent as possible with other false testimony fabricated against McDonough, support the prosecution theory, and continue the scapegoat prosecution.

835.   McInerney gave his false statement in furtherance of the wrongful prosecution of McDonough and to cover-up the conspiracy.

836.   McInerney did not tell the truth about the AB forgery because it would have exonerated McDonough, proven the guilt of all the Dem C/O for the AB forgery and/or perjury, and proven the conspiratorial scapegoat prosecution.

837.   McInerney intentionally failed to exonerate McDonough, incriminate the Dem C/O who committed the AB forgery or admit that they committed the AB forgery in conspiracy.

838.   McInerney denied having forged the AB documents of Suozzo even though he did so then as well as in the past and was the only person to have any contact with him.

839.   At trial, Suozzo also essentially testified that he was recruited by McInerney to vote by AB and he had contacted him in the past, but not in 2009.

840.   McInerney forged the Suozzo AAB in conspiracy with other Dem C/O, knew who had written false information on it, and forged his AB.

841.   Trey Smith "needed" McInerney to tell the fabricated falsehood that he did not forge the Suozzo AB for the inference that it was forged by McDonough at the BOE.

842.   On the other hand, if McInerney told the truth it would have completely debunked the prosecution theory and itself exonerate McDonough.

843.   Among other false statements, McInerney falsely incriminated McDonough by saying that he gave McDonough the names of several voters, including Robertson, to falsely vote and that he was "*certain that those AB never left the BOE, and that they were forged by McDonough while in his office.*" Ogden's memo dated November 1, 2011 to the supervisor of the NYSP lab confirming the same is incorporated herein by reference.

844.   At the time, McInerney also did not admit that he had helped Jermaine Joseph and Donnell Paterson, two Hudson Valley College students, establish city residency so they could get reduced tuitions, paid them to enroll in the WFP in 2009 and forged their AB documents.

845.   McDonough and O'Malley had no knowledge about those facts at any time.

B.   <u>Trey Smith Fabricated Renna's False Statements to Continue Prosecution</u>

846.   On or about September 20, 2011, and October 18, 2011, Renna was interviewed by Ogden and Fancher.

847.   Renna gave sworn written depositions on October 20, 2011, and November 9, 2011. Renna's depositions are incorporated herein by reference.

848.   In his October 20, 2011 deposition, Renna admitted to having forged the Testa AAB in 2009 because McInerney asked him to help "*get votes*."

849.   In his October 20, 2011 deposition, Renna admitted to having forged at least 11 AAB in the 2007 general election.

850.   In his October 20, 2011 deposition, Renna stated that he almost always gave the AAB that he filed at the BOE to McDonough or Mary Sweeney because he "*knew they would not be questioned*" but admitted that he never discussed forging AB or AAB with anyone or witnessed anyone forge them in his presence.

851.   Therefore, Renna was asked specifically about McDonough.

852.   In his November 9, 2011, deposition Renna admitted that he knew voter Robertson and entirely forged her AAB and AB.

853.   In that deposition, Renna also stated that he was "*relatively certain that [he] completed [] Testa's [AB] while [he] was in [] McDonough's office … [McDonough] was in the office when [he] voted the [AB]*" and did not recall completing the Robertson AB at that time but looking at the documents it appears that he completed the AB for each of those voters then.

854.   On one or more occasions prior to November 9, 2011, and thereafter, Trey Smith directly and/or indirectly through McInerney and/or others acted in concert and conspiracy with Renna to fabricate the false statements and testimony he gave on October 20, 2011 and thereafter

to incriminate McDonough in support of the prosecution theory and continuation of his wrongful prosecution and conviction.

855.    Prior to December 5, 2011, Renna was, in fact, represented in the negotiation of his cooperation agreement and plea bargain by McInerney's attorney or an attorney from his office.

856.    After September 20, 2011, Smith and McInerney's attorney engaged in plea negotiations on behalf of Renna.

857.    On one or more occasions prior to November 9, 2011, and at times thereafter, Trey Smith met with Renna to fabricate his false testimony.

858.    On December 5, 2011, Renna executed a cooperation agreement pursuant to which he was required to provide complete truthful cooperation in return for a plea of guilty to 1 felony and sentenced of 200 hours community service in satisfaction of his 2009 AB forgery. Renna's cooperation agreement is incorporated herein by reference.

859.    On or about December 6, 2011, Renna testified at Grand Jury related to Galuski, Campana, and Brown and gave more fabricated false testimony against McDonough.

860.    At the Grand Jury, Renna falsely testified that he entirely forged the AAB and AB of Testa and Robertson on September 14, 2009, in front of McDonough while in his office and that he trace forged the voter signatures from registration cards McDonough gave him. Renna's relevant Grand Jury testimony is incorporated herein by reference.

861.    In truth, Renna knew that McDonough had only handled the Testa and Robertson AB documents in assisting him at the counter when he filed their AAB.

862.    That fact also explains why Trey Smith was so persistent in having the NYSP lab use new and "better" methods to test for the presence of DNA on those specific AB Env.

863.     However, certain NYSP memos show that although McInerney and Renna were acting in concert and conspiracy with Trey Smith to continue the wrongful prosecution of McDonough through their fabricated testimony - they could not keep the false stories straight.

864.     Thus, for example, in a November 1, 2011 memo to the supervisor of the NYSP lab, Ogden said that McInerney told him that he gave the name of several voters, including Robertson, to McDonough for AB voting and that he was "*certain that those AB never left the BOE, and that they were forged by McDonough while in his office.*"

865.     Yet, in a December 26, 2011 memo to the lab supervisor, Ogden stated that Renna told him that "*he had forged the ballot inside [the Robertson AB Env].*" Those emails are incorporated herein by reference.

866.     Those record facts show Trey Smith, McInerney, and Renna fabricated false testimony against McDonough in furtherance of their conspiracy, but also failed to get their stories straight quickly enough under the pressure of the actions of the supervisory NYSP.

867.     The inference Trey Smith intended to have drawn from the fabricated false testimony of McInerney and Renna was that the Suozzo, Robertson, and Testa AB Env, and, therefore, all the AAB in question, were forged by McDonough in the BOE "forgery factory."

868.     Again, voters Robertson and Testa were not public housing residents and there would not have been anything to connect Renna to the forgery of their AB Env or his involvement in said AB forgeries if McDonough and supervisory NYSP did not force his prosecution because Trey Smith and Ogden "missed" him during their investigation (as they did Martiniano).

869.     Similarly, voter Suozzo was not a public housing voter and, therefore, if McInerney was not prosecuted (as promised) he would never have had to talk about that forged AB because he would have asserted his 5th Amendment rights.

870.   However, as discussed, that orchestration and fabrication of false evidence was ruined when McDonough discovered that the Testa and Robertson AAB were forged entirely in Renna's handwriting and that Suozzo's 2008 and 2007 AAB were forged entirely in McInerney's handwriting, which led Sr. Inv. O'Brien to force their prosecutions.

871.   Trey Smith fabricated the false statement and testimony of Renna to not tell the truth or provide complete information about all the relevant facts, but instead to be as consistent as possible with other false testimony fabricated against McDonough, support the prosecution theory, and continue the scapegoat prosecution.

872.   Renna gave his false statement and testimony in furtherance of the wrongful prosecution of McDonough and to cover-up the conspiracy.

873.   Renna intentionally gave materially false information about the AB forgery in his statement to continue the scapegoat prosecution.

874.   Renna did not tell the truth about the AB forgery because it would have exonerated McDonough, proven the guilt of all the Dem C/O for the AB forgery and/or perjury and proven the conspiratorial scapegoat prosecution.

875.   Renna intentionally failed to exonerate McDonough, fully incriminate the Dem C/O who committed the AB forgery in conspiracy with him or admit that the AB forgery was committed by the Dem C/O acting in conspiracy.

C.   Trey Smith Fabricated Brown's False Statements to Continue Prosecution

876.   Trey Smith was forced by the action of McDonough, the supervisory NYSP and FBI to begin Grand Jury proceedings against Galuski and Campana in the fall of 2011.

877.   Trey Smith leaked to local newspapers that he was also presenting a case against Brown at the same time.

878.   Brown testified before the Grand Jury with counsel pursuant to a waiver of immunity on October 27, 2011, and December 14, 2011.

879.   Brown's appearance before the Grand Jury was a ruse because the supervisory NYSP were already aware that Brown forged the AB documents of DeFabio, Tangredi, and Petit and their readily obtainable AB documents were alone sufficient to convict him.

880.   The NYSP obtained affidavits from DeFabio and Tangredi on or about December 2, 2011, after Brown testified before the Grand Jury on October 27, 2011.

881.   On December 6, 2011, Brown executed a cooperation agreement pursuant to which he was required to provide complete truthful cooperation in return for a plea of guilty to 1 felony and be sentenced solely in discretion of the Court with Trey Smith's recommendation of up to 6 months incarceration and 5 years' probation in full satisfaction of his 2009 AB forgery and perjury. Brown's cooperation agreement is incorporated herein by reference.

882.   On that same day, Brown gave a sworn written deposition. Brown's deposition is incorporated herein by reference.

883.   In his deposition and before the Grand Jury, Brown gave fabricated false testimony about what happened in McDonough's office on September 14, 2009 that was consistent with the false Grand Jury testimony of McGrath and O'Malley.

884.   In particular, Brown falsely stated in his deposition that: (a) he saw McGrath gave McDonough an AAB and what seemed to be a false Excuse for an older voter and McDonough wrote information on that AAB; (b) he was in McDonough's office for about 40 minutes and saw the AAB he brought to the BOE sitting on McDonough's desk; (c) he saw McDonough writing on documents but could not say for sure that they were those AAB; and, (d) he saw O'Malley come in and out of the office but did not recall him sitting at a desk or writing on any AAB.

885.    Brown's false testimony was essentially consistent with the false testimony of McGrath and O'Malley in support the prosecution theory that McDonough falsely completed all the AAB Brown filed that day, but it was otherwise materially contradictory.

886.    On one or more occasions prior to December 6, 2011, and at times thereafter, Trey Smith met with Brown to fabricate his false testimony.

887.    Trey Smith fabricated the false statement and testimony of Brown to not tell the truth or provide complete information about all the relevant facts, but instead to be as consistent as possible with other false testimony fabricated against McDonough, support the prosecution theory and continue the scapegoat prosecution.

888.    Brown gave his false statement and testimony in furtherance of the wrongful prosecution of McDonough and to cover-up the conspiracy.

889.    Brown intentionally gave materially false information about the AB forgery in his statement to continue the scapegoat prosecution.

890.    Brown did not tell the truth about the AB forgery because it would have exonerated McDonough, proven the guilt of all the Dem C/O for the AB forgery and/or perjury and proven the conspiratorial scapegoat prosecution.

891.    Brown intentionally failed to exonerate McDonough, fully incriminate the Dem C/O who committed the AB forgery in conspiracy with him or admit that the AB forgery was committed by the Dem C/O acting in conspiracy.

**XXXIII.    Fabricated False Complaint Made Against Sr. Inv. O'Brien**
**Trey Smith Questioned Sr. Inv. O'Brien re FBI Investigation**
**Trey Smith Asked if FBI "Bugged His Office" or Tapped His Telephones**

892.    Sometime after Trey Smith learned that the FBI and Sr. Inv. O'Brien interviewed McDonough, the NYSP independent investigation into the AB forgery, and arrest of McInerney

113

without his prior knowledge, Trey Smith and Ogden orchestrated a false personnel complaint and/or departmental charges to be made against Sr. Inv. O'Brien concerning an unrelated matter.

893.     That false complaint and/or charges was made by Trey Smith with the assistance of Ogden to quash the NYSP independent investigation, impugn the credibility of Sr. Inv. O'Brien when subpoenaed by McDonough to testify about the matters at trial, and to force him to answer questions about a pending FBI investigation.

894.     Subsequently, on the date or dates known to Trey Smith, Ogden and the NYSP, Sr. O'Brien was ordered by his superiors to submit to a compelled interrogation by Trey Smith about the purported leaking of information concerning Trey Smith's investigation.

895.     However, when Trey Smith questioned Sr. Inv. O'Brien, he asked questions solely about his knowledge of the FBI investigation and, specifically, whether the FBI had "*bugged his office*" or "*tapped his phone*" during its investigation of McDonough's complaint of public corruption, so it was stopped by the NYSP.

896.     During the interrogation, Trey Smith was nervous and perspired so profusely that sweat dripped down his face and wet his clothes.

**XXXIV.     Favorable Plea Agreements and Defective Convictions**

897.     Subsequently, Campana and Galuski were indicted for a few felonies each.

898.     Thus, McDonough forced the arrest and/or ostensible prosecutions of McInerney, Brown, Renna, Campana, and Galuski almost 2 years after the AB forgery they committed in conspiracy but only because of the integrity and commendable actions of Sr. Inv. O'Brien and an FBI agent, both of whom Trey Smith labeled as criminals.

114

899.    However, Trey Smith gave immunity agreements to one of the three primary perpetrators and extraordinarily favorable cooperation agreements and plea bargains to the other two whom he initially told would not prosecute after misleading and lying to the NYSP.

900.    Trey Smith also blindly accepted the denial of guilt from about seven other people the evidence directly implicated in criminal responsibility.

901.    Thereafter, Trey Smith gave extraordinarily favorable plea bargains, sentences, and other dispositions to those Dem C/O prosecuted.

A.    Trey Smith Arranged a Jurisdictionally Defective Conviction for McInerney

902.    As stated, even though McInerney committed 100s of readily provable AB forgery crimes in 2009, 2008, and 2007, Trey Smith agreed to accept 1 felony conviction and a sentence of a minimum number of hours work order.

903.    Trey Smith also arranged for McInerney to plead guilty before he cooperated.

904.    However, Trey Smith cancelled that plea deal after the supervisory NYSP indicated that they would then arrest McInerney for AB forgery he committed in 2007 and 2008 because they were not satisfied with the manner in which the matter was being handled.

905.    Trey Smith then had himself appointed for the prosecution of those crimes and arranged a jurisdictionally defective conviction for McInerney by filing a Superior Court Information ("SCI") alleging a crime not charged by felony complaint.

906.    When McDonough exposed the defect to the trial court, Trey Smith initially denied the same but then tacitly admitted it after McInerney's attorney did so.

907.    Specifically, on August 26, 2011, McInerney waived indictment and consented to be prosecuted by SCI for a 2009 AB forgery.

908.    However, the SCI was apparently not filed with the Court at the time of the waiver of indictment as strictly and jurisdictionally required by State Constitution and statutes.  See, NYS Constitution Art. 1, §6; CPL 195.40 CPL 195.20, 200.15, 1.20(3-a); *People v. Boston*, 75 NY2d 585 (1990); and McKinney's, CPL 195, Practice Commentaries, Peter Preiser, p.190.

909.    Consequently, under State statutory and case law, McInerney's conviction is effectively a nullity that must be vacated upon motion whenever made.

910.    More importantly, the subject waiver and SCI charged a 2009 forgery for which a felony complaint was never filed and upon which McInerney was not held for Grand Jury action.

911.    Again, therefore, McInerney's conviction is a nullity and subject to being vacated upon motion whenever made. See, N.Y.S. CPL  §§180.30, 190.55, 195.40 and CPL 200.15.

912.    Nonetheless, Trey Smith never cured that defect even though it provides a basis for McInerney to vacate the conviction upon motion without limitation.

B.    <u>Trey Smith Arranged a Jurisdictionally Defective Conviction for Brown</u>

913.    Trey Smith also arranged a jurisdictionally defective conviction for Brown by filing a felony complaint alleging a crime which was the subject of a pending Grand Jury proceeding.

914.    Brown testified before the Grand Jury that was considering evidence of his AB forgery obtained through the NYSP independent investigation.

915.    Without an indictment being returned, Trey Smith then filed a SCI and accepted Brown's guilty plea to the charge alleged therein.

916.    Consequently, under State statutory and case law, Brown's conviction is effectively a nullity that must be vacated upon motion whenever made.

917.    Nonetheless, Trey Smith never cured that defect even though it provides a basis for Brown to vacate the conviction upon motion without limitation.

116

918.   The immunity and extraordinarily favorable cooperation agreements, pleas bargains and other dispositions that Trey Smith provided for all the Dem C/O and others implicated in the AB forgery is evidence of the conspiratorial scapegoat prosecution and its objectives.

**XXXV.      Fabricated False Trial Testimony to Continue Scapegoat Prosecution**

919.   Next, Trey Smith presented the fabricated false testimony of Ogden, McGrath, O'Malley, McInerney, Brown, Renna, and Robillard at trial to continue the scapegoat prosecution.

920.   All of the witnesses were interviewed by Trey Smith in his investigatory capacity and their false testimony was fabricated and presented to initiate, continue, and cover-up their conspiracy entered into on or about October and/or November 2009, and thereafter.

921.   The actions, including the silencing and tampering with witnesses, as well as any later false testimony as needed, were all overt acts that were done and anticipated to be done as the conspiracy evolved, depending initially only on McDonough's actions but later also those of the supervisory NYSP and FBI.

922.   The most plausible inference to be drawn from the record facts is that once the conspiracy was hatched, those involved were "coached" by Trey Smith as to what false testimony was needed to incriminate McDonough and/or not incriminate their cohorts, exonerate McDonough or expose the conspiracy; i.e. he fabricated the testimony needed, as needed.

A.      DeFiglio's New Fabricated False Testimony was Precluded by Court

923.   At trial, to support the prosecution theory, Trey Smith also attempted to offer the additional fabricated false testimony of DeFiglio that McDonough taught him how to trace forge voter signatures from voter registration cards.

924.   In chambers, Trey Smith proffered DeFiglio's new testimony that McDonough had showed him how to place registration cards against his computer to trace voter signature's onto

forged AB documents, but then, when McDonough disclosed that he had no computer when the incident was alleged to have happened, Trey Smith proffered DeFiglio's changed testimony that McDonough showed him at that time how to trace the signatures by placing the cards against his office window, until McDonough disclosed that he was not the BOE Commissioner and had no office or workplace window at the time.

925.    The Court then denied Trey Smith's proffer to introduce the new false testimony.

926.    Otherwise, DeFiglio testified as truthfully about facts that exposed the conspiratorial prosecution as he did falsely about facts fabricated to further it.

927.    DeFiglio's false testimony was fabricated in material part and given to support of the prosecution theory, be consistent with the false testimony of McGrath, Ogden, and O'Malley and falsely convict McDonough.

B.    McInerney's Fabricated False Trial Testimony

928.    McInerney testified falsely consistent with his prior fabricated statement in the incrimination of McDonough and support of the prosecution theory.

929.    McInerney's false testimony was fabricated and given to support of the prosecution theory and be consistent with false testimony of McGrath, Ogden, and O'Malley.

C.    O'Malley's Fabricated False Testimony

930.    O'Malley gave false trial testimony to continue the scapegoat prosecution that was consistent with his false Grand Jury testimony.

931.    At trial, O'Malley gave other false testimony in addition to that given before a grand jury to incriminate McDonough and support of the prosecution theory.

932.   At trial, O'Malley added that on September 14, 2009, he heard McDonough tell McInerney the number of AB votes needed to win the WFP primary and that he had 2 HVCC students who owed him a favor and could be counted on to vote by AB.

933.   O'Malley's testimony was fabricated to be consistent with the false testimony of McInerney concerning the forged AB documents of Joseph and Patterson (the 2 HVCC students from whom the Dem C/O did not solicit an AAB on September 12, 2009).

934.   In fact, only McInerney knew that he helped those 2 HVCC students establish residency for reduced tuition and paid them to enroll in the WFP. Neither McDonough nor O'Malley had any contact with either of them.

935.   Trey Smith fabricated O'Malley's additional false accusation with McInerney's participation because their false trial testimony could not have been consistent unless McInerney told Smith about the 2 HVCC students and O'Malley agreed to lie.

936.   O'Malley's false testimony was fabricated and given to support of the prosecution theory and be consistent with the false testimony of McGrath and Brown.

D.   McGrath's Fabricated False Testimony

937.   McGrath gave false trial testimony to continue the scapegoat prosecution that was consistent with his false written statement and Grand Jury testimony.

938.   Essentially, McGrath testified that he committed no crime, any voter who incriminated him was wrong, any AB document that contradicted his false testimony was wrong, and only McDonough committed any crime.

939.   McGrath's false testimony was fabricated and given to support of the prosecution theory and be consistent with the false testimony of O'Malley and Brown.

E.   Brown's Fabricated False Testimony

940.   Brown gave false trial testimony to continue the scapegoat prosecution that was consistent with his false written statement.

941.   Despite having to admit that he forged AB documents, that he knew completed AAB had to be filed to obtain AB, and that he and/or his brother took all the AAB in question to McInerney to be copied and used to forge signatures on AB Env, Brown still failed to exonerate McDonough or admit the entire truth.

942.   Brown denied that he committed the crimes in conspiracy with other Dem C/O, and then admitted it, but only to recant that admission the next day.

943.   Brown did not tell the truth about what happened on September 14, 2009 in McDonough's office concerning the entry of AB Agent names or Excuses on those AAB that would have incriminated McGrath and O'Malley in perjury and exonerated McDonough.

944.   Brown's testimony was false in all material respects and fabricated in conspiracy with Trey Smith and/or others to continue the scapegoat prosecution of McDonough and obtain the objectives of their extrajudicial conspiracy.

945.   Brown's false testimony was fabricated and given to support of the prosecution theory and be consistent with the false testimony of McGrath and O'Malley.

F.     Renna's Past and New Fabricated False Testimony Stricken by Court at Retrial

946.   Renna gave false trial testimony to continue the conspiratorial scapegoat prosecution of McDonough that was consistent with his false written statement.

947.   At the first trial, Renna also gave the additional fabricated false testimony that McDonough licked the AB Env of either Testa or Robertson or both.

948.    Renna also falsely testified that McDonough gave him voter registration cards to trace forge the signatures of those voters onto their AB documents, even though the BOE was computerized and had none.

949.    Renna's false testimony was wholly fabricated and given to support of the prosecution theory, be consistent with the false testimony of McInerney and others.

950.    When subjected to cross-examination at the second trial, Renna's testimony was so patently false to support the prosecution theory and fabricated false testimony of others that it was stricken in its entirety and he was directed to leave the courthouse immediately.

951.    Nonetheless, Trey Smith did not prosecute Renna for perjury or rescind his cooperation agreement because of his patently false testimony.

   G.    Dan Brown's Fabricated False Testimony

952.    Dan Brown testified that he essentially committed no crimes and did not know anything about any crimes committed by anyone.

953.    However, Dan Brown was his brother's campaign manager, obtained signed AAB from voters on September 12, 2009 that were falsely completed, and he was in possession of the AAB that McInerney copied to forge signatures on AB Env.

954.    Dan Brown's trial and Grand Jury testimony puts him in possession of AAB and/or AB he gave to McInerney and/or obtained from him and filed before and/or after they were forged and his contradictory and inconsistent testimony shows that he was involved in the commission of the AB forgery in conspiracy with him and other guilty Dem C/O, especially his brother's admission albeit recanted.

955.    Regarding the 13 AAB filed on September 12, 2009, McInerney admitted that he had all those AAB in his possession and that one of his co-conspirators filed them with the BOE, but he could not recall which one.

956.    The Grand Jury and trial testimony of Dan Brown and others makes it more plausible than not that Dan Brown at least possessed and filed them.

957.    Dan Brown testified that he obtained AB from McInerney and mailed them to the BOE without knowledge that they were forged.

958.    However, Dan Brown testified in the Grand Jury that he filed certain AAB which McDonough was indicted for forging, but Trey Smith then changed his question to elicit that he meant to say AB, not AAB. That relevant testimony is incorporated herein by reference.

959.    Dan Brown testified materially falsely and failed to tell the truth about the AB forgery that would have exonerated McDonough.

H.    Ogden's Fabricated False Testimony

960.    At trial, Ogden had to admit that his Grand Jury testimony that all the AB Agent names and Excuses on all the AAB were written in the same handwriting and in a pattern that showed they were all written by the same person was wrong.

961.    Ogden admitted that Trey Smith directed and participated in the investigation.

962.    Ogden also admitted that he talked to Robillard about the theory of prosecution and evidence before he rendered his purported objective FDE report.

963.    Most interestingly, Ogden testified that he and Trey Smith believed the self-serving sworn statements of McGrath over those of the voters where their testimony was contradictory concerning whether they wrote or gave him permission to write on their AAB or voted or gave him permission to vote their AB.

964.    Otherwise, Ogden falsely testified consistently with his fabricated false Grand Jury testimony to continue the scapegoat prosecution of McDonough.

I.    Robillard's Fabricated False Testimony

965.    At trial, Robillard falsely testified consistent with his report, as stated.

966.    In substance, Robillard gave the fabricated false testimony that his FDE findings indicated that McDonough wrote all the false AB Agent names and Excuses on all the falsified AAB in support of the prosecution theory and the fabricated false Grand Jury and trial testimony of McGrath, O'Malley, Brown, and Ogden.

967.    Robillard's testimony regarding his purported findings and opinions was no more than fabricated false, improper, and subjective testimony contrary to accepted standards of FDE practice that he was required to follow to render objective findings and opinions in a Court.

968.    Robillard admitted that he came to his findings and rendered his related opinion testimony without comparing the handwriting of Brown, Dan Brown, McGrath, or other suspects.

969.    Later, after the NYSP arrested McInerney and Brown, Robillard obtained and compared handwriting exemplars from Brown and Dan Brown.

970.    At that time, Robillard had to admit that the handwriting of Brown, Dan Brown, and McDonough was very similar.

971.    Robillard also gave well-rehearsed, improper, and false subjective opinion testimony about indentation "evidence" he found from analysis of the falsified AAB.

972.    Robillard also gave testimony about ink analysis performed on AAB.

973.    Robillard also falsely and improperly testified numerous times that his handwriting opinions were "overwhelming evidence" that McDonough wrote the false AB Agent names and Excuses on all the AAB, despite the fact that established standards of practice permit only

"expressions in degree of confidence" in the "grey area" of opinion and he did not make a single "identification" for any document.

974.    Robillard also testified that his indentation and ink findings were evidence that McDonough wrote the AB Agent names and Excuses on all those AAB.

975.    However, Robillard admitted that Trey Smith directed him to not perform an ink analysis on 14 specifically identified AAB, including the Dickenson AAB.

976.    Again, McGrath testified before the Grand Jury that he witnessed McDonough write a false Excuse on the Dickenson AAB and heard McDonough talking about names he could write as false AB Agents on all the AAB the Dem C/O obtained in concert.

977.    Based on McGrath's testimony, Trey Smith adopted the prosecution theory that all questioned AAB were forged "behind the counter" by McDonough at his "forgery factory."

978.    Ogden then falsely testified at Grand Jury to support the prosecution theory that the false AB Agent and Excuses on all the AAB appeared were written in the same handwriting as the Dickenson AAB and showed a pattern that indicated that they were all written by the same person.

979.    However, the Dickenson and each of the other AAB Trey Smith directed Robillard to not perform an ink analysis upon appear to have been written entirely in the same ink.

980.    The finding that all (or any) of the 14 AAB were completed in the same ink alone would have exonerated McDonough, debunked the prosecution theory, and exposed the wrongful prosecution, but it was effectively suppressed by Trey Smith and Robillard.

981.    Therefore, Trey Smith and Robillard did not perform an ink analysis on those 14 AAB because the findings would have confirmed what was apparent to the naked eye before McDonough was indicted for entering false data on them: they were completed entirely in the same ink before being filed at the BOE by the Dem C/O.

982.    That forensic evidence also would have proven that McGrath, McInerney, Brown, and others committed the crimes in conspiracy, breached Cooperation Agreements and committed perjury; debunked the purported prosecution theory; and, exonerated McDonough.

983.    Robillard's false testimony was fabricated and given to support the prosecution theory and be consistent with the false testimony of McGrath, Ogden, O'Malley, and others.

984.    Robillard's fabricated false testimony was also given to provide Ogden a basis to assert that his Grand Jury testimony was ostensibly reasonable.

**XXXVI.    Trey Smith Sought More Favorable Sentence for Brown, Spoke on Behalf of Renna at Sentencing, Aided Brown in Frivolous Appeal and Dismissed Indictments against Campana and Galuski**

A.    <u>Trey Smith Asked Court to Sentence Brown to Probation</u>

985.    At Brown's sentencing, Trey Smith asked the court to impose a sentence of probation even though he committed perjury at the state court hearing and Grand Jury and he and Trey Smith at trial repeatedly told the jury that he might be sentenced to prison to bolster his credibility and rebut evidence of the scapegoat prosecution.

B.    <u>Trey Smith Spoke in Support of Renna at Sentencing</u>

986.    At sentencing, Trey Smith asked the court to sentence Renna to work order in accordance with his cooperation agreement even though he committed such blatant perjury in breach of it that his entire trial testimony was stricken from the record

C.    <u>Trey Smith Dismissed Indictments against Campana and Galuski</u>

987.    Consistent with the scapegoat prosecution and its cover-up, Trey Smith ostensibly prosecuted Galuski or Campana only to dismiss their indictments after McDonough's acquittal.

D.    <u>Trey Smith Did Not Oppose Brown's Frivolous Appeal or Misrepresentations</u>

988.    According to a record plea agreement, Brown waived the right to appeal and agreed to be sentenced within the sole discretion of the Court, but upon Trey Smith's recommendation of no more than 6 months incarceration and 5 years of probation.

989.    At trial, Brown testified he was the only defendant who was going to go to jail or prison and Trey Smith repeatedly made the same representation to bolster his credibility.

990.    However, when the court imposed that sentence, Brown filed a frivolous appeal to have his sentence reduced based purely on misrepresentations of fact and law. Brown's brief on appeal is incorporated herein by reference.

991.    Trey Smith joined in Brown's appeal until McDonough exposed its fraudulent nature. Smith's brief and McDonough's amicus brief are incorporated herein by reference.

## XXXVII.    Additional General Allegations

992.    It is alleged that Trey Smith and Ogden in their investigative capacity intentionally suppressed evidence incriminating those who committed AB forgery, suppressed exculpatory evidence through intimidation, coercion, and other tactics, and maliciously prosecuted McDonough without probable cause to deprive him of his constitutional rights.

993.    In his investigatory capacity Trey Smith made promises and threats to the guilty Dem C/O to fabricate their false testimony against McDonough in Grand Jury and trial.

994.    The defendants conspired in the fabrication and related overt acts.

## XXXVIII.    Defendants Conspiratorially

995.    It is further alleged that the defendants were conspirators and, at all times relevant, engaged in a scheme designed and intended to deny and deprive the plaintiff of his rights guaranteed to him under the Constitution and the laws of the Unites States, as alleged herein.

996.   It is alleged that Trey Smith in an investigative capacity entered into an extra-judicial conspiracy with the other defendants to fabricate their false testimonial evidence to later use in Grand Jury and trial proceedings to initiate and continue the wrongfully prosecution of McDonough without probable cause in deprivation of his constitutional rights.

997.   Trey Smith, McGrath, McInerney, Renna, and others acted in conspiracy or complicity prior to September 24, 2009 and/or thereafter up to and including, December 21, 2012, to scapegoat prosecute McDonough and cover-up the AB forgery of known Dem C/O.

998.   Before and after March 2010, Trey Smith, acting in an investigative capacity, fabricated the false statements and testimonial evidence of the co-defendants and others as needed to initiate and continue the scapegoat prosecution of McDonough, as alleged.

999.   On or about date(s) unknown to McDonough, Trey Smith entered a conspiracy with those Dem C/O known to have committed AB forgery, including McGrath, Brown, McInerney, O'Malley, Dan Brown, and Renna, to frame and wrongfully prosecute McDonough without probable cause for alleged acts he did not commit through the fabrication of their false testimony, and committed other overt acts in furtherance thereof at all times thereafter, up to and including, December 21, 2012.

1000.   On or about date(s) unknown to McDonough, Ogden entered that conspiracy and gave fabricated false testimony and committed other overt acts in furtherance thereof up to and including, December 21, 2012.

1001.   McGrath, McInerney, Ogden, Renna, and others intentionally and maliciously gave that false testimony in conspiracy with Trey Smith to initiate, continue, and cover-up the unlawful, scapegoat prosecution of McDonough.

1002.   The false testimony and other alleged acts of the defendants to initiate, continue, and cover-up the scapegoat prosecution of McDonough, from on or about October 2009 until December 21, 2012, were overt acts in furtherance of that conspiracy.

1003.   Trey Smith affirmatively acted to fabricate and use false testimony to wrongfully prosecute McDonough and deprive him of his liberty, property, and other rights, as alleged.

1004.   Trey Smith's actions caused McDonough to suffer a wrongful prosecution resulting in two protracted trials at great monetary expense and personal, mental, and emotion injury.

## XXXIX.      Violations and Claims Alleged

1005.   McDonough has been subjected to the deprivation of rights secured to him by the Constitution and laws of the Unites States by Trey Smith, acting under color of law, as alleged.

1006.   As a direct result of defendants' concerted actions, under color of law, McDonough has suffered the deprivation of his civil and constitutional rights; serious physical, mental, and emotional injuries, pain, and suffering, including physical illness, extreme mental and emotional distress, depression and anxiety, loss of self-esteem, and feelings of helplessness and worthlessness; humiliation, embarrassment, ridicule, indignity and social and personal stigmatization; invasion of privacy; actual and *presumed damages* to his good professional name and reputation in the social community; medical expenses, investigation costs, substantial attorney fees, and other monetary damages in defending against the defendants' persistent nefarious conduct and pursuing the claims herein.

## XL.       Plaintiff's Injuries

1007.   As a direct consequence of the alleged acts of the defendants, plaintiff was deprived of his liberty, property, subject to unreasonable seizure, caused great expense, restrained in his travel, injured, and otherwise damaged.

1008.   On January 28, 2011, at the direction of Trey Smith, McDonough was arrested, processed, handcuffed, and paraded before the public and news media while in custody of the NYSP as a staged "perp walk" before being arraigned on a sealed indictment. At arraignment, he was ordered to remain within the Court's jurisdiction and surrender any passport.

1009.   McDonough then suffered a wrongful prosecution, including two protracted trials, until he was exonerated by acquittal or dismissal of all charges on December 21, 2012.

1010.   No reasonable view of the evidence and relevant facts could have supported any justified prosecution of McDonough.

1011.   All the true evidence and circumstances showed that McDonough was innocent of the charges on which he was wrongfully and maliciously prosecuted.

1012.   Plaintiff suffered greatly from January 27, 2010, when Trey Smith threatened to fuck him unless he admitted his guilt of crimes he did not commit until December 21, 2012, when he was exoneration of all 74 felony charges, including 16 weeks of two trial proceedings.

1013.   McDonough also suffered emotional distress due to being subjected to the criminal process and the deprivation of his rights as stated herein.

1014.   McDonough's injuries were caused by Trey Smith's investigatory fabrication of evidence in conspiracy and concert with the co-defendants and others that he later used to initiate and continue a malicious prosecution as intended and alleged herein.

1015.   Due to the conduct of the defendants, McDonough has and likely will suffer public disgrace, ridicule, contempt and reproach; castigation from law enforcement officials; injury to his character and good reputation; great mental anguish and pain, and irreparable injury in his profession, all to his monetary damage.

1016.   Plaintiff also sustained exorbitant criminal defense attorney fees and costs.

1017.   The monetary damages and injuries suffered by McDonough were caused solely and directly by the malicious actions of Trey Smith in complicity and conspiracy with the co-defendants and others to scapegoat prosecute the plaintiff for acts he did not do.

1018.   Plaintiff has also suffered the loss of income as a result of his wife effectively being compelled to resign to avoid wrongfully termination from employment due to the adverse publicity of the matter and the same has also caused his substantial economic hardship.  He has also suffered continued emotional distress and public humiliation.

## COUNT I

### FIFTH / SIXTH / FOURTEENTH AMENDMENT CLAIM
#### *Constitutional Right Not to be Deprived of Liberty as a Result of Fabrication of Evidence*
### (CIVIL RIGHTS CLAIM UNDER 42 U.S.C. SECTION 1983)
#### *Zahrey v. Coffey, 221 F3d 342, 344 (2d Circ., 2000)*

1019.   Plaintiff incorporates by reference and re-alleges all the allegations contained in paragraphs 1 through 1018 as if set forth fully herein.

1020.   In committing the acts complained of herein, the defendants acted, individually and/or conspiratorially, under color of state law to deprive the plaintiff of certain constitutionally protected rights under the Fourth, Fifth, Sixth, and/or Fourteenth Amendments to the Constitution of the United States, including, but not limited to: (a) the right to be free from unreasonable searches and seizures; (b) the right not to be deprived of liberty without due process of law; (c) the right not to deprived of due process of law, both procedural and substantive; (d) the right to be free from malicious prosecution without probable cause; and (e) the right to a fair trial.

1021.   Specifically, the plaintiff has Constitutional right not to be deprived of his liberty, liberty interests or a fair trial as a result of the fabrication of false evidence by a government officer acting in an investigatory capacity especially where that officer foresees that he himself will use the evidence with a resulting deprivation of liberty.

1022.  This claim arises directly under both Title 42 USCS §1983, and the Fourth, Fifth, Sixth, and/or Fourteenth Amendments under the United States Constitution.

## COUNT II

**FOURTH / FOURTEENTH AMENDMENT CLAIM**
***Constitutional Right Not to be Prosecuted Maliciously without Probable Cause***
**(CIVIL RIGHTS CLAIM UNDER 42 U.S.C. SECTION 1983)**
*Singer v. Fulton County Sheriff, 63 F3d. 110 (2d Circ., 1995)*

1023.  Plaintiff incorporates by reference and re-alleges all the allegations contained in paragraphs 1 through 1018 as if set forth fully herein.

1024.  In committing the acts complained of herein, the defendants acted, individually and/or conspiratorially, under color of state law to deprive the plaintiff of certain constitutionally protected rights under the Fourth, Fifth, Sixth, and/or Fourteenth Amendments to the Constitution of the United States, including, but not limited to: (a) the right to be free from unreasonable searches and seizures; (b) the right not to be deprived of liberty without due process of law; (c) the right not to deprived of due process of law, both procedural and substantive; and (d) the right to be free from malicious arrest and/or prosecution without probable cause.

1025.  Specifically, the plaintiff has Constitutional right not to be arrested, detained, restricted in liberty and/or prosecuted without probable cause, including when deprived of his liberty, liberty interests, or a fair trial as a result of the fabrication of false evidence by a government officer acting in an investigatory capacity especially where that officer foresees that he himself will use the evidence with a resulting deprivation of liberty.

1026.  This claim arises directly under both Title 42 USCS §1983, and the Fourth, Fifth, Sixth, and/or Fourteenth Amendments under the United States Constitution.

## **DEMAND FOR PUNITIVE DAMAGES**

Upon information and belief, at all times relevant, the individual defendants acted with malice, intent to injure, or deliberate, reckless or callous indifference to McDonough's well established rights under the Fourth, Sixth and Fourteenth Amendments of the United States Constitution which provides a basis for the imposition of punitive damages.

The actions of the individual defendants as described herein were outrageous and shock the conscience of a reasonable person. Consequently, an award of punitive damages is appropriate to punish the defendants for their cruel and uncivilized conduct.

## DEMAND FOR TRIAL BY JURY

The plaintiff hereby demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully prays for the following relief:

1.      Judgment against defendants, individually and jointly, in the amount of six million ($6,000,000.00) dollars in compensatory damages suffered.

2.      Judgment against defendants, individually and jointly, in the amount of two million ($2,000,000.00) dollars or in such other amount commensurate with the wrong and with the defendants' ability to pay in punitive damages.

3.      Order defendants, individually and jointly, to make plaintiff whole with respect to paying his full damages that proximately resulted from their wrongful actions, including medical and related expenses, travel, copying, and postage costs.

4.      Award of reasonable attorney's fees and costs pursuant to 42 USCS §1988.

5.      Award such other and further relief the Court deems just and proper.

If the Court should find for plaintiff, on any or all counts, plaintiff respectfully requests that a separate hearing be held for production of evidence on the amount of damages.

Dated: June 8, 2020.

s / Brian D. Premo, Esq.
BRIAN D. PREMO, ESQ.
Fed Bar No. 102394
PREMO LAW FIRM PLLC
Attorneys for Plaintiff
20 Corporate Woods Boulevard
Albany, New York 12211
(518) 436-8000