**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**EDWARD G. MCDONOUGH,**

                              **Plaintiff,**

        **vs.**                                                          **1:15-CV-1505**
                                                                          **(MAD/DJS)**

**YOUEL C. SMITH, III,** *individually and as Special*
*District Attorney for The County of Rensselaer, New*
*York, also known as Trey Smith*,

                              **Defendant.**
_____

**APPEARANCES:**                              **OF COUNSEL:**

**PREMO LAW FIRM**                            **BRIAN D. PREMO, ESQ.**
20 Corporate Woods Boulevard
Albany, New York 12211
Attorneys for Plaintiff

**NAPIERSKI, VANDENBURGH,**                   **THOMAS J. O'CONNOR, ESQ.**
**NAPIERSKI & O'CONNOR, LLP**                 **DIANE LUFKIN SCHILLING, ESQ.**
296 Washington Avenue Extension
Albany, New York 12203
Attorneys for Defendant

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

Plaintiff Edward G. McDonough ("Plaintiff") commenced the instant action by filing a

174 page, 1220 paragraph complaint on December 18, 2015, asserting three causes of action

pursuant to 42 U.S.C. § 1983 against eleven named Defendants. *See* Dkt. No. 1. As relevant

here, this Court dismissed Plaintiff's claim that he was denied due process based on fabricated

evidence against Defendant Youel C. Smith, III ("Defendant"), finding that the claim was barred

by the three-year statute of limitations.  *See* Dkt. No. 114.  Additionally, the Court dismissed the malicious prosecution claim against Defendant, finding that he was entitled to absolute prosecutorial immunity.  *See* Dkt. No. 121.

After the Court's second Memorandum-Decision and Order, Plaintiff filed a notice of appeal to the Second Circuit, appealing only the dismissal of all claims against Defendant.  *See* Dkt. No. 124.  On May 8, 2017, the Court granted Plaintiff's motion for entry of final judgment with respect to the dismissal of all claims against Defendant.  *See* Dkt. No. 142.  On August 3, 2018, the Second Circuit affirmed this Court's dismissal of the claims against Defendant.  *See McDonough v. Smith*, 898 F.3d 259 (2d Cir. 2018).  As to the fabrication of evidence claim, the Second Circuit held that the Court properly determined that, under the circumstances of Plaintiff's claim, it accrued when Plaintiff "(1) learned of the fabrication of the evidence and its use against him in criminal proceedings, and (2) was deprived of a liberty interest by his arrest and trial."  *Id.* at 267.  This determination was made, in part, based on the fact that, unlike a malicious prosecution claim, a fabricated evidence claim does not require the plaintiff to establish that the criminal proceedings terminated in his favor.  *See id.* at 267-68.  Finally, the Second Circuit held that the Court correctly determined that Defendant was entitled to absolute prosecutorial immunity as to Plaintiff's malicious prosecution claim.  *See id.* at 269.

Noting the circuit split on the issue, the Supreme Court granted certiorari to decide when "the statute of limitations for a Section 1983 claim based on fabrication of evidence in criminal proceedings begins to run."  *McDonough v. Smith*, ___ U.S.___, 139 S. Ct. 2149 (2019).  On June 20, 2019, the Supreme Court found that this Court and the Second Circuit incorrectly determined the date of accrual and held that the statute of limitations for Plaintiff's Section 1983 claim "alleging that he was prosecuted using fabricated evidence began to run when the criminal

proceedings against him terminated in his favor — that is, when he was acquitted at the end of his second trial." *Id.* at 2161.  Accordingly, the matter was remanded for further proceedings.

Upon remand to this Court, Plaintiff filed an amended complaint on June 8, 2020, asserting two causes of action against five Defendants.  *See* Dkt. No. 185.  In his first cause of action, Plaintiff claims that Defendants deprived him of his rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments when they deprived him of his liberty "as a result of fabrication of evidence." *Id.* at ¶¶ 1019-22.  In his second cause of action, Plaintiff claims that he was maliciously prosecuted without probable cause in violation of the Fourth, Fifth, Sixth, and Fourteenth Amendments.[1]  *See id.* at ¶¶ 1023-26.  On October 30, 2020, Plaintiff voluntarily dismissed the amended complaint against Defendants Kevin B. McGrath, William A. McInerney, John J. Ogden, and Anthony J. Renna, leaving Defendant Smith the only remaining Defendant. *See* Dkt. Nos. 199-201.

Currently before the Court is Defendant's motion to dismiss or, in the alternative, for summary judgment.  *See* Dkt. No. 223.

## II. BACKGROUND

### A.   *Lambertsen* Petition

---

[1] It is not entirely clear why Plaintiff's amended complaint includes a malicious prosecution claim against Defendant.  On December 30, 2016, this Court dismissed that claim against Defendant based on absolute prosecutorial immunity and the Second Circuit affirmed that decision.  While the Supreme Court subsequently determined that the Court erred in its analysis of the accrual date for Plaintiff's fabrication of evidence claim, that decision left this Court's and the Second Circuit's decision regarding the malicious prosecution claim undisturbed.  In Defendant's motion for summary judgment and Plaintiff's response, however, both parties treat these two causes of action as alleging denial of Plaintiff's right to a fair trial through the fabrication of evidence, with the first cause of action relating to the fabrication of evidence during the criminal investigation and the second cause of action relating to its subsequent use during judicial proceedings.  In light of the parties' submissions, the Court will construe both causes of action as asserting denial of the right to a fair trial.

On September 15, 2009, a primary election for the Working Families Party ("WFP") was held in the City of Troy, New York.  *See* Dkt. No. 223-1 at ¶ 1.  On September 23, 2009, a Special Proceeding pursuant to Article XVII of the New York Elections Law was commenced in New York Supreme Court, Rensselaer County (the "*Lambertsen* proceeding").  *See id.* at ¶ 2.  The *Lambertsen* petition and supporting affidavit alleged that numerous absentee ballots and absentee ballot applications contained false and unauthorized entries, including forged signatures.  *See id.* at ¶ 3.

**B.     McNally Disqualification and Defendant's Appointment**

On September 24, 2009, Rensselaer County District Attorney Richard J. McNally, Jr. ("DA McNally") filed a letter-application with Rensselaer County Court Judge Robert M. Jacon, stating that after review of the *Lambertsen* pleadings, he had concluded that a criminal investigation was appropriate.  *See id.* at ¶ 4.  To avoid the appearance of impropriety, DA McNally disqualified himself from presiding over any matter related to the *Lambertsen* proceeding, including the investigation and prosecution, and requested the appointment of a Special Prosecutor for this purpose.  *See id.* at ¶ 5.

On September 28, 2009, Judge Jacon issued an order appointing Defendant Youel ("Trey") C. Smith as a Special Prosecutor for the investigation and "for all purposes in this matter up to and including the disposition of this case[.]" *Id.* at ¶ 6; Dkt. No. 237 at ¶ 6.  In his September 28, 2009 order, Judge Jacon determined that DA McNally's disqualification was appropriate.  *See* Dkt. No. 223-1 at ¶ 7.

**C.     *Lambertsen* Hearing**

On October 1, 2009, an evidentiary hearing in the *Lambertsen* proceeding was conducted in Rensselaer County Supreme Court.  *See id.* at ¶ 8.  On October 2, 2009, the court issued a

Decision and Order voiding numerous absentee ballots, finding that "the testimony and affidavits reveal significant election law violations (see Election Law Article 17) that have compromised the rights of numerous voters and the integrity of the election process in the Working Family's [sic] Party September 15, 2009 primary." *Id.* at ¶ 9.

**D.     Sara Couch**

On October 22, 2009, State Police Investigator John Ogden, formerly a named defendant in this matter, obtained a sworn statement from Sara Couch, a WFP worker, describing certain relevant events that occurred on September 15, 2009, the day of the primary, and thereafter. *See id.* at ¶ 10.  In her sworn statement, Ms. Couch described a meeting that occurred the afternoon of the primary, at LoPorto's Restaurant in downtown Troy. *See id.* at ¶ 11.  Ms. Couch's statement also described that, after the meeting, Michael LoPorto asked her to run an errand for him, producing approximately thirty (30) absentee ballot envelopes wrapped in a newspaper, and stating "'[t]here's a really good article in there that you should read.'" *Id.* at ¶ 12 (quoting Dkt. No. 99-13).  Ms. Couch indicated that Mr. LoPorto asked her to file the absentee ballots at the Board of Elections, only a few city blocks from LoPorto's Restaurant.  *See id.* at ¶ 13.  Ms. Couch stated that she personally delivered the ballots to Plaintiff, the Democratic Commissioner of the Rensselaer County Board of Elections, who stated that he knew what they were. *See id.* at ¶ 14. Ms. Couch indicated that she specifically asked for Plaintiff "because he is the Democratic Commissioner and I thought at the time that when I give him something it will be handled properly." Dkt. No. 99-13 at 2-3.  As she was leaving, one of the secretaries in Plaintiff's office returned one of the absentee ballots to Ms. Couch while she was waiting at the elevator because the ballot was not signed by the voter. *See id.* at 3.

5

Ms. Couch also recounted a September 24, 2009 meeting, again held at LoPorto's Restaurant, attended by several individuals associated with the Rensselaer County Democratic and WFP political parties, including Plaintiff. *See* Dkt. No. 223-1 at ¶ 15. According to Ms. Couch, Plaintiff opened the meeting by stating "I don't mean to be a dickhead, but I want to make sure that this conversation isn't being recorded. Does anyone have any type of recording device[?]" *Id.* at ¶ 16. Ms. Couch indicated that Plaintiff continued, stating "[t]his is really, really bad, and it needs to go away." *Id.* at ¶ 17. Ms. Couch's statement continued as follows:

> Ed said to Jim [Welch] and Brandt [Caird], "Your names are on here"[.] Jim Welch said, "I've done nothing wrong[.] The only thing I did wrong was to take a phone call from John Brown"[.] Then Ed said to Brandt "What are you going to do on the stand facing eighteen counts of forgery" and Brandt chuckled and said "Tell the truth". Ed asked Brandt "What about Figgy" [DeFiglio's nickname]. Brandt didn't seem to understand and replied "What about Figgy". So Ed said again, this needs to go away. He offered what he thought might be a solution. He offered that he would reverse his vote on the absentee ballots and agree with Bugbee, and the whole thing might go away. I asked him "Do you really think that this can go away, this is going to Court". He indicated that he agreed. Ed said that "we" could go to Mirch and try to make a deal with him. I knew the "we" he referred to was the WFP. I replied the WFP wasn't in a position to make any deals with anyone on this issue. I thought to myself that he is asking us to commit a crime to cover up another crime and enter into a conspiracy.

*Id.* at ¶ 18.[2]

**E.    Joseph Caird**

On November 4, 2009, Joseph Caird, Vice-Chair of the Rensselaer County WFP, gave a sworn statement to Investigator Ogden. *See* Dkt. No. 223-1 at ¶ 19. Mr. Caird's statement

---

[2] The Court notes that Plaintiff denies "as false the assertions in sentences 8-13 ('He offered ... this issue')." Dkt. No. 237 at ¶ 18. Plaintiff is not denying that Ms. Couch gave this statement, he simply claims that she was lying, without citing to any evidence in support of this assertion.

indicated that he had attended the September 24, 2009 meeting at LoPorto's Restaurant and confirmed Ms. Couch's description of Plaintiff's conduct at the meeting. *See id.* at ¶ 20.[3]  Mr. Caird confirmed that Plaintiff, at the start of the meeting, stated that he did not want anyone to record the meeting with an electronic device. *See id.* at ¶ 21.  Mr. Caird further stated that Plaintiff appeared "very, very concerned" about the *Lambertsen* lawsuit and thought he could make a deal with the Republicans and Robert Mirch, a career Republican political operative. *See id.* at ¶ 22.

## F.    Robert Mirch

Robert Mirch was interviewed by Investigator Ogden on October 21, 2009.  *See id.* at ¶ 23.  During the interview with Investigator Ogden, Mr. Mirch told him that, "[b]ased on my forty five years of experience working on local elections I was immediately concerned, alarmed and suspicious [when told by Commissioner Bugbee that thirty-four, thirty-five absentee ballots for the WFP for the City of Troy had gone out on September 14, 2009].  I knew that the number Larry had identified was completely out of the ordinary for that party in a primary election in the City of Troy." *Id.* at ¶ 24.

## G.    Larry Bugbee

On October 22, 2009, Commissioner Larry Bugbee, Plaintiff's Republican counterpart, told Investigator Ogden that he "was shocked to see there w[ere] thirty four absentee ballots for the Working Family [sic] Party that had been released to the City of Troy.  In my experience in

---

[3] Throughout his response to Defendant's statement of material facts, Plaintiff denies Defendant's statements as "mischaracterizations" of the facts stated. *See, e.g.*, Dkt. No. 237 at ¶ 20.  No reasonable mind could agree that many of these alleged "mischaracterizations" are, in fact, mischaracterizations.  As such, the Court will only address such denials when necessary.

politics and as Commissioner of the Board of Elections I would expect no more than ten of these [absentee] ballots to have been released." *Id.* at ¶ 25.

## H.   Anthony DeFiglio

On November 6, 2009, Anthony DeFiglio gave a sworn statement to Investigator Ogden. *See id.* at ¶ 26.  Defendant was not present when Mr. DeFiglio gave his statement.  *See id.* at ¶ 27 (citing Dkt. No. 99-23 at 2-3).  Mr. DeFiglio's statement indicated that in late August or early September, he and City Clerk Bill McInerney obtained absentee ballot applications from voters registered in the WFP who resided in the Griswold Heights Public Housing Complex where Mr. DeFiglio worked as a clerk.  *See id.* at ¶ 28.  DeFiglio and McInerney obtained signed absentee ballot applications from the voters, telling them they would "take care of them getting a ballot." *Id.* at ¶ 29.  However, "it was common knowledge that these people were never going to receive an absentee [b]allot."  *Id.*

According to Mr. DeFiglio, Mr. McInerney took all the signed absentee ballot applications that they obtained and he did not "know what happened to them after he left."  *Id.* at ¶ 30.  Mr. DeFiglio indicated that he knew the voters would never receive the ballots, stating, "this [was] an ongoing scheme and it occurs on both sides of the aisle."  *Id.* at ¶ 31.  Mr. DeFiglio did not specifically implicate Plaintiff in his statement; however, he stated, "[w]ith the number of [b]allots [that] left the BOE it is obvious to me that red flags went up.  Larry Bugbee isn't stupid. I know that there is no possible way that the Democratic Commissioner of the BOE, Ed McDonough, could not have known what was happening."  *Id.* at ¶ 32.

## I.   Edward McDonough

On November 19, 2009, Plaintiff was interviewed by Investigator Ogden and provided a sworn statement.  *See* Dkt. No. 223-1 at ¶ 34.  Plaintiff stated that on September 15, 2009,

Commissioner Bugbee told him that Robert Mirch "had become aware that an inordina[te] number of absentee ballots for the WFP had gone out to the [F]ifth [C]ouncil [D]istrict." *Id.* at ¶ 35.  The day after the primary, September 16, 2009, Plaintiff stated that he spoke with William McInerney, the Troy City Clerk, who told him that "it wasn't as bad as it appears," and that "he and his people had been to all of the apartments that were being contested." *Id.*

Plaintiff further stated that on September 24, 2009, he received a call from John Brown, one of the candidates for Troy City Council, asking Plaintiff to meet him at LoPorto's Restaurant. *See id.* at ¶ 36.  Later that day, Plaintiff met with Brown, Couch, Caird, and Welch at LoPorto's Restaurant. *See id.* at ¶ 37.  Plaintiff indicated that he "had read the [voters'] affidavits prior to the meeting." *Id.*  In his statement, Plaintiff acknowledged that, at the meeting, "we did discuss how to deal with the problem from this point forward.  I may or may not have stated that 'this has to go away', I don't specifically remember." *Id.* at ¶ 38.

Plaintiff further stated that on September 14, 2009, around 10:00 a.m., John Brown came into his office with a handful of applications for absentee ballots.  *See id.* at ¶ 39.  Plaintiff told Brown that they would take some time to process and Brown said he could not wait.  *See id.* at ¶ 40.  Plaintiff told Brown that he would "drop the ballots ... at City Hall." *Id.* at ¶ 41.  Later that day, Plaintiff "dropped off somewhere between ten and twenty ballots off at City Hall." *Id.* at ¶ 42.  In Investigator Ogden's summary of this interview, he states that "McDonough did not specify upon questioning who he gave the ballots to at City Hall." *Id.* at ¶ 43.

On December 7, 2009, Plaintiff again met with Investigator Ogden to "clarify" his delivery of the absentee ballots to City Hall.  *See id.* at ¶ 44.  In the second sworn statement, Plaintiff stated as follows:

> I would like to clarify that statement to say that I dropped off those
> absentee ballots to the desk of the City [C]lerk, Bill McInerney.
> Bill was not in his office but I did place those ballots on his desk.
> They were the ballots that were generated from the applications that
> I received from John Brown earlier in the day.

*Id.* at ¶ 45 (quoting Dkt. No. 99-26 at 2).

On January 27, 2010, Plaintiff was interviewed by Defendant.  *See* Dkt. No. 223-1 at ¶ 46.

At his 50-h hearing testimony, Plaintiff testified that at the January 27, 2010 meeting, Defendant

described how years before, Plaintiff's father had snubbed him at a political fundraiser and

declined to endorse him for district attorney.  *See id.* at ¶ 47.  According to Plaintiff, at the

January 27, 2010 meeting, Defendant stated "[t]his is my opportunity to fuck you like your father

fucked me." *Id.*[4]  Plaintiff testified at the 50-h hearing that he initially laughed at Defendant's

comment and acknowledged that, although Investigator Ogden was present for the January 27,

2010 interview, he was not in the room when this comment was made.  *See* Dkt. No. 223-4 at 80-

89.  Plaintiff further testified that Defendant acted in a hostile manner towards him during the

---

[4] The Court notes that, while Plaintiff testified at his June 25, 2013 50-h hearing that Defendant made this comment, it is notably absent from his February 24, 2011 affidavit in support of his motion to disqualify Defendant as special prosecutor.  *See* Dkt. No. 239-6. Although Plaintiff recounts the January 27, 2010 interview with Defendant and that Defendant made threats of criminal prosecution and referenced Plaintiff's father's rejection of Defendant as a possible candidate for District Attorney, no mention is made of Defendant stating "[t]his is my opportunity to fuck you like your father fucked me" or anything even closely resembling such a comment.  *See id.* at ¶¶ 17-25.  Similarly, no mention of this interaction is made in Plaintiff's counsel's February 24, 2011 affidavit, despite recounting that interview and all of the ways Defendant was perceived as biased against his client.  *See* Dkt. No. 239-33 at ¶¶ 145-52.  Rather, Plaintiff recounts that Defendant stated Plaintiff's father decided that Lou Catone would become the candidate for District Attorney and that "it was probably best that 'things turned out the way they did.'" Dkt. No. 239-6 at ¶ 22.  Plaintiff took this comment to be Defendant alluding to the fact that Lou Catone lost that election due to the publicity of the federal criminal investigation into Plaintiff's father.  *See id.*  Plaintiff further recalls that as Investigator Ogden returned to the room, Defendant concluded by stating as follows: "'in finishing what I was talking about, I think you can now see how it is ironic that now we are here, I am Special Prosecutor and I have the ability to make you King for the Day.'" *Id.* at ¶ 23.

interview and repeatedly stated how important and busy he was.  *See id.*  Plaintiff claimed that, at one point during the interview, Defendant mentioned something about being "king or queen for the day," which sounded to Plaintiff as if Defendant was asking him to tell him about the supposed "forgery factory" and that Plaintiff would not be prosecuted in the underlying criminal probe, despite the fact that Defendant never mentioned Plaintiff's possible cooperation.  *See* Dkt. No. 223-1 at ¶ 49; *see also* Dkt. No. 237 at ¶ 49.  After repeatedly telling Defendant that he had already told Investigator Ogden everything that he knew regarding the alleged forged absentee ballots, Plaintiff ended the January 27, 2010 interview.  *See id.* at ¶ 50.[5]

At his September 30, 2021 deposition, Plaintiff acknowledged that he did not tell Investigator Ogden on November 19, 2009 or December 7, 2009 – or in his two sworn statements – that the fields on the applications delivered by John Brown on September 14, 2009 were blank; that John Brown made several phone calls in Plaintiff's office that morning related to completing the blank fields in the applications; or any other details regarding what transpired in his office that morning.  *See* Dkt. No. 223-5 at 32-41, 115-21.  Plaintiff also acknowledged at his deposition that he intentionally lied in his December 7, 2009 sworn statement in order to protect Mr. McInerney, despite being aware that his statement was given under penalty of perjury.  *See id.* at 117-19.  In his November 19, 2009 sworn statement, Plaintiff falsely stated that Mr. McInerney "was not in

---

[5] In his affidavit in response to Plaintiff's motion to dismiss the indictment and for Defendant to be disqualified from the prosecution of the criminal case, Defendant explained that it was his intention during the January 27, 2010 interview to make Plaintiff "psychologically uncomfortable," and to get him "to tell me the truth about the identity of those who had forged absentee ballots in this case."  Dkt. No. 239-13 at 14.  He further indicated that the purpose of the meeting was not to gather evidence against Plaintiff, but to get Plaintiff to be more forthcoming regarding the culpability of others, including McInerney.  *See id.*  Finally, the affidavit made clear that no relevant evidence against Plaintiff was generated from that interview and that evidence of that meeting was not used by Defendant either before the grand jury or at the two criminal trials. *See id.* at 14-16.

his office, but I did place those ballots on his desk." *Id.*  Plaintiff, in fact, personally gave the ballots to Mr. McInerney in a manila envelope and then engaged him in conversation.  *See id.* at 59-61.

**J.      Kevin McGrath Cooperation**

Following his January 27, 2010 interview with Plaintiff, Defendant had conversations with Peter Moschetti, Esq., the attorney for Kevin McGrath, a candidate for Troy Common Council in the 2009 primary, regarding a potential Cooperation Agreement with McGrath.  *See* Dkt. No. 223-1 at ¶ 55.  These discussions culminated in a meeting on March 12, 2010, at Defendant's office between Defendant, Investigators Ogden and Fancher, Mr. McGrath, and Mr. Moschetti.  *See id.* at ¶ 56.  At the March 12, 2010 meeting, a proffer was made by Mr. McGrath, followed by execution of a Cooperation Agreement.  *See id.* at ¶ 57.  The Cooperation Agreement entered into by Mr. McGrath provided, generally, that in exchange for McGrath's truthful testimony and continued cooperation, he would receive immunity from prosecution and that his failure to cooperate in the preparation and investigation of any case or to testify would be a breach of the agreement, which would permit Defendant to void the agreement and subsequently prosecute McGrath.  *See id.* at ¶ 58; *see also* Dkt. No. 237 at ¶ 58.

After McGrath executed the Cooperation Agreement, a more detailed discussion of McGrath's potential testimony was then conducted.  *See id.* at ¶ 59.  Subsequently, Investigator Fancher drafted a proposed typewritten statement which McGrath executed on March 29, 2010. *See id.* at ¶ 60.  According to this statement, on August 24, 2009, he observed Plaintiff falsely complete the excuse fields on the absentee ballot applications of Thomas Dickinson and Jennifer Taylor.  *See id.* at ¶ 61.  McGrath's statement further indicated that on September 14, 2009, the day before the WFP primary, he was in Plaintiff's office at the Board of Elections when Plaintiff

and John Brown discussed the need to enter names in the blank "release to" fields on numerous

absentee ballot applications.  *See id.* at ¶ 62.  McGrath stated that Jim Welch, the local chair of

the WFP, was suggested as a possible candidate and Brown proceeded to call Welch on his cell

phone.  *See id.* at ¶ 63.  McGrath heard Brown ask Welch if he could use his name in the "release

to" field on numerous applications for absentee ballots.  *See id.* at ¶ 64.  After the call ended,

Brown told Plaintiff that Welch had consented.  *See id.* at ¶ 65.  At this point, Plaintiff told

McGrath and Brown to leave the office "because they were candidates."  *Id.* at ¶ 66.  McGrath

stated that he assumed that Plaintiff meant that he did not want them to witness him entering

Welch's name in the "release to" fields on the applications.  *See id.* at ¶ 67.[6]

　　At his deposition, McGrath testified that his March 29, 2010 typewritten statement

represents what he told Defendant and the two New York State Police Investigators on March 12,

2010, and that there is nothing that he would change or add to his statement.  *See id.* at ¶ 69.

McGrath further testified that, after his meeting with Defendant and the investigators on March

12, 2010 and on March 29, 2010, when he executed his statement, he did not recall meeting with

Defendant at any other times other than to prepare for his grand jury and trial testimony.  *See id.*

at ¶ 70 (citing Dkt. No. 223-7 at 68-70).  At his deposition, McGrath testified that Defendant

never asked him to "provide information against Ed McDonough" nor did Defendant state "that it

---

[6] The Court notes that Plaintiff denies that he wrote false excuses on the absentee ballot
applications as alleged in paragraph 61 and he denies that any such discussion occurred as alleged
in paragraphs 62 through 67.  *See* Dkt. No. 237 at ¶¶ 61-67.  In support of these denials, he cites
to his affidavit in support of his motion to disqualify Defendant as the Special District Attorney in
the underlying criminal matter, in which he denies that these events ever occurred.  *See* Dkt. No.
237 at ¶¶ 61-67 (citing Dkt. No. 239-6 at 5).  Plaintiff does not deny that McGrath made these
statements and signed a written statement summarizing his recollection of what occurred on these
dates.

was his belief that McDonough had falsified documents with respect to the election[.]" *Id.* at ¶ 71 (citing Dkt. No. 223-7 at 138-40).

**K.    Anthony DeFiglio Cooperation**

Anthony DeFiglio testified before the grand jury on December 8, 2010.  *See* Dkt. No. 223-1 at ¶ 72.  On December 6, 2010, in preparation for his December 8, 2010 grand jury testimony, DeFiglio met with Defendant and Investigator Ogden and entered into a Cooperation Agreement, which provided he would plead to an unspecified crime in exchange for his continued cooperation and truthful testimony.  *See id.* at ¶ 73.  DeFiglio testified at his deposition that he never spoke with Plaintiff at any time leading up to the 2009 WFP primary about collecting fraudulent ballot applications.  *See id.* at ¶ 82.  In fact, DeFiglio indicated that he had no dealings or contact with Plaintiff at all concerning the solicitation of absentee ballots.  *See id.* at ¶ 83.

**L.    Grand Jury**

On December 7, 2010, Defendant, as Special Prosecutor, empaneled a Rensselaer County grand jury to consider criminal charges against Plaintiff and Michael LoPorto.  *See id.* at ¶ 84. During the grand jury presentation, Anthony DeFiglio, Sara Couch, and Kevin McGrath provided testimony generally consistent with their earlier depositions.  *See id.* at ¶ 85.

### 1. James Welch

James Welch, who was Chairman of the Rensselaer County WFP in September 2009, also testified before the grand jury.  *See* Dkt. No. 223-1 at ¶ 86.  Welch testified that, on September 14, 2009, at 10:30 a.m., he received a telephone call from John Brown who asked him for permission to use his name in the "release to" field on approximately five of thirty absentee ballot applications he had.  *See id.* at ¶ 87.

### 2. Christine Robinson

14

Christine Robinson, a forensic scientist employed by the New York State Police Forensic Investigation Center, also testified.  *See id.* at ¶¶ 88-89.  Ms. Robinson testified that, at Defendant's request, she extracted DNA from the glue flap of numerous absentee ballot envelopes.  She then compared the DNA extracted from the envelopes with the DNA profiles of several of the suspects of the investigation, including Plaintiff's DNA, which was obtained pursuant to a court order.  *See id.* at ¶ 90.  Ms. Robinson testified that the DNA taken from the glue flaps of absentee ballot envelopes for voters Suozzo and Testa matched the DNA sample provided by Plaintiff.  *See id.* at ¶ 91.

### 3. Kevin O'Malley

Kevin O'Malley, who was employed by the Rensselaer County Board of Election as Custodian of Records in September of 2009, testified before the grand jury on December 9 and 15, 2010.  *See id.* at ¶¶ 92-93.  During his initial grand jury testimony, Defendant believed that O'Malley was being evasive when answering questions regarding his activities with Plaintiff on September 14, 2009.  *See id.* at ¶ 94.  On December 13, 2010, Defendant emailed Investigators Ogden and Fancher, directing them to contact O'Malley to let him know that he wanted to discuss the possibility of O'Malley testifying a second time before the grand jury.  *See* Dkt. No. 239-27 at 1.  In that email, Defendant asked the investigators to inform O'Malley that "under the law a witness who has perjured himself before the grand jury can 'cure' the perjury if he promptly corrects it before the same grand jury and that this is the topic I wish to discuss with him."  *Id.* Additionally, Defendant reiterated what was known about O'Malley's involvement in the alleged absentee ballot fraud and concluded that O'Malley "has immunity for everything but perjury."  *Id.*

At his deposition, O'Malley recounted that Defendant called him before his return to the grand jury, and stated that "my answers were vague and some were untruthful and that I should

15

seek counsel." Dkt. No. 223-1 at ¶ 96. O'Malley then called his sister-in-law, an attorney, who advised him that he needed an attorney and arranged for Andrew Safranko, Esq. to represent him. *See id.* at ¶ 97. O'Malley testified at his deposition that he met with Mr. Safranko before his return to the grand jury, told him that his initial testimony was false, and further informed him what his truthful testimony would be. *See id.* at ¶ 98. Mr. Safranko told O'Malley to tell the truth when he returned to the grand jury. *See id.* at ¶ 99.

During his return appearance before the grand jury on December 15, 2010, O'Malley identified his handwriting or printing in the "Excuse" fields on the absentee ballot applications of Demetrius Banks, Maritza Berrios, Diane Jordan, Michael Rebel, Bridget Ryan, and Jolene VanVranken. *See id.* at ¶ 100. O'Malley also testified that his boss, Plaintiff, called him into his office on September 14, 2009, and instructed him to make those false entries. *See id.* at ¶ 101.[7] O'Malley repeated this testimony at Plaintiff's two subsequent criminal trials and at his November 18, 2020 deposition. *See id.* at ¶ 102. O'Malley further testified that he was never pressured to give testimony incriminating Plaintiff, other than his attorney instructing him to tell the truth when he returned to testify before the grand jury. *See id.* at ¶ 103.

### 4. Investigator Ogden

Investigator Ogden testified before the grand jury on January 31, 2011. *See* Dkt. No. 223-1 at ¶ 104. Prior to his grand jury testimony, Investigator Ogden obtained New York State Department of Motor Vehicles records of Plaintiff's handwriting. *See id.* at ¶ 105. During Investigator Ogden's grand jury testimony, Defendant presented for the grand jurors' review, a

---

[7] Again, Plaintiff relies on his own affidavit from the underlying criminal case to deny that he engaged in this conduct but does not deny the fact that O'Malley testified that this occurred. *See* Dkt. No. 237 at ¶ 101 (citing Dkt. No. 239-6 at 7-8).

two-page chart that reproduced the "Excuse" fields of thirty absentee ballot applications for comparisons by the grand jurors of the handwriting in these fields among the applications themselves and with Plaintiff's Department of Motor Vehicle exemplars.  *See id.* at ¶ 106.  In his grand jury testimony, Investigator Ogden observed, "[g]enerally speaking, most of the excuses appear to be written in the same hand."  *Id.* at ¶ 107.  In response to a question by a grand juror, Investigator Ogden testified that the handwriting at several locations on the applications "appeared to be the same as" Plaintiff's handwriting from the Department of Motor Vehicle exemplars.  *See id.* at ¶ 108.  During his deposition, Investigator Ogden testified that this was his opinion, which he discussed with Defendant prior to his grand jury testimony.  *See id.* at ¶ 109.  Investigator Ogden further testified that he never fabricated evidence, never encouraged any witnesses to fabricate evidence, and had no personal knowledge of Defendant fabricating evidence.  *See id.* at ¶ 110.

### 5. Indictment

On January 28, 2011, the grand jury returned an indictment which charged Plaintiff with thirty-eight (38) counts of forgery in the second degree, in violation of New York Penal Law § 170.10(2), and thirty-six (36) counts of criminal possession of a forged instrument in the second degree, in violation of New York Penal Law § 170.25.  *See id.* at ¶ 111.  Plaintiff filed successive motions for dismissal of the indictment on multiple grounds, including Defendant's alleged misconduct before the grand jury.  *See id.* at ¶ 112.  Each motion was denied, with the court stating that, after review of the grand jury minutes, it could "find no hint of prosecutorial misconduct[.]" *Id.* at ¶ 113.

### M.    2007-2008 McInerney Election Forgeries Investigation

On November 17, 2010, Rensselaer County Republican Commissioner of Elections Larry Bugbee delivered twenty (20) absentee applications and ballots from the 2007-2008 election cycles to Defendant, alleged by Bugbee to have been forged by William McInerney.  *See* Dkt. No. 223-1 at ¶ 114.  Defendant subsequently forwarded these materials to Investigators Ogden and Fancher for their review.  *See id.* at ¶ 115.  Between May 27 and June 21, 2011, Investigators Ogden and Fancher obtained affidavits from twenty (20) 2007-2008 voters.  *See id.* at ¶ 116.  On June 23-24, 2011, Investigator Ogden provided Defendant with copies of the affidavits from the 2007-2008 voters, which allegedly established McInerney's criminal responsibility for these forgeries.  *See id.* at ¶ 117.  In November 2009, McInerney declined an interview by the State Police and subsequently retained an attorney, James Long, Esq.  *See id.* at ¶ 118.

### 1. McInerney Cooperation

In early July 2011, Defendant discussed the evidence of McInerney's 2007-2008 election forgeries with Mr. Long.  *See id.* at ¶ 119.  Shortly thereafter, Mr. Long advised Defendant that McInerney wanted to explore a plea and Cooperation Agreement with the prosecution.  *See id.* at ¶ 120.  On July 6, 2011, in a meeting with Defendant, Investigators Ogden and Fancher, and Mr. Long, McInerney signed a Use Immunity Agreement and provided information incriminating himself, John Brown, Michael LoPorto, Plaintiff, and others.  *See id.* at ¶ 121.  At one point during the July 6, 2011 meeting, Mr. Long terminated the interview, stating "that was all we were getting until the Coop Agreement is signed and approved by Judge Pulver."  *Id.* at ¶ 122.

On July 18, 2011, Mr. Long and Defendant participated in a conference call with Judge Pulver during which the proposed plea arrangement with McInerney was discussed, as well as the need for Defendant to have his authority enlarged to the 2007-2008 ballot fraud committed by McInerney.  *See id.* at ¶ 123.  Judge Pulver conditionally approved the proposed plea agreement

with McInerney, reserving sentencing to his discretion.  *See id.* at ¶ 124.  On July 22, 2011, McInerney signed a Cooperation Agreement, which required him to provide truthful information and to cooperate with the Special Prosecutor (Defendant), the New York State Police, and, if requested, the United States Attorney and FBI.  *See id.* at ¶¶ 125-26.

On August 5, 2011, Defendant conducted a debriefing of McInerney in the presence of his attorney.  *See id.* at ¶ 127.  On August 8, 2011, Defendant's prosecutorial authority was enlarged by court order to include the 2007-2008 crimes committed by McInerney.  *See id.* at ¶ 128.

### 2. Special Grand Jury Authorization

On August 10, 2011, Defendant applied to the Honorable George B. Ceresia, Jr., Administrative Judge for the Third Judicial District, for the impanelment of a special grand jury. *See* Dkt. No. 223-1 at ¶ 129.  Defendant's supporting affirmation stated as follows: "Recently discovered evidence implicates other individuals in the September 15, 2009 ballot fraud, and the People intend to present the case against these individuals to a grand jury.  Depending on the evidence and circumstances as they develop, there could be as many as five individuals indicted." *Id.* at ¶ 130.  On August 15, 2011, an administrative order was issued authorizing the impanelment of an additional grand jury commencing September 6, 2011, and continuing through March 5, 2012.  *See id.* at ¶ 131.

### 3. McInerney Cooperation and Plea

On August 15, 2011, Defendant continued his debriefing of McInerney in the presence of counsel.  *See id.* at ¶ 132.  On August 26, 2011, pursuant to the terms of his Cooperation Agreement, McInerney entered a guilty plea to the crime of forgery in the second degree, a class D felony.  *See id.* at ¶ 133.

19

On September 6, 2011, Defendant impaneled the special grand jury. *See id.* at ¶ 134. On September 16, 2011, pursuant to his Cooperation Agreement and in preparation for his grand jury testimony, McInerney executed a sworn statement. *See id.* In his September 16, 2011 statement, McInerney implicated Anthony Renna in the forgery of four absentee ballots Renna procured from the Mamone residences on Jackson Street. *See id.* at ¶ 135. In his statement, McInerney also stated that he observed John Brown completing the four ballots after Renna returned with those unvoted ballots. *See id.* at ¶ 136. On November 22, 2011, McInerney testified before the special grand jury. *See id.* at ¶ 137.

### 4. John Brown

Initially, John Brown retained counsel and declined to be interviewed. *See id.* at ¶ 138. John Brown did not testify before the grand jury that indicted Plaintiff. *See id.* at ¶ 139.

On October 27, 2011, Brown appeared voluntarily with his attorney before the special grand jury. *See id.* at ¶ 140. While testifying before the special grand jury, Brown was questioned at length by Defendant during which he provided the names of absentee ballot applications he had handled on other party lines in the 2009 primary: DeFabio, Pettit, and Tangredi. *See id.* at ¶ 141.

Subsequently, at Defendant's direction, Investigators Ogden and Fancher interviewed voters DeFabio and Tangredi who implicated Brown in the forgery of their absentee ballot applications and ballot envelopes. *See id.* at ¶ 142. On December 6, 2011, confronted with this evidence, Brown signed a Use Immunity Agreement and after a proffer of information, executed a Cooperation Agreement. *See id.* at ¶ 143. The next morning, Brown was interviewed at length by Investigators Ogden and Fancher. *See id.* at ¶ 144. Subsequently, Investigator Fancher prepared a draft of Brown's statement and forwarded it to Brown's attorney for review. *See id.* at

¶ 145.  Brown then made changes to the statement, which he initialed and signed on December 9, 2011.  *See id.* at ¶ 146.  At his September 27, 2021 deposition, Brown testified that, upon review, there was nothing in his December 9, 2011 statement that he would change.  *See id.* at ¶ 147.

In his December 9, 2011 statement, Brown stated that on September 14, 2009, after stopping at McInerney's office, he brought absentee ballot applications that had been collected by himself and others to the BOE in an envelope.  *See id.* at ¶ 148.  Before he left, McInerney told him to be sure to "give the envelope directly to Ed McDonough."  *Id.* at ¶ 149 (quoting Dkt. No. 223-17 at 5).  When he arrived at the BOE on September 14, 2009, he gave his own four (4) applications (DeFabio, Pettit, Tangredi, and Daniel) to Mary Sweeney at the front counter, requesting ballots.  *See id.* at ¶ 150.  Brown then slid the envelope containing the other applications received from McInerney across the counter and told Sweeney that the envelope was for Plaintiff.  *See id.*  Sweeney told Brown that Plaintiff was in his office and that he could go right in.  *See id.* at ¶ 151.

Upon entering his office, Brown stated that Plaintiff took the applications out of the envelope and said "they need excuses and they can't be 'Temporary Illness.'" Dkt. No. 223-1 at ¶ 152.[8]  Brown told Plaintiff that he did not know what the excuses were and Plaintiff then asked Brown who the ballots were supposed to be released to "'as none of them had that field filled in either.'" *Id.* at ¶ 153.  Brown stated that he suggested putting his own name in the fields, but Plaintiff rejected the idea.  *See id.* at ¶ 154.  Brown then called McInerney and told him "Ed wants

---

[8] Plaintiff again denies that he made such a statement or that this interaction occurred, again relying on his own affidavit from a motion filed in the underlying criminal case.  *See* Dkt. No. 237 at ¶ 152 (citing Dkt. No. 239-6 at 5).  Plaintiff raises the same objection to paragraphs 152 through 165 of Defendant's statement of material facts, but does not deny the fact that Brown's December 9, 2011 statement makes these allegations or that they are misrepresented in Defendant's statement of material facts.

to know whom the ballots were to be released to." *Id.* at ¶ 155.  McInerney said to put the names of WFP people in the fields so Robert Mirch would not know that this was a Democratic effort to control the WFP line.  *See id.* at ¶ 156.  Brown then called several WFP people and received permission from Jim Welch and Brent Caird to put their names in the blank fields.  *See id.* at ¶ 157.  During the time Brown was on the phone, Kevin McGrath came into the office, in a hurry, with an application, and gave it to Plaintiff.  *See id.* at ¶ 158.  When Plaintiff asked McGrath what the excuse was, McGrath responded "he's old, can't you just put that in?"  *Id.* at ¶¶ 159-60. Brown stated that he then observed Plaintiff fill out information on that ballot application and summon someone from the outer office to whom he gave the application.  *See id.* at ¶ 161.  That individual returned in a few minutes with a ballot for McGrath.  *See id.*

Brown stated that he was in McDonough's office for thirty-to-forty minutes and observed Plaintiff writing on documents on his desk.  *See id.* at ¶ 162.  Brown could not say that Plaintiff was making entries on the applications that he brought in, but those applications were on top of the papers on Plaintiff's desk.  *See id.* at ¶ 163.  When McGrath received his ballot and Brown received his four ballots, Plaintiff allegedly told them that "you guys should get going," and they left.  *Id.* at ¶ 164.

Brown testified that he had never spoken with Defendant prior to his October 27, 2011 grand jury testimony and December 6, 2011 Cooperation Agreement.  *See id.* at ¶ 165.  Brown testified that he spoke with Defendant three times as a cooperating witness: the day he signed his Cooperation Agreement; in preparation for his return to the grand jury; and in preparation for testifying at trial.  *See id.* at ¶ 166.  Through his deposition testimony, Brown confirmed his discussions with Defendant and his grand jury and trial testimony were conducted pursuant to the Cooperation Agreement.  *See id.* at ¶ 167.

### 5. Anthony Renna

In his September 16, 2011 statement, McInerney implicated Anthony Renna in the forgery of four unvoted absentee ballots Renna procured from the Mamone residences on Jackson Street. *See id.* at ¶ 168.  Subsequently, Investigators Ogden and Fancher interviewed Renna at the New York State Police barracks, producing two written statements.  *See id.* at ¶ 169.  In his October 20, 2011 statement, Renna admitted his complicity in the forgery of the four Mamone voters' ballots.  *See id.* at ¶ 170.  Renna also admitted telling DeFiglio, at McInerney's request, that they had an attorney for him, they supported him, and that they would get him a job when it was all over.  *See id.* at ¶ 171.  Renna further admitted to forging the voter Testa's application, as well as eleven of fifteen applications from the 2007 election cycle.  *See id.* at ¶ 172.  In his November 9, 2011 statement, Renna stated as follows: "I'm relatively certain that I completed Peter Testa's Ballot while I was in Ed McDonough's office at the Board of Elections.  Ed was in the office when I voted the Ballot."  *Id.* at ¶ 173.

On December 5, 2011, Renna and his attorney met with Defendant at Defendant's office where a Use Immunity Agreement and a Cooperation Agreement were signed.  *See id.* at ¶ 174.  The Cooperation Agreement provided that, as long as Renna cooperated with the prosecution and gave truthful testimony, he would be allowed to plead to a single count of forgery in the second degree.  *See id.* at ¶ 175; *see also* Dkt. No. 237 at ¶ 175.  On December 6, 2011, Renna testified before the grand jury.  *See id.* at ¶ 177.  At his deposition, Renna testified that neither Defendant, nor Investigators Ogden or Fancher asked him to give false or fabricated testimony.  *See id.* at ¶ 178.  On December 20, 2011, Renna pled guilty to forgery in the second degree, a felony.  *See id.* at ¶ 180.

**N.     December 20, 2011 Campana Indictment**

23

On December 20, 2011, the special grand jury returned an indictment against Clement Campana, charging him with falsifying business records in the first degree, among other crimes. *See* Dkt. No. 223-1 at ¶ 181.

**O.      January 11, 2011 Galuski Indictment**

On January 11, 2012, the special grand jury returned an indictment against Gary Galuski, charging him with, among other crimes, four counts of falsifying business records in the first degree. *See id.* at ¶ 182.

**P.      March 7, 2012 Mistrial**

Following a joint trial of Plaintiff and Mr. LoPorto, the jury deliberated for seven days without reaching a verdict. *See id.* at ¶ 183. On March 7, 2012, the court declared a mistrial. *See id.*

**Q.      December 21, 2012 Acquittal**

Plaintiff was subsequently retried individually. *See id.* at ¶ 184. On December 21, 2012, Plaintiff was acquitted on all counts but one, on which the jury deadlocked, which was *sua sponte* dismissed by the court. *See id.* at ¶ 185.

**R.      Dismissal of Campana and Galuski Indictments**

After Plaintiff's acquittal, the court dismissed the indictments against Campana and Galuski in furtherance of justice, on the application of Defendant. *See id.* at ¶ 187.

**S.      Convictions**

**1. *Anthony DeFiglio***

Anthony DeFiglio, who became temporarily homeless during the underlying criminal matter, pled guilty to an unspecified charge and entered into a Cooperation Agreement. He was sentenced to 100 hours of community service and no probation, assuming he remained out of

24

trouble for three years.  Dkt. No. 223-6 at 102-04, 124.  Mr. DeFiglio previously worked for the Troy Housing Authority where much of the fraud took place.  *See id.* at 133.  The Troy Record also reported that Mr. DeFiglio was homeless and that he suffered from mental illness.

### 2. William McInerney

William McInerney was the Troy City Clerk.  He pled guilty to one felony and sentenced to 90 days sheriff's work-release program, in satisfaction of all of his 2007, 2008, and 2009 absentee ballot crimes.  The agreement called for the sentence to be left for the sentencing judge to decide at the time of sentencing.  *See* Dkt. No. 240-6 at ¶ 150.  Additionally, the plea agreement called for him to resign from his office as Troy City Clerk.  *See* Dkt. No. 223-6 at 287-88.

### 3. John Brown

John Brown was a Troy City Councilman who was up for reelection.  He pled guilty to one felony (criminal possession of a forged instrument in the second degree), with the plea agreement providing that the prosecution would recommend a sentence of six months in jail and five years of probation, with the ultimate sentence to be decided by the Court.  Approximately two weeks prior to his sentencing date, Brown entered into a Cooperation Agreement, but that was not mentioned during his sentencing.  It did, however, lead Defendant and the probation department to recommend a lighter sentence than what was originally agreed to (intermittent weekend incarceration was recommended).  *See People v. Brown*, 119 A.D.3d 980 (3d Dep't 2014).  Despite the recommendation, the court sentenced Brown to six months, followed by five years of probation.  This was in satisfaction for his perjury in the *Lambertsen* hearing and Special Grand Jury, as well as his absentee ballot fraud and forgery.  *See* Dkt. No. 240-6 at ¶ 159.

### 4. Anthony Renna

Anthony Renna entered into a cooperation agreement and was sentenced to 100 hours of community service. *See* Dkt. No. 185 at ¶ 986. At the second criminal trial, Mr. Renna was asked to leave the stand and escorted out of the courtroom "on the basis that his testimony was patently incredible" and because he changed his testimony a number of times. *See* Dkt. No. 223-6 at 321-22, 232-36. At his deposition, Mr. Renna admitted that he is bipolar and has a "chemical imbalance, and I think sometimes it does inhibit me understanding and answering properly." Dkt. No. 223-18 at 83, 155-60. Despite this, Mr. Renna stated at his deposition that he did not lie in any of his statements or at trial. *See id.* During his deposition, Mr. Renna indicated that he was currently taking medication for his condition. *See id.* at 84. At sentencing, Defendant indicated that Mr. Renna had voided his cooperation agreement when he changed his testimony during the second trial, which had to be stricken, dealing a "significant blow" to Defendant's case. According to the Troy Record, Defendant declined to state what he thought would be a fair sentence for Mr. Renna, indicating that he "would have to hear why he changed his testimony." Mr. Renna's attorney told the sentencing court that Mr. Renna's "bi-polar disorder led to his client's conflicting testimony during trial."

### 5. Kevin McGrath

Kevin McGrath was running for reelection to the Troy City Council during the time in question and is the brother of Judge McGrath of the New York State Supreme Court. *See* Dkt. No. 185 at 3. He signed an immunity agreement that promised he would not be charged criminally in exchange for his truthful testimony and cooperation. *See* Dkt. No. 240-6 at ¶ 81. According to Defendant's deposition testimony, the decision was made not to prosecute him because, of the witnesses they had against him who were interviewed by the State Police, "none of them wanted to see Mr. McGrath prosecuted." Dkt. No. 223-6 at 144-45. During Investigator

Ogden's deposition, it was indicated that at least one of the witnesses was related by marriage to McGrath and that other potential witnesses refused to speak with the State Police, or were otherwise not inclined to provide evidence against him. *See* Dkt. No. 224-2 at 35-36, 126-29. As such, the quality of evidence against him was not great and his cooperation was determined to be more important. *See id.*

### III. DISCUSSION

**A.    Waiver**

Initially, Plaintiff contends that Defendant abandoned and waived any absolute immunity defense or argument as to his fabricated evidence claim since he failed to raise the argument in his initial motion to dismiss or on appeal before either the Second Circuit or the Supreme Court. *See* Dkt. No. 237-3 at 11-23. Defendant disagrees, arguing that he sufficiently raised the issue before this Court and on appeal. *See* Dkt. No. 240-7 at 6-9. Further, Defendant contends that, notwithstanding any alleged failure to raise the issue on appeal, the law is clear that with the reversal of this Court's ruling on the fabricated evidence claim, "the claim 'reverted back to the prior, pre-trial status.'" Dkt. No. 223-2 at 36 (quoting *Brown v. City of New York*, 862 F.3d 182, 185 (2d Cir. 2017)). "Consequently, this Court is not constrained from entertaining defendant's motion(s) relating to issues not previously decided, including dispositive motions relating to absolute or qualified immunity." *Id.* (citations omitted).

Plaintiff's argument merits little discussion. As Plaintiff acknowledges at the beginning of his argument, "defendant previously moved to dismiss plaintiff's fabricated evidence claim based on absolute immunity." Dkt. No. 237-3 at 11. Plaintiff continues by claiming that, "[i]n doing so, he advanced no argument in his initial Rule 12 motion or on appeal to the Second Circuit or before the United States Supreme Court that a prosecutor has absolute immunity for investigative

fabrication of evidence." *Id.*  Why would Defendant advance this argument on appeal in addressing Plaintiff's fabricated evidence claim, when the issue was not addressed by this Court in dismissing the claim?

In its September 30, 2016 Memorandum-Decision and Order, after dismissing the fabrication of evidence claim on statute of limitations grounds, the Court stated that it "will not address the merits of the individual Defendants' arguments that Plaintiff failed to state a claim for his fabrication of evidence cause of action." *McDonough v. Smith*, No. 1:15-cv-1505, 2016 WL 5717263, *12 (N.D.N.Y. Sept. 30, 2016).  Three months later, in its December 30, 2016 Memorandum-Decision and Order, the Court determined that Defendant was entitled to absolute immunity with respect to Plaintiff's claims of malicious prosecution and conspiracy to commit malicious prosecution.  *See McDonough v. Smith*, No. 1:15-cv-1505, 2016 WL 7496128, *10 (N.D.N.Y. Dec. 30, 2016).  The Court explained the difference between a prosecutor's investigative and prosecutorial functions was immaterial as to the malicious prosecution claim; adding, however, that "if Plaintiff's fabrication of evidence claim was timely ... then the distinction between the investigative and prosecutorial actions would be relevant." *Id.*

Characterizing this statement by the Court on December 30, 2016 as a "ruling," Plaintiff argues that Defendant was required to cross-appeal from the Court's statement.  *See* Dkt. No. 237-3 at 13-16, 19-21.  This statement was not a "ruling;" it was simply an observation that the investigative/prosecutorial distinction would be "relevant" if the fabrication of evidence claim was timely.  It was not an appealable "ruling."  Moreover, the Second Circuit has held that an appellee is not required, upon pain of subsequent waiver, to raise every possible alternative ground upon which the lower court could have decided an issue.  *See Brown v. City of New York*, 862 F.3d 182, 186 (2d Cir. 2017).  Rather, "[t]he role of the appellee is to defend the decision of

the lower court." *Id.*  Thereafter, upon reversal, the lower court is free to consider defenses previously raised and not previously decided.  *See id.* at 185.

Additionally, the Court notes that Plaintiff's argument that Defendant was required to raise this issue before the Supreme Court is entirely frivolous.  The Supreme Court granted certiorari to decide the limited question of when "'the statute of limitations for a Section 1983 claim based upon fabrication of evidence in criminal proceedings begins to run.'" *McDonough v. Smith*, ___ U.S. ___, 139 S. Ct. 2149, 2161 (2019) (Thomas, J., dissenting).  Given the limited nature of the question before the Supreme Court, any discussion of prosecutorial immunity by Defendant would have been inappropriate.

Even assuming that Defendant had failed to raise this defense previously, his failure to do so would have been entirely understandable.  Plaintiff's original complaint is exceedingly long (certainly not a short and plain statement of the case) and certainly not a model of clarity.  Additionally, before this Court, the Second Circuit, and the Supreme Court, Plaintiff has been either unwilling or unable to expressly state what the exact nature of his fabricated evidence claim is.  He has claimed that it is most closely analogous to a malicious prosecution claim, but has refused to state what constitutional amendment it arises under.  Upon remand, Plaintiff filed an amended complaint.  *See* Dkt. No. 185.  In his first cause of action, Plaintiff claims that Defendants deprived him of his rights under the Fourth, Fifth, Sixth and Fourteenth Amendments when they deprived him of his liberty "as a result of fabrication of evidence." *Id.* at ¶¶ 1019-22. In his second cause of action, Plaintiff claims that he was "maliciously prosecuted without probable cause" in violation of the Fourth, Fifth, Sixth and Fourteenth Amendments.  *See id.* at ¶¶ 1023-26.  Plaintiff is clearly still struggling to determine which constitutional amendment his fabricated evidence claim arises under, so he just cites to every possible candidate.  Given

29

Plaintiff's own confusion regarding the nature of his fabricated evidence claim, it would have been reasonable for Defendant to previously fail to raise all possible defenses. *See Brown*, 862 F.3d at 187 (noting that the district courts have discretion in determining whether an argument or defense has been waived). However, Defendant previously raised this defense, asserted it in his answer to the amended complaint, *see* Dkt. No. 191 at 5-6, and the Court is free to consider it on remand.

**B.   Standard of Review**

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "'cannot try issues of fact; it can only determine whether there are issues to be tried.'" *Id.* at 36-37 (quotation and other citation omitted). Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 258 (1986). In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson*, 477 U.S. at 255) (other citations omitted). Irrelevant or unnecessary facts do not preclude summary judgment, even when they are in dispute. *See Anderson*, 477 U.S. at 258.

The moving party bears the initial burden of establishing that there is no genuine issue of material fact to be decided. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). With respect to any issue on which the moving party does not bear the burden of proof, it may meet its burden on summary judgment by showing that there is an absence of evidence to support the nonmoving

party's case.  *See id.* at 325.  Once the movant meets this initial burden, the nonmoving party must

demonstrate that there is a genuine unresolved issue for trial.  *See* Fed. R. Civ. P. 56(e).  A

genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a

verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**C.    Duplicative Claims**

In his motion, Defendant argues that Plaintiff's due process fabricated evidence claim is

"coextensive with, and based upon the same underlying conduct giving rise to [P]laintiff's

malicious prosecution claim," and, therefore, it must be dismissed as duplicative and without

merit.  Dkt. No. 223-2 at 44.  The Court disagrees that these claims are duplicative.  Courts in the

Second Circuit have long treated malicious prosecution and fair trial claims as separate causes of

action.  *See Garnett v. Undercover Officer C0039*, 838 F.3d 265, 278 (2d Cir. 2016) (noting that

"fair trial claims cover kinds of police misconduct not addressed by false arrest or malicious

prosecution claims"); *McCaffrey v. City of New York*, No. 11-CV-1636, 2013 WL 494025, *12

(S.D.N.Y. Feb. 7, 2013) (treating the plaintiff's malicious prosecution and fair trial claims as

separate constitutional torts); *Brandon v. City of New York*, 705 F. Supp. 2d 261, 276 (S.D.N.Y.

2010) (noting that the Second Circuit has permitted "claims for both malicious prosecution and a

denial of his right to trial based on the same alleged fabrication of evidence") (citation omitted).

Moreover, there are several important distinctions between fair trial and malicious prosecution

claims.  For example, "[t]he existence of probable cause is a defense to a claim of malicious

prosecution" but not to a fair trial claim.  *Bailey v. City of New York*, 79 F. Supp. 3d 424, 449-50

(E.D.N.Y. 2015) (citing *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003)).  Similarly, a

malicious prosecution claim generally requires a "seizure" cognizable under the Fourth

Amendment.  *See Lanning v. City of Glens Falls*, 908 F.3d 19, 28 (2d Cir. 2018), *abrogated on*

*other grounds by Thompson v. Clark*, ___ U.S. ___, 142 S. Ct. 1332 (2022) ("A § 1983 claim for malicious prosecution essentially alleges a violation of the plaintiff's right under the Fourth Amendment to be free from unreasonable seizure"); *Washington v. County of Rockland*, 373 F.3d 310, 316 (2d Cir. 2004) (explaining that a malicious prosecution claim requires "a seizure or other perversion of proper legal procedures implicating [his] personal liberty and privacy interests under the Fourth Amendment") (quotation marks omitted).  By contrast, a violation of the right to fair trial claim requires a "a deprivation of life, liberty, or property" under the Fourteenth Amendment.  *Ganek v. Leibowitz*, 874 F.3d 73, 90 (2d Cir. 2017).  The claims are composed of distinct elements and therefore reflect distinct constitutional claims.  *See Bailey*, 79 F. Supp. 3d at 447 (explaining that even where "malicious prosecution and fair trial claims would rise or fall together," they "remain distinct constitutional claims") (citation omitted).

Accordingly, the Court declines to dismiss Plaintiff's due process claim as duplicative of his malicious prosecution claims.

## D.   Prosecutorial Immunity

"The doctrine of absolute immunity applies broadly to shield a prosecutor from liability for money damages (but not injunctive relief) in a § 1983 lawsuit, even when the result may be that a wronged plaintiff is left without an immediate remedy." *Anilao v. Spota*, 27 F.4th 855, 863-64 (2d Cir. 2022) (citing *Imbler v. Pachtman*, 424 U.S. 409, 427, 96 S. Ct. 984, 47 L. Ed. 2d 128 (1976)).  The Second Circuit has made clear that "prosecutors enjoy 'absolute immunity from § 1983 liability for those prosecutorial activities intimately associated with the judicial phase of the criminal process.'" *Id.* at 864 (quoting *Barr v. Abrams*, 810 F.2d 358, 361 (2d Cir. 1987)).  "The immunity covers 'virtually all acts, regardless of motivation, associated with [the prosecutor's] function as an advocate.'" *Id.* (quotation and other citation omitted).  "For example, a prosecutor

enjoys absolute immunity when determining which offenses to charge, initiating a prosecution, presenting a case to a grand jury, and preparing for trial." *Id.* (citations omitted); *see also Imbler*, 424 U.S. at 431 (concluding that a prosecutor is absolutely immune from a § 1983 suit for damages based on his "initiating a prosecution and ... presenting the State's case").  For that reason, the Second Circuit has held that "absolute immunity extends even to a prosecutor who 'conspir[es] to present false evidence at a criminal trial.  The fact that such a conspiracy is certainly not something that is properly within the role of a prosecutor is immaterial, because the immunity attaches to his function, not to the manner in which he performed it.'" *Anilao*, 27 F.4th at 864 (quotation omitted).

"'Thus, unless a prosecutor proceeds in the clear absence of all jurisdiction, absolute immunity [from § 1983 liability] exists for those prosecutorial activities intimately associated with the judicial phase of the criminal process.'" *Id.* (quotation and emphasis omitted); *see also Shmueli v. City of New York*, 424 F.3d 231, 237 (2d Cir. 2005).  "'Conversely, where a prosecutor acts without any colorable claim of authority, he loses the absolute immunity he would otherwise enjoy' and is left with only qualified immunity as a potential shield." *Id.* (quotation and other citation omitted).  "'[A] limitation upon the immunity,' Chief Judge Hand explained, '[is] that the official's act must have been within the scope of his powers,' but this does not mean that 'to exercise a power dishonestly is necessarily to overstep its bounds.'" *Id.* (quoting *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949)).

"A narrow limitation to the scope of absolute immunity in § 1983 actions thus exists where the defect is jurisdictional — that is, where the prosecutor acted well outside the scope of authority, rather than where the defect relates, as here, to the prosecutor's motivation or the reasonableness of his official action." *Anilao*, 27 F.4th at 864.  "The jurisdictional defect must be

clear and obvious." *Id.*  "'In considering whether a given prosecution was clearly beyond the scope of that jurisdiction, or whether instead there was at least a colorable claim of authority, ... we inquire whether' any relevant criminal statute exists that 'may have authorized prosecution for the charged conduct.'" *Id.* at 864-65 (quotation and other citation omitted).

"So '[e]ven if a prosecutor may lose his absolute immunity for prosecutorial acts for which he has no colorable claim of authority,' it is not lost 'immediately upon crossing the technical bounds of the power conferred on him by local law,' or 'simply because he acted in excess of his authority.'" *Anilao*, 27 F.4th at 865 (quotation omitted); *see also Ashelman v. Pope*, 793 F.2d 1072, 1076-77 (9th Cir. 1986) (*en banc*) (unanimously holding that a prosecutor was entitled to absolute immunity after overruling a prior Ninth Circuit holding that a prosecutor who "'files charges he or she knows to be baseless ... is acting outside the scope of his or her authority and thus lacks immunity'") (quotation omitted).  "Instead, 'absolute immunity must be denied' only where there is both the absence of all authority (because, for example, no statute authorizes the prosecutor's conduct) and the absence of any doubt that the challenged action falls well outside the scope of prosecutorial authority." *Anilao*, 27 F.4th at 865 (quoting *Bernard v. County of Suffolk*, 356 F.3d 495, 504 (2d Cir. 2004)).  In the vast majority of cases "the laws do authorize prosecution for the charged crimes," *Bernard*, 356 F.3d at 504, and if the charging decision or other act is within the prosecutor's jurisdiction as a judicial officer, then absolute immunity attaches to their actions "regardless of any allegations" that their "actions were undertaken with an improper state of mind or improper motive," *Shmueli*, 424 F.3d at 237.  "Prosecutors thus have absolute immunity in a § 1983 action even if it turns out that 'state law did not empower [them] to bring the charges,' so long as 'they have at least a semblance of jurisdiction' that does not run far afield of their job description." *Anilao*, 27 F.4th at 865 (quotation omitted); *see also Barr*, 810

34

F.2d at 361 (declining to adopt "a holding that a prosecutor is without absolute immunity the moment he strays beyond his jurisdictional limits," because doing so would "do violence to [the] spirit" of the doctrine).

In *Bernard*, the Second Circuit considered whether county prosecutors were entitled to absolute immunity for their politically motivated investigation and prosecution of the plaintiffs without probable cause.  *See Bernard*, 356 F.3d at 497-98.  The plaintiffs alleged that the prosecutors had sought indictments without probable cause and "knowingly present[ed] false evidence to, while at the same time withholding exculpatory evidence from, the various grand juries that returned the[ ] flawed indictments." *Id.* at 503.  The Second Circuit held, that even in the absence of probable cause, "as long as a prosecutor acts with colorable authority, absolute immunity shields his performance of advocative functions regardless of motivation." *Id.* at 498, 505; *see also id.* at 503 (collecting cases in which prosecutors were absolutely immune for initiating prosecutions without probable cause and/or presenting false evidence to a grand jury). In doing so, the Second Circuit reaffirmed the principle that "[w]here, as in this case, a prosecutor's charging decisions are not accompanied by any ... unauthorized demands," such as for a bribe or sexual favors, "the fact that improper motives may influence his authorized discretion cannot deprive him of absolute immunity." *Id.* at 504; *see also Dorman v. Higgins*, 821 F.2d 133, 139 (2d Cir. 1987) (holding that "absolute immunity spares the official any scrutiny of his motives" so that allegations of "bad faith or ... malice [cannot] defeat[ ] a claim of absolute immunity").

In *Shmueli*, decided a year after *Bernard*, the Second Circuit held that absolute immunity applied to protect local prosecutors who engaged in conduct that, if it occurred, was nothing short of outrageous.  The plaintiff alleged that two New York County Assistant District Attorneys

maliciously prosecuted her for aggravated harassment of her former domestic partner "despite knowing that the charges against her were false and that [she] was innocent" of those charges. *Shmueli*, 424 F.3d at 233.  The plaintiff also alleged that the prosecutors made several threatening phone calls to her home during the prosecution.  *See id.* at 233-34.  The district court rejected the prosecutors' defense of absolute immunity because they acted "without clear jurisdiction and without any colorable claim of authority." *Id.* at 235.  The Second Circuit reversed, holding that the district court had improperly "equat[ed] an allegedly improper prosecutorial state of mind with a lack of prosecutorial jurisdiction." *Id.*  Absolute immunity shielded the prosecutors' conduct because the indictment contained allegations that, even if completely false, could authorize the prosecutors to prosecute the plaintiff under the New York Penal Law prohibiting aggravated harassment in the second degree.  *See id.* at 238-39.  The prosecutors' "jurisdiction ... to prosecute ... depended on the authority conferred by the New York statutes" — no more, no less.  *Id.* at 238.

The Second Circuit has even extended absolute immunity to prosecutorial misconduct that was arguably more reprehensible than the conduct alleged in *Shmueli*.  *See, e.g., Pinaud v. County of Suffolk*, 52 F.3d 1139, 1148 (2d Cir. 1995) (granting absolute immunity to prosecutors who improperly sought to increase the plaintiff's bail; made false representations to prompt a plea agreement which they later breached; manufactured a bail jumping charge; lied to the Bureau of Prisons; and unnecessarily transferred the plaintiff from county to state jail); *Dory*, 25 F.3d at 83 (granting absolute immunity to a prosecutor who allegedly participated in a conspiracy to present false evidence at trial).

However, absolute immunity does not thwart every claim against prosecutors.  Under the functional test, "absolute immunity may not apply when a prosecutor is not acting as 'an officer of

the court,' but is instead engaged in other tasks, say, investigative or administrative tasks." *Van de Kamp v. Goldstein*, 555 U.S. 335, 342 (2009) (quoting *Imbler*, 424 U.S. at 431 n.33). Investigative tasks beyond the scope of absolute immunity are those "normally performed by a detective or police officer." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993); *see also Kanciper v. Lato*, 989 F. Supp. 2d 216, 228-29 (E.D.N.Y. 2013) ("Investigation, arrest, and detention have historically and by precedent been regarded as the work of police, not prosecutors, and 'they do not become prosecutorial functions merely because a prosecutor has chosen to participate'") (quoting *Day v. Morgenthau*, 909 F.2d 75, 77-78 (2d Cir. 1990)).  Where absolute immunity does not apply, a prosecutor is eligible only for qualified immunity.  *See Smith v. Garretto*, 147 F.3d 91, 94 (2d Cir. 1998) (citing *Buckley*, 509 U.S. at 273).

Prosecutors generally only have qualified immunity for actions taken before there is probable cause to arrest a defendant, because they are performing an investigative function, rather than acting as advocates.  *See Hill*, 45 F.3d at 661; *Buckley*, 509 U.S. at 273.  And, although "knowingly presenting evidence" to a grand jury is considered the "core of a prosecutor's role as an advocate," *Bernard*, 356 F.3d at 503, the Second Circuit has distinguished between a prosecutor's knowing presentation of false evidence to the grand jury — which is still entitled to absolute immunity — from a prosecutor's deliberate fabrication of evidence, *Hill*, 45 F.3d at 662-63 (finding that where a prosecutor deliberately manufactured evidence to establish probable cause for the plaintiff's arrest, his conduct was investigatory, regardless of whether, when the evidence was manufactured, the prosecutor intended to present it to the grand jury).

In the present matter, the Court finds that the undisputed facts establish that, at nearly all relevant times, Defendant was acting in his capacity as an advocate and is entitled to absolute prosecutorial immunity.  For example, on March 12, 2010, Defendant met with McGrath and his

attorney in Defendant's office for a proffer, which was followed by the execution of a

Cooperation Agreement.  *See* Dkt. No. 223-1 at ¶¶ 55-57.  This Cooperation Agreement provided

generally that, in exchange for McGrath's truthful testimony and continued cooperation, he would

receive immunity from prosecution and that his failure to cooperate in the presentation of the case

or to testify would be a breach of the agreement, which would permit Defendant to void the

agreement and subsequently prosecute McGrath.  *See id.* at ¶ 58.  After McGrath provided his

March 29, 2010 statement, he did not meet with Defendant again other than to prepare for his

grand jury and trial testimony.  *See id.* at ¶ 70.  Defendant taking a proffer from a witness,

entering into a Cooperation Agreement to ensure that witness' testimony before the grand jury

and/or at trial, and preparing a witness for his testimony before the grand jury is clearly conduct

"undertaken by a prosecutor in preparing for the initiation of judicial proceedings" and is

protected by absolute prosecutorial immunity.  *Buckley*, 509 U.S. at 273.

In his response to Defendant's motion, Plaintiff argues that "the false statements of

witnesses Kevin McGrath, Kevin O'Malley and Inv. Ogden were fabricated to affirmatively

incriminate the plaintiff and initiate plaintiff's prosecution.  Thereafter, defendant fabricated the

false opinions of [the] private Forensic Document Examiner[9] to supplant the prior fabricated false

---

[9] In July 2011, Defendant hired Alan T. Robillard, a private forensic document examiner, to compare handwriting exemplars provided by Plaintiff with the handwriting on the absentee ballot applications that Plaintiff was suspected of forging.  *See* Dkt. No. 185 at ¶¶ 707-25.  Mr. Robillard was previously employed as a supervisor in the FBI's crime laboratory.  *See id.* at ¶ 712. In his December 1, 2011 handwriting comparison report, Mr. Robillard stated that his opinion was that Plaintiff wrote the false absentee ballot agents and excuses on the absentee ballot applications in question.  *See id.* at ¶ 722.  According to the amended complaint, Mr. Robillard "testified that his handwriting opinions were 'overwhelming evidence'" that Plaintiff wrote the false absentee ballot agent names and excuses on all of the absentee ballot applications in question.  *See id.* at ¶ 973.  In an entirely conclusory manner and without citing to any evidence in the record to support his assertion, Plaintiff claims that Mr. Robillard's forensic handwriting

(continued...)

grand jury opinion testimony of Inv. Ogden and provide additional false opinion evidence concerning indentations and ink findings." Dkt. No. 237-3 at 10.  Plaintiff continues by alleging that Defendant subsequently "fabricated the false statements of McInerney, Brown, and Renna to directly incriminate the plaintiff at trial and/or not disclose the truth that would have exonerated him to be as consistent as possible with the previously fabricated false testimony of others and supported the purported prosecution theory.  The false testimony of McInerney, Brown, and Renna was based on written statement taken during investigative gathering of evidence and presented to continue the prosecution.  The witnesses testified consistently at grand jury and/or trial with such false evidence fabricated by the prosecutor." *Id.* at 10-11.

Plaintiff's argument is problematic for a number of reasons, not the least of which is the fact that Plaintiff has failed to present anything other than conclusory allegations that Defendant fabricated this evidence, supported by only his own conjecture.  For example, as to Kevin O'Malley, the undisputed facts make clear that he first testified before the grand jury on December 9, 2010.  *See* Dkt. No. 223-1 at ¶ 92.  During his initial testimony, Defendant believed O'Malley was being evasive when answering questions.  *See id.* at ¶ 94.  As such, on December 13, 2010, Defendant emailed Investigators Ogden and Fancher directing them to contact O'Malley

---

[9](...continued)
report and testimony at trial were entirely fabricated and takes issue with the fact that Mr. Robillard did not perform an "ink analysis" on fourteen absentee ballot applications identified by Plaintiff, which Plaintiff claims would have exonerated him.  *See id.* at ¶¶ 973-81.  Plaintiff, of course, was free to hire his own forensic document examiner to perform such an analysis had he thought such an analysis would have been helpful in his defense.  Moreover, the decision to retain an expert witness for use at trial, after Plaintiff had already been indicted, is clearly intimately associated with the judicial process for which Defendant is entitled to absolute prosecutorial immunity.  *See Van de Kamp v. Goldstein*, 555 U.S. 335, 343-44 (2009); *see also Bryson v. Macy*, 611 F. Supp. 2d 1234, 1263 (W.D. Okla. 2009) (holding that a prosecutor's the decision to use an expert witness and forensic evidence at trial is entitled to prosecutorial immunity).

to let him know that he wanted to discuss the possibility of O'Malley testifying a second time before the grand jury. *See* Dkt. No. 239-27 at 1. In that email, Defendant asked the investigators to inform O'Malley that "under the law a witness who has perjured himself before the grand jury can 'cure' the perjury if he promptly corrects it before the same grand jury and that this is the topic I wish to discuss with him." *Id.* Additionally, Defendant reiterated what was known about O'Malley's involvement in the alleged absentee ballot fraud and concluded that O'Malley "has immunity for everything but perjury." *Id.* During his return appearance before the grand jury on December 15, 2010, after retaining counsel, O'Malley was more forthcoming and implicated himself and Plaintiff in the alleged criminal conduct. O'Malley repeated this testimony at Plaintiff's two subsequent criminal trials and at his November 18, 2020 deposition. *See* Dkt. No. 223-1 at ¶ 102. O'Malley further testified that he was never pressured to give testimony incriminating Plaintiff, other than his attorney instructing him to tell the truth when he returned to testify before the grand jury. *See id.* at ¶ 103. Contrary to Plaintiff's claims, such conduct is not outside the scope of prosecutorial immunity. Even assuming you could consider Defendant's conduct "coercive" by indicating that he believed O'Malley had perjured himself, the Second Circuit has made clear that "the coercion of witnesses" is a prosecutorial activity for which absolute immunity applies. *See Taylor v. Kavanagh*, 640 F.2d 450, 452 (2d Cir. 1981) (citation omitted). Moreover, even assuming that O'Malley (and all of these other individuals) lied before the grand jury and at trial as Plaintiff claims, "the solicitation and subornation of perjured testimony" is similarly protected by absolute immunity. *See id.* (citation omitted).

In his statement of additional material facts in dispute, Plaintiff discusses a meeting that occurred on January 27, 2010, where Plaintiff met with Investigator Ogden and Defendant at the Brunswick State Police Barracks. *See* Dkt. No. 237-2 at ¶¶ 68-73. Plaintiff claims that, in his

40

affirmation in opposition to his disqualification and dismissal of the criminal case, Defendant swore that Investigator Ogden asked him to meet with Plaintiff because they thought he was not being truthful to protect McInerney and "[t]he whole purpose of the meeting was for Inv. Ogden to observe his demeanor." Dkt. No. 237-2 at ¶ 68 (citing Dkt. No. 239-13 at 12-16).  Plaintiff notes that Defendant "also affirmed that he agreed to meet with plaintiff because 'it did not occur to [his investigative unit that plaintiff] was actually involved in [ ] falsification of [absentee ballot applications]' and he played a 'bad cop' role to pressure him into providing information about McInerney while doing a 'human polygraph' because they considered him to be a cooperating witness and they had no reason to suspect he was involved in ... any criminal activity." *Id.* at ¶ 69. At his deposition, however, Plaintiff notes that Investigator Ogden testified that Plaintiff was definitely a suspect at that time, that he did not ask Defendant to meet with Plaintiff, and that the purpose of the meeting was not for him to observe Plaintiff's demeanor but for Defendant to "'press him.'" *Id.* at ¶ 72 (quoting Dkt. No. 224-2 at 136).

Although it is true that Defendant's recollection of the January 27, 2010 meeting and the manner in which it was brought about differs from that of Investigator Ogden, the Court fails to see the relevance.  Plaintiff fails to allege that any fabricated evidence was created at this meeting or that it was in any way used before the grand jury or in his criminal trials.

The Court also notes that, throughout his response, Plaintiff repeatedly discusses the fact that others were treated more favorably than he was, despite the fact that there was substantial and direct evidence indicating that they were significantly more involved in the alleged voter fraud. Plaintiff implies that this occurred because either Defendant was seeking revenge for a decades-old slight by Plaintiff's father, or because Defendant was seeking to protect these other individuals for personal reasons.  *See Bernard*, 356 F.3d at 504 (holding that prosecutorial immunity still

applies despite "the fact that improper motives may influence his authorized discretion");

*Dorman*, 821 F.2d at 139 (holding that "absolute immunity spares the official any scrutiny of his

motives" so that allegations of "bad faith or ... malice [cannot] defeat[ ] a claim of absolute

immunity").  Since nothing in the record supports the inference that Defendant was acting beyond

the scope of his jurisdiction, any allegations concerning his motives or alleged malice are not

relevant to the issue of absolute prosecutorial immunity.[10]

In response to the motion and at oral argument, Plaintiff repeatedly discusses a press

release that Defendant issued on the day Plaintiff was arraigned on the indictment as proof that

Defendant continually acted in an investigatory capacity.  *See* Dkt. No. 238 at 8; *see also* Tr. at

30.  For example, Plaintiff notes that the press release specifically states that the "scope of

[Defendant's] powers as set forth in the order of appointment is limited to the investigation and

prosecution of crimes related to the September 15th primary." *Id.*  The press release certainly

states that, under the order appointing Defendant as special prosecutor, he was authorized to

investigate and prosecute the underlying criminal matter.  As discussed in great detail below,

however, the simple fact that Defendant may have engaged in some investigative activities is

insufficient, by itself, to support his fabricated evidence claim.  Rather, Plaintiff is required to

---

[10] Although Plaintiff claims that he was treated less favorably than others who received
favorable plea deals, evidence in the record shows that, prior to presenting the case to the grand
jury, Defendant and Plaintiff's counsel spoke on several occasions to discuss a possible plea deal
for Plaintiff.  *See* Dkt. No. 239-13 at ¶¶ 57-62.  Plaintiff's counsel was seeking total immunity for
Plaintiff in exchange for Plaintiff's cooperation against Mr. McInerney.  *See id.*  When asked to
specify his client's evidence against Mr. McInerney, Defendant claims that Plaintiff's counsel
"was vague" and indicated that Plaintiff "probably did not have any evidence of great value."
*Id.* at ¶ 59.  Based on this representation, the parties were unable to come to an agreement on a
plea deal/immunity for Plaintiff.

provide evidence that, while Defendant was acting in an investigative capacity, he actually fabricated evidence.

Contrary to Plaintiff's assertions, the Court finds that Defendant is entitled to absolute prosecutorial immunity for all of the alleged actions taken in his role as an advocate. As discussed below, however, even assuming that absolute prosecutorial immunity did not apply, all remaining claims are nevertheless still subject to dismissal.

**E.    Due Process Right to a Fair Trial**

Plaintiff claims that Defendant violated his "right not to be deprived of his liberty, liberty interests or a fair trial as a result of the fabrication of false evidence by a government officer acting in an investigatory capacity" as protected by the "Fourth, Fifth, Sixth, and/or Fourteenth Amendments to the Constitution of the United States." Dkt. No. 185 at ¶¶ 1019-22. Initially, the Court finds that it is unnecessary to determine the precise constitutional amendment underpinning Plaintiff's due process right to a fair trial claim. The Second Circuit has noted that its own decisions have been "'inconsistent as to whether' fabrication of evidence claims 'arise[ ] under the Sixth Amendment right to a fair and speedy trial, or under the due process clauses of the Fifth and Fourteenth Amendments.'" *Morse v. Fusto*, 804 F.3d 538, 547 n.7 (2d Cir. 2015) (quotation and other citations omitted). Despite these inconsistencies, the Second Circuit has not clarified the issue, noting that regardless of which amendment the right is rooted, it is undisputed that the "constitutional harm resulting from the falsified information at issue is ... redressable in an action for damages under 42 U.S.C. § 1983." *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 276 n.6 (2d Cir. 2016) (citing *Morse v. Fusto*, 804 F.3d 538, 547 n.7 (2d Cir. 2015)). In line with this authority, the Court declines to determine whether the right to a fair trial is rooted in the Sixth

Amendment right to a fair and speedy trial or the due process clauses of the Fifth and Fourteenth Amendments, and will instead simply address the merits of Plaintiff's claim.

"The Due Process Clause guarantees a criminal defendant's 'right to a fair trial.'" *Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 244 (2d Cir. 2020) (quoting *Ramchair v. Conway*, 601 F.3d 66, 73 (2d Cir. 2010)). "This right is violated '[w]hen a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors.'" *Id.* (quoting *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997)). "Such violations are 'redressable in an action for damages under 42 U.S.C. § 1983.'" *Id.* (quotation omitted). "And unlike a malicious prosecution claim, 'a Section 1983 claim for the denial of a right to a fair trial based on an officer's provision of false information to prosecutors can stand even if the officer had probable cause to arrest the Section 1983 plaintiff.'" *Id.* (quoting *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 277-78 (2d Cir. 2016)).

To set forth a claim of the denial of the right to a fair trial, the plaintiff must establish that an "(1) investigating official (2) fabricates evidence (3) that is likely to influence a jury's decision, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of liberty as a result." *Jovanovic v. City of New York*, 486 Fed. Appx. 149, 152 (2d Cir. 2012) (citing *Jochs v. Tavernier*, 316 F.3d 128, 138 (2d Cir. 2003)) (other citation omitted). The inquiry as to causation is "whether the liberty deprivations that occurred are legally traceable back ... to [the] earlier investigatory act of fabrication." *Zahrey v. Coffey*, 221 F.3d 342, 352 (2d Cir. 2000). In a recent decision, however, the Second Circuit made clear that the right to a fair trial can be violated even if the fabricated evidence that was supplied to the prosecutor was not ultimately used at trial, so long as the fabricated evidence was a proximate cause of his deprivation of liberty. *See Frost*, 980 F.3d at 250. In other words, the claim only accrues "when fabricated

44

information is forwarded to a prosecutor and results in the deprivation of a defendant's liberty." *Soomro v. City of New York*, 174 F. Supp. 3d 806, 815 (S.D.N.Y. 2016) (citation omitted).

Additionally, the Second Circuit has made clear that, despite the nomenclature, "a criminal defendant's right to a fair trial protects more than the fairness of the trial itself." *Frost*, 980 F.3d at 249.  Rather, a fair trial claim can proceed when an investigating official knowingly fabricates evidence and forwards it to the prosecutor, which ultimately causes a deprivation of liberty, even if the charges are subsequently dismissed. *See id.* (citing *Ricciuti*, 124 F.3d at 129-30).

In the present matter, the Court finds that Defendant's motion for summary judgment must be granted with respect to all remaining claims on the merits.  Notably absent from the record in this case is any evidence indicating that Defendant **fabricated evidence** in any manner.  In his statement of material facts, Defendant repeatedly cites to evidence (including statements from cooperating witnesses) that implicated Plaintiff in the alleged voter fraud. *See, e.g.*, Dkt. No. 223-1 at ¶¶ 61-68.  Plaintiff does not deny that these witnesses made statements implicating him in the alleged voter fraud. *See* Dkt. No. 237 at ¶¶ 61-68.  Rather, Plaintiff simply denies that he actually engaged in the conduct alleged. *See id.*  Similarly, aside from his own conclusory allegations, Plaintiff fails to point to any evidence in the record suggesting that these incriminating statements were obtained through improper means or fabricated by Defendant.

For example, on March 12, 2010, at a meeting with Kevin McGrath, his attorney Peter Moschetti, Defendant, Investigators Ogden and Fancher, McGrath entered into a Cooperation Agreement. *See* Dkt. No. 223-1 at ¶¶ 55-71.  Upon executing the Cooperation Agreement, "a more detailed discussion of McGrath's potential testimony was then conducted." *Id.* at ¶ 59.  Subsequently, Investigator Fancher drafted a proposed typewritten statement, which McGrath

executed on March 29, 2010. *See id.* at ¶ 60. "According to McGrath's sworn statement, on August 24, 2009, he observed McDonough falsely complete the excuse fields on the absentee ballot applications of Thomas Dickinson and Jennifer Taylor." *Id.* at ¶ 61. McGrath's statement further indicated that on September 14, 2009, the day before the WFP primary, he was in Plaintiff's office at the Board of Elections when Plaintiff and John Brown discussed the need to enter names in the blank "release to" fields on numerous absentee ballot applications. *See id.* at ¶ 62. McGrath stated that Jim Welch, the local chair of the WFP, was suggested as a possible candidate and Brown proceeded to call Welch on his cell phone. *See id.* at ¶ 63. McGrath heard Brown ask Welch if he could use his name in the "release to" field on numerous applications for absentee ballots. *See id.* at ¶ 64. After the call ended, Brown told Plaintiff that Welch had consented. *See id.* at ¶ 65. At this point, Plaintiff told McGrath and Brown to leave the office "because they were candidates." *Id.* at ¶ 66. McGrath stated that he assumed that Plaintiff meant that he did not want them to witness him entering Welch's name in the "release to" fields on the applications. *See id.* at ¶ 67.

At his deposition, McGrath testified that his March 29, 2010 typewritten statement represents what he told Defendant and the two New York State Police Investigators on March 12, 2010, and that there is nothing that he would change or add to his statement. *See id.* at ¶ 69. McGrath further testified that, after his meeting with Defendant and the investigators on March 12, 2010, and when he executed his statement on March 29, 2010, he did not recall meeting with Defendant at any other times other than to prepare for his grand jury and trial testimony. *See id.* at ¶ 70 (citing Dkt. No. 223-7 at 68-70). Moreover, McGrath testified that Defendant never asked him to "provide information against Ed McDonough" nor did Defendant state "that it was his

46

belief that McDonough had falsified documents with respect to the election[.]" *Id.* at ¶ 71 (citing Dkt. No. 223-7 at 138-40).

In response to these allegations, Plaintiff denies that he "knowingly wrote false excuses" on absentee ballot applications and generally denies that the alleged discussions that McGrath recounted took place. *See* Dkt. No. 237 at ¶¶ 60-68.  In support of these denials, he cites to his affidavit in support of his motion to disqualify Defendant as the Special District Attorney in the underlying criminal matter, in which he denies that these events ever occurred. *See* Dkt. No. 237 at ¶¶ 61-67 (citing Dkt. No. 239-6 at 5).  Plaintiff does not deny that McGrath made these statements and signed a written statement summarizing his recollection of what occurred on these dates.  As to McGrath's subsequent deposition testimony, Plaintiff admits that McGrath testified that there was nothing that he would add or change about the March 29, 2010 statement. *See id.* at ¶ 69.  As to McGrath's testimony that, aside from the March 12 and 29, 2010 meetings, he did not meet with Defendant at any other point other than to prepare for his grand jury and trial testimony, Plaintiff simply objects to the testimony "as self-serving hearsay, bolstering of testimony, and conclusion regarding a question of witness credibility, law and/or fact for the Court or a trial jury, rather than a proper assertion of material fact." *Id.* at ¶ 70.  Contrary to Plaintiff's assertions, however, this testimony is directly relevant to determining whether any evidence supports his claims that Defendant improperly coerced witnesses into testifying falsely against him in his underlying criminal trials or before the grand jury.

Similarly, Kevin O'Malley, who was employed by the Rensselaer County Board of Election as Custodian of Records in September of 2009, testified before the grand jury on December 9 and 15, 2010. *See* Dkt. No. 223-1 at ¶¶ 92-93.  During his initial grand jury testimony, Defendant believed that O'Malley was being evasive when answering questions

regarding his activities with Plaintiff on September 14, 2009.  *See id.* at ¶ 94.[11]  On December 13, 2010, Defendant emailed Investigators Ogden and Fancher, directing them to contact O'Malley to let him know that he wanted to discuss the possibility of O'Malley testifying a second time before the grand jury.  *See* Dkt. No. 239-27 at 1.  In that email, Defendant asked the investigators to inform O'Malley that "under the law a witness who has perjured himself before the grand jury can 'cure' the perjury if he promptly corrects it before the same grand jury and that this is the topic I wish to discuss with him." *Id.*  Additionally, Defendant reiterated what was known about O'Malley's involvement in the alleged absentee ballot fraud and concluded that O'Malley "has immunity for everything but perjury." *Id.*

At his deposition, O'Malley recounted that Defendant called him before his return to the grand jury, and stated that "my answers were vague and some were untruthful and that I should seek counsel." Dkt. No. 223-1 at ¶ 96.  O'Malley then retained Andrew Safranko, Esq. to represent him.  *See id.* at ¶ 97.  O'Malley testified at his deposition that he met with Mr. Safranko before his return to the grand jury, told him that his initial testimony was false, and further

---

[11] The Court notes that Plaintiff objects to this assertion "as self-serving hearsay, bolstering of testimony, and conclusion regarding a question of witness credibility, law and/or fact for the Court or a trial jury, rather than proper assertion of fact." Dkt. No. 237 at ¶ 94.  In this statement, Defendant simply asserts that he *believed* that O'Malley was being evasive in his answers, not that he was, in fact, being evasive.  This fact is properly supported by not only Defendant's affidavit, but also his email to Investigator Ogden dated December 13, 2010, discussing the fact that he believed that O'Malley may have perjured himself during his initial grand jury testimony in two respects: "1), by saying that he does not remember the precise date of the meeting he attended between McDonough & McInerney at the City Clerk's Office and 2), by saying he does not remember anything that was said during the 10 to 15 minute meeting that took place at that time.  I would like to give Mr. O'Malley the opportunity to come clean." Dkt. No. 239-27 at 1.  This contemporaneous evidence clearly demonstrates that Defendant believed O'Malley was evasive, and perhaps perjured himself, during his initial grand jury appearance.

informed him what his truthful testimony would be. *See id.* at ¶ 98.[12]  Mr. Safranko told O'Malley

to tell the truth when he returned to the grand jury. *See id.* at ¶ 99.

During his return appearance before the grand jury on December 15, 2010, O'Malley

identified his handwriting or printing in the "excuse" fields on the absentee ballot applications of

Demetrius Banks, Maritza Berrios, Diane Jordan, Michael Rebel, Bridget Ryan, and Jolene

VanVranken. *See id.* at ¶ 100.  O'Malley also testified that his boss, Plaintiff, called him into his

office on September 14, 2009, and instructed him to make those false entries. *See id.* at ¶ 101.[13]

O'Malley repeated this testimony at Plaintiff's two subsequent criminal trials and at his November

18, 2020 deposition. *See id.* at ¶ 102.  O'Malley further testified that he was never pressured to

give testimony incriminating Plaintiff, other than his attorney instructing him to tell the truth

when he returned to testify before the grand jury. *See id.* at ¶ 103.

Again, Plaintiff does not deny that O'Malley provided testimony that directly implicated

Plaintiff in the alleged voter fraud.  Rather, Plaintiff relies on his own self-serving affidavit to

deny that he engaged in the conduct alleged and otherwise misconstrues the facts.  Plaintiff argues

that O'Malley only changed his testimony "after he was purportedly threatened with prosecution

for perjury and as a primary culprit." Dkt. No. 237-3 at 30.  However, Defendant's email to

Investigators Ogden and Fancher makes clear that it was only his belief that O'Malley had not

been entirely forthcoming in his original grand jury testimony and he was simply to be reminded

---

[12] Plaintiff has objected to this statement "as self-serving hearsay, bolstering of testimony, and conclusion regarding a question of witness credibility[.]" Dkt. No. 237 at ¶ 98.  O'Malley's own recollection of statements that he made are clearly not hearsay and this statement is otherwise relevant to the issues presently before the Court. *See* Dkt. No. 223-14 at 240-41.

[13] Again, Plaintiff relies on his own affidavit from the underlying criminal case to deny that he engaged in this conduct but does not deny the fact that O'Malley testified that this occurred. *See* Dkt. No. 237 at ¶ 101 (citing Dkt. No. 239-6 at 7-8).

of what was required of him in his Cooperation Agreement.  Nothing about providing O'Malley with a reminder or recalling him before the grand jury was improper.

It is true that in certain circumstances courts have permitted fabrication claims to proceed based on an official's alleged coercion of witnesses.  In those cases, however, the claimed coercion was exceedingly more problematic than the alleged coercion in this case, which amounts to nothing more than favorable treatment in exchange for the witnesses' cooperation in the ongoing investigation.  For example, in *Gilliam v. Sealey*, 932 F.3d 216 (4th Cir. 2019), the Fourth Circuit denied the law enforcement officers' motion for summary judgment because of evidence that the officers had met with the plaintiffs' sixteen-year-old friend multiple times and made him take a polygraph test in which he declared that he did not know anything about the crime.  *See id.* at 228.  The officers subsequently "marked [the friend] as a suspect in the case" and ordered an analysis of his fingerprints.  *See id.* Only then did the friend change his story and testify at the plaintiffs' trial that one of the plaintiffs had confessed to committing the crime.  *See id.* The Fourth Circuit found that this, in addition to other evidence of the officers' bad faith,[14] was sufficient to create a fact issue as to whether the friend's confession was fabricated or coerced.  *See id.* at 240; *see also White v. Smith*, 696 F.3d 740, 757 (8th Cir. 2012) (allowing a Section 1983 fabrication claim to proceed when evidence demonstrated "that Defendants coached and manipulated" witnesses "into adopting Defendants' theory of the case" and interview transcripts contained "a number of inexplicable moments" where the plaintiff's "alleged

---

[14] A witness testified at deposition that she had told officers she had observed a different suspect attack the murder victim on the night of the murder, but the officer's interview notes for this witness did not reflect this testimony.  The officers had also requested that this alternative suspect's fingerprints be tested against prints on a beer can found at the crime scene, but then withdrew this request three days before the defendant's trial.  *See Gilliam*, 932 F.3d at 228.

accomplices completely changed their stories or suddenly remembered important details about the crime after breaks in the tape recording").  Here, there are no allegations, or more importantly evidence, of such outrageous conduct by Defendant.

In his response to Defendant's motion, Plaintiff argues that "Defendant's motion is premised entirely on the self-serving assertions of he [sic] and the others that they did not fabricate evidence, but the facts and circumstances permit a reasonable inference that if they are not telling the truth as they assert, then it must be that there is a genuine issue in dispute about that issue because there is no other reasonable explanation for their false assertions and omissions of truth that resulted in the initiation and continuation of [P]laintiff's prosecution that could not have otherwise happened." Dkt. No. 237-3 at 30-31.  This statement clearly demonstrates just how flawed Plaintiff's position is.  The issue here is not whether all of the individuals who came forward to testify against Plaintiff fabricated their testimony.  Rather, the issue is whether Defendant knowingly fabricated evidence or knowingly presented fabricated evidence or false testimony against Plaintiff.  The witnesses discussed above have consistently testified against Plaintiff in written statements provided to the State Police, in their testimony at two criminal trials, and during their depositions taken in this case.  Moreover, all of the principal witnesses against Plaintiff in the underlying criminal case have since testified that they were not pressured or coerced by Defendant into giving false testimony against Plaintiff.  While Plaintiff may have consistently alleged that all of these witnesses were lying, nothing in the record suggests that Defendant knew or should have known that these witnesses consistently fabricated evidence to implicate Plaintiff.  Indeed, not one of the witnesses who testified against Plaintiff during his criminal trials has since recanted his or her testimony or even implied that it was untruthful or fabricated.  *See Isaac v. City of New York*, No. 16-cv-4729, 2020 WL 1694300, *9 (E.D.N.Y.

Apr. 6, 2020) (granting the defendant's motion for summary judgment where the "[p]laintiff claim[ed] that the testimony of four witnesses and [the] defendant ... was false, but offer[ed] no evidence in support, other than his own testimony").

In *Halsey v. Pfeiffer*, 750 F.3d 273 (3d Cir. 2014), the Third Circuit indicated that there are significant hurdles facing a plaintiff alleging a due process violation for fabrication of evidence. For instance, the court cautioned that a civil plaintiff's fabricated evidence claim should not survive summary judgment unless he can demonstrate that the fabricated evidence "was so significant that it could have affected the outcome of the criminal case." *Halsey*, 750 F.3d at 295. In addition, the court held that there is a notable bar for evidence to be considered "fabricated." The *Halsey* court noted that "testimony that is incorrect or simply disputed should not be treated as fabricated merely because it turns out to have been wrong." *Id.* There must be "persuasive evidence supporting a conclusion that the proponents of the evidence" are aware that evidence is incorrect or that the evidence is offered in bad faith. *Id.* For these reasons, the court stated that "we expect that it will be an unusual case in which a police officer cannot obtain a summary judgment in a civil action charging him with having fabricated evidence used in an earlier criminal case." *Id.* at 295; *see also Black v. Montgomery Cty.*, 835 F.3d 358, 372 (3d Cir. 2016).

Plaintiff does not challenge, in anything but the most conclusory terms, the undisputed fact that none of the witnesses against him ever recanted their incriminating testimony and each stated under oath that Defendant did not improperly influence or coerce their testimony, or ask them to fabricate evidence. *See Thorpe v. Duve*, 2022 WL 332804, *3 (2d Cir. Feb. 4, 2022) ("However, Mashaw has never recanted or claimed that she lied in her interview, before the grand jury, or at trial—facts that distinguish this appeal from the cases Thorpe and Durand rely on to

support their assertion that Mashaw was coerced into falsely testifying") (citing *Zahrey v. City of New York*, No. 98-4546, 2009 WL 54495 (S.D.N.Y. Jan. 7, 2009); *Blake v. Race*, 487 F. Supp. 2d 187 (E.D.N.Y. 2007)).  Plaintiff relies almost exclusively on his own affidavit in attempting to undermine the sworn testimony of the numerous witnesses who consistently testified against him. Such conclusory allegations are insufficient to create an issue of fact.  *See Boseman v. Upper Providence Township*, 680 Fed. Appx. 65, 70 (3d Cir. 2017) (holding that the district court correctly determined that the defendant was entitled to summary judgment on the plaintiff's fabricated evidence claim where the plaintiff merely denied the conclusions reached by the defendant in his report); *Rodriguez v. Derienzo*, No. 20-cv-87, 2020 WL 615052, *3 (S.D.N.Y. Feb. 7, 2020) (noting that "[t]estimony that is incorrect or simply disputed should not be treated as fabricated merely because it turns out to have been wrong").

Even assuming that O'Malley was "coerced" into returning to the grand jury and providing additional testimony as Plaintiff claims, any such "coercion" does not necessarily render his subsequent testimony fabricated.  There is clearly a difference between "coercing witnesses to testify and fabricating witness testimony." *Petty v. City of Chicago*, 754 F.3d 416, 422 (7th Cir. 2014).  As the Seventh Circuit explained, "'[c]oerced testimony is testimony that a witness is forced by improper means to give; the testimony may be true or false.  Fabricated testimony is testimony that is made up; it is invariably false.  False testimony is the equivalent; it is testimony known to be untrue by the witness and by whoever cajoled or coerced the witness to give it.'" *Id.* (quoting *Fields v. Wharrie*, 740 F.3d 1107, 1110 (7th Cir. 2014)).[15]  "In fabrication cases, the police or prosecutor manufactures evidence that he knows to be false." *Id.* (citation omitted).

---

[15] The Second Circuit has cited with approval the Seventh Circuit's decision in *Fields*.  *See Anilao v. Spota*, 27 F.4th 855, 869-70 (2d Cir. 2022).

However, "a prosecutor fabricating evidence that she knows to be false is different than getting 'a reluctant witness to say what may be true.'" *Id.* (quotation omitted).

In *Petty*, the plaintiff alleged that members of the Chicago Police Department coerced a witness named Tarver "into giving false evidence by threatening him with jail time if he did not cooperate, holding him against his will in a locked room without food or water for over 13 hours, badgering him, and pressuring him to identify Petty as one of the assailants." *Petty*, 754 F.3d at 423. As a result of these alleged tactics, the plaintiff argued that the defendants "knew or should have known that Tarver's statements were flawed." *Id.* The Seventh Circuit found such allegations were insufficient to support a due process fabricated evidence claim because nothing in the record supported an inference that the defendants fabricated the statements or knowingly introduced false statements against the plaintiff. *See id.*

Here, aside from his own conclusory allegations, Plaintiff has not pointed to any evidence suggesting that Defendant "fabricated" evidence against him. Rather, he has pointed to one instance where Defendant reminded a witness of his responsibilities under his cooperation agreement and arranged for him to return to the grand jury to provide additional testimony. Without more, this is insufficient to support his due process fabricated evidence claim. *See Coleman v. City of Peoria, Illinois*, 925 F.3d 336, 346 (7th Cir. 2019) (holding that the plaintiff "cannot save a claim based on coercive interrogation techniques via speculation that defendants were knowingly fabricating evidence"); *see also Fields*, 740 F.3d at 1110 (holding that coerced testimony is not necessarily fabricated. A reluctant witness or co-conspirator whose testimony an officer must pry out through aggressive interrogation techniques may be telling the truth despite the measures used. Fabricated testimony, meanwhile, is invariably false because it is made up by the officer, who knows he is making it up). At summary judgment, it was Plaintiff's burden to

present evidence of the alleged fabrication, not Defendant's burden to disprove Plaintiff's

speculation.  Having failed to present admissible evidence that any evidence was fabricated in this

case, Plaintiff's due process claim must be dismissed.

Accordingly, the Court grants Defendant's motion for summary judgment.

## F.      **Qualified Immunity**

In the alternative, Defendant contends that he is entitled to qualified immunity for any of

his conduct that for which absolute prosecutorial immunity does not apply.  *See* Dkt. No. 223-2 at

53-55.  The Court agrees.

"The doctrine of qualified immunity shields public officials from liability for civil

damages insofar as their conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known." *Salahuddin v. Goord*, 467 F.3d 263, 273

(2d Cir. 2006) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396

(1982)).

> For a constitutional right to be "clearly established" for purposes of
> determining whether an officer is entitled to qualified immunity, the
> "contours of the right must be sufficiently clear that a reasonable
> official would understand that what he is doing violates that right.
> This is not to say that an official action is protected by qualified
> immunity unless the very action in question has previously been
> held unlawful, but it is to say that *in the light of pre-existing law the
> unlawfulness must be apparent*."

*Mollica v. Volker*, 229 F.3d 366, 370-71 (2d Cir. 2000) (quoting *Anderson v. Creiehton*, 483 U.S.

635, 640 (1987)) (emphasis in original).  "Where the right at issue in the circumstances

confronting police officers ... was clearly established but was violated, the officers will

nonetheless be entitled to qualified immunity 'if ... it was objectively reasonable for them to

believe their acts did not violate those rights.'" *Zellner v. Summerlin*, 494 F.3d 344, 367 (2d Cir. 2007) (quotation and other citation omitted).

"Although a mere mistake in the performance of an official duty may not deprive the officer of qualified immunity, the doctrine does not shield performance that either (a) was in violation of clearly established law, or (b) was plainly incompetent." *Manganiello v. City of New York*, 612 F.3d 149, 165 (2d Cir. 2010) (citations omitted). "With respect to both the legal question and the matter of competence, the officials' actions must be evaluated for objective reasonableness. ... That is, '[e]ven if the right at issue was clearly established in certain respects ... an officer is still entitled to qualified immunity if "officers of reasonable competence could disagree" on the legality of the action at issue in its particular factual context.'" *Id.* (quotations omitted).

The determination of whether an official's conduct was objectively reasonable is a mixed question of law and fact. *See Zellner*, 494 F.3d at 367 (citing *Kerman v. City of New York*, 374 F.3d 93, 109 (2d Cir. 2004)) (other citations omitted). "The ultimate question of whether it was objectively reasonable for the officer to believe that his conduct did not violate a clearly established right, *i.e.*, whether officers of reasonable competence could disagree as to the lawfulness of such conduct, is to be decided by the court." *Id.* (citation omitted). "However, '[a] contention that ... it was objectively reasonable for the official to believe that his acts did not violate those rights has "its principle focus on the particular facts of the case."'" *Id.* (quotation and other citations omitted).

If there is no dispute as to any material fact, the issue of whether the official's conduct was objectively reasonable is an issue of law to be decided by the court. *See id.* at 368 (citation omitted). Any unresolved factual issues, however, must be resolved by the jury. *See id.* (quoting

*Kerman*, 374 F.3d at 109) (other citations omitted).  Once the court has received the jury's

decision as to "what the facts were that the officer faced or perceived," the court must then "make

the ultimate legal determination of whether qualified immunity attaches on those facts."

*Stephenson v. Doe*, 332 F.3d 68, 81 (2d Cir. 2003) (quotation omitted); *see also Lennon v. Miller*,

66 F.3d 416, 421 (2d Cir. 1995) (quotation omitted).

　　　As discussed above, Plaintiff takes issue with many of the decisions Defendant made in

the underlying criminal case, including the fact that he was targeted for prosecution while others

were not.  Absent from the record, however, is any evidence that Defendant acted in an unlawful

manner or that an objectively reasonable officer would believe that Defendant acted in an

unlawful manner.  Plaintiff's attempts at impugning the quality of the investigation are insufficient

to create a question of fact precluding granting Defendant's motion on this alternative ground.

*See Ferris v. City of Cadillac, Mich.*, 726 Fed. Appx. 473, 481 (6th Cir. 2018) (finding that the

defendants were entitled to qualified immunity on the plaintiff's fabrication of evidence claim

where the record revealed only inferences of negligence in the defendants' investigation of a

child's cause of death) (quoting *Caminata v. County of Wexford*, 664 Fed. Appx. 496, 501 (6th

Cir. 2016)).

## IV. CONCLUSION

　　　Although evidence in the record suggests that Investigator Ogden and other individuals

from the New York State Police were not thrilled with the work Defendant was doing, the length

of the investigation, and the lack of progress at certain points, nothing in the record suggests that

Defendant fabricated evidence or improperly coerced individuals into perjuring themselves.  The

underlying criminal investigation was exceedingly broad in scope, and it was not conducted by

the Rensselaer County District Attorney's office and all of its resources.  Rather, it was conducted

by Defendant (a former assistant district attorney who was then in private practice) and two investigators from the New York State Police.  It is beyond dispute that mistakes were made and some aspects of the underlying investigation were handled in a way that would not be considered typical.  Despite Plaintiff's perceived and the actual shortcomings of that investigation, what is lacking is any evidence that would permit a reasonable factfinder to find that Defendant fabricated evidence or coerced witnesses into providing false testimony.

At oral argument on the motion, the Court noted that not one of the witnesses that provided evidence against Plaintiff in the underlying criminal case has ever come forward and indicated they were told to fabricate evidence or lie on the witness stand.  *See* Tr. at 13.  The Court asked Plaintiff's counsel what evidence, aside from Plaintiff's own affidavit, was available to "establish that any of these witnesses were told to fabricate evidence[?]" *Id.*  In response, Plaintiff's counsel provided the following answer:

> Well, why then has Mr. McGrath not been charged?  Why was Mr. McGrath allowed to continue on with absolute immunity when the first words out of his mouth were [to] call the victim voters liars which demonstrably was false.  Irrefutably demonstrably false.  He purposely lied about what he did.  He essentially said he did nothing wrong whatsoever, and that all emanated directly after Mr. Smith told my client to his face what you know is recorded in the records that he was going to prosecute him in the grand jury.
>
> So, that same day he called Mr. McGrath.  That same day and thereafter Mr. McGrath then came in for absolute immunity.  Now we don't really know what occurred because we weren't there.  Either he gave a brief summary of what he was going to say, or as Ogden testified in one of the trials, he just was given absolute immunity and then he spoke.  But in any event, the cooperation agreement specifically says if you don't tell everything and you aren't truthful in every detail, you don't get the benefit of the bargain and you may prosecuted.

*Id.* at 13-14.  Later on, when discussing Defendant's suspected coercion of witnesses, Plaintiff's counsel further acknowledges that "[w]e weren't there.  We don't know.  We don't know how he did it, but, again, I suspect it was a lot of cajoling and talking." *Id.* at 25.  These exchanges highlight the problem with Plaintiff's case.  He has no evidence other than his own conclusory assertions, that are supported by nothing more than his own bald speculation that Defendant engaged in nefarious conduct.  Such speculative allegations are insufficient to create a question of fact.  *See Debrosse v. City of New York*, 739 Fed. Appx. 48, 51 (2d Cir. 2018) (holding that the plaintiff's conclusory, speculative allegations in his deposition testimony and summary judgment affidavit failed to create a genuine issue of material fact as to whether city police officers fabricated information that was likely to influence jury's verdict); *Fappiano v. City of New York*, 640 Fed. Appx. 115, 118-19 (2d Cir. 2016) (same); *Scotto v. Almenas*, 143 F.3d 105, 115 (2d Cir. 1998) (holding the plaintiff's evidence, which "consists primarily of several telephone calls and other communications between Almenas's and the non-government defendants ... does no more than demonstrate that [the non-government defendants] cooperated with Almenas's investigation into Scotto's alleged parole violation" and, as such, summary judgment was appropriate); *San Filippo v. U.S. Trust Co.*, 737 F.2d 246, 256 (2d Cir. 1984) (holding that there was "nothing suspicious or improper in such meetings, which are routine and necessary in the preparation of evidence," and that the "mere allegation of their occurrence is [not] sufficient to create a material issue of fact as to whether something improper took place during them"); *Gilliard v. City of New York*, No. 10-cv-5187, 2013 WL 521529, *6 (E.D.N.Y. Feb. 11, 2013) (holding that "[s]imply asserting that a party is lying is insufficient to create a genuine issue of material fact").

Finally, the Court acknowledges that Plaintiff believes that he was treated less favorably than others he claims were more clearly culpable in the alleged voter fraud.  While this may well

be true, the decision to not offer Plaintiff a favorable deal or immunity must be placed into context: he was and is the Democratic Commissioner of the Board of Elections, tasked with ensuring the integrity of the elections in his jurisdiction.  While Plaintiff may believe that others were unjustifiably treated more favorably, none of these individuals was in a position comparable to Plaintiff.

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendant's motion for summary judgment (Dkt. No. 223) is **GRANTED in its entirety**; and the Court further

**ORDERS** that Plaintiff's amended complaint (Dkt. No. 185) is **DISMISSED with prejudice**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendant's favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: August 11, 2022
     Albany, New York

Mae A. D'Agostino
U.S. District Judge